IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

---

USCA Case No. 22-13051

On Appeal from the United States District Court,
Northern District of Alabama
Case No. 2:13-cv-20000

---

*In re: Blue Cross Blue Shield Antitrust Litigation*

---

## THE HOME DEPOT APPELLANTS' BRIEF

FRANK M. LOWREY IV
Georgia Bar No. 410310
RONAN P. DOHERTY
Georgia Bar No. 224885
E. ALLEN PAGE
Georgia Bar No. 640163
BONDURANT MIXSON &
ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309-3417
(404) 881-4100
lowrey@bmelaw.com
doherty@bmelaw.com
page@bmelaw.com

*Attorneys for Appellants Home Depot U.S.A., Inc., et al.*

USCA Case No. 22-13051

*In re: Blue Cross Blue Shield Antitrust Litigation*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, Home Depot[1] submits this Certificate of Interested Persons and Corporate Disclosure Statement and states as follows:

### Certificate of Interested Persons

Home Depot certifies that below is a complete list of the trial judges, attorneys, persons, associations of persons, firms, partnerships, corporations, and other legal entities that have an interest in the outcome of this case:

Adams and Reese LLP (Counsel for Appellees)

Adamson, Virginia Nicole (Counsel for Appellants)

Adcox, Rachel (Counsel for Appellees)

American Electric Motor Services, Inc. (Appellee)

Anthem Blue Cross (Blue Cross of California) (Appellee)

---

[1] As used throughout, Home Depot refers to Home Depot U.S.A., Inc., together with all its parents, subsidiaries, affiliates, and associated benefit plans who are—to the extent not excluded by the Settlement Agreement or Court Order—members of the Injunctive Relief Class. As outlined in its corporate disclosure statement, those additional entities include HD Operations Holding Company, Inc., The Home Depot, Inc., The Home Depot Group Benefits Plan, and The Home Depot Medical and Dental Plan. Home Depot has consistently acted on behalf of all these associated entities and plans when objecting, opting out, and appealing.

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Anthem Blue Cross and Blue Shield of Connecticut (Appellee)

Anthem Blue Cross and Blue Shield of Indiana (Appellee)

Anthem Blue Cross and Blue Shield of Missouri (Appellee)

Anthem Blue Cross and Blue Shield of New Hampshire (Appellee)

Anthem Blue Cross and Blue Shield of Virginia, Inc. (Appellee)

Anthem Blue Cross Life and Health Insurance Company (Appellee)

Anthem Health Plans of Kentucky, Inc. (Appellee)

Anthem Health Plans of Maine (Appellee)

Anthem Health Plans of Maine, Inc. (Appellee)

Anthem Health Plans of New Hampshire, Inc. (Anthem Blue Cross and Blue Shield of New Hampshire) (Appellee)

Anthem Health Plans of Virginia, Inc. (Anthem Blue Cross and Blue Shield of Virginia Inc.) (Appellee)

Anthem Health Plans, Inc. (Anthem Blue Cross and Blue Shield of Connecticut) (Appellee)

Anthem Holding Corporation (Appellee)

Anthem Insurance Companies, Inc. (Anthem Blue Cross and Blue Shield of Indiana) (Appellee)

Anthem, Inc. (Anthem Health Plans of Virginia, Inc.) (Appellee)

Anthem, Inc. (ANTM) (Appellee)

C-2 of 21

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Anthem, Inc. (Parent to Anthem Insurance Companies, Inc.) (Appellee)

Anthem, Inc. (Parent to Community Insurance Company) (Appellee)

Anthem, Inc., f/k/a WellPoint, Inc. d/b/a Anthem Blue Cross Life and Health Insurance Company, Blue Cross of California, Blue Cross of Southern California, Blue Cross of Northern California, Rocky Mountain Hospital and Medical Service Inc. d/b/a Anthem Blue Cross Blue Shield of Colorado and Anthem Blue Cross Blue Shield of Nevada, Anthem Blue Cross Blue Shield of Connecticut, Anthem Blue Cross Blue Shield of Georgia, Anthem Blue Cross Blue Shield of Indiana, Anthem Blue Cross Blue Shield of Kentucky, Anthem Blue Cross Blue Shield of Maine, Anthem Blue Cross Blue Shield of Missouri, RightCHOICE Managed Care, Inc., HMO Missouri Inc., Anthem Health Plans of New Hampshire as Anthem Blue Cross Blue Shield of New Hampshire, Empire HealthChoice Assurance, Inc. as Empire Blue Cross Blue Shield, Community Insurance Company as Anthem Blue Cross Blue Shield of Ohio, Anthem Blue Cross and Blue Shield of Virginia, Anthem Blue Cross Blue Shield of Wisconsin (Appellee)

Anthem Life Insurance Company (Appellee)

Arcara, Hon. Richard J. (W.D.N.Y.)

Arkansas Blue Cross and Blue Shield (Appellee)

Armbrecht Jackson LLP (Counsel for Appellees)

Axinn, Veltrop & Harkrider, LLP (Counsel for Appellees)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Bailey & Glasser, LLP (Counsel for Appellee)

Bailey, Arthur (Counsel for Appellees)

Balch & Bingham LLP (Counsel for Appellees)

BCBSM, Inc., d/b/a Blue Cross Blue Shield of Minnesota (Appellee)

Behenna, David G. (Appellant)

Bernick, Justin (Counsel for Appellees)

Bisio, Peter (Counsel for Appellees)

Bloomberg, Edward S. (Counsel for Appellees)

Blue Cross and Blue Shield of Alabama (Appellee)

Blue Cross and Blue Shield of Arizona (Appellee)

Blue Cross and Blue Shield of Florida, Inc. (Appellee)

Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue (Appellee)

Blue Cross and Blue Shield of Georgia (Appellee)

Blue Cross and Blue Shield of Georgia, Inc. (Appellee)

Blue Cross and Blue Shield of Kansas City (Appellee)

Blue Cross and Blue Shield of Kansas, Inc. (Appellee)

Blue Cross and Blue Shield of Louisiana (Appellee)

Blue Cross and Blue Shield of Massachusetts, Inc. (Appellee)

Blue Cross and Blue Shield of Michigan (Appellee)

Blue Cross and Blue Shield of Minnesota (Appellee)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Blue Cross and Blue Shield of Mississippi (Appellee)

Blue Cross and Blue Shield of Nebraska (Appellee)

Blue Cross and Blue Shield of North Carolina, Inc. (Appellee)

Blue Cross and Blue Shield of North Dakota (Appellee)

Blue Cross and Blue Shield of Rhode Island (Appellee)

Blue Cross and Blue Shield of South Carolina (Appellee)

Blue Cross and Blue Shield of Tennessee, Inc. (Appellee)

Blue Cross and Blue Shield of Vermont (Appellee)

Blue Cross and Blue Shield of Wyoming (Appellee)

Blue Cross Blue Shield Association (Appellee)

Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. (Appellee)

Blue Cross Blue Shield of Alabama (Appellee)

Blue Cross Blue Shield of Arizona (Appellee)

Blue Cross Blue Shield of Minnesota (Appellee)

Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company
(Appellee)

Blue Cross Blue Shield of North Dakota (Appellee)

Blue Cross Blue Shield of Wyoming (Appellee)

Blue Cross of Idaho Health Service, Inc. (Appellee)

Bodman PLC (Counsel for Appellees)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Boies, David (Counsel for Appellees)

Boies, Schiller & Flexner LLP (Counsel for Appellees)

Bojedla, Swathi (Counsel for Appellees)

Bondurant Mixson & Elmore, LLP (Counsel for Appellant)

Bradley Arant Boult Cummings, LLP (Counsel for Appellants)

Briggs, John (Counsel for Appellees)

Brunini, Grantham, Grower & Hewes, PLLC (Counsel for Appellees)

Buchanan, Virginia (Counsel for Appellees)

Burkhalter, Carl S. (Counsel for Appellees)

Burns Charest LLP (Counsel for Appellees)

Burns, Warren T. (Counsel for Appellees)

Bush, Hon. Ronald E. (D. Idaho)

Bustamante, Travis A. (Counsel for Appellees)

Cafferty Clobes Meriwether & Sprengel LLP (Counsel for Appellees)

Cafferty, Patrick (Counsel for Appellees)

Caliendo, Charles T. (Counsel for Appellees)

California Physicians' Service (Appellee)

California Physicians' Service, d/b/a Blue Shield of California (Appellee)

Callister, Joshua (Counsel for Appellees)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Cambia Health Solutions, Inc., f/d/b/a Regence Blue Shield of Idaho,

Regence Blue Cross Blue Shield of Oregon, Regence Blue Cross Blue Shield of

Utah, Regence Blue Shield of Washington (Appellee)

Campbell Partners LLC (Counsel for Appellees)

Campbell, Andy P. (Counsel for Appellees)

Campbell, A. Todd (Counsel for Appellees)

Capital BlueCross (Appellee)

CareFirst Blue Cross and Blue Shield of Maryland (Appellee)

CareFirst BlueChoice, Inc. (Appellee)

CareFirst of Maryland, Inc. (Appellee)

CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield (Appellee)

CareFirst, Inc. (Appellee)

Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana,

Inc. (Appellee)

Caring for Montanans, Inc. (Appellee)

CB Roofing, LLC (Appellee)

Chavez, Kathleen (Counsel for Appellees)

Chesler, Evan R. (Counsel for Appellees)

Cihlar, Nate (Counsel for Appellees)

Clark, Anna Mercado (Counsel for Appellees)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Clobes, Bryan (Counsel for Appellees)

Cochran, Jennifer (Appellant)

Cohen, Hon. James I. (S.D. Fla.)

Cohen, Lucile H. (Counsel for Appellees)

Colatriano, Vincent J. (Counsel for Appellees)

Community Insurance Company (Appellee)

Cooper & Kirk, PLLC (Counsel for Appellees)

Cooper, Charles J. (Counsel for Appellees)

Cornelius, Hon. Staci G. (N.D. Ala.)

Cory Watson Crowder & DeGaris, P.C. (Counsel for Appellees)

Costello, Honor (Counsel for Appellees)

Cottrell, Christa C. (Counsel for Appellees)

Craker, Aaron (Appellant)

Cravath Swaine & Moore (Counsel for Appellees)

Crowell & Moring LLP (Counsel for Appellees)

Cylkowski, Sarah L. (Counsel for Appellees)

Davis & Taliaferro LLC (Counsel for Appellees)

Davis, Gregory (Counsel for Appellees)

Dellaccio, Douglas (Counsel for Appellees)

DeGiusti, Hon. Timothy D. (W.D. Okla.)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Del Sole Cavanaugh Stroyd LLC (Counsel for Appellees)

DeMasi, Karin A. (Counsel for Appellees)

Doherty, Hon. Rebecca F. (W.D. La.)

Doherty, Ronan (Counsel for Appellant)

Dominick Feld Hyde, PC (Counsel for Appellee)

Donnell, Sarah J. (Counsel for Appellees)

Dryden, Benjamin R. (Counsel for Appellees)

Dyer, Karen (Counsel for Appellees)

Eisler, Robert (Counsel for Appellees)

Empire HealthChoice Assurance, Inc. (Appellee)

Empire HealthChoice Assurance, Inc., f/k/a Empire Blue Cross Blue Shield
(Appellee)

Employee Services, Inc. (Appellant)

Erickson, Hon. Ralph R. (D.N.D.)

Excellus Blue Cross Blue Shield (Appellee)

Excellus BlueCross BlueShield of New York (Appellee)

Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield (Appellee)

Feinberg, Kenneth (Mediator)

Feinstein, Richard (Counsel for Appellees)

Foley & Lardner LLP (Counsel for Appellees)

USCA Case No. 22-13051

*In re: Blue Cross Blue Shield Antitrust Litigation*

Foote, Mielke, Chavez & O'Neil LLC (Counsel for Appellees)

Foote, Robert M. (Counsel for Appellees)

Franz, Morgan B. (Counsel for Appellees)

Galactic Funk Touring, Inc. (Appellee)

Gentle, Edgar C. (Special Master)

Gilbert, Sarah (Counsel for Appellees)

Gillis, H. Lewis (Counsel for Appellees)

Gordon, Jr., Ben W. (Counsel for Appellee)

Grant & Eisenhofer (Counsel for Appellees)

Green, Cheri D. (Counsel for Appellees)

Group Hospitalization and Medical Services, Inc. (Appellee)

Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross

BlueShield (Appellee)

Guin, Stokes & Evans, LLC (Counsel for Appellees)

Guin, David (Counsel for Appellees)

Gustafson Gluek PLLC (Counsel for Appellees)

Gustafson, Daniel (Counsel for Appellees)

Harris, Hon. Alonzo (27th Judicial District Court, St. Landry Parish,

Louisiana)

Harwood, Jr., Hon. R. Bernard (Special Master)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Hauser, Brian C. (Counsel for Appellees)

Hausfeld LLP (Counsel for Appellees)

Hausfeld, Michael D. (Counsel for Appellees)

Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of

Hawaii (Appellee)

Hazzard Law, LLC (Counsel for Appellees)

Hazzard, Brent (Counsel for Appellees)

HD Operations Holding Company, Inc. (Appellant)

Health Care Service Corporation (Appellee)

Health Care Service Corporation d/b/a Blue Cross Blue Shield of Illinois,

Blue Cross Blue Shield of New Mexico, Blue Cross Blue Shield of Oklahoma,

Blue Cross and Blue Shield of Montana, Blue Cross Blue Shield of Texas

(Appellee)

Hedlund, Daniel C. (Counsel for Appellees)

Hellums, Chris T. (Counsel for Appellees)

Hibbett Sports, Inc (Appellee)

Highmark Blue Cross Blue Shield of Delaware, Inc. (Appellee)

Highmark Blue Cross Blue Shield of West Virginia (Appellee)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Highmark Health Services, d/b/a Highmark Blue Cross Blue Shield of

Delaware, Highmark Blue Cross Blue Shield, and Highmark Blue Cross Blue

Shield of West Virginia (Appellee)

Highmark Inc. (Appellee)

Highmark Western and Northeastern New York Inc. (Appellee)

Hill Hill Carter Franco Cole & Black, P.C. (Counsel for Appellees)

HMO Missouri Inc. (Appellee)

HMO Missouri, Inc. (Anthem Blue Cross and Blue Shield of Missouri)

(Appellee)

Hodge, David J. (Counsel for Appellees)

Hogan Lovells US LLP (Counsel for Appellees)

Hogan, E. Desmond (Counsel for Appellees)

Hogewood, Mark M. (Counsel for Appellees)

Holmstead, Zachary D. (Counsel for Appellees)

Home Depot U.S.A., Inc. (Appellant)

Hoover, Craig A. (Counsel for Appellants)

Horizon Blue Cross and Blue Shield of New Jersey(Appellee)

Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross and Blue Shield

of New Jersey (Appellee)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of

New Jersey (Appellee)

Hoss, Henry D. (Counsel for Appellants)

Hovland, Hon. Daniel L. (D.N.D.)

Hume, Hamish P.M. (Counsel for Appellees)

Huppert, Hon. Michael D. (5th Judicial District Court, Polk County, Iowa)

Independence Hospital Indemnity Plan, Inc., f/k/a Independence Blue Cross

(Appellee)

Isaacson, William A. (Counsel for Appellees)

Jarvey, Hon. John A. (S.D. Iowa)

Johnson, John M. (Counsel for Appellees)

Jones Ward PLC (Counsel for Appellees)

Jones, Lawrence (Counsel for Appellees)

Jones, Megan (Counsel for Appellees)

Jose, Elizabeth (Counsel for Appellees)

Kappel, Brian P. (Counsel for Appellees)

Kaufman, David R. (Counsel for Appellees)

Kennedy, Lauren R. (Counsel for Appellees)

Kilpatrick Townsend & Stockton LLP (Counsel for Appellees)

Kilpela, Jr., Edwin J. (Counsel for Appellees)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Kimble, Cavender C. (Counsel for Appellees)

Kirkland & Ellis LLP (Counsel for Appellees)

Koch, H. James (Counsel for Appellees)

Korn, David H. (Counsel for Appellees)

Lawrence, Hon. William T. (S.D. Ind.)

Laytin, Daniel E. (Counsel for Appellees)

Lemmon Law Firm (Counsel for Appellees)

Lemmon, Andrew (Counsel for Appellees)

Levin Papantonio Thomas Mitchell Rafferty & Proctor, P.A. (Counsel for

Appellees)

Lifetime Healthcare, Inc. (Appellee)

Lightfoot Franklin & White LLC (Counsel for Appellees)

Lite DePalma Greenberg & Afanador, LLC (Counsel for Appellees)

Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue

Shield of Louisiana (Appellee)

Lowrey, IV, Frank M. (Counsel for Appellant)

Lungstrum, Hon. John W. (D. Kan.)

Kravitz, Carl S. (Counsel for Appellees)

Maier, Jeny M. (Counsel for Appellees)

Malatesta, III, John Thomas A. (Counsel for Appellees)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Martin, John D. (Counsel for Appellees)

Maynard Cooper & Gale PC (Counsel for Appellees)

McAfee & Taft A Professional Corporation (Counsel for Appellants)

McCafferty, Hon. Landya B. (D.N.H.)

McCallum, Methvin & Terrell, P.C. (Counsel for Appellees)

McDevitt, Larry (Counsel for Appellees)

McDonald, Yawanna N. (Counsel for Appellees)

McDowell, Patrick M. (Counsel for Appellees)

McGartland & Borchardt LLP (Counsel for Appellees)

McGartland, Michael (Counsel for Appellees)

McKinney, Rebekah Keith (Counsel for Appellee)

McLeod, Aaron G. (Counsel for Appellees)

Means Gillis Law, LLC (Counsel for Appellees)

Meriwether, Ellen (Counsel for Appellees)

Methvin, Robert (Counsel for Appellees)

Moreno, Hon. Federico A. (S.D. Fla.)

Morris, King & Hodge (Counsel for Appellees)

Mullins, M. Richard (Counsel for Appellants)

Naranjo, Michael A. (Counsel for Appellees)

Nelson Mullins Riley & Scarborough LLP (Counsel for Appellees)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Nix, Jess R. (Counsel for Appellees)

Nix, Richard D. (Counsel for Appellants)

Norman, Brian K. (Counsel for Appellants)

O'Connor, Hon. Reed. C. (N.D. Tex.)

Pacella, Mario Anthony (Counsel for Appellee)

Page, E. Allen (Counsel for Appellant)

Paul Weis (Counsel for Appellees)

Payne, Joshua K. (Counsel for Appellees)

Payton, Gwendolyn (Counsel for Appellees)

Pearce, Bevill, Leesburg, Moore, P.C. (Appellee)

Pennington, Michael R. (Counsel for Appellants)

Pettus Plumbing & Piping, Inc. (Appellee)

Phillips Lytle LLP (Counsel for Appellees)

Physicians' Service, d/b/a Blue Shield of California (Appellee)

Pittman, Dutton & Hellums, P.C. (Counsel for Appellees)

Priester, James L. (Counsel for Appellees)

Premera Blue Cross, d/b/a Premera Blue Cross Blue Shield of Alaska

(Appellee)

Proctor, Hon. R. David (N.D. Ala.)

Putnam, Hon. T. Michael (N.D. Ala.)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Ragsdale, Barry Alan (Counsel for Appellee)

Redgrave, LLP (Counsel for Appellees)

Redgrave, Jonathan M. (Counsel for Appellees)

Reeves, Harold S. (Counsel for Appellees)

Regence BlueCross BlueShield of Oregon (Appellee)

Regence BlueCross BlueShield of Utah (Appellee)

Regence BlueShield (Appellee)

Regence BlueShield of Idaho, Inc. (Appellee)

Reuben, Mindee (Counsel for Appellees)

Rheaume, Jr., Thomas J. (Counsel for Appellees)

Richie, J. Thomas (Counsel for Appellants)

RightChoice Managed Care, Inc. (Appellee)

Riley & Jackson P.C. (Counsel for Appellees)

Riley, Jr., Robert R. (Counsel for Appellees)

Rocky Mountain Hospital & Medical Service Inc., d/b/a Anthem Blue Cross
Blue Shield of Colorado (Appellee)

Rocky Mountain Hospital & Medical Service Inc., d/b/a Anthem Blue Cross
Blue Shield of Nevada (Appellee)

Roman, Tracy A. (Counsel for Appellees)

Rowe, Stephen A. (Counsel for Appellees)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Rutenberg, Alan D. (Counsel for Appellees)

Ruzic, Emily M. (Counsel for Appellants)

Sansbury, Michael T. (Counsel for Appellees)

Saw, Edmund Y. (Counsel for Appellees)

Saxon, John (Counsel for Appellees)

John D. Saxon, P.C. (Counsel for Appellees)

Schmidt, Jr., John G. (Counsel for Appellees)

Shamoun & Norman, LLP (Counsel for Appellees)

Shearman & Sterling LLP (Counsel for Appellees)

Slate, Pamela B. (Counsel for Appellees)

Smith, Cyril V. (Counsel for Appellees)

Smith, Scott Burnett (Counsel for Appellants)

Snyder, Hon. Christina A. (C.D. Cal.)

Snyder, Eric B. (Counsel for Appellee)

Sooy, Kathleen Taylor (Counsel for Appellees)

Spencer, Mark D. (Counsel for Appellants)

Spotswood, Robert K. (Counsel for Appellees)

Spotswood Sansom & Sansbury LLC (Counsel for Appellees)

Stenerson, Todd M. (Counsel for Appellees)

Stokes, Tammy (Counsel for Appellees)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Strauss & Boies (Counsel for Appellees)

Strom Law Firm (Counsel for Appellee)

Sweet, Benjamin (Counsel for Appellees)

Terrell, James M. (Counsel for Appellees)

The Home Depot Group Benefits Plan (Appellant)

The Home Depot, Inc. (HD) (Appellant)

The Home Depot Medical and Dental Plan (Appellant)

Topographic, Inc. (Appellant)

Triple-S Salud, Inc. (Appellee)

USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue

Shield (Appellee)

Van Winkle Law Firm (Counsel for Appellees)

Varney, Christine R. (Counsel for Appellees)

Voorhees, Hon. Richard (W.D.N.C.)

Wallace, Jordan, Ratliff & Brandt, LLC (Counsel for Appellees)

Walsh, Stephen A. (Counsel for Appellees)

Watson, McKinney, LLP (Counsel for Appellee)

Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC (Counsel for Appellees)

Wellmark Blue Cross and Blue Shield of Iowa (Appellee)

Wellmark Blue Cross and Blue Shield of South Dakota (Appellee)

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

Wellmark Health Plan of Iowa, Inc. (Appellee)

Wellmark Holdings, Inc. (Appellee)

Wellmark Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa and

Wellmark Health Plan of Iowa, Inc. (Appellee)

Wellmark, Inc. d/b/a Blue Cross and Blue Shield of Iowa and Wellmark

Blue Cross Blue Shield of South Dakota (Appellee)

Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield

of South Dakota (Appellee)

WellPoint, Inc. (Appellee)

West, Kimberly R. (Counsel for Appellees)

Wilkerson, David (Counsel for Appellees)

Witt, P.C., Helen E. (Counsel for Appellees)

Zeiger, P.C., Jeffrey J. (Counsel for Appellees)

Zott, David J. (Counsel for Appellees)

Zuckerman Spaeder, LLP (Counsel for Appellees)

### Corporate Disclosure

1.　　Appellant Home Depot U.S.A., Inc. is wholly owned by HD Operations

Holding Company, Inc., which is wholly owned by The Home Depot, Inc., a publicly

traded company. No publicly traded corporation owns 10% or more of the stock of

The Home Depot, Inc.

#3486315v5                 C-20 of 21

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

2.    The Home Depot Group Benefits Plan and The Home Depot Medical and Dental Plan are related HD entities. Neither plan is publicly traded.

## STATEMENT REGARDING ORAL ARGUMENT

The Home Depot appellants respectfully submit that oral argument would be useful to the Court. Home Depot's appeal arises from the district court's approval of a settlement of complex antitrust claims. This settlement includes a compulsory settlement class certified under Federal Rule of Civil Procedure 23(b)(2) that receives limited injunctive relief from some of the competitive restraints challenged in the litigation but forever releases their rights to seek injunctive or declaratory relief against other restraints that will continue after the settlement, including agreements among horizontal competitors to allocate customers. Further, the 23(b)(2) class was represented by the same class representatives and counsel that negotiated the cash settlement of $2.67 billion on behalf of the 23(b)(3) class. Oral argument will assist the Court in evaluating the parties' disputes over whether the mandatory perpetual release and this representational structure violate limits imposed by substantive law, Rule 23, and Due Process.

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ........................................1

    Certificate of Interested Persons........................................................1

    Corporate Disclosure ......................................................................20

STATEMENT REGARDING ORAL ARGUMENT ............................. i

TABLE OF CONTENTS....................................................................... ii

TABLE OF CITATIONS ........................................................................v

STATEMENT OF JURISDICTION..................................................... xii

    1.    Subject matter jurisdiction in the District Court ................................. xii

    2.    Appellate jurisdiction in the Court of Appeals .................................. xii

    3.    Home Depot's proper and timely appeal ......................................... xiii

STATEMENT OF THE ISSUES..............................................................1

STATEMENT OF THE CASE..................................................................1

    1.    The Blue Plans and the Blue Cross and Blue Shield Association ........2

    2.    Fully-Insured Subscribers, Self-Funded Subscribers, and National Accounts ....................................................................................3

    3.    The Blues restrict competition for National Accounts.........................4

        A.    Allocation of National Accounts ...............................................4

        B.    Best Efforts Rules restricting off-brand competition.................5

    4.    The Subscriber Track litigation.................................................................5

    5.    The Subscriber Track settlement negotiations ......................................7

    6.    The Settlement..........................................................................................9

        A.    The Settlement classes ................................................................9

B.    The Settlement class representatives .........................................9

C.    The 23(b)(3) Settlement class benefits .....................................9

D.    The 23(b)(2) Settlement class benefits ...................................10

E.    The release of class member claims .......................................12

7.    Settlement objections and final approval ............................................15

STANDARD OF REVIEW ....................................................................17

SUMMARY OF THE ARGUMENT ......................................................18

ARGUMENT AND AUTHORITY .........................................................23

I.    The district court erred by approving a compulsory and perpetual release of the 23(b)(2) class members' rights to seek declaratory and injunctive relief...................................................................23

A.    Releasing the right to enforce the antitrust laws against continuing or new competitive restraints violates public policy..........................................................................................23

B.    The public policy against perpetual releases of antitrust claims applies fully to class actions. ........................................28

C.    Preserving the right to seek "individualized" relief does not negate the public policy violation posed by the 23(b)(2) release. .......................................................................32

D.    The law prohibits release of the right to enforce antitrust laws against continuing restraints of trade, not merely brand-new ones. .......................................................................34

1.    Continuing restraints raise the same antitrust concerns as new ones......................................................34

2.    The cases distinguishing new versus continuing violations do not meaningfully address antitrust law...................................................................................35

E.   The release also exceeds the "identical factual predicate" limitation. ..................................................................42

F.   The Provider Track ruling applying the Rule of Reason to the Blues' post-Settlement restraints does not negate the public policy violation posed by the prospective release. ........46

1.   The district court did not decide what standard of antitrust review would apply to the Blues' Allocation Rules for National Accounts.........................46

2.   The release would violate antitrust policy even if the rule of reason governs the allocation of National Accounts. .......................................................49

3.   A future release violates antitrust policy even if the released conduct has not already been held "clearly illegal."..........................................................51

II.   The district court erred by approving a Settlement where the same named plaintiffs and counsel represented both the Rule 23(b)(2) and (b)(3) classes. .................................................54

A.   Federal Rule 23 and the Due Process Clause require the adequate representation of settlement class members by representatives and counsel with undivided interests...............54

B.   The same plaintiffs and counsel cannot represent injunctive relief and damages classes that have different and competing settlement priorities. .........................................55

C.   Home Depot and other 23(b)(2) class members were inadequately represented because the same plaintiffs and counsel represented both the 23(b)(2) and 23(b)(3) classes. ..................................................................................59

CONCLUSION .......................................................................................60

# TABLE OF CITATIONS

<u>Case</u>                                                                                     <u>Page</u>

*Am. Needle, Inc. v. Nat'l Football League*,
    560 U.S. 183 (2010)...........................................................................48

*Am. Safety Equip. Corp. v. J.P. Maguire & Co.*,
    391 F.2d 821 (2d Cir. 1968) .........................................................26

*\*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997)..........................................................54-55, 58-59

*Arrington v. Burger King Worldwide, Inc.*,
    47 F.4th 1247 (11th Cir. 2022) ...................................................48

*Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*,
    729 F.2d 1050 (6th Cir. 1984) ......................................................33

*Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*,
    211 F.R.D. 457 (S.D. Fla. 2002) ..................................................36

*Bennett v. Behring Corp.*,
    737 F.2d 982 (11th Cir. 1984) ..................................................51-52

*Brandt v. Bassett*,
    69 F.3d 1539 (11th Cir. 1995) ...................................................xiii

*California v. Am. Stores Co.*,
    495 U.S. 271 (1990).......................................................................24

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981)........................................................................29

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) ................................................29-30

*Edwards v. Prime, Inc.*,
    602 F.3d 1276 (11th Cir. 2010) .................................................xiii

*F.T.C. v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986)..................................................................50

*F.T.C. v. Ticor Title Ins. Co.*,
    504 U.S. 621 (1992)..................................................................30

*Fox Midwest Theatres v. Means*,
    221 F.2d 173 (8th Cir. 1955) ...................................................26

*FTC v. Phoebe Putney Health Sys. Inc.*,
    568 U.S. 216 (2013)..................................................................23

*Grunin v. International House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) ............................................... 52-53

*Herrera v. Wyoming*,
    139 S. Ct. 1686 (2019)..............................................................45

*Hines v. Widnall*,
    334 F.3d 1253 (11th Cir. 2003) ...............................................17

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006)....................................................................33

*In re Am. Express Merchants' Litig.*,
    634 F.3d 187 (2d Cir. 2011) ..........................................24, 26, 53

*\*In re Blue Cross Blue Shield Antitrust Litig.*,
    308 F. Supp. 3d 1241 (N.D. Ala. 2018) ...................... 2, 4-5, 7, 48

*In re Chicken Antitrust Litigation*,
    669 F.2d 228 (5th Cir. 1982) ...................................................37

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
    999 F.3d 1247 (11th Cir. 2021) ...............................................30

*In re Managed Care Litig.*,
    2008 WL 11333988 (S.D. Fla. Apr. 21, 2008)............................36

*In re Managed Care Litig.*,
    2010 WL 6532982 (S.D. Fla. Aug. 15, 2010) ...............................................38

*In re Managed Care Litigation*,
    756 F.3d 1222 (11th Cir. 2014) ............................................................40, 41

\*In re Payment Card Interchange Fee & Merchant Discount Antitrust
Litigation,
    827 F.3d 223 (2d Cir. 2016) ...................................................*passim*

*In re Smith*,
    926 F.2d 1027 (11th Cir. 1991) ............................................................27, 34

*Int'l Salt Co. v. United States*,
    332 U.S. 392 (1947)...............................................................................33

*Jenkins v. Prime Ins. Co.*,
    32 F.4th 1343 (11th Cir. 2022) ..................................................... xii

*Kazi v. PNC Bank, N.A.*,
    2021 WL 965372 (N.D. Cal. Mar. 15, 2021) ...............................................42

*Kilgoar v. Colbert Cty. Bd. of Educ.*,
    578 F.2d 1033 (5th Cir. 1978) .....................................................43

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997)...............................................................................35

*Koon v. United States*,
    518 U.S. 81 (1996).................................................................................18

\*Lawlor v. Nat'l Screen Serv. Corp.,
    349 U.S. 322 (1955)...............................................................................24

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)................................................................... 6, 44, 49-50

\*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.,
    140 S. Ct. 1589 (2020).......................................................................44

*McClendon v. Georgia Department of Community Health*,
  261 F.3d 1252 (11th Cir. 2001) ................................................................. 36-37

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
  161 F.3d 443 (7th Cir. 1998) ........................................................................38

*Melito v. Experian Mktg. Sols., Inc.*,
  923 F.3d 85 (2d Cir. 2019) ...........................................................................37

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*,
  702 F.3d 1312 (11th Cir. 2012) ....................................................................43

*Minnesota Mining & Mfg. v. N.J. Wood Finishing Co.*,
  381 U.S. 311 (1965)........................................................................................24

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985).......................................................................................24

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*,
  198 F.3d 823 (11th Cir. 1999) ......................................................................35

*N. Pac. Ry. Co. v. United States*,
  356 U.S. 1 (1958)...........................................................................................49

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
  779 F.2d 592 (11th Cir. 1986) ......................................................................49

*Nat'l Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross of Kansas City*,
  452 U.S. 378 (1981).......................................................................................23

*\*Nat'l Soc'y of Pro. Eng'rs v. United States*,
  435 U.S. 679 (1978)..................................................................................23, 50

*\*NCAA v. Alston*,
  141 S. Ct. 2141 (2021)............................................................................30, 50, 53

*\*NCAA v. Bd. of Regents of Univ. of Oklahoma*,
  468 U.S. 85 (1984)..................................................................................50, 53

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*,
    50 F.4th 1126 (11th Cir. 2022) ........................................................27

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999)......................................................... 55, 57-59

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*,
    604 F.3d 1291 (11th Cir. 2010) ....................................................28

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985).....................................................................54

*\*Redel's Inc. v. General Electric Co.*,
    498 F.2d 95 (5th Cir. 1974) ..................................................*passim*

*Robertson v. NBA*,
    556 F.2d 682 (2d Cir. 1977) .................................................. 52-53

*Rutstein v. Avis Rent-A-Car Sys., Inc.*,
    211 F.3d 1228 (11th Cir. 2000) .............................................17, 35

*Se. Fla. Cable, Inc. v. Martin Cnty.*,
    173 F.3d 1332 (11th Cir. 1999) ....................................................45

*\*TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*,
    959 F.3d 1318 (11th Cir. 2020) ............................................. 42-43

*U.S. ex rel. Chapman v. Fed. Power Comm'n*,
    345 U.S. 153 (1953).....................................................................27

*United States v. Sealy, Inc.*,
    388 U.S. 350 (1967).......................................................................7

*United States v. Topco Associates, Inc.*,
    405 U.S. 596 (1972)..................................................................7, 30

*\*Valley Drug Co. v. Geneva Pharmaceuticals*,
    350 F.3d 1181 (11th Cir. 2003) ......................................... 55, 58-59

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)..................................................................10, 28

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ......................................................38

*Wilk v. Am. Med. Ass'n*,
    671 F. Supp. 1465 (N.D. Ill. 1987)..........................................33

*Williams v. GE Cap. Auto Lease, Inc.*,
    159 F.3d 266 (7th Cir. 1998) ....................................................37

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    395 U.S. 100 (1969)..................................................................23

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    401 U.S. 321 (1971)..................................................................24

## Other

11th Cir. R. 26.1-1 ........................................................................C-1

11th Cir. R. 26.1-2 ........................................................................C-1

11th Cir. R. 26.1-3 ........................................................................C-1

11th Cir. R. 28-1(g) ......................................................................xii

15 U.S.C. § 1 ..................................................................................xii

15 U.S.C. § 2 ..................................................................................xii

15 U.S.C. § 15 ..........................................................................xii, 23

15 U.S.C. § 26 ..........................................................................xii, 23

28 U.S.C. § 1331 ............................................................................xii

28 U.S.C. § 2072(b) ......................................................................28

28 U.S.C. §§ 1337(a) ....................................................................xii

Clayton Act § 4 ..............................................................................xii

Clayton Act § 16 ......................................................................xii, 33

Fed. R. App. P. 26.1 ....................................................................C-1

Fed. R. App. P. 28(a)(4) ..............................................................xii

Fed. R. Civ. P. 23(a)(4) ....................................................22, 54, 56, 58, 61

Fed. R. Civ. P. 23(b)(2) ....................................................................*passim*

Fed. R. Civ. P. 23(b)(3) ....................................................................*passim*

Fed. R. Civ. P. 23(e)(2)(A) ........................................................................54

Fed. R. Civ. P. 54(b) ......................................................................... xii-xiii

James Grimmelmann, *Future Conduct and the Limits of Class-Action Settlements*
    91 N.C. L. Rev. 387, 472–73 (2013) ............................................28

Sherman Act § 1 ............................................................................ 6, 48-49

Sherman Act § 2 .................................................................................. xii

## STATEMENT OF JURISDICTION

Pursuant to the Court's direction, Home Depot provided responses to the Court's Jurisdictional Questions in its earlier filing. In addition to those responses, and pursuant for FRAP 28(a)(4) and 11th Cir. R. 28-1(g), Home Depot provides the following statement of jurisdiction.

## 1.    Subject matter jurisdiction in the District Court

The MDL district court had federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because the class Plaintiffs brought their claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 against the Individual Blue Plans and BCBSA for the injuries sustained by Plaintiffs and the Classes by reason of the violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

## 2.    Appellate jurisdiction in the Court of Appeals

The trial court's final approval of the Settlement Agreement is an appealable final judgment under Federal Rule of Civil Procedure 54(b). "Aside from final decisions," the Court of Appeals has "appellate jurisdiction over interlocutory orders" through Rule 54(b).[2] Under Rule 54(b), a district court may enter an appealable judgment as to fewer than all claims or parties if the district court "expressly" determines that there is "no just reason for delay."[3]

---

[2] *Jenkins v. Prime Ins. Co.*, 32 F.4th 1343, 1345 (11th Cir. 2022).

[3] *Id*.

Here, the MDL Court satisfied that requirement. In the Final Judgment, the Court expressly determined that:

> There is no just reason for delay in the entry of this Final Order and Judgment. The dismissed Subscriber Actions are severable from all remaining Provider Actions and immediate entry of this Final Order and Judgment by the Clerk of the Court is expressly directed.[4]

The Final Judgment possesses "the requisite degree of finality" for appeal under Rule 54(b) because it "completely dispose[s] of at least one substantive claim."[5] Indeed, the order here finally resolves *all* the claims for the three Subscriber class actions, and so it is properly subject to appeal.

### 3.    Home Depot's proper and timely appeal

Home Depot is a proper appellant because, despite objecting to the Settlement, it remains bound by the Final Judgment as a member of the (b)(2) indivisible injunctive relief class, which covers those entities that "purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Settlement Class Period."[6] The evidence shows that Home Depot meets

---

[4] D-2931 at 92, ¶31.

[5] *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1289 (11th Cir. 2010) (citing *Brandt v. Bassett*, 69 F.3d 1539, 1547 (11th Cir. 1995)).

[6] D-2931 at 82.

this definition because "at least some Blue Cross Blue Shield coverage was provided under the Plan in each year between 2008 and the present."[7]

The record evidence also shows that Home Depot timely objected to the Settlement in the MDL court below.[8] Further, the Subscribers expressly acknowledged Home Depot's timely objection in the Motion for Final Approval, both by listing Home Depot as an objector[9] and arguing against the substance of Home Depot's objections in its brief.[10] Counsel for Home Depot appeared at the final approval hearing to argue the objections.[11] After the hearing, and pursuant to the MDL Court's directive, Home Depot filed a Renewal of Objections and Post-Hearing Response.[12] And in the Final Judgment, the MDL Court expressly overruled Home Depot's objections.[13]

Finally, Home Depot timely appealed. The MDL court's final order and judgment was entered by the Court on August 9, 2022 and amended by the Court on September 7, 2022 Home Depot filed its notice of appeal on September 8, 2022.

---

[7] Home Depot Objection, D-2812-20 at 53.

[8] D-2812-20 at 7 *et seq.*

[9] D-2812-1 at 167

[10] *E.g., id.* at 87.

[11] D-2864 at 155 *et seq.*

[12] D-2875.

[13] D-2931 at 46.

## STATEMENT OF THE ISSUES

Home Depot appeals from the approval of a class action settlement terminating antitrust litigation against the Blue Cross and Blue Shield Association and its three-dozen Blue Plan members (together, the "Blues"). Home Depot raises the following issues on appeal:

(1)    Whether the district court erred in approving a mandatory Rule 23(b)(2) settlement that perpetually releases class members' rights to seek declaratory or injunctive relief from (a) the Blues' continuing competitive restraints or (b) future restraints related in any way to any fact or issue raised at any point in this decade-long litigation; and

(2)    Whether the district court erred in approving a settlement where all representatives of the Rule 23(b)(2) class also represented the 23(b)(3) class and thus had a structural incentive to trade a broad future injunctive release to obtain greater monetary consideration.

## STATEMENT OF THE CASE

This multi-district litigation consolidated antitrust suits challenging competitive restraints that the Blues—three dozen independent companies and the association through which they govern their affairs—imposed on their sale of health insurance plans. The MDL court divided the cases into a Subscriber Track, involving claims by health plan subscribers, and a Provider Track, involving claims by

healthcare providers. This appeal arises from the approval of a class settlement fully resolving the Subscriber Track litigation.

## 1. The Blue Plans and the Blue Cross and Blue Shield Association

As the district court found on summary judgment, "the Blue Plans are 36 independent companies and each company sells health insurance."[14] They include some of the country's largest health insurers, with extensive provider networks.[15] "Nationwide, 96 percent of hospitals and 92 percent of physicians are in-network with the Blue Plans."[16]

All Blue Plans belong to the Blue Cross and Blue Shield Association, or the BCBSA. The Plans govern the Association, setting its rules by vote. All Blue Plans agree to follow the rules they adopt through their Association, and each Plan enters a license with the Association regarding its use of the Blue trademarks.[17]

As the district court also found, the Association is controlled by its licensees—the Blue Plans themselves—rather than being a "vertical" trademark licensor serving

---

[14] *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1250 (N.D. Ala. 2018).

[15] *Id.* at 1256-57.

[16] *Id.* at 1257.

[17] *Id.* at 1250.

its own independent financial interests.[18] "[T]he undisputed record evidence also reveals that the Blue Plans control the terms of each Blue's License Agreement."[19]

## 2. Fully-Insured Subscribers, Self-Funded Subscribers, and National Accounts

Some Blue Plan subscribers are fully insured, meaning that they pay a fixed premium and the Plan pays for the covered healthcare. Other subscribers are self-funded, meaning that they pay a Blue Plan for administrative services and network access, but absorb the cost of the healthcare themselves. Self-funded subscribers (also known as administrative-services-only subscribers or ASOs) are typically sizeable employers.[20] Self-funded subscribers employing numerous employees across multiple states are National Accounts.[21]

Home Depot is a self-funded subscriber that contracts with Blue Plans for administrative services and network access. Home Depot is also a National Account, operating 2,000 stores nationwide and employing approximately 500,000 associates.

---

[18] *Id*. at 1267.

[19] *Id*.

[20] D-2616 at 11-12 ¶2.

[21] *Id.* at 85 ¶385.

### 3.    The Blues restrict competition for National Accounts

The Blue Plans collectively adopted and enforce rules through their Association restricting their competition for National Accounts, including Home Depot.

### A.    Allocation of National Accounts

The Blue Plans have adopted rules that, with few exceptions, restrict each Plan to an exclusive geographic area, known as an Exclusive Service Area or ESA. Beyond the ESAs, the Blues have agreed upon additional rules determining who may bid on a National Account. The Plan in whose ESA the National Account is headquartered has the exclusive right to bid on that account's *nationwide* business using Blue trademarks unless that Plan "cedes" this right to one—and only one—other Blue Plan.[22]

Before settling, the Subscribers correctly characterized this restriction as "a naked customer allocation agreement for national accounts" that "not only forecloses competition among Member Plans for national accounts, depriving those accounts of the benefit of competitive bidding, but also prevents the national account itself from requesting and receiving a competitive bid from a Member Plan of its

---

[22] 308 F. Supp. 3d at 1256. In the limited instances where two Blue Plans have overlapping service areas, both may bid on that account. *Id.*

choice."[23] The Subscribers developed substantial proof that, absent this restraint, Blue Plans would compete fiercely for National Accounts.[24]

## B.     Best Efforts Rules restricting off-brand competition

In addition to allocating National Accounts, the Blue Plans adopted "best efforts" rules restricting their ability to compete with each other (or anyone else) without using Blue trademarks—what is known as "Green competition."

Under the Local Best Efforts Rule, or LBE, a Plan must earn at least 80% of its health insurance revenue from within its service area using Blue marks. In other words, all Blue Plans have agreed that no Plan's Green competition may produce more than 20% of its revenue from within its service area.[25]

Until April 2021, the Blues also enforced a National Best Efforts Rule, or NBE, requiring each Plan to derive at least two-thirds of its national health insurance revenue from its Blue brand. By agreement, a Plan's revenue from Green competition could not exceed a third of its national revenue.[26]

## 4.    The Subscriber Track litigation

The Subscribers challenged these competitive restraints under the Sherman Act. During discovery, they retained an antitrust economist to estimate the supra-

---

[23] D-2408 at 15.

[24] *Id.* at 16.

[25] 308 F. Supp. 3d at 1255-56.

[26] *Id.* at 1256.

competitive overcharges the Blues have extracted from subscribers through these restraints. He estimated the total overcharges through 2019 as ranging from $18.6 to $36.1 billion, before mandatory trebling under antitrust law.[27]

After discovery, the district court resolved cross-motions for summary judgment contesting which standard of antitrust review applied to the Blues' competitive restraints. The Subscribers argued that these restraints were illegal *per se*, while the Blues urged that the rule of reason applied.

As background, "[t]he rule of reason is the accepted standard for testing whether a practice restrains trade in violation of [Sherman Act] § 1. Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."[28] But with some restraints, including agreements by head-to-head competitors to fix price or divide markets, the judiciary has sufficient experience to dispense with this reasonableness inquiry. Those restraints are illegal *per se*, meaning that they are conclusively presumed unreasonable without proof of their actual effects.[29]

---

[27] D-2610-11 ¶10.

[28] *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (cleaned up).

[29] *Id.*

In a 2018 order, the district court held that the rule of *per se* illegality, not the rule of reason, governed the Blues' system of restraints. The court concluded that "[t]he ESAs in which Blue Plans may sell Blue-branded insurance are at least as anticompetitive as the exclusive sales areas" that the Supreme Court held illegal *per se* in *United States v. Sealy, Inc.*, 388 U.S. 350 (1967), and *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972).[30] And, although the court did not reach the Local Best Efforts rule, it concluded that "the National Best Efforts rule constitutes a *per se* violation of the Sherman Act, particularly when layered on top of other restrictions Defendants have placed on competition."[31]

This Court declined interlocutory review.[32] And, in April 2021, long before final settlement approval, the Blues rescinded their National Best Efforts rule.

**5.    The Subscriber Track settlement negotiations**

Starting in 2015, the Subscribers and Blues discussed settlement, holding intensive discussions every month from November 2017 to May 2018 and January through August 2019.[33] Through those years of compromise negotiations, the subscribers were represented by only fully-insured individuals and employers, along

---

[30] 308 F. Supp. 3d at 1268.

[31] *Id.* at 1273 & n.16.

[32] 2018 WL 7152887 (11th Cir. Dec. 12, 2018).

[33] D-2610-12 ¶¶1-18.

with their counsel.[34] There was no putative self-funded representative, no self-funded sub-class, and no counsel representing the distinct interests of such a class.[35]

In July 2019, the 67 fully-insured subscriber representatives and their counsel "coordinated the recruitment of separate class counsel for [a self-funded] sub-class and a class representative."[36] Counsel for a new self-funded sub-class first began participating in mediation sessions in September 2019.[37] Two months later, the parties signed their term sheet.[38]

Dissemination of class notice in Spring 2021[39] first alerted Home Depot that the proposed Settlement would encompass self-funded subscribers, rather than only the fully-insured subscribers that had litigated the claims and overwhelmingly negotiated the Settlement. And only then did Home Depot learn that a proposed 23(b)(2) Settlement would terminate its future equitable claims. Home Depot promptly attempted to opt out of all classes and objected to the 23(b)(2) class Settlement.[40]

---

[34] *Id.*; D-2641 at 17.

[35] *Id.*

[36] D-2931 at 4.

[37] D-2610-12 ¶19; D-2931 at 75.

[38] D-2610-12 ¶21.

[39] D-2812-2 ¶4.

[40] D-2941-1 ¶3; D-2812-20 at 7.

## 6.    The Settlement

### A.    The Settlement classes

The Settlement includes two classes of essentially all Blue subscribers, one certified under Federal Rule 23(b)(2) and another under Rule 23(b)(3). The 23(b)(3) class includes a self-funded subscriber sub-class, while the sole 23(b)(2) class includes all subscribers, both fully-insured and self-funded.[41]

### B.    The Settlement class representatives

The court approved 65 fully-insured subscribers to represent both the 23(b)(2) and 23(b)(3) classes.[42] It approved a sole self-funded subscriber (Hibbett Sports) to represent the 23(b)(3) subclass, but not the (b)(2) class.[43] The self-funded subscriber's role was to negotiate the division of the monetary relief between the 23(b)(3) class and subclass.[44]

### C.    The 23(b)(3) Settlement class benefits

The 23(b)(3) class would divide the approximately $1.9 billion of the $2.67 billion fund expected to remain after attorney fees and expenses. The Settlement allocates 93.5% of those dollars to fully-insured subscribers and 6.5% to the self-

---

[41] D-2931 at 8-9.

[42] D-2931 at 84.

[43] *Id.*

[44] D-2610-6 ¶¶31-33; D-2931 at 4.

funded subclass.[45] In addition, a limited number of National Accounts that both remain in the 23(b)(3) class *and* meet certain criteria may request a second Blue Plan bid, rather than the single bid to which most subscribers would remain restricted.[46] The district court described the right to request that second bid as "divisible injunctive relief," since some class members would receive it but most would not.[47]

As Due Process requires,[48] members of the 23(b)(3) class and subclass could opt out. Home Depot and many other self-funded employers did so.[49] Opt-outs from the 23(b)(3) classes received no money and no right to request a Second Blue Bid, even if they would otherwise qualify under the Settlement. Having opted out, Home Depot does not challenge the 23(b)(3) Settlement.

### D.    The 23(b)(2) Settlement class benefits

The court approved a single 23(b)(2) class covering all subscribers, allowing no opt outs.[50] Home Depot is a compulsory member of that class, along with everyone else who is or has subscribed to a Blue Plan. As described above, the 23(b)(2) class is represented by the same 65 fully-insured subscribers that represent

---

[45] D-2931 at 35.

[46] D-2610-2 ¶15.

[47] D-2931 at 44.

[48] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011).

[49] D-2941-1 ¶3; D-2928 at 4-37.

[50] D-2931 at 9.

the 23(b)(3) class, who will share in 93.5% of $1.9 billion and whose counsel will presumably receive the lion's share of the $626 million fee award.

The 23(b)(2) class members receive only what the court described as "indivisible injunctive relief." As specified in the Settlement Agreement,[51] that entails changing some competitive restraints while protecting others against any challenge:

(1) Elimination of the National Best Efforts rule (which the district court had already ruled *per se* unlawful and the Blues have abandoned);

(2) Perpetuation of the Local Best Efforts rule, provided that the 80% Blue revenue requirement is not calculated based on any geographic area smaller than a state;

(3) A limited allowance for self-funded subscribers to contract directly with healthcare vendors for certain services;

(4) Perpetuation of the Exclusive Service Areas;

(5) A provision that, if the Blue Plan that would ordinarily have the sole right to serve a National Account chooses to bid without the Blue marks, *i.e.*, a "Green bid," then the Blue Plan where the National Account is headquartered or, if not applicable, where it has the most employees, may submit a Blue bid;

(6) Perpetuation of the Blues' right to collectively block any third-party acquisition of a Blue Plan by Association vote determining that the acquisition is adverse to the Blue brand; and

(7) Some limitations upon most-favored-nation's clauses in contracts with healthcare providers.

---

[51] D-2610-2 at 31-37.

### E.    The release of class member claims

The Settlement's release is breathtakingly broad; it encompasses "any and all" claims "based upon, arising from, or relating in any way to" any of the following:

> (i) the factual predicates of the Subscriber Actions … including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through [the conclusion of appeal];
>
> (ii) any issue raised in any of the Subscriber Actions by pleading or motion; or
>
> (iii) any mechanisms, rules, or regulations [approved by the "Monitoring Committee" described below].[52]

Thus, the release covers *all* claims relating in *any* way to *any* fact or issue raised in *any* filing at *any* time during a decade of Subscriber litigation. In addition, the release shields any new restraints that a Monitoring Committee (selected by the Subscribers, the Blues, and the district court) deems consistent with the indivisible injunctive relief framework described above.

Although it has been characterized as additional relief, the Monitoring Committee's only power is to expand the already broad release to cover additional competitive restrictions. For the five years after the Settlement is final, the Committee would decide whether new competitive restrictions the Blues adopt are consistent with the Settlement's injunctive relief provisions. If so, then the release

---

[52] D-2610-2 ¶1(uuu).

expands to cover those post-Settlement restrictions.[53] If not, the *only* consequence is that the new restrictions fall outside the release.[54] Thus, the Monitoring Committee cannot prohibit the Blues from doing anything.[55] It merely oversees a one-way process that can expand the release to immunize new conduct.

Although the *subject matter* of released claims is the same across all settlement classes, the *type of relief* covered is not. Subscribers remaining in the 23(b)(3) class forever release all right to seek *any* form of relief for claims falling within the subject matter of the release. That includes "claims that arise *after* the Effective Date" of the Settlement.[56]

Subscribers (like Home Depot) who opted out of the 23(b)(3) class preserve all *damages* claims. After additional wrangling and a supplemental class notice—but no amendment to the Settlement Agreement or release—the district court ruled that (b)(2) members also preserve their right to seek "*individualized* declaratory or injunctive relief," which "may include the right to pursue in litigation more than one Blue bid based upon an Opt-Out's individual business and the facts and circumstances of the individual claims."[57] But because all subscribers are stuck in

---

[53] *Id.* ¶20(a)(ii)-(iii).

[54] *Id.* ¶20(a)(iv).

[55] *Id.* ¶20.

[56] *Id.* ¶1(uuu) (emphasis added).

[57] D-2939 at 2.

the 23(b)(2) class, they release all rights to what the district court described as "indivisible injunctive or declaratory relief"[58] that relates in any way to any of the facts or issues raised at any point in the Subscriber Track litigation, plus any new practices the Monitoring Committee adds to the release. That perpetual release is enforced by threat of contempt, as the district court warned.[59]

The proceedings below leave the scope of the carve-out for "individualized declaratory or injunctive relief" unclear. Plainly, no subscriber may sue to enjoin or declare unlawful any of the competitive restraints that the Settlement retains. That includes the Blues' overall allocation system for National Accounts, their ESAs, their LBE rule, or any of the other restrictions the Settlement preserves, or any restriction the Monitoring Committee adds to the release.

According to the Blues, though, the release is even broader. They maintain that the right to seek individualized declaratory or injunctive relief "does *not* mean … that an Opt-Out could obtain either a declaration that service areas are unlawful *as to them*, or an injunction enjoining the application of service areas *as to them*."[60] In other words, say the Blues, the (b)(2) release prohibits even *individualized* relief if based on a premise that could, by logical extension, imply the general illegality of

---

[58] *Id.* at 1-2.

[59] D-2864 at 107-09, 175-76.

[60] D-2895 at 2 (emphasis added).

their allocation of National Accounts or other restraints protected by the Settlement.[61]

## 7.    Settlement objections and final approval

In November 2020, the district court preliminarily approved the Settlement and class notice.[62] Home Depot timely opted out of the 23(b)(3) class and endeavored to opt out of the 23(b)(2) class as well.[63] But it also objected to the 23(b)(2) Settlement, in case—as it feared—the court would forbid opt out.[64]

In pre-hearing and post-hearing briefs, and at the final approval hearing, Home Depot argued that the compulsory release of claims for prospective injunctive and declaratory relief violated federal antitrust policy and was overbroad as to future claims.[65] Home Depot further objected that it was inadequately represented because Home Depot and the mandatory 23(b)(2) class had no representative that did not also represent the 23(b)(3) class.[66] That created a structural incentive for the (b)(3)

---

[61] *Id.*; D-2864 at 97 (Blues' lead counsel: "if [an Opt-Out's] argument is there should be no restriction on any Blue's ability to give a bid to me, service areas impose that restriction right now. And so they would basically be saying, at least as to me, you shouldn't enforce service areas; but they've already released the claim that they can challenge service areas … That's gone.").

[62] D-2641.

[63] D-2941-1 ¶7.

[64] D-2812-20 at 15–20.

[65] *Id.* at 19–32; D-2875 at 34–39; D-2864, 181:7–195:21.

[66] D-2875 at 46–47 nn.131-32; D-2812-20 at 45–47; D-2864, 177:3–178:8.

representatives and counsel to trade a broad (b)(2) release of any market-wide injunctive relief in order to get a larger monetary award, hefty fees, and a second bid.

As Home Depot argued, that structure raises the same Due Process and adequacy of representation problem that was fatal to the $6.5 billion settlement in *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*:[67]

> [T]he (b)(2) class members are represented by the *same* representatives and the *same* counsel as the (b)(3) class members. Just as in *Payment Card*, the (b)(3) stakeholders in this case have the same inherent structural incentive to trade off injunctive relief for monetary compensation. Just as in *Payment Card*, no one who was disinterested in the (b)(3) relief negotiated for the (b)(2) class. That constitutes inadequate representation, and it is fatal here, too.[68]

The district court granted final approval in August 2022.[69] The court rejected all challenges to adequacy of representation.[70] It also rejected the argument that the Settlement would perpetuate unlawful conduct. The court believed that, so long as the post-Settlement restraints were not "clearly illegal," the possibility that they were in fact illegal posed no obstacle to approval.[71] The court noted that it had never ruled

---

[67] 827 F.3d 223 (2d Cir. 2016).

[68] D-2875 at 46–47 (emphasis original).

[69] D-2931, D-2939.

[70] D-2931 at 30, 74–75.

[71] *Id.* at 46.

that the Blues' ESAs would be illegal *per se* absent their NBE rule.[72] Moreover, the court took comfort from a summary judgment order it entered on the same day in the Provider Track cases. That order held that, after the Blues abandoned their NBE rule, the rule of reason, rather than the *per se* standard, governed the providers' challenges to the ESAs.[73]

The court further concluded that a class settlement may release future claims, so long as they are based on the "identical factual predicate" of the settled lawsuit.[74] In particular, the court saw no public policy problem with a compulsory, perpetual release of antitrust claims so long as those claims arise from the continuation of pre-settlement competitive restraints.[75]

Home Depot appealed.

## STANDARD OF REVIEW

This Court reviews the district court's legal conclusions de novo.[76] And, *if* "the district court correctly interpreted the applicable law," the Court "review[s] the court's grant of class certification for an abuse of discretion."[77] As the Supreme

---

[72] *Id.*

[73] *Id.* at 47.

[74] *Id.* at 53.

[75] *Id.* at 54–56.

[76] *Hines v. Widnall*, 334 F.3d 1253, 1256 (11th Cir. 2003).

[77] *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000).

Court explains, "[t]he abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions."[78] Thus, a district court abuses its discretion in approving a class settlement when "the decision (i) rests on a legal error or … (ii) falls outside the range of permissible decisions."[79]

## SUMMARY OF THE ARGUMENT

Two features of the Settlement preclude its approval.

*First*, it would bind the 23(b)(2) class members to a perpetual release of their right to seek declaratory or injunctive relief from the competitive restraints that would continue under the Settlement, as well as all future restraints related in any way to any fact or issue previously raised in a decade of litigation.

Circuit law makes clear that immunizing horizontal restraints of competition through private release violates the fundamental national economic policy that Congress declared a through the antitrust laws. In particular, the Clayton Act provisions authorizing private antitrust enforcement—including the right to seek broad injunctive relief—represent a legislative judgment that private action is crucial to the *public* interest in ensuring open, competitive markets.

This Settlement would terminate the rights of 23(b)(2) class members— essentially all Blue subscribers—to seek systemic injunctive or declaratory relief

---

[78] *Koon v. United States*, 518 U.S. 81, 100 (1996).

[79] *Payment Card*, 827 F.3d at 231.

from the competitive restraints protected by the Settlement. That includes the Blues' agreement to allocate bidding rights for National Accounts, along with all future restraints relating in any way to the facts and issues raised in the litigation. This mandatory perpetual release thus forecloses the very type of private enforcement that—compared to individualized relief—is most crucial to the public interest. And, if the Blues' interpretation is correct, the release precludes any meaningful injunctive relief for even an individual plaintiff.

The district court believed that class action releases did not pose the same public policy problem as individual releases. But disqualifying the entire class of purchasers who could seek relief is far worse than sidelining a single potential plaintiff. If it violates legislative policy to trade away one plaintiff's future antitrust claims, surely it is even worse to trade away *every* plaintiff's future claims.

Nor does court approval change that. Settlement approval is a deferential-to-the-parties finding that a privately negotiated bargain falls within the broad range of reasonable compromises; it is not a merits ruling that a challenged practice complies with antitrust law. Indeed, settlement approval is a decision *not* to make such a determination. Further, this Settlement does not authorize the district court or Monitoring Committee to impose any additional relief if competition fails to emerge from the Settlement structure.

Fundamentally, the district court accepted the settling parties' legal contention that releases of future antitrust liability pose no problem unless they extinguish claims based on entirely unrelated, brand-new types of misconduct. But the courts that originated this distinction—between releases of ongoing conduct and new, qualitatively different conduct—did so to protect an interest separate from antitrust policy. Specifically, limiting class action releases to claims arising from the "identical factual predicate" of the settled lawsuit aspires to protect the Due Process rights of absent class members by barring the release of claims they would not fairly expect to be released. That is different than the *public* interest in ensuring competitive markets through private antitrust enforcement.

Releasing ongoing competitive restraints from private challenge violates antitrust policy for the same reason as releasing the right to challenge hypothetical new restraints. Under substantive antitrust law, each additional transaction made under a pre-existing anti-competitive restraint is a new violation. Indeed, release of an ongoing competitive restraint may well present *more* risk than releasing a hypothetical future one, especially in a class action where defendants will—as here—pay large damages and attorney fees to immunize ongoing restraints that have already proved effective in maximizing their supra-competitive pricing and profits.

Even if the "identical factual predicate" doctrine supplied the only limitation on future antitrust releases, the release here exceeds its parameters. Rather than

requiring an *identical* factual predicate, this release applies so long as a claim "relate[s] in *any* way to" either "the factual predicates of" or "any issue raised in any of the Subscriber Actions."[80] In other words, it requires only *some* overlap with a fact or issue raised in the litigation, rather than the precise overlay Circuit law requires. So even if antitrust policy did not forbid the future release here, this Circuit's identical factual predicate caselaw would do so.

*Second,* the Settlement failed to provide adequate representation for 23(b)(2) class members. The same plaintiffs and counsel represent both the (b)(2) class—which receives limited injunctive relief—and the (b)(3) class, which splits $2.67 billion dollars with its counsel and, in some cases, may request a Second Blue Bid. That creates a fatal due process and adequacy of representation problem: the class representatives and counsel negotiated under a structural incentive to trade cash in exchange for broad future antitrust immunity for the Blues.

To make things worse, all 23(b)(2) representatives are fully-insured subscribers, whose economic interests are different from self-insured class members, particularly national accounts. The only self-funded subscriber representative appeared on the eve of settlement and was appointed to represent only the 23(b)(3)

---

[80] D-2610-2 at 19 (emphasis added).

21 of 60

subclass. There was no subscriber or counsel representing the 23(b)(2) class who was not also financially interested in the 23(b)(3) class.

As with the antitrust settlement vacated in *Payment Card*,[81] this structure presents an unacceptable risk of class representatives and counsel trading off the interests of (b)(2) class members *and the public* in market-wide injunctive relief in exchange for big dollars. In that unanimous decision, one panel member wrote separately to emphasize the structural problem where some plaintiffs receive a substantial settlement payment while others "give up forever their potentially valid claims, without ever having an opportunity to reject the settlement by opting out of the class."[82] In words that apply equally well here, that judge wrote: "This is not a settlement; it is a confiscation."[83]

Presumably, the Settlement proponents will extol the size of the (b)(3) cash settlement and the changes to be made under the (b)(2) settlement. Yet, Home Depot's argument is not that the Subscribers didn't *get* enough; rather that they *gave* too much—a staggeringly broad future release that the law does not allow—and did so through a representational structure that violates Rule 23(a)(4) and Due Process. For both reasons, this Court should vacate the approval of the Settlement.

---

[81] 827 F.3d at 223.

[82] *Id.* at 240.

[83] *Id.* at 241.

## ARGUMENT AND AUTHORITY

I.    **The district court erred by approving a compulsory and perpetual release of the 23(b)(2) class members' rights to seek declaratory and injunctive relief.**

    A.    **Releasing the right to enforce the antitrust laws against continuing or new competitive restraints violates public policy.**

As the Supreme Court has emphasized, "[t]he antitrust laws represent a 'fundamental national economic policy.'"[84] "The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services."[85]

To ensure robust antitrust enforcement, Congress enacted Sections 15 and 16 of the Clayton Act, which empower private litigants to pursue not only damages, but also injunctive relief to dismantle unlawful competitive restraints.[86] As the Supreme Court explains, "the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws."[87] By providing these remedies, "Congress has expressed its belief that private antitrust litigation is one of the surest weapons

---

[84] *Nat'l Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross of Kansas City*, 452 U.S. 378, 388 (1981) (citations omitted); *FTC v. Phoebe Putney Health Sys. Inc.*, 568 U.S. 216, 225 (2013) (antitrust laws embody "the fundamental national values of free enterprise and economic competition").

[85] *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978).

[86] 15 U.S.C. §§ 15, 26.

[87] *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130–32 (1969).

for effective enforcement of the antitrust laws."[88] "Private enforcement of the Act was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition."[89]

As a corollary, the Supreme Court warned in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, that, if an agreement operates "as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy."[90] This admonition rests "on a firm principle of antitrust law that an agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void as a matter of public policy."[91] As the Second Circuit recounts:

> More than a half-century ago, the Supreme Court stated that "in view of the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action," an agreement which confers even "a partial immunity from civil liability for future violations" of the antitrust laws is inconsistent with the public interest.[92]

---

[88] *Minnesota Mining & Mfg. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 318 (1965).

[89] *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990); *see also Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 336 (1971).

[90] 473 U.S. 614, 637 n.19 (1985).

[91] *In re Am. Express Merchants' Litig.*, 634 F.3d 187, 197 (2d Cir. 2011) (*reversed on different grounds*, 570 U.S. 228 (2013) (class action waiver enforceable).

[92] *Id.* (quoting *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955)).

This Circuit likewise prohibits prospective antitrust releases. As the former Fifth Circuit held in *Redel's Inc. v. General Electric Co.*: "Releases may not be executed which absolve a party from liability for future violations of our antitrust laws." The Court explained:

> A right conferred on a private party by federal statute, but granted in the public interest to effectuate legislative policy, may not be released if the legislative policy would be contravened thereby.[93]

In *Redel's*, a franchisee sued its franchisor, alleging unlawful price discrimination from 1965 to 1971.[94] In 1969, however, those parties had entered a new agreement including a release. The Court grudgingly held that this release—although general—barred claims for antitrust violations occurring prior to its execution.[95] But, as a matter of public policy, the release could not bar claims for antitrust violations after that date, including price discrimination that continued thereafter.[96] "The prospective application of a general release to bar private antitrust actions arising from subsequent violations is clearly against public policy."[97]

---

[93] 498 F.2d 95, 99 (5th Cir. 1974).

[94] *Id.* at 98.

[95] *Id.* at 99–100.

[96] *Id.* at 98–99.

[97] *Id.* at 99. The Court reached the same result based on the release language, but it expressly and equally grounded its holding in public policy. "There are two answers, *both* of which conclusively deny prospective effect." *Id.* at 98 (emphasis added).

In invalidating the release as to post-release conduct, the former Fifth Circuit endorsed this reasoning:

> "Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy. This is because the effect of such a release could be to permit a restraint of trade to be engaged in, which would have impact, *not simply between the parties, but upon the public as well*."[98]

Other circuits have condemned future antitrust releases for the same reason— they undermine private enforcement to the *public* detriment:

> "A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy; thus, the plaintiff asserting his [or her] rights under the Act has been likened to a private attorney-general who protects the public's interest."[99]

Thus, a party's release of the right to challenge continuing anticompetitive conduct is not merely a private matter; it affects the fundamental *public* interest in competitive markets.

Those strong national interests outweigh the judicial preference otherwise favoring settlements. As *Redel's* explained, "[t]here are two policies which must be accommodated."[100]

---

[98] *Id.* (quoting *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955)) (emphasis added).

[99] *Am. Safety Equip. Corp. v. J.P. Maguire & Co.*, 391 F.2d 821, 826 (2d Cir. 1968); *see also In re Am. Express*, 634 F.3d at 197.

[100] 498 F.2d at 100.

The first requires the greatest respect for private enforcement as the hallmark of the federal antitrust regulatory system. The second policy requires us to respect the amicable settlement and release of antitrust claims by the parties themselves.[101]

The Court concluded: "[w]here these policies are brought into conflict, *the first must prevail*."[102] Circuit precedent since *Redel's* likewise confirms that, "[t]hough settlements in accord and satisfaction are favored in law, they may not be sanctioned and enforced when they contravene and tend to nullify the letter and spirit of an Act of Congress."[103] That deference is appropriate, because it is Congress that declares national policy and the courts' duty to carry it out.[104] The understandable interest in settling this litigation cannot override Circuit precedent prohibiting prospective antitrust releases or legislative policy.

---

[101] *Id.*

[102] *Id.* (emphasis added).

[103] *In re Smith*, 926 F.2d 1027, 1029 (11th Cir. 1991) (citation omitted).

[104] *U.S. ex rel. Chapman v. Fed. Power Comm'n*, 345 U.S. 153, 180 (1953) ("Congress alone makes policy decisions affecting the public domain."). A "strong deference [is] ordinarily due to the Legislature." *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*, 50 F.4th 1126, 1151 (11th Cir. 2022).

**B.    The public policy against perpetual releases of antitrust claims applies fully to class actions.**

The district court thought it significant that *Redel's* was not a class settlement.[105] But the prohibition against releasing future private antitrust enforcement must apply as fully to class actions as to individual lawsuits.

First, that conclusion flows from the sources of the governing rules. The "Clayton Act creates a private *right* of action" to vindicate legislative policy.[106] In contrast to these *substantive* statutory rights, Rule 23 is merely procedural. It cannot authorize a court to do something that would contravene a substantive legislative policy. To the contrary, the Rules Enabling Act explicitly "forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'"[107] That is why, as one of the few academic analyses to address this issue concluded, "[f]uture-conduct releases for antitrust claims are impermissible in settlements, regardless of whether they are class actions or not."[108]

Second, as a practical matter, applying a perpetual release to an entire class of plaintiffs makes the public policy threat *worse*, not better. Instead of losing one

---

[105] D-2864 at 182–88.

[106] *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1298 (11th Cir. 2010) (emphasis added).

[107] *Wal-Mart*, 564 U.S. at 367 (citing 28 U.S.C. § 2072(b)).

[108] James Grimmelmann, *Future Conduct and the Limits of Class-Action Settlements*, 91 N.C. L. Rev. 387, 472–73 (2013).

private antitrust enforcer, a mandatory (b)(2) class release disqualifies the entire group of private litigants that could otherwise sue to end an ongoing violation. Because of their scale, class action settlements, far more than individual ones, pose the risk that class representatives and counsel will trade a broad prospective antitrust immunity in exchange for an enormous payment of damages and attorney fees. Thus, classwide releases, rather than individual ones, pose the greater threat to Congress's purpose in creating private antitrust remedies.

Moreover, court approval under Federal Rule 23(e) is no reason to relax the prohibition on prospective releases of antitrust remedies. Judicial settlement approval is not a merits ruling that any challenged restraint comports with antitrust law. To the contrary, as the Supreme Court instructs, "[c]ourts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement. They do not decide the merits of the case or resolve unsettled legal questions."[109] Circuit precedent is equally clear on this point.[110]

Rather than a merits determination, settlement approval entails substantial deference in which a "trial judge 'should be hesitant to substitute its own judgment

---

[109] *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981) (cleaned up).

[110] *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).

for that of counsel.'"[111] Deference to private bargain may be appropriate when compromising upon the amount of compensation for past wrongs. But it is another matter to defer to private bargaining to determine what competitive restraints are permitted going forward. Decisions to limit competition "must be made by Congress and not by private forces or by the courts."[112] Antitrust law does not allow even sovereign actors (the states) to defer to private agreements restraining competition.[113] As the Supreme Court recently warned, "[t]he orderly way to temper that … policy of competition is by legislation and not by court decision. … [U]ntil Congress says otherwise, the only law it has asked us to enforce is the Sherman Act, and that law is predicated on one assumption alone—competition is the best method of allocating resources in the Nation's economy."[114]

Nor does the Court's continuing jurisdiction to enforce the Settlement ameliorate this problem. The Settlement does not provide any continuing oversight to ensure the competitiveness of health insurance markets. As explained above, the

---

[111] *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1274 (11th Cir. 2021) (quoting *Cotton*, 559 F.2d at 1330).

[112] *Topco*, 405 U.S. at 612.

[113] *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 633 (1992). States may approve contractual arrangements that would otherwise violate federal antitrust law only by substituting an adequate, ongoing system of active regulation. *Id.* This Settlement does nothing of the sort.

[114] *NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021).

Monitoring Committee can do nothing but expand the release. Likewise, the district court has no power to modify the Settlement or impose any additional restrictions upon the Blues.

Instead, the Settlement largely gambles that eliminating the NBE requirement (which previously limited competition through *non*-Blue Branded Plans) will spur so much off-brand competition as to render the continuing restrictions on Blue competition benign. But no one knows whether that will prove true, let alone whether it will remain true over the duration of this perpetual release. And if not, there is nothing that the Monitoring Committee or the district court can do.

Rather than allow parties to gamble with important national markets, this Court should enforce the prohibition on releasing future private antitrust enforcement. If the changes contemplated by this Settlement unleash the competitive forces its proponents predict, there may be no basis or incentive for future private claims. But if horizontal restraints continue to choke the health insurance market, federal law insists that these defendants must answer private suits for injunctive and declaratory relief. Nothing in Rule 23 authorizes the settling parties or the reviewing court to change that.

**C.    Preserving the right to seek "individualized" relief does not negate the public policy violation posed by the 23(b)(2) release.**

As explained above, a 23(b)(2) class member opting out of the 23(b)(3) class retains the right to seek individualized damages or individualized injunctive relief. However, the prospect of such individualized relief does not salvage the release.

First, if the Blues are correct, then an Opt-Out seeking even purely individualized declaratory or injunctive relief could not do so on any basis logically implying that any of the Blues' continuing competitive restraints (or any other practices covered by the expansive release) violate antitrust law. It is hard to see what ground this leaves. Under the Blues' reading, an Opt-Out would have to establish some unique and individualized antitrust violation, whatever that might be, rather than one generally affecting the market. If so, the carve-out for individualized declaratory or injunctive relief is largely illusory.

Even if the Blues are wrong, the release cannot stand. Under any reading, (b)(2) class members forever release their right to pursue the type of relief most crucial to the public interest—systemic declaratory and injunctive relief to restore competition to the marketplace. The prospect of market-wide relief, not piecemeal relief benefitting a single claimant, animates the Clayton Act's injunctive relief provisions. As the Supreme Court has emphasized:

> In an equity suit, the end to be served is not punishment of past transgression, *nor is it merely to end specific illegal practices*. A public interest served by such civil suits is that they effectively *pry open to*

*competition a market* that has been closed by defendants' illegal restraints.[115]

The intended purpose of Clayton Act § 16 is "restoring competition *in the marketplace*."[116]  "While it is true that a private plaintiff may not bring an action *on behalf* of the public, it does not follow that the relief granted to a private litigant may not take on a 'public' character."[117] Relief limited to a single claimant does not "pry open" noncompetitive markets,[118] particularly where the entire class of similarly situated claimants remains bound by a perpetual release.

Thus, from the legislative policy perspective, recovering individual damages for past violations is no substitute for preventing future ones. Instead, as the Subscribers themselves recognize, "equitable relief is far more likely to provide long-lasting relief [from the Blues' practices] than continual annual awards of damages."[119] Apparently, the Blues agree, as they are willing to pay $2.67 billion for a Settlement that allows individual damages lawsuits but forecloses any further

---

[115] *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947) (emphasis added), abrogated on unrelated grounds by *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

[116] *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 729 F.2d 1050, 1059 (6th Cir. 1984) (emphasis added).

[117] *Wilk v. Am. Med. Ass'n*, 671 F. Supp. 1465, 1485 (N.D. Ill. 1987) (emphasis original), *aff'd*, 895 F.2d 352 (7th Cir. 1990).

[118] 332 U.S. at 401.

[119] D-2408 at 35.

market-wide injunctive or declaratory relief. Accordingly, even if narrowly read, the perpetual 23(b)(2) release forecloses the type of relief most vital to vindicating legislative antitrust policy.

### D.  The law prohibits release of the right to enforce antitrust laws against continuing restraints of trade, not merely brand-new ones.

#### 1.  Continuing restraints raise the same antitrust concerns as new ones.

The district court wrongly concluded that prospective antitrust releases were benign so long as they shielded only the continuation of pre-settlement conduct, rather than entirely new violations.[120] In general, there is no good reason to treat a continuing violation of federal statutory law more leniently than a future one. In fact, as this Court explains, "settlement against public policy typically involves endorsement of *continuing* violations of a statute . . . or a waiver of protective rights under such statutes."[121]

And, in the antitrust context, such a distinction makes particularly little sense. Substantive antitrust law takes continuing violations as seriously as new ones. As a matter of blackletter law, the continuation of anticompetitive conduct after a release

---

[120] D-2931 at 50–56.

[121] *Smith*, 926 F.2d at 1029 (emphasis added).

or judgment gives rise to *new* injuries and *new* claims.[122] In other words, continuing to sell under an existing competitive restraint is a future antitrust violation.

Further, there is no reason to assume that a continuing antitrust violation will have any less detrimental effect on competition than some hypothetical future one. To the contrary, participants in a scheme that has already proved effective in generating supra-competitive profits would have a particular incentive to pay a large cash settlement in exchange for the right to continue the scheme free from challenge.

### 2. The cases distinguishing new versus continuing violations do not meaningfully address antitrust law.

The authorities the district court cited to distinguish releases of ongoing violations from releases of new ones are neither binding nor persuasive. Some do not involve antitrust at all. Some apply only the identical factual predicate doctrine, which addresses notice and due process principles, rather than antitrust. And none of them explain *why* continuing competitive restraints should be treated differently than new ones.

The Final Approval Order cites a Florida district court opinion (in other *Managed Care* litigation) for the proposition that "claims that arise from an

---

[122] *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997). "Even though the illegal act occurs at a specific point in time, if it inflicts 'continuing and accumulating harm' on a plaintiff, an antitrust violation occurs each time the plaintiff is injured by the act. *"Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000).

'identical factual predicate' as the settled litigation may be released by the terms of a class action settlement agreement."[123] But, as that opinion recognized, that proposition flows from "due process principles [that] restrict the scope of a permissible release in a class action settlement agreement according to standards that are adopted from the traditional *res judicata* analysis."[124] Accordingly, the court did not address whether substantive antitrust policy independently bars a prospective release to protect the public interest in competition, aside from the individual interests of the releasing party. [125]

The Final Approval Order next cited this Court's decision in *McClendon v. Georgia Department of Community Health* as purportedly approving a release of future claims in the multi-state settlement with the tobacco companies.[126] But while *McClendon* recites that the settlement contained a partial future release, it did not rule upon its validity. Instead, it rejected *on the merits* a post-settlement claim by

---

[123] *In re Managed Care Litig.*, 2008 WL 11333988, at *5 (S.D. Fla. Apr. 21, 2008), *adopted*, 2008 WL 11333876 (S.D. Fla. May 14, 2008).

[124] 2008 WL 11333988, at *5.

[125] *Id.* at **5-12. The opinion also cited *Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 471 n.10 (S.D. Fla. 2002), which also does not address antitrust policy.

[126] 261 F.3d 1252 (11th Cir. 2001), cited in D-2931 at 53.

smokers to commandeer a portion of Georgia's settlement proceeds.[127] *McClendon* is irrelevant.

The Order also cited *In re Chicken Antitrust Litigation* as purportedly "noting that a release of future claims is an important element of antitrust class settlements."[128] But that decision involved no challenge to the release, only to the allocation of settlement proceeds between claimant classes. Nothing suggests that this release permitted continued horizontal price-fixing (unlikely because the Department of Justice was involved). The opinion's only reference to "future" peace addresses the defendants' insistence on avoiding post-settlement damages claims based on *pre*-settlement sales.[129] It does not indicate that the release would apply if the defendants continued their illegal price-fixing post-settlement.

The Final Approval Order cites several circuit court decisions that did not involve antitrust claims and so could not address the question here.[130] To the extent the Order cites antitrust cases, they do not control or persuade. For example, the

---

[127] 261 F.3d at 1262.

[128] D-2931 at 53 (citing 669 F.2d 228, 239 (5th Cir. 1982)).

[129] 669 F.2d at 234 ("Defendants would not agree to any settlement … unless they were assured of 'total peace' in the future. Accordingly, they insisted upon a settlement that included all potential plaintiffs ….").

[130] D-2931 at 53–54 (citing *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 95–96 (2d Cir. 2019) (TCPA) and *Williams v. GE Cap. Auto Lease, Inc.*, 159 F.3d 266, 268 (7th Cir. 1998) (deceptive lease)).

Second Circuit approved a future release of antitrust claims in *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.* But, as with other cases the Order cites, that opinion analyzed the issue only as a possible notice and due process problem.[131] It did not address the public interest in private enforcement of antitrust law.

The Final Approval Order cites another Florida district court opinion for the proposition "that public policy considerations differ when the only 'prospective' application of the release in question is the continued adherence to a pre-release restraint on trade."[132] But neither that opinion nor the cases cited therein explain *why* releasing an ongoing antitrust violation is any less offensive to the antitrust policy than releasing a hypothetical future one. As explained above, there is no good reason to draw that distinction and substantial reason not to.

The Order cites *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.* from the Seventh Circuit.[133] That was an antitrust case, but "[o]n its face, the Release does not attempt to release claims for future violations; it expressly discharges only the claims … 'arising out of any matter, cause or thing from the beginning of the world

---

[131] 396 F.3d 96, 106–17 (2d Cir. 2005).

[132] D-2931 at 53–54 (quoting *In re Managed Care Litig.*, 2010 WL 6532982, at *12 (S.D. Fla. Aug. 15, 2010), *adopted*, 2011 WL 1522561 (S.D. Fla. Mar. 8, 2011)).

[133] 161 F.3d 443 (7th Cir. 1998).

to April 25, 1992.'"[134] If the plaintiff had shown an antitrust violation after that date, the outcome would have been different. In any event, this opinion, too, never explains *why* releasing the right to enjoin a continuing antitrust violation comports with the public interest in competitive markets.[135]

The Final Approval Order cites a New York district court opinion in the *Payment Card* litigation for its conclusion that cases rejecting future releases of antitrust claims involved only

> "'future' entirely unrelated antitrust claims not circumscribed to an identical factual predicate or to claims that arose out of the alleged conduct or related conduct that could have been alleged."[136]

But, again, this opinion never endeavors to explain *why* the public interest in antitrust enforcement should tolerate the perpetual protection of ongoing competitive restraints that have never been adjudicated benign. That should not be Circuit law. Further, as addressed below, the release here exceeds the identical factual predicate doctrine that the *Payment Card* district court thought governed this issue.

---

[134] *Id.* at 448.

[135] As a practical matter, the Seventh Circuit's lack of concern may be explained by the limited scope of the alleged violation, which arose from one agreement, solely between two parties, with no broader competitive effect.

[136] 2019 WL 6875472, at *27 (E.D.N.Y. Dec. 16, 2019).

The *Payment Card* district court also incorrectly distinguished *Redel's* as resting solely upon the generality of the release.[137] That cannot be correct because *Redel's* enforced the release as to pre-release conduct and invalidated it only as to post-release conduct.[138] And the misconduct (price discrimination) started years before and continued after the release.[139] Notably, the identical-factual-predicate doctrine would have sustained that release as to the future continuation of pre-suit conduct, but *Redel's* did not.

Below, the Blues (but not the district court) cited this Court's *In re Managed Care Litigation*[140] decision as authorizing the Settlement's future release. But that case does not control here. It involved both (1) a release of future claims based on *past conduct occurring by or before its effective date* and (2) a different kind of proceeding—enforcement of an already-approved settlement against a party that had not opted out or objected to the release when it had the chance.

In that case, the defendant (Wellpoint) sought to enforce a previously-approved class to extinguish an individual lawsuit. Wellpoint's settlement released only claims arising "'on or before the Effective Date.'"[141] So if "the acts giving rise

---

[137] *Id.* at *26.

[138] 498 F.2d at 98–100.

[139] *Id.* at 98.

[140] 756 F.3d 1222 (11th Cir. 2014).

[141] *Id.* at 1226 (quoting the agreement).

to the complaint occurred ... after the effective date of the settlement agreement," the agreement would not release them; whereas, if those acts occurred before that date, the claim was barred.[142] That is narrower than the release here, which expressly releases "claims that arise *after* the Effective Date."[143]

Importantly, the release described above was the only one at issue in *Managed Care* because Wellpoint was the only defendant to the follow-on suit. The opinion's background section references another release, but it did not apply to Wellpoint, only to the non-party Blue Cross/Blue Shield Association.[144] And even the BCBSA release that was *not* at issue didn't immunize claims based on post-settlement *conduct*—it released claims "that might arise in the future" if they "arise from, or are based on, conduct on or before the Effective Date." Thus, the release at issue (and even the one not at issue) did not purport to release claims based on post-settlement conduct, as does the (b)(2) release approved here.

Furthermore, *Managed Care* is not a settlement approval decision; it involved enforcement of an already-approved settlement to bar other litigation. Unlike *Redel's*, there had already been a judicial proceeding in which class members could have objected to the release. But the *Managed Care* plaintiff neither opted out nor,

---

[142] *Id*. at 1235.

[143] D-2610-2 ¶1(uuu) (emphasis added).

[144] 756 F.3d at 1226 (quoting Settlement § 13.1(b), which the Court notes is "applicable only to claims against" BCBSA).

it seems, objected to the release. So, the issue was not whether the release could properly be approved—it had already been approved. Instead, *Managed Care* simply considered whether the conduct at issue fell under the already-approved settlement's terms. It is a contract interpretation case, not a license to approve a release that would violate *Redel's* and comparable cases.

### E. The release also exceeds the "identical factual predicate" limitation.

As noted, the district court relied on the "identical factual predicate" doctrine in rejecting Home Depot's antitrust policy challenges to the release.[145] But even if this principle supplied the only limitation on the release of future antitrust claims, the release here exceeds its parameters and so could not be approved.

In *TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.,* this Court confirmed that the boundaries of the identical factual predicate limitation mirror res judicata principles, which "apply with *equal force* when considering the preclusive effect of a prior class action settlement agreement."[146] Accordingly, this Court held that "a

---

[145] D-2931 at 53-55.

[146] 959 F.3d 1318, 1325 (11th Cir. 2020) (emphasis added); *see also Kazi v. PNC Bank, N.A.*, 2021 WL 965372, at *15 (N.D. Cal. Mar. 15, 2021) ("Courts have generally interpreted that requirement to coincide with the general res judicata test of whether claims share a "common nucleus of operative fact.") (surveying cases and commentators).

class release may not preclude a subsequent action unless 'the released conduct arises out of the 'identical factual predicate' as the claims at issue in the case.'"[147]

The perpetual release here exceeds this principle in both scope and duration. Rather than requiring an *identical* factual predicate, it applies so long as a future claim "relate[s] in *any* way to" either "the factual predicates of" or "any issue raised in any of the Subscriber Actions."[148] In other words, it requires only *some* overlap with a fact or issue raised in the litigation.

Circuit law requires more. As this Court explains, "an 'identical factual predicate' cannot exist unless the defendant was engaged in the *same* offending conduct during the prior action."[149] "'Subsequent conduct, even if it is of the *same nature* as the conduct complained of in a prior lawsuit, may give rise to an entirely separate cause of action.'"[150] Under Circuit law, therefore, "the passage of time may evoke change of circumstances which preclude the creation of an estoppel" and "[a] party need only point to one material differentiating fact that would alter the legal inquiry … and thereby overcome the preclusive effect."[151]

---

[147] *TVPX*, 959 F.3d at 1326 (quoting Newberg treatise).

[148] D-2610-2 ¶1(uuu) (emphasis added).

[149] *TVPX*, 959 F.3d at 1326 (emphasis added).

[150] *Id.* at 1326-27 (quoting *Kilgoar v. Colbert Cty. Bd. of Educ.*, 578 F.2d 1033, 1035 (5th Cir. 1978)).

[151] *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1319 (11th Cir. 2012) (cleaned up).

Notably, the new facts giving rise to a claim outside the identical factual predicate doctrine may be changes in surrounding market conditions, rather than changes in a defendant's conduct. The Supreme Court recently made this point in the trademark context, where "marketplace realities … can change dramatically from year to year."[152] But that is equally true of antitrust claims, particularly rule of reason claims, which require weighing "all of the circumstances" to determine how a restraint affects the market.[153] And, as the Supreme Court explains, new market developments "taken in conjunction with the *antecedent* facts, create a new claim to relief."[154]

The perpetual release here fails to respect that limitation. By its express terms, relation "in any way" to any fact or issue raised over a decade of litigation may be enough to extinguish a future claim. Changes to the Blues' existing competitive restrictions would not be enough to allow suit, so long as what emerged either arose from or related in any way to pre-Settlement conduct. Nor would changes in marketplace realities matter, even though they are crucial to antitrust analysis.[155] The

---

[152] *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1596 (2020).

[153] *Leegin*, 551 U.S. at 885.

[154] *Lucky*, 140 S. Ct. at 1596 (emphasis added, cleaned up).

[155] For example, future reduction in the strength or number of non-Blue health insurers might make competition between Blue Plans even more critical. *See* 308 F.Supp.3d at 1256 (Blues compete with Aetna, Cigna, and United).

release requires only some relation to pre-Settlement facts, rather than the identical factual predicate required by Circuit law.

Thus, this perpetual release exceeds even the res judicata effect if the Blues had prevailed in a merits judgment. As noted, res judicata does not bar future claims if changed factual circumstances[156] or developments in the law[157] warrant a different outcome. This release does not account for these limitations, giving the Settlement here a permanence not extended even to litigated judgments.

And the Monitoring Committee only makes this worse. It can add *new* restrictions to the release that it decides fall "within the scope of" conduct allowed by the Settlement Agreement.[158] There is no assurance, or even reason to expect, that "within the scope of" equates to "identical factual predicate."

In sum, the district court erred in deciding that the identical factual predicate doctrine answered the legislative policy concerns Home Depot raised regarding the release of future antitrust claims. The release could not be approved under that doctrine either.

---

[156] *Se. Fla. Cable, Inc. v. Martin Cnty.,* 173 F.3d 1332, 1336 (11th Cir. 1999) ("If there has been a modification of significant facts creating new legal conditions, *res judicata* is no defense.") (cleaned up).

[157] *Herrera v. Wyoming*, 139 S. Ct. 1686, 1697–98 (2019).

[158] D-2610-2 ¶20(a)(ii).

**F.    The Provider Track ruling applying the Rule of Reason to the Blues' post-Settlement restraints does not negate the public policy violation posed by the prospective release.**

In approving the Settlement, the district court referenced its contemporaneous Provider Track ruling that, once the Blues abandoned their NBE rule, the rule of reason governed their system of ESAs.[159] In ruling against the Providers, the court accepted the Blues' fact-laden account that these exclusive territories arose organically in the early 1900s to accommodate common law trademark rights.[160] That history supposedly explains why the rule of reason, rather than *per se* illegality, governs their contemporary contractual agreement not to contract with providers in each other's territories.

Home Depot recognizes that this is not the forum to challenge a ruling in the different, Provider Track cases. But to the extent the district court relied upon this ruling in approving the 23(b)(2) release, that reliance was misplaced.

**1.    The district court did not decide what standard of antitrust review would apply to the Blues' Allocation Rules for National Accounts.**

The district court did not hold—and it does not follow from the Provider Track ruling—that the Blues' agreements to allocate bids for National Accounts would escape *per se* condemnation. For one thing, the Provider Track cases do not involve

---

[159] D-2931 at 47.

[160] 2022 WL 3221887 (N.D. Ala. Aug. 9, 2022).

the allocation of National Accounts, since the provider plaintiffs are not subscribers, national or otherwise. Further, they are suing over reimbursement, rather than charges to subscribers. More importantly, the scope of the anti-competitive conduct released in the Settlement, particularly as it relates to National Accounts, goes beyond the preservation of ESAs.

Agreements to allocate National Accounts extend beyond territorial division supposedly incident to colliding trademark rights. National Accounts have covered employees throughout many, sometimes all, of the ESAs. Yet the Blues have agreed upon a preset allocation of National Accounts to a single Plan, an allocation not necessarily dictated by their service areas. By horizontal agreement, they allocate each National Account to the one Plan designated to serve the area where the account is headquartered, no matter how many employees that account may have in other areas. That one Plan has a stranglehold on *nationwide* Blue Plan competition for that account.

The underlying issue supposedly justifying ESAs—the preservation of historical trademark rights in geographic markets—does not dictate their allocation of National Accounts, which necessarily involve cross-market business. Absent their horizontal agreement, Blue Plans could respond individually to any obstacles that purportedly hinder their competition to serve a National Account. Possible competitive responses include (1) joint venturing to compete with other Blue and

non-Blue providers for the account, (2) mutual forbearance allowing multiple Blue Plans to bid on all or some of that account's business,[161] or (3) individual Plan attempts to enforce their supposed trademark rights (thereby resolving the dispute, rather than allowing it to linger forever to justify market allocation). But whatever the decisions, they would be—as they must be under antitrust law—*individual* decisions based on each Plan's independent economic interests. They would not be dictated by horizontal agreement, as they are today.

Under Sherman Act § 1, "'[t]he relevant inquiry ... is whether there is [an arrangement] amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decision-making, and therefore of diversity of entrepreneurial interests.'"[162] That is *precisely* what the Blues do by allocating National Accounts—substitute a collective, rather than individualized, response to the obstacles supposedly presented by common law trademarks.

---

[161] Before the current structure, the Blues had resolved other territorial issues without restraining competition. For example, historically (and today) some Blue Plans serve the same geographic areas. *See* 308 F. Supp. 3d at 1252. And even Plans with mutually exclusive territorial licenses had sometimes each elected to tolerate competition by the other. *Id.* at 1253 (West Virginia example).

[162] *Arrington v. Burger King Worldwide, Inc.*, 47 F.4th 1247, 1254 (11th Cir. 2022) (quoting *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186 (2010) (cleaned up)).

In sum, the standard of antitrust review applicable to the National Account allocation rules remains in dispute because those rules reach beyond the allocation of territories that supposedly accommodate common law trademarks. The point (at this stage) is not that these rules are illegal *per se*, but that this should be an open issue if challenged in post-Settlement litigation. Yet the Settlement attempts to short-circuit that challenge by release.

### 2. The release would violate antitrust policy even if the rule of reason governs the allocation of National Accounts.

The prospective release here cannot stand whether the Blues' allocation of National Accounts requires *per se* or rule of reason review. Conduct proved to violate the rule of reason violates antitrust law just as surely as conduct that violates a *per se* rule.

Rule of reason review is "the accepted standard for testing whether a practice restrains trade in violation of [Sherman Act] § 1".[163] As this Court recognized, "[t]he Supreme Court has clearly articulated that the rule of reason is the vehicle by which the Sherman Act—the 'comprehensive charter of economic liberty'—is to be implemented."[164] In the Supreme Court's words: "The rule of reason is designed

---

[163] *Leegin*, 551 U.S. at 885 (cleaned up).

[164] *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 597 (11th Cir. 1986) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958)).

and used to eliminate anticompetitive transactions from the market."[165] Proving the point, that Court has repeatedly upheld injunctions dismantling competitive restrictions under the rule of reason, rather than the *per se* standard.[166] In each case, the Court found an unacceptable actual injury to competition.

This case, in particular, offers no justification to treat rule of reason review lightly. As noted above, the Provider Track decision rests upon the Blues' factual narrative that their explicit agreement dividing the country into service areas originated with common law trademark rights. Even if that origin story counsels against reflexive *per se* condemnation (despite binding Supreme Court precedent), it is no reason to expect that their territorial division does anything other than damage competition, as market allocation schemes usually do.[167] To the contrary, the Subscribers amassed evidence that the account allocation rules that would continue under this Settlement prevent what would otherwise be rigorous, Blue-brand competition for national accounts.[168] Absent the Settlement's overbroad release, a future challenger might prove that to be true, no matter how those rules originated.

---

[165] *Leegin,* 551 U.S. at 898.

[166] *See, e.g., NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85 (1984); *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986); *Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. 679; *NCAA v. Alston*, 141 S. Ct. 2141.

[167] As the Supreme Court explains, "horizontal market division and horizontal price fixing … both have similar economic effect." *Leegin*, 551 U.S. at 904.

[168] D-2408 at 16.

### 3. A future release violates antitrust policy even if the released conduct has not already been held "clearly illegal."

In citing its contemporaneous Provider Track order that the ESAs were not *per se* illegal, the district court also accepted that a future antitrust release poses no problem if the conduct shielded by the release is not "clearly illegal."[169] As support, the court cited this Circuit's decision in *Bennett v. Behring Corp.*[170]

For several reasons, *Bennett* does not stand for that proposition. First, although the *Bennett* objectors characterized that settlement as "perpetuating" illegal conduct, nothing in the underlying approval order[171] or this Court's opinion indicates that the settlement contained any future release, as opposed to the objectors simply arguing that the affirmative relief didn't go far enough. Second, the *Bennett* settlement *allowed* class members to terminate the tying arrangements challenged in that case; it simply didn't require their termination.[172] The Settlement here offers no

---

[169] D-2931 at 46-47.

[170] 737 F.2d 982 (11th Cir. 1984).

[171] 96 F.R.D. 343 (S.D. Fla. 1982).

[172] As the *Bennett* district court noted, "this objection [asserting continuing illegality] ignores the fact that the settlement provides an opportunity to terminate the existing situation by permitting the class members themselves to acquire title to the recreational facilities through either future recreation districts or through their representative homeowners associations." 96 F.R.D. at 354.

such option. Finally, unlike the Settlement here, the *Bennett* settlement did not *compel* anyone to release anything—it allowed opt outs.[173]

Below, the Blues emphasized *Grunin v. International House of Pancakes*, an Eighth Circuit case cited in *Bennett*. *Grunin* permitted settlement approval so long as "the alleged illegality of the settlement agreement is not a legal certainty."[174] *Grunin* further asserts that illegality is not a legal certainty "unless the terms of the agreement are per se violations of antitrust law."[175] That proposition is not and should not be this Circuit's law.

Contrary to *Grunin*'s reasoning, whether a restraint violates antitrust law does not depend on whether it is illegal *per se*. As addressed above, a restraint proved to violate the rule of reason is just as unlawful as a restraint that is illegal *per se*. The only difference is that, with a rule of reason violation, the evidence has proved an *actual*, rather than merely assumed, injury to competition. Under *Redel's* and similar cases discussed above, a defendant cannot protect an ongoing restraint from rule of reason scrutiny by buying a future release.

The district court also cited *Robertson v. NBA*, 556 F.2d 682, 686 (2d Cir. 1977), which approved a future release under *Grunin* because "[t]he challenged

---

[173] 737 F.2d at 985 (thousands of opt outs)

[174] 513 F.2d 114, 124 (8th Cir. 1975).

[175] *Id*.

practices have not been held to be illegal per se in any previously decided case." The obvious problem with this reasoning is that it allows defendants to *forever* avoid any such holding by paying billions for a release. And defendants are most likely to strike such a bargain where they already know that the challenged practice has reduced competition and expanded their profits. Thus, the ongoing restraints most likely to be protected under the *Grunin* and *Robinson* approach are the ones that have proved most profitable to the perpetrators, rather than those most likely to be benign.

Like *Grunin*, *Robertson* implicitly and unjustifiably dismisses the prospect of a rule of reason violation as inconsequential. Subsequent law reveals the error of that thinking. The *Robertson* settlement protected (albeit for limited time) certain mutually adopted limits on NBA salary competition. After *Robertson*, the Supreme Court has twice affirmed permanent injunctions under the rule of reason prohibiting enforcement of comparable league-adopted restraints on player compensation and other competitive matters.[176] And post-*Robinson* Second Circuit cases have recognized what *Robertson* did not: "a waiver of future liability under the federal antitrust statutes is void as a matter of public policy."[177]

The Subscriber representatives may be content to allow the Blues' ongoing restraints to continue indefinitely with no determination whether they unreasonably

---

[176] *NCAA v. Bd. Of Regents*, 468 U.S. 85; *NCAA v. Alston*, 141 S. Ct. 2141.

[177] *In re Am. Express*, 634 F.3d at 197.

suppress competition. But forcing the entire class of Blue subscribers to do so—forever—violates legislative policy. Accordingly, this Court must reverse approval of the Settlement.

## II. The district court erred by approving a Settlement where the same named plaintiffs and counsel represented both the Rule 23(b)(2) and (b)(3) classes.

### A. Federal Rule 23 and the Due Process Clause require the adequate representation of settlement class members by representatives and counsel with undivided interests.

Rule 23(a)(4) and the Due Process Clause require the adequate representation of absent class members.[178] And, as the Supreme Court warns in *Amchem Products, Inc. v. Windsor*, the Rule 23(a) requirements "demand undiluted, even heightened, attention in the settlement context."[179] That is particularly true "when (as here) the district court certifies the class at the same time it approves a settlement."[180] Moreover, the purported fairness of the underlying settlement terms is no substitute for adequate representation.[181]

---

[178] *See* Fed. R. Civ. P. 23(a)(4); 23(e)(2)(A); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) ("The Due Process Clause … requires that the named plaintiff at all times adequately represent the interests of the absent class members.").

[179] 521 U.S. 591, 620 (1997).

[180] *Payment Card*, 827 F.3d at 232.

[181] *Amchem*, 521 U.S. at 621; *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 858 (1999).

Under Circuit law, determining the adequacy of representation requires two inquiries: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action."[182] Further, as this Court explained in *Valley Drug Co. v. Geneva Pharmaceuticals*, "'antagonistic interests are not only those which directly oppose one another, but also are those which *may* be hostile to one another or unharmonious such that one party's interest *may* be sacrificed for another's."[183]

Thus, as this Court confirms, an objector "does not have to show actual antagonistic interest; the potentiality is enough."[184] Other circuits concur: "To assure vigorous prosecution, courts consider whether the class representative has adequate incentive to pursue the class's claim, and whether some difference between the class representative and some class members *might* undermine that incentive."[185]

**B.      The same plaintiffs and counsel cannot represent injunctive relief and damages classes that have different and competing settlement priorities.**

In *Payment Card*, the Second Circuit applied the principles above to reverse approval of an antitrust settlement featuring two classes: (1) a mandatory 23(b)(2) class that would receive some injunctive relief and release any claims for additional

---

[182] 350 F.3d 1181, 1189 (11th Cir. 2003) (cleaned up).

[183] *Id.* at 1194 (cleaned up) (emphasis added).

[184] *Id.*

[185] *Payment Card*, 827 F.3d at 231 (emphasis added).

injunctive relief based on the continuation of other challenged restraints and (2) an optional 23(b)(3) class that would share a multi-billion dollar settlement fund. Members of the (b)(2) class were interested in maximizing the injunctive relief and minimizing the scope of the release, while (b)(3) class members were interested in maximizing damages. Yet "[t]he same counsel represented both the (b)(3) and the (b)(2) classes. The class counsel and class representatives who negotiated and entered into the Settlement Agreement were in the position to trade diminution of (b)(2) relief for increase of (b)(3) relief."[186]

Based on this potential tradeoff, the Second Circuit "conclude[d] that class members of the (b)(2) class were inadequately represented in violation of both Rule 23(a)(4) and the Due Process Clause."[187] "Unitary representation of separate classes that claim distinct, competing, and conflicting relief create unacceptable incentives for counsel to trade benefits to one class for benefits to the other in order somehow to reach a settlement."[188]

That court elaborated: "Class counsel stood to gain enormously if they got the deal done," specifically "$544.8 million in fees."[189] Citing the Supreme Court's

---

[186] *Id.* at 234.

[187] *Id.* at 231.

[188] *Id.* at 234.

[189] *Id.*

warning in *Ortiz v. Fibreboard*,[190] the Second Circuit added, "when the potential for gigantic fees is within counsel's grasp for representation of one group of plaintiffs, but only if counsel resolves another group of plaintiffs' claims, a court cannot assume class counsel adequately represented the latter group's interests."[191] As the concurring judge wrote, this "is a confiscation."[192]

Without suggesting misconduct by the class representatives or their counsel, the Second Circuit held that "[s]tructural defects in this class action created a fundamental conflict between the (b)(3) and (b)(2) classes and sapped class counsel of the incentive to zealously represent the latter."[193] Moreover, "[t]he trouble with unitary representation here is exacerbated because the members of the worse-off (b)(2) class could not opt out. The (b)(2) [members] are stuck with this deal and this representation," which "compounded the problem."[194]

*Payment Card* followed Supreme Court precedent. In *Amchem*, the district court had appointed a single class representative although the interests of the asbestos-exposed class members were divided between the already sick, who needed to maximize short term compensation, and the not-yet sick, who had greater interest

---

[190] 527 U.S. at 856.

[191] 827 F.3d at 234 (cleaned up).

[192] *Id.* at 241.

[193] *Id.*

[194] *Id.*

in preserving funds for future diagnosis and treatment. The Supreme Court reversed settlement approval because the same class representative could not adequately serve both interests.[195] Similarly in *Ortiz*, the Supreme Court reversed a settlement involving a single class combining class members most interested in future relief with those most interested in recovering immediate damages.[196] Both cases establish that the same plaintiffs and counsel cannot represent class members with different priorities for relief.

*Payment Card* is further persuasive because it reflects the same underlying approach to adequacy of representation this Court expressed in *Valley Drug* and similar cases. This Circuit, like others, "interpret[s] Rule 23(a)(4) to preclude class certification where the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class members."[197] As noted above, even the "potentiality" that divided objectives will compromise the best interest of one of the classes is unacceptable.[198]

---

[195] 521 U.S. at 626.

[196] 527 U.S. at 856.

[197] 350 F.3d at 1190.

[198] *Id.* at 1194.

**C.    Home Depot and other 23(b)(2) class members were inadequately represented because the same plaintiffs and counsel represented both the 23(b)(2) and 23(b)(3) classes.**

The Settlement here suffers from the same representation problems that required reversal of the *Amchem*, *Ortiz*, and *Payment Card* settlements. The district court approved 65 fully-insured subscribers to represent both the 23(b)(2) indivisible injunctive relief class and the 23(b)(3) divisible relief class that receives the Settlement fund (and, in some cases, rights to request a second bid).[199] The only self-funded subscriber representative joined the negotiations late (two months before the parties signed the term sheet) to negotiate the 93.5/6.5% split of the Settlement fund.[200] The court appointed that self-funded representative and its counsel to represent only the 23(b)(3) subclass.[201]

Thus, there was no subscriber or counsel representing Home Depot or the (b)(2) indivisible injunctive relief class who was not also financially interested in the 23(b)(3) class. As in *Payment Card*, that presents an unacceptable risk of trading off the interests of (b)(2) class members *and the public* in market-wide injunctive relief in exchange for dollars. Even if the one self-funded subscriber had been appointed to represent self-funded interests in the (b)(2) class, that would have presented the

---

[199] D-2931 at 84.

[200] D-2610-6 ¶¶31-33; D-2931 at 4.

[201] D-2931 at 4-5.

same problem, since that subscriber was expressly appointed to represent the (b)(3) self-funded sub-class. And, as in *Payment Card*, the inability of (b)(2) class members to opt out exacerbates this problem.

Home Depot recognizes the efforts of the district court and mediators who lent their efforts to resolution. But "[o]ne aspect of the Settlement Agreement that emphatically cannot remedy the inadequate representation is the assistance of judges and mediators in the bargaining process."[202] Nor is it enough that "the settlement 'was the product of an intense, protected, adversarial mediation.'"[203]

In the words of *Payment Card*, "[w]e expressly do not impugn the motives or acts of class counsel. Nonetheless, class counsel was charged with an inequitable task."[204] This Settlement structure poses the same inherent and intolerable prospect of sacrificing the interests of (b)(2) class members and the public in systemic injunctive relief. That violates not only legislative antitrust policy, but also the rights of Home Depot and the (b)(2) class members under Rule 23(a)(4) and Due Process.

## CONCLUSION

For both reasons above, the Court must reverse the Settlement approval.

*Signatures appear on the following page.*

---

[202] 827 F.3d at 234-35.

[203] *Id.* at 233 (citation omitted).

[204] *Id.* at 234 (cleaned up).

Respectfully submitted this 12th day of December, 2022.

/s/ *Frank M. Lowrey*
Frank M. Lowrey
Georgia Bar No. 410310
lowrey@bmelaw.com
Ronan P. Doherty
Georgia Bar No. 224885
doherty@bmelaw.com
E. Allen Page
Georgia Bar No. 640163
page@bmelaw.com
BONDURANT MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309-3417
(404) 881-4100

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains a total of 12,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (f) and 11th Cir. R. 32-4.

This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with size 14 Times New Roman font.

This certification is made on December 12, 2022.

*/s/ Frank M. Lowrey IV*

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. Counsel for all parties as well as *pro se* parties are registered CM/ECF users and will be served with the foregoing document by the Court's CM/ECF System.

/s/ *Frank M. Lowrey*
Frank M. Lowrey

Certificate of Service Page