**No. 22-13051-HH**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

### IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL 2406)

**On Appeal from the United States District Court for the
Northern District of Alabama, Southern Division,
No.  2:13-CV-20000-RDP**

## BRIEF OF APPELLANTS
## TOPOGRAPHIC, INC. AND EMPLOYEE SERVICES, INC.

Richard D. Nix
Henry D. Hoss
M. Richard Mullins
Mark D. Spencer
MCAFEE & TAFT A PROFESSIONAL
CORPORATION
Eighth Floor, Two Leadership Sq.
211 N. Robinson
Oklahoma City, OK 73102
Telephone: (405) 235-9621
Facsimile: (405) 235-0439
richard.nix@mcafeetaft.com
henry.hoss@mcafeetaft.com
richard.mullins@mcafteetaft.com
mark.spencer@mcafeetaft.com

Michael R. Pennington
J. Thomas Richie
Emily M. Ruzic
BRADLEY ARANT BOULT CUMMINGS LLP
1819 5th Avenue North
Birmingham, Alabama 35203
(205) 521-8447
mpennington@bradley.com
trichie@bradley.com
eruzic@bradley.com

Virginia N. Adamson
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division St, Suite 700
Nashville, Tennessee 37203
(615) 252-3885
jadamson@bradley.com

Scott Burnett Smith
BRADLEY ARANT BOULT CUMMINGS LLP
200 Clinton Avenue West, Suite 900
Huntsville, Alabama 35801
(256) 517-5198
ssmith@bradley.com

*Counsel for Appellants Topographic, Inc. and Employee Services, Inc.*

*In re Blue Cross Blue Shield Antitrust Litigation,*

No. 22-13051

### CERTIFICATE OF INTERESTED PERSONS
### AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11TH CIR. R. 26.1, Appellants hereby certify that the following is a complete list of the trial judges, attorneys, persons, associations of persons, firms, partnerships, corporations, and other legal entities that have an interest in the outcome of this particular case on appeal:

Adams and Reese LLP (Counsel for Appellees)

Adamson, Virginia Nicole (Counsel for Appellants)

Adcox, Rachel (Counsel for Appellees)

American Electric Motor Services, Inc. (Appellee)

Anthem Blue Cross (Blue Cross of California) (Appellee)

Anthem Blue Cross and Blue Shield of Connecticut (Appellee)

Anthem Blue Cross and Blue Shield of Indiana (Appellee)

Anthem Blue Cross and Blue Shield of Missouri (Appellee)

Anthem Blue Cross and Blue Shield of New Hampshire (Appellee)

Anthem Blue Cross and Blue Shield of Virginia, Inc. (Appellee)

Anthem Blue Cross Life and Health Insurance Company (Appellee)

Anthem Health Plans of Kentucky, Inc. (Appellee)

Anthem Health Plans of Maine (Appellee)

Anthem Health Plans of Maine, Inc. (Appellee)

*In re Blue Cross Blue Shield Antitrust Litigation,*

No. 22-13051

Anthem Health Plans of New Hampshire, Inc. (Anthem Blue Cross and Blue Shield of New Hampshire) (Appellee)

Anthem Health Plans of Virginia, Inc. (Anthem Blue Cross and Blue Shield of Virginia Inc.) (Appellee)

Anthem Health Plans, Inc. (Anthem Blue Cross and Blue Shield of Connecticut) (Appellee)

Anthem Holding Corporation (Appellee)

Anthem Insurance Companies, Inc. (Anthem Blue Cross and Blue Shield of Indiana) (Appellee)

Anthem, Inc. (Anthem Health Plans of Virginia, Inc.) (Appellee)

Anthem, Inc. (ANTM) (Appellee)

Anthem, Inc. (Parent to Anthem Insurance Companies, Inc.) (Appellee)

Anthem, Inc. (Parent to Community Insurance Company) (Appellee)

Anthem, Inc., f/k/a WellPoint, Inc. d/b/a Anthem Blue Cross Life and Health Insurance Company, Blue Cross of California, Blue Cross of Southern California, Blue Cross of Northern California, Rocky Mountain Hospital and Medical Service Inc. d/b/a Anthem Blue Cross Blue Shield of Colorado and Anthem Blue Cross Blue Shield of Nevada, Anthem Blue Cross Blue Shield of Connecticut, Anthem Blue Cross Blue Shield of Georgia, Anthem Blue Cross Blue Shield of Indiana,

*In re Blue Cross Blue Shield Antitrust Litigation*,

No. 22-13051

Anthem Blue Cross Blue Shield of Kentucky, Anthem Blue Cross Blue Shield of Maine, Anthem Blue Cross Blue Shield of Missouri, RightCHOICE Managed Care, Inc., HMO Missouri Inc., Anthem Health Plans of New Hampshire as Anthem Blue Cross Blue Shield of New Hampshire, Empire HealthChoice Assurance, Inc. as Empire Blue Cross Blue Shield, Community Insurance Company as Anthem Blue Cross Blue Shield of Ohio, Anthem Blue Cross and Blue Shield of Virginia, Anthem Blue Cross Blue Shield of Wisconsin (Appellee)

Anthem Life Insurance Company (Appellee)

Arcara, Hon. Richard J. (W.D.N.Y.)

Arkansas Blue Cross and Blue Shield (Appellee)

Armbrecht Jackson LLP (Counsel for Appellees)

Axinn, Veltrop & Harkrider, LLP (Counsel for Appellees)

Bailey & Glasser, LLP (Counsel for Appellee)

Bailey, Arthur (Counsel for Appellees)

Balch & Bingham LLP (Counsel for Appellees)

BCBSM, Inc., d/b/a Blue Cross Blue Shield of Minnesota (Appellee)

Behenna, David G. (Appellant)

Bernick, Justin (Counsel for Appellees)

Bisio, Peter (Counsel for Appellees)

*In re Blue Cross Blue Shield Antitrust Litigation,*

No. 22-13051

Bloomberg, Edward S. (Counsel for Appellees)

Blue Cross and Blue Shield of Alabama (Appellee)

Blue Cross and Blue Shield of Arizona (Appellee)

Blue Cross and Blue Shield of Florida, Inc. (Appellee)

Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue (Appellee)

Blue Cross and Blue Shield of Georgia (Appellee)

Blue Cross and Blue Shield of Georgia, Inc. (Appellee)

Blue Cross and Blue Shield of Kansas City (Appellee)

Blue Cross and Blue Shield of Kansas, Inc. (Appellee)

Blue Cross and Blue Shield of Louisiana (Appellee)

Blue Cross and Blue Shield of Massachusetts, Inc. (Appellee)

Blue Cross and Blue Shield of Michigan (Appellee)

Blue Cross and Blue Shield of Minnesota (Appellee)

Blue Cross and Blue Shield of Mississippi (Appellee)

Blue Cross and Blue Shield of Nebraska (Appellee)

Blue Cross and Blue Shield of North Carolina, Inc. (Appellee)

Blue Cross and Blue Shield of North Dakota (Appellee)

Blue Cross and Blue Shield of Rhode Island (Appellee)

Blue Cross and Blue Shield of South Carolina (Appellee)

*In re Blue Cross Blue Shield Antitrust Litigation*,

No. 22-13051

Blue Cross and Blue Shield of Tennessee, Inc. (Appellee)

Blue Cross and Blue Shield of Vermont (Appellee)

Blue Cross and Blue Shield of Wyoming (Appellee)

Blue Cross Blue Shield Association (Appellee)

Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. (Appellee)

Blue Cross Blue Shield of Alabama (Appellee)

Blue Cross Blue Shield of Arizona (Appellee)

Blue Cross Blue Shield of Minnesota (Appellee)

Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company
(Appellee)

Blue Cross Blue Shield of North Dakota (Appellee)

Blue Cross Blue Shield of Wyoming (Appellee)

Blue Cross of Idaho Health Service, Inc. (Appellee)

Bodman PLC (Counsel for Appellees)

Boies, David (Counsel for Appellees)

Boies, Schiller & Flexner LLP (Counsel for Appellees)

Bojedla, Swathi (Counsel for Appellees)

Bondurant Mixson & Elmore, LLP (Counsel for Appellant)

Bradley Arant Boult Cummings, LLP (Counsel for Appellants)

*In re Blue Cross Blue Shield Antitrust Litigation*,

No. 22-13051

Briggs, John (Counsel for Appellees)

Brunini, Grantham, Grower & Hewes, PLLC (Counsel for Appellees)

Buchanan, Virginia (Counsel for Appellees)

Burkhalter, Carl S. (Counsel for Appellees)

Burns Charest LLP (Counsel for Appellees)

Burns, Warren T. (Counsel for Appellees)

Bush, Hon. Ronald E. (D. Idaho)

Bustamante, Travis A. (Counsel for Appellees)

Cafferty Clobes Meriwether & Sprengel LLP (Counsel for Appellees)

Cafferty, Patrick (Counsel for Appellees)

Caliendo, Charles T. (Counsel for Appellees)

California Physicians' Service (Appellee)

California Physicians' Service, d/b/a Blue Shield of California (Appellee)

Callister, Joshua (Counsel for Appellees)

Cambia Health Solutions, Inc., f/d/b/a Regence Blue Shield of Idaho,

Regence Blue Cross Blue Shield of Oregon, Regence Blue Cross Blue Shield of

Utah, Regence Blue Shield of Washington (Appellee)

Campbell Partners LLC (Counsel for Appellees)

Campbell, Andy P. (Counsel for Appellees)

*In re Blue Cross Blue Shield Antitrust Litigation,*

No. 22-13051

Campbell, A. Todd (Counsel for Appellees)

Capital BlueCross (Appellee)

CareFirst Blue Cross and Blue Shield of Maryland (Appellee)

CareFirst BlueChoice, Inc. (Appellee)

CareFirst of Maryland, Inc. (Appellee)

CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield (Appellee)

CareFirst, Inc. (Appellee)

Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc. (Appellee)

Caring for Montanans, Inc. (Appellee)

CB Roofing, LLC (Appellee)

Chavez, Kathleen (Counsel for Appellees)

Chesler, Evan R. (Counsel for Appellees)

Cihlar, Nate (Counsel for Appellees)

Clark, Anna Mercado (Counsel for Appellees)

Clobes, Bryan (Counsel for Appellees)

Cochran, Jennifer (Appellant)

Cohen, Hon. James I. (S.D. Fla.)

Cohen, Lucile H. (Counsel for Appellees)

*In re Blue Cross Blue Shield Antitrust Litigation*,

No. 22-13051

Colatriano, Vincent J. (Counsel for Appellees)

Community Insurance Company (Appellee)

Cooper & Kirk, PLLC (Counsel for Appellees)

Cooper, Charles J. (Counsel for Appellees)

Cornelius, Hon. Staci G. (N.D. Ala.)

Cory Watson Crowder & DeGaris, P.C. (Counsel for Appellees)

Costello, Honor (Counsel for Appellees)

Cottrell, Christa C. (Counsel for Appellees)

Craker, Aaron (Appellant)

Cravath Swaine & Moore (Counsel for Appellees)

Crowell & Moring LLP (Counsel for Appellees)

Cylkowski, Sarah L. (Counsel for Appellees)

Davis & Taliaferro LLC (Counsel for Appellees)

Davis, Gregory (Counsel for Appellees)

Dellaccio, Douglas (Counsel for Appellees)

DeGiusti, Hon. Timothy D. (W.D. Okla.)

Del Sole Cavanaugh Stroyd LLC (Counsel for Appellees)

DeMasi, Karin A. (Counsel for Appellees)

Doherty, Hon. Rebecca F. (W.D. La.)

*In re Blue Cross Blue Shield Antitrust Litigation,*

No. 22-13051

Doherty, Ronan (Counsel for Appellant)

Dominick Feld Hyde, PC (Counsel for Appellee)

Donnell, Sarah J. (Counsel for Appellees)

Dryden, Benjamin R. (Counsel for Appellees)

Dyer, Karen (Counsel for Appellees)

Eisler, Robert (Counsel for Appellees)

Empire HealthChoice Assurance, Inc. (Appellee)

Empire HealthChoice Assurance, Inc., f/k/a Empire Blue Cross Blue Shield

(Appellee)

Employee Services, Inc. (Appellant)

Erickson, Hon. Ralph R. (D.N.D.)

Excellus Blue Cross Blue Shield (Appellee)

Excellus BlueCross BlueShield of New York (Appellee)

Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield (Appellee)

Feinberg, Kenneth (Mediator)

Feinstein, Richard (Counsel for Appellees)

Foley & Lardner LLP (Counsel for Appellees)

Foote, Mielke, Chavez & O'Neil LLC (Counsel for Appellees)

Foote, Robert M. (Counsel for Appellees)

*In re Blue Cross Blue Shield Antitrust Litigation,*

No. 22-13051

Franz, Morgan B. (Counsel for Appellees)

Galactic Funk Touring, Inc. (Appellee)

Gentle, Edgar C. (Special Master)

Gilbert, Sarah (Counsel for Appellees)

Gillis, H. Lewis (Counsel for Appellees)

Gordon, Jr., Ben W. (Counsel for Appellee)

Grant & Eisenhofer (Counsel for Appellees)

Green, Cheri D. (Counsel for Appellees)

Group Hospitalization and Medical Services, Inc. (Appellee)

Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross

BlueShield (Appellee)

Guin, Stokes & Evans, LLC (Counsel for Appellees)

Guin, David (Counsel for Appellees)

Gustafson Gluek PLLC (Counsel for Appellees)

Gustafson, Daniel (Counsel for Appellees)

Harris, Hon. Alonzo (27th Judicial District Court, St. Landry Parish,

Louisiana)

Harwood, Jr., Hon. R. Bernard (Special Master)

Hauser, Brian C. (Counsel for Appellees)

*In re Blue Cross Blue Shield Antitrust Litigation,*

No. 22-13051

Hausfeld LLP (Counsel for Appellees)

Hausfeld, Michael D. (Counsel for Appellees)

Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii (Appellee)

Hazzard Law, LLC (Counsel for Appellees)

Hazzard, Brent (Counsel for Appellees)

Health Care Service Corporation (Appellee)

Health Care Service Corporation d/b/a Blue Cross Blue Shield of Illinois, Blue Cross Blue Shield of New Mexico, Blue Cross Blue Shield of Oklahoma, Blue Cross and Blue Shield of Montana, Blue Cross Blue Shield of Texas (Appellee)

Hedlund, Daniel C. (Counsel for Appellees)

Hellums, Chris T. (Counsel for Appellees)

Hibbett Sports, Inc (Appellee)

Highmark Blue Cross Blue Shield of Delaware, Inc. (Appellee)

Highmark Blue Cross Blue Shield of West Virginia (Appellee)

Highmark Health Services, d/b/a Highmark Blue Cross Blue Shield of Delaware, Highmark Blue Cross Blue Shield, and Highmark Blue Cross Blue Shield of West Virginia (Appellee)

*In re Blue Cross Blue Shield Antitrust Litigation,*

No. 22-13051

Highmark Inc. (Appellee)

Highmark Western and Northeastern New York Inc. (Appellee)

Hill Hill Carter Franco Cole & Black, P.C. (Counsel for Appellees)

HMO Missouri Inc. (Appellee)

HMO Missouri, Inc. (Anthem Blue Cross and Blue Shield of Missouri) (Appellee)

Hodge, David J. (Counsel for Appellees)

Hogan Lovells US LLP (Counsel for Appellees)

Hogan, E. Desmond (Counsel for Appellees)

Hogewood, Mark M. (Counsel for Appellees)

Holmstead, Zachary D. (Counsel for Appellees)

Home Depot U.S.A., Inc. (Appellant)

Hoover, Craig A. (Counsel for Appellants)

Horizon Blue Cross and Blue Shield of New Jersey(Appellee)

Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey (Appellee)

Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey (Appellee)

Hoss, Henry D. (Counsel for Appellants)

*In re Blue Cross Blue Shield Antitrust Litigation,*

No. 22-13051

Hovland, Hon. Daniel L. (D.N.D.)

Hume, Hamish P.M. (Counsel for Appellees)

Huppert, Hon. Michael D. (5th Judicial District Court, Polk County, Iowa)

Independence Hospital Indemnity Plan, Inc., f/k/a Independence Blue Cross (Appellee)

Isaacson, William A. (Counsel for Appellees)

Jarvey, Hon. John A. (S.D. Iowa)

Johnson, John M. (Counsel for Appellees)

Jones Ward PLC (Counsel for Appellees)

Jones, Lawrence (Counsel for Appellees)

Jones, Megan (Counsel for Appellees)

Jose, Elizabeth (Counsel for Appellees)

Kappel, Brian P. (Counsel for Appellees)

Kaufman, David R. (Counsel for Appellees)

Kennedy, Lauren R. (Counsel for Appellees)

Kilpatrick Townsend & Stockton LLP (Counsel for Appellees)

Kilpela, Jr., Edwin J. (Counsel for Appellees)

Kimble, Cavender C. (Counsel for Appellees)

Kirkland & Ellis LLP (Counsel for Appellees)

*In re Blue Cross Blue Shield Antitrust Litigation*,

No. 22-13051

Koch, H. James (Counsel for Appellees)

Korn, David H. (Counsel for Appellees)

Lawrence, Hon. William T. (S.D. Ind.)

Laytin, Daniel E. (Counsel for Appellees)

Lemmon Law Firm (Counsel for Appellees)

Lemmon, Andrew (Counsel for Appellees)

Levin Papantonio Thomas Mitchell Rafferty & Proctor, P.A. (Counsel for Appellees)

Lifetime Healthcare, Inc. (Appellee)

Lightfoot Franklin & White LLC (Counsel for Appellees)

Lite DePalma Greenberg & Afanador, LLC (Counsel for Appellees)

Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana (Appellee)

Lowrey, IV, Frank M. (Counsel for Appellant)

Lungstrum, Hon. John W. (D. Kan.)

Kravitz, Carl S. (Counsel for Appellees)

Maier, Jeny M. (Counsel for Appellees)

Malatesta, III, John Thomas A. (Counsel for Appellees)

Martin, John D. (Counsel for Appellees)

*In re Blue Cross Blue Shield Antitrust Litigation,*

No. 22-13051

Maynard Cooper & Gale PC (Counsel for Appellees)

McAfee & Taft A Professional Corporation (Counsel for Appellants)

McCafferty, Hon. Landya B. (D.N.H.)

McCallum, Methvin & Terrell, P.C. (Counsel for Appellees)

McDevitt, Larry (Counsel for Appellees)

McDonald, Yawanna N. (Counsel for Appellees)

McDowell, Patrick M. (Counsel for Appellees)

McGartland & Borchardt LLP (Counsel for Appellees)

McGartland, Michael (Counsel for Appellees)

McKinney, Rebekah Keith (Counsel for Appellee)

McLeod, Aaron G. (Counsel for Appellees)

Means Gillis Law, LLC (Counsel for Appellees)

Meriwether, Ellen (Counsel for Appellees)

Methvin, Robert (Counsel for Appellees)

Moreno, Hon. Federico A. (S.D. Fla.)

Morris, King & Hodge (Counsel for Appellees)

Mullins, M. Richard (Counsel for Appellants)

Naranjo, Michael A. (Counsel for Appellees)

Nelson Mullins Riley & Scarborough LLP (Counsel for Appellees)

*In re Blue Cross Blue Shield Antitrust Litigation,*

No. 22-13051

Nix, Jess R. (Counsel for Appellees)

Nix, Richard D. (Counsel for Appellants)

Norman, Brian K. (Counsel for Appellants)

O'Connor, Hon. Reed. C. (N.D. Tex.)

Pacella, Mario Anthony (Counsel for Appellee)

Page, E. Allen (Counsel for Appellant)

Paul Weis (Counsel for Appellees)

Payne, Joshua K. (Counsel for Appellees)

Payton, Gwendolyn (Counsel for Appellees)

Pearce, Bevill, Leesburg, Moore, P.C. (Appellee)

Pennington, Michael R. (Counsel for Appellants)

Pettus Plumbing & Piping, Inc. (Appellee)

Phillips Lytle LLP (Counsel for Appellees)

Physicians' Service, d/b/a Blue Shield of California (Appellee)

Pittman, Dutton & Hellums, P.C. (Counsel for Appellees)

Priester, James L. (Counsel for Appellees)

Premera Blue Cross, d/b/a Premera Blue Cross Blue Shield of Alaska

(Appellee)

Proctor, Hon. R. David (N.D. Ala.)

*In re Blue Cross Blue Shield Antitrust Litigation,*

No. 22-13051

Putnam, Hon. T. Michael (N.D. Ala.)

Ragsdale, Barry Alan (Counsel for Appellee)

Redgrave, LLP (Counsel for Appellees)

Redgrave, Jonathan M. (Counsel for Appellees)

Reeves, Harold S. (Counsel for Appellees)

Regence BlueCross BlueShield of Oregon (Appellee)

Regence BlueCross BlueShield of Utah (Appellee)

Regence BlueShield (Appellee)

Regence BlueShield of Idaho, Inc. (Appellee)

Reuben, Mindee (Counsel for Appellees)

Rheaume, Jr., Thomas J. (Counsel for Appellees)

Richie, J. Thomas (Counsel for Appellants)

RightChoice Managed Care, Inc. (Appellee)

Riley & Jackson P.C. (Counsel for Appellees)

Riley, Jr., Robert R. (Counsel for Appellees)

Rocky Mountain Hospital & Medical Service Inc., d/b/a Anthem Blue Cross

Blue Shield of Colorado (Appellee)

Rocky Mountain Hospital & Medical Service Inc., d/b/a Anthem Blue Cross

Blue Shield of Nevada (Appellee)

*In re Blue Cross Blue Shield Antitrust Litigation,*

No. 22-13051

Roman, Tracy A. (Counsel for Appellees)

Rowe, Stephen A. (Counsel for Appellees)

Rutenberg, Alan D. (Counsel for Appellees)

Ruzic, Emily M. (Counsel for Appellants)

Sansbury, Michael T. (Counsel for Appellees)

Saw, Edmund Y. (Counsel for Appellees)

Saxon, John (Counsel for Appellees)

John D. Saxon, P.C. (Counsel for Appellees)

Schmidt, Jr., John G. (Counsel for Appellees)

Shamoun & Norman, LLP (Counsel for Appellees)

Shearman & Sterling LLP (Counsel for Appellees)

Slate, Pamela B. (Counsel for Appellees)

Smith, Cyril V. (Counsel for Appellees)

Smith, Scott Burnett (Counsel for Appellants)

Snyder, Hon. Christina A. (C.D. Cal.)

Snyder, Eric B. (Counsel for Appellee)

Sooy, Kathleen Taylor (Counsel for Appellees)

Spencer, Mark D. (Counsel for Appellants)

Spotswood, Robert K. (Counsel for Appellees)

*In re Blue Cross Blue Shield Antitrust Litigation,*

No. 22-13051

Spotswood Sansom & Sansbury LLC (Counsel for Appellees)

Stenerson, Todd M. (Counsel for Appellees)

Stokes, Tammy (Counsel for Appellees)

Strauss & Boies (Counsel for Appellees)

Strom Law Firm (Counsel for Appellee)

Sweet, Benjamin (Counsel for Appellees)

Terrell, James M. (Counsel for Appellees)

Topographic, Inc. (Appellant)

Triple-S Salud, Inc. (Appellee)

USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue

Shield (Appellee)

Van Winkle Law Firm (Counsel for Appellees)

Varney, Christine R. (Counsel for Appellees)

Voorhees, Hon. Richard (W.D.N.C.)

Wallace, Jordan, Ratliff & Brandt, LLC (Counsel for Appellees)

Walsh, Stephen A. (Counsel for Appellees)

Watson, McKinney, LLP (Counsel for Appellee)

Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC (Counsel for Appellees)

Wellmark Blue Cross and Blue Shield of Iowa (Appellee)

*In re Blue Cross Blue Shield Antitrust Litigation*,

No. 22-13051

Wellmark Blue Cross and Blue Shield of South Dakota (Appellee)

Wellmark Health Plan of Iowa, Inc. (Appellee)

Wellmark Holdings, Inc. (Appellee)

Wellmark Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa and Wellmark Health Plan of Iowa, Inc. (Appellee)

Wellmark, Inc. d/b/a Blue Cross and Blue Shield of Iowa and Wellmark Blue Cross Blue Shield of South Dakota (Appellee)

Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota (Appellee)

WellPoint, Inc. (Appellee)

West, Kimberly R. (Counsel for Appellees)

Wilkerson, David (Counsel for Appellees)

Witt, P.C., Helen E. (Counsel for Appellees)

Zeiger, P.C., Jeffrey J. (Counsel for Appellees)

Zott, David J. (Counsel for Appellees)

Zuckerman Spaeder, LLP (Counsel for Appellees)

*In re Blue Cross Blue Shield Antitrust Litigation*,

No. 22-13051

**Corporate Disclosure**. Pursuant to FED. R. APP. P. 26.1 and 11TH CIR. R. 26.1-1, 26.1-2, and 26.1-3, Appellants submit this Corporate Disclosure Statement and state as follows:

1. Appellant Topographic, Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

2. Appellant Employee Services, Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

### STATEMENT REGARDING ORAL ARGUMENT

This is an appeal challenging the allocation scheme of the $2.67 billion Blue Cross Blue Shield antitrust class action settlement, which sells out the Self-Funded Subclass in favor of the Fully Insured Subclass. Although it makes up 50–60% of the total class, the settlement allocates only 6.5% of the money to Self-Funded Subclass members. The rest, 93.5% of the money, is allocated to Fully Insured Subclass members. The 93.5%-to-6.5% ratio is inequitable on its face. Such an inequitable allocation implicates the new amendments to Federal Rule of Civil Procedure 23(e), which were designed to prevent selling out a subclass in allocating a class action settlement. This Court's precedent in *Holmes v. Continental Can Company* also requires "careful judicial scrutiny" of such inequitable allocations. 706 F.2d 1144, 1148 (11th Cir. 1983).

The record shows that the 93.5%-to-6.5% allocation was adopted after the $2.67 billion settlement amount had already been negotiated.  Counsel for the Fully Insured Subclass then chose and recruited counsel for the Self-Funded Subclass. They then sold out the Self-Funded Subclass to maximize the take for the Fully Insured Subclass and their counsel. The Fully Insured Subclass offered no evidence to support the allocation, initially. After members of the Self-Funded Subclass objected, Fully Insured Subclass counsel tried to rationalize the disproportionate

split using an apples-to-oranges comparison of revenue from the two subclasses, an arbitrarily imposed shorter statute of limitations, and creative accounting from an expert.

The District Court approved the allocation without applying the careful scrutiny required by amended Rule 23(e) and *Holmes*. Had the court properly considered the parties' relative market shares, the services both subclasses purchased from BCBS, and the strength of the Self-Funded Subclass's claims, it would have recognized that the allocation should have been closer to 50%-50%. Better yet, the court could have refused to approve an allocation altogether because there is no need for one. The Settlement defines BCBS's commercial health benefit products as all health care services, however funded, including insured or self-funded. BCBS itself accounts for income from fully insured and self-funded customers using, respectively, "premiums" and "premium equivalents." Each class member should be permitted to make claims against the $2.67 billion settlement fund using the same calculation, regardless of whether it is fully insured or self-funded.

Applying the recently amended Rule 23(e) to a settlement allocation that treats a subclass disproportionately is a question of first impression in the circuits. Federal law imposes on the judiciary a fiduciary obligation to protect absent class members,

given the incentives that drive large class action settlements. The defendants here agreed to a gross amount to buy peace from the litigation in exchange for a maximal release that required creation of a subclass. Original class counsel, who had a clear incentive to maximize their take, then chose to represent the Fully Insured Subclass and, at the same time, hand-picked new counsel for the Self-Funded Subclass with whom they would negotiate a split of the $2.67 billion settlement fund. Without careful judicial scrutiny in such situations, the subclass often gets sold out. That's the moral of this appeal. The neutral check required by amended Rule 23(e) and *Holmes* requires reversal of this inequitable 93.5%-to-6.5% allocation. Oral argument is well warranted.

## TABLE OF CONTENTS

Certificate Of Interested Persons And Corporate Disclosure Statement ...............C-1

Statement Regarding Oral Argument ......................................................... i

Table of Contents ....................................................................... iv

Table of Citations...................................................................... vii

Jurisdictional Statement ................................................................ xi

Statement of The Issues ..................................................................1

Statement of The Case ...................................................................3

      A.    Statement of facts....................................................3

      B.    Procedural history. ...................................................7

           1.    The lawsuits and the MDL. .....................................7

           2.    Class action settlement negotiations..............................10

           3.    The Settlement and preliminary approval. .....................11

           4.    The Subclass's objection. .................................14

           5.    Fairness hearing and final approval...............................18

           6.    The appeals. .................................................20

Summary of the Argument.........................................................21

Standard of Review.............................................................23

Argument......................................................................24

    I.    The District Court failed to carefully scrutinize the settlement allocation. ..................................................................24

      A.    Amended Rule 23(e) requires that subclasses be treated equitably......................................................24

B.     The District Court has a fiduciary role to scrutinize a proposed settlement allocation to ensure it satisfies Rule 23(e)(2)'s standards.................................................................26

C.     Here, the settlement allocation was facially unfair, and the District Court failed to apply careful judicial scrutiny............29

D.     The District Court approved the allocation based on inadequate evidence and erroneous factual findings. ..............32

    1.     The District Court erred by approving an allocation without evidentiary support. ...........................................33

    2.     The District Court erred by failing to justify its reliance on Mason's opinions. ........................................38

    3.     The District Court erred by approving the Settlement based on a clearly erroneous factual finding. ................44

E.     The District Court erred in preventing Self-Funded Objectors from discovering Fully Insured Subclass counsel's input into the Mason Report. ......................................................................45

II.     The District Court abused its discretion by approving the Self-Funded damages period....................................................................48

A.     The District Court clearly erred by finding that the *Cerven* complaint did not notify Defendants that it asserted claims on behalf of self-funded class members. ...................................48

    1.     The *Cerven* Injunctive Relief Class included persons and entities covered by self-funded plans. .....................51

    2.     The *Cerven* Complaint Alleged Anticompetitive Behavior that Affected Every Type of Plan Participating in a Blue Network. ....................................53

B.     The District Court Erred by Approving the Allocation Based on an Unsupported 50% Discount. ...........................................55

III.     No allocation was necessary. ............................................................58

Conclusion ......................................................................................................59

Certificate of Compliance ...........................................................................62

Certificate of Service ................................................................................63

TABLE OF CITATIONS

**Page(s)**

**Cases**

*Allapattah Servs. v. Exxon*,
   333 F.3d 1248 (11th Cir. 2003) ..........................................................23

*Am. Pipe & Constr. v. Utah*,
   414 U.S. 538 (1974)............................................................................52

*Bemis Bros. Bag v. United States*,
   289 U.S. 28 (1933)..............................................................................50

\**Bennett v. Behring*,
   737 F.2d 982 (11th Cir. 1984) .................................................25, 34

*Boeing v. Van Gemert*,
   444 U.S. 472 (1980)............................................................................23

*Briseño v. Henderson*,
   998 F.3d 1014 (9th Cir. 2021) ..........................................................24

\**Cliff v. Payco Gen'l Am. Credits*,
   363 F.3d 1113 (11th Cir. 2004) ...........................................48, 49, 50

\**In re Corrugated Container Antitrust Litig.*,
   659 F.2d 1322 (5th Cir. Unit A 1981) ........................................*passim*

*Davenport v. United States*,
   217 F.3d 1341 (11th Cir. 2000) ........................................................49

\**Day v. Persels & Assocs.*,
   729 F.3d 1309 (11th Cir. 2013) ...................................................*passim*

*Devlin v. Scardeletti*,
   536 U.S. 1 (2002)............................................................................. xii

*Dewey v. Volkswagen*,
   681 F.3d 170 (3d Cir. 2012) ...........................................46, 47, 57, 58

vii

*In re Equifax Customer Data Sec. Breach Litig.*,
   999 F.3d 1247 (11th Cir. 2021) ...................................................................*passim*

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
   503 U.S. 60 (1992)................................................................................50

*Friederichsen v. Renard*,
   247 U.S. 207 (1918)................................................................................50

*Garner v. Wolfinbarger*,
   430 F.2d 430 F.2d 1093 (5th Cir. 1970) ..........................................................45

*In re Gen'l Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) ...............................................................55, 56

*In re Grand Jury Subpoena Duces Tecum*,
   112 F.3d 910 (8th Cir. 1997) ...............................................................46

*Grand Lodge of Pa. v. Peters*,
   560 F. Supp. 2d 1270 (M.D. Fla. 2008)............................................................49

*In re HealthSouth Sec. Litig.*,
   334 F. App'x 248 (11th Cir. 2009) ................................................................ xii

*Holmes v. Continental Can*,
   706 F.2d 1144 (11th Cir. 1983) ..................................................................*passim*

*Johnson v. NPAS Sols.*,
   975 F.3d 1244 (11th Cir. 2020) .................................................................*passim*

*King v. Cessna Aircraft*,
   No. 03-20482-CIV, 2010 WL 5253526 (S.D. Fla. Sept. 13, 2010) ...................49

*Makro Capital of Am. v. UBS AG*,
   543 F.3d 1254 (11th Cir. 2008) ...............................................................48, 49

*Managed Care Advisory Grp., LLC v. CIGNA Healthcare*,
   939 F.3d 1145 (11th Cir. 2019) ................................................................27

*Mirfasihi v. Fleet Mortg.*,
   356 F.3d 781 (7th Cir. 2004) ...............................................................34

*Petruzzi's v. Darling-Delaware*,
    880 F. Supp. 292 (M.D. Penn. 1995) ................................................. 29

*Plummer v. Chem. Bank*,
    668 F.2d 654 (2d Cir. 1982) ............................................................... 28

*Powers v. Graff*,
    148 F.3d 1223 (11th Cir. 1998) ......................................................... 49

*Ret. Assoc. v. Isaacson/Weaver Family Tr.*,
    925 F.3d 63 (2d Cir. 2019) ............................................................... 24

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002) ..................................................*passim*

*Roes, 1-2 v. SFBSC Mgmt.*,
    944 F.3d 1035 (9th Cir. 2019) ........................................................... 28

*Sharp Farms v. Speaks*,
    917 F.3d 276 (4th Cir. 2019) ................................................ 38, 39, 57

*Staton v. Boeing*,
    327 F.3d 938 (9th Cir. 2003) ............................................................. 34

*United States v. Almeida*,
    341 F.3d 1318 (11th Cir. 2003) ......................................................... 45

*United States v. Anthem*,
    236 F. Supp. 3d 171 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir.
    2017) ............................................................................................... 17

*United States v. Miami*,
    614 F.2d 1322 (5th Cir. 1980) ........................................................... 26

*ZF Meritor v. Eaton*,
    696 F.3d 254 (3d Cir. 2012) ....................................................... 37, 38

**Statutes**

28 U.S.C. § 1291 ................................................................................. xii

28 U.S.C. § 1331 ................................................................................. xii

28 U.S.C. § 1337(a) ............................................................................ xii

42 U.S.C. § 300gg-18(b)(1) ........................................................7

**Other Authorities**

Fed. R. Civ. P. 8(e)..................................................................51

* Fed. R. Civ. P. 15(c)...........................................................48, 49

* Fed. R. Civ. P. 23(e).........................................................*passim*

Fed. R. Civ. P. 54(b)...............................................................xii

Fed. R. Evid. 702(b) ...............................................................37

5 Federal Practice and Procedure (Wright & Miller) § 1286
(4th ed. 2022 Update) ..........................................................51

6A Federal Practice and Procedure (Wright & Miller) § 1437
(3d ed. 2022 Update) ...........................................................50

1 McCormick on Evidence § 91.1 (8th ed. 2020).................................46

Moore's Fed'l Practice, Manual for Complex Litig. § 21.61 (4th
ed. 2004) .......................................................................27, 28

4 William B. Rubenstein, Newberg and Rubenstein on Class
Actions § 13:40 (5th ed. 2021) .....................................26, 27, 55, 56

## JURISDICTIONAL STATEMENT

The District Court had federal question jurisdiction over the Subscribers' consolidated antitrust class action complaint, 28 U.S.C. §§ 1331 & 1337(a). R-2616-15.[1] In finally approving the Settlement, the District Court certified the order as final under Federal Rule of Civil Procedure 54(b). R-2931-92.

The District Court entered final judgment on August 9, 2022. R-2931. Self-Funded Subclass Objectors have standing to appeal because they timely objected to the proposed settlement and are bound by the approved settlement, unless it is vacated or reversed on appeal. *See Devlin v. Scardeletti*, 536 U.S. 1, 14 (2002); *In re Equifax Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1260 n.7 (11th Cir. 2021); *In re HealthSouth Sec. Litig.*, 334 F. App'x 248, 253 (11th Cir. 2009).

Self-Funded Objectors filed a timely notice of appeal on September 7, 2022. R-2940. This Court has jurisdiction under 28 U.S.C. § 1291. *See also* Self-Funded Objectors' response to the Court's jurisdictional questions, No. 21-13051, Doc. No. 66.

---

[1] Record references are formatted R-_(_)-_. The first blank is the docket entry from the District Court docket sheet. The second blank, inside the parentheses, is to any sub-document assigned by the CM/ECF system. The third blank is any pinpoint reference, using the CM/ECF pagination in the header at the top of the page.

**STATEMENT OF THE ISSUES**

1.      Whether the District Court erred by failing to apply careful judicial scrutiny and failing to require the Settlement allocation's proponents to carry their substantial evidentiary burden under *Holmes* and Rule 23(e) to demonstrate and document the allocation's fairness, when the Settlement allocated 6.5% of damages to more than 50% of the class (the Self-Funded Subclass) while subjecting those members to the same complete release as the rest of the class (the Fully Insured Subclass), which received 93.5% of the allocation.

2.      Whether the District Court erred by approving a claims period for the Self-Funded Subclass that was less than half that for Fully Insured claimants—5 years versus 12.5 years—based on a clearly erroneous finding that Self-Funded Subclass members were not included in the original complaint and by approving a double discount of Self-Funded Subclass claims based on the same unsupported assumption that the Subclass arrived late to the litigation.

3.      Whether an allocation between the two subclasses was appropriate or even necessary where creating subclasses for purposes of allocation resulted in a fundamental intra-class conflict and where record evidence supported either a 50%-

50% allocation or distributing the Settlement to all members of the class using the same formula.

## STATEMENT OF THE CASE

### A.    Statement of facts.

This case concerns BCBS's dominance of the American commercial health care market exercised through state and regional Blues. BCBS has enormous market power enabling it to offer subscribers discounts on the large networks of medical practices and doctors developed by each Blue in its assigned territory. Those individual Blues are organized under an umbrella, the BCBS Association, that licenses the familiar Blue Cross and Blue Shield trademarks and enforces anti-competitive geographic restrictions. R-2616-13–14, 26. As the most powerful health care intermediary in the American health care market, BCBS squeezes doctors and patients on both ends so profits flow to the middle.

Most Americans obtain commercial health coverage from their or their spouse's employer. Private sector employer health plans are regulated by ERISA. Employer sponsors can either buy an insurance policy to cover most of the cost of their employees' health care, or they can choose to "self-fund" portions of their employees' health care costs in a given year. R-2998(1)-103. The industry labels these alternatives "fully insured" and "self-funded," though neither term is entirely accurate. After running the cost-benefit analysis, most employers over 200 employees are self-funded for their employees' health costs in a given coverage year,

3

because they can spread their costs (and risk) across the large number of covered lives in their own employee pool. R-2998(3)-43.

A fully insured health plan fully delegates administration of its health benefits to BCBS and pays for these services as part of its premium. BCBS issues an insurance policy and administers all the health claims. R-2998(1)-62. In exchange, the employer pays BCBS premiums. R-2998(1)-62, 104. Premiums cover not only the doctor and hospital bills, but also the bundled costs of administering claims, any ancillary services, and excess risk for health costs over and above actuarial expectations, plus a profit margin for BCBS. R-2998(1)-106.

A self-funded health plan still delegates administration of its health benefits to BCBS and pays BCBS for these services, typically on a per member per month basis. BCBS acts as the third-party administrator for all the health claims. R-2998(1)-105. The employer covers the doctor and hospital bills up to a negotiated maximum by reimbursing BCBS after BCBS pays the providers. R-2998(1)-62; R-2845(5)-2. The employer also pays BCBS unbundled prices for a suite of services that includes claims administration, dental or vision insurance, overpayment collection, pharmacy benefit management, and other ancillary services. R-2998(1)-58, 106, 109–15. Each ancillary service carries a separate price, each with its own

profit margin. R-2998(1)-58, 109; R-2845(4)-7–8, 32, 34–35. The excess risk posed by unexpected health care costs over and above what the self-funded employer budgeted is often covered by a separate "stop-loss" insurance policy. R-2998(1)-111–12; R-2845(1)-5. BCBS is the nation's largest stop-loss insurer. R-2845(10)-3. When BCBS serves as the third-party administrator, the employer is typically required to buy stop-loss insurance from BCBS and cannot freely use other vendors for ancillary services. R-2998(1)-58, 112; R-2998(2)-73. It also cannot directly negotiate with health care providers on the price of medical services. R-2998(1)-58, 116. Purchase of BCBS administrative services gives the employer access to the BCBS provider at the prices BCBS has negotiated with the providers in its network. R-2998(1)-64, 116. Self-funded employers purchase access to the BCBS network every bit as much as fully insured employers do. *Id.*

From the perspective of the doctors and covered patients, BCBS's services are the same regardless of whether the payor is fully insured or self-funded. The network of medical practices and doctors available to the patient is the same for both. R-2998(1)-64, 116. The services are the same. *Id.* And from the perspective of the employer, those services are interchangeable. R-2845(4)-8. Which explains why some employers, after balancing the books on last year's health care budget, will

choose to switch from a self-funded plan one year to a fully insured plan the next, or vice versa. *Id.*

BCBS does not have separate businesses, one for fully insured and another for self-funded customers. R-2998(1)-53–54; R-2845(4)-3. In fact, BCBS accounts for its income from both types of customers in a similar fashion, using "premiums" and "premium equivalents." A premium equivalent puts a self-funded plan on the same footing as a fully insured account by adding the administrative services fees paid by the plan to the claims paid on its behalf. R-2845(3)-3; R-2845(4)-10–11.

For purposes of this case, the medical claims costs paid to third-parties (doctors and hospitals, say) are not at issue. R-2812(1)-126. They are pass-through items. R-2998(1)-107. So the costs of claims must either be included or excluded on both sides of the ledger for a true comparison of BCBS income from fully insured and self-funded customers. Comparing insurance premiums (which includes claims costs) with self-funded administrative charges (which excludes claims costs and ancillary services) is an improper gross-to-net comparison. R-2998(1)-59, 71–72, 107–08. The more important comparison is net-net after disregarding claims paid for both groups. After Obamacare, by law BCBS must pay out 80–85% of its insurance premiums from any given customer in health care claims. 42 U.S.C.

§ 300gg-18(b)(1). If it does not, BCBS must refund the difference in excess premiums to the customer. *Id.* This regulatory check on health care premium margins is called the medical-loss ratio. R-2998(1)-105. This prevents BCBS from profiting on the costs of claims. R-2845(7)-2–3.

More than 50% of employers are self-funded, a number that increases by one or two points each year. R-2998(1)-103–04; R-2998(3)-40. And because the largest employers tend to be self-funded, they account for the bulk of commercially covered patients. Recent statistics indicate 60–65% of covered patients are covered by self-funded plans. R-2998(1)-103; R-2998(3)-37.

## B.    <u>Procedural history</u>.

### 1.    <u>The lawsuits and the MDL</u>.

This case uses Subscribers to describe those who pay for health care and Providers for those who provide medical services. Providers and Subscribers brought antitrust cases against BCBS starting in 2012 in courts across the country. An MDL was created in the Northern District of Alabama. R-1. Thereafter, the Court permitted each set of Plaintiffs to file a consolidated class-action complaint. R-79.

The Providers' consolidated complaint accuses BCBS of abusing its market power to drive down the price payable to doctors for their services. *See* R-1083-9, 18–19. The Providers' complaint covers both fully insured and self-funded plans. *Id.* That lawsuit is ongoing.

The Subscribers' consolidated complaint attacks the other side, alleging BCBS abused its market power to drive up the cost of BCBS products and services for patients. In the beginning, the complaints sought damages on behalf of fully insured individuals and small employers (with less than 200 employees) who "paid health insurance premiums" to local Blues, and injunctive relief on behalf of all "persons or entities" who are "insured" by a local Blue who has a license agreement with the BCBS Association that imposes geographic restrictions. *See* R-85-60–61, 100. The same relief was sought in the first-filed complaint in *Cerven*, which was filed in the Western District of North Carolina on February 7, 2012. *See* R-2998(3)-94, 99–100.

The claims of self-funded plans have thus been in this lawsuit from the outset. In the first Subscriber-side complaint, *Cerven* alleged the geographic restrictions central to the BCBS conspiracy impacted "100 million" covered lives. R-2998(3)-98. This number is repeated in both the consolidated Provider-side and Subscriber-

side complaints in the MDL. *See* R-86-6; R-85-19. You cannot get to this number without counting self-funded plans. (In 2012, when *Cerven* was first filed, BCBS had roughly 50 million fully insured and 50 million self-funded members. R-2825-Ex.1.) Plaintiffs sought injunctive relief not just for those who paid "health insurance premiums," but also for every person or entity insured by a local Blue whose license agreement with the Association contains the geographic restrictions sought to be enjoined. R-2998(3)-99–100. And the alleged anti-competitive effects sought to be remedied included reduced competition and inflated prices for *both* administrative "services" *and* "insurance." R-2998(3)-147, 152. Thus, regardless of what *relief* was initially sought, the *claims* of self-funded plans were always in this case.

If there could ever have been any doubt about this, the parties' litigation conduct removed it. The Subscribers' first set of discovery requests defined Commercial Health Plan Coverage to include both health insurance and "administrative services." R-364(2)-3. The document requests were designed to uncover the full gamut of information on BCBS's self-funded business. R-364(2)-19–20, 27. And likewise, the Defendants freely admitted in their 2013 consolidated motion to dismiss that the nationwide injunction class in the Subscribers' MDL complaint "encompasses both large and small groups that self-insure." R-120-61.

2.    <u>Class action settlement negotiations</u>.

The Subscribers and BCBS discussed settlement over several years. R-2610(1)-19. In the summer of 2019, the BCBS Defendants agreed to settle with the Subscribers for $2.67 billion. R-2865-126. They were not willing to part with this sum, however, unless it bought total peace from "the entire marketplace." R-2864-15. So BCBS insisted on a full release of all possible legal and equitable claims from all subscribers nationwide, including not only BCBS's small and large fully insured customers, but also its self-funded accounts. R-2865-137, 148.

So in August 2019, original Subscriber Class counsel decided to create subscriber subclasses and chose to recruit new subclass counsel, Burns Charest, for what would become the Self-Funded Subclass. R-2865-121. Burns started attending mediations in September 2019. R-2610(7)-4. Two months later, in November 2019, all the parties signed a settlement term sheet with original counsel for the entire Subscriber class now acting as Fully Insured Subclass counsel. R-2610(6)-11; R-2610(7)-4.

Thereafter, Fully Insured Subclass counsel and newly minted Self-Funded Subclass counsel decided how much of the $2.67 billion settlement to allocate to the Self-Funded Subclass. R-2610(8)-6. Fully Insured Subclass counsel believed the

Self-Funded Subclass "w[as] entitled to either nothing or a very, very small amount." R-2865-136. Fully Insured Subclass counsel started the negotiations with a range between 3.4% and 6.8%. R-2610(8)-6. Self-Funded Subclass counsel started between 7.6% and 16%. *Id.* The negotiations ended at 6.5%, 0.3% below Fully Insured Subclass counsel's high number, 1.1% underneath Self-Funded Subclass counsel's entire range. *Id.* The two sides presented their agreement to mediator Kenneth Feinberg, who declared it to be reasonable, considering his understanding of "potential statute of limitations issues and the relative size of the administrative fees paid by Self-Funded Claimants vs. the premiums paid by FI Claimants." R-2610(8)-6.

3.    The Settlement and preliminary approval.

Nearly a year later, after COVID-caused delays, Fully Insured Counsel filed a motion for preliminary approval. R-2610. The same day, they filed a new complaint to serve as the basis of what would be settled. It covered all fully insured subscribers, large and small, and added two class representatives for a Self-Funded Subclass, Hibbett and A. Duie Pyle, Inc. R-2616-11–12, 25–26, 71–72. The amended complaint broadly defines BCBS's Commercial Health Benefit Product as "any product or plan providing for the payment or administration of health care services . . . or expenses through insurance, reimbursement, or other similar

11

healthcare financing mechanism" and includes "medical, pharmacy, dental, and vision products and services" and "stop-loss" insurance. R-2616-138. The nationwide injunction class covers all of BCBS's customers: "All Individual Members, Insured Groups, Self-Funded Accounts, and Members that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan." R-2616-71. The damages class is similarly broad. *Id.* Notably, it gives the Fully Insured Class the full limitations period stretching back to 4 years before *Cerven* was first filed, from February 7, 2008 through October 16, 2020, for a total of 12.5 years. *Id.* Yet it foreshortens the class period for the Self-Funded Subclass, limiting it to only 5 years, from September 1, 2015 through October 16, 2020. R-2616-71–72. Burns began attending mediations in September 2019, which explains the September 1 start date. *See* R-2610(6)-11; R-2610(7)-4.

The motion for preliminary approval offered no evidence to support the 93.5%-to-6.5% allocation. The allocation is mentioned in passing, on only 1 page of a 73-page brief. R-2610(1)-32. The only items offered in support were Feinberg's affidavit with his mediator's opinion that the allocation was reasonable and assurances of counsel. R-2610(8); R-2610(6); R-2610(7). While the Fully Insured damages expert submitted a declaration, he provided no independent justification for

12

the allocation. He simply stated that he "underst[ood]" that the subclass's damages were "6.5% of total damages" and so "used that fraction to estimate damages" to self-funded accounts. R-2610(11)-4. Thus, the circular logic goes, the 6.5% figure used to estimate the Self-Funded Subclass's recovery is the same number used in the allocation. *See id.* The circular logic likewise extends to Fully Insured counsel's reliance on the foreshortened "Self-Funded Class Period" to justify the allocation, which did not exist until it was written into the settlement complaint. *See* R-2610(1)-32. And the circle ends with Fully Insured counsel's argument that there's a "large difference" between the "premiums paid for fully-insured coverage" as opposed to "administrative fees charged for self-insured coverage," the same rationalization presented to Feinberg. *See* R-2610(1)-32; R-2610(8)-6. This inapt comparison utterly ignores the identical services sold by BCBS to both groups and the 80–85% of premiums that is a statutory pass-through.

The District Court preliminarily approved the Settlement. R-2641. The court also granted Fully Insured Subclass counsel a whopping $75 million advance on their fee petition (which the Settlement indicated would be 25% of $2.67 billion). R-2641-45–47. The $75 million "quick pay" attorneys' fee was disbursed nearly a year before the final fairness hearing. R-2641-66.

13

4.     <u>The Subclass's objection</u>.

Self-Funded Objectors Topographic and Employee Services then objected to the 93.5%-to-6.5% allocation on behalf of all members of the Self-Funded Subclass. R-2998(1). They argued the allocation is facially inequitable and violates Rule 23(e) as amended, given that the larger Self-Funded Subclass gets only 6.5% of the money but is bound by the same release as the Fully Insured Subclass of all damages claims going back to the "beginning of time" (R-2610(2)-19). R-2998(1)-5–9, 25–26. Self-Funded Objectors pointed out that the comparison of "premiums" to "administrative services only" contains two mathematical flaws. It compares gross premiums on the fully insured side, which includes the cost of claims passed through to third parties, to net revenue on the self-funed side, which excludes the cost of claims from administrative service fees. R-2998(1)-13–14, 26–28; *see also* R-2812(19)-22 n.15 (same, National Account Objectors' Br.). It also fails to include the other unbundled fees paid to BCBS by self-funded employers for dental and vision insurance, pharmaceutical benefit management, other ancillary services, stop-loss insurance, and the like. R-2998(1)-14–17, 28–38. Further, the truncated class period for the subclass ignores the fact that self-funded employers have been in the case since *Cerven*. R-2998(1)-21–26. Thus, regardless of what relief was initially sought on their behalf, they should enjoy the same class period given to the Fully Insured Subclass and the large fully insured customers first added in the settlement

complaint. R-2998(1)-24–25. Eliminating these errors, the Self-Funded Subclass Objectors argued, would make the allocation closer to 55%-45% or 50%-50%. R-2998(1)-38–39.

In support of their objection, the Self-Funded Objectors offered reports from two experts, Teah Corley and BDO. They explained in detail BCBS's bundled pricing for fully insured customers and unbundled pricing for self-funded customers. R-2998(1)-48, 101. These experts also refuted the assumptions Burns used in negotiating the allocation against Fully Insured Subclass counsel. R-2998(1)-56–60, 106–17. Those assumptions were provided to Self-Funded Objectors by Burns two months before their objection was due and were based on input from an LSU expert economist, Joe Mason. R-2998(1)-124.

Fully Insured Subclass counsel then moved for final approval of the Settlement. R-2812. In response to the Self-Funded Objectors, they for the first time offered purported evidence in support of the allocation. R-2812(1)-125–27. Although they had their own expert, the Fully Insured Subclass instead offered the expert report of Mason, the expert Burns had used to negotiate on behalf of the Self-

Funded Subclass. R-2812(9); R-2825(1).[2] Mason's opinions are purely post-hoc explanations of how a 6.5% share for the Self-Funded Subclass could be justified. *See* R-2825(1)-2 (dated 9/3/21). Mason admits that he relied on opaque information BCBS gave him on fully insured and self-funded revenues that does not separate profits attributable to each line. R-2825(1)-6, 14 & n.54, 16, 19. And his analysis admittedly rests on "proxies," "hypothes[e]s," and "assumptions." R-2825(1)-10, 11, 12, 13, 18 & n.74. To get the number down to 6.5%, Mason opined that, depending on how he ran the numbers, the Self-Funded Subclass was entitled to much lower percentages, in the range of 1% to 3%. R-2825(1)-15–18. He also applied an arbitrary 50% across-the-board discount to the Self-Funded Subclass because he was told they were not included in the Settlement until late 2019. R-2825(1)-13–14.


Self-Funded Objectors responded with rebuttal expert reports from BDO and sworn testimony from the antitrust trial in the D.C. District Court on the proposed merger of Cigna with Anthem, the largest Blue. R-2845. *See United States v. Anthem*, 236 F. Supp. 3d 171 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017).

---

[2] The second citation (R-2825(1)) is the copy submitted at the final fairness hearing, which is what the District Court cites in its final approval order. *See* R-2931-37–38, 57–59. Cites to the sealed exhibits to Mason's report will correspond to those exhibits included in Self-Funded Objectors' sealed record excerpts.

The rebuttal expert report showed Mason's analysis suffers from the same mathematical flaws, namely the gross-to-net comparison of fully insured premiums (including claims costs) to self-funded administrative service fees (excluding claims costs) and the exclusion of other unbundled revenues paid by self-funded plans. R-2845(4)-2–12. Mason's additional 50% discount has no basis beside his own fiat. R-2845(4)-9–10. By contrast, the sworn testimony showed that Self-Funded Objectors' allocation methodology matched the way BCBS accounts for income and profit from fully insured and self-funded accounts. R-2845-10–18.

The District Court gave the Subscribers and Self-Funded Objectors time at the hearing for expert testimony and cross-examination. R-2836, R-2841. To prepare, Self-Funded Objectors sought to discover all communications between Fully Insured Subclass counsel and the Self-Funded Subclass's expert Mason. Allocating a settlement fund is a zero-sum game; one subclass gains at the other's expense. The objectors wanted to see Mason's communications to see which side he was advocating for. R-2832; R-2836; R-2851. The District Court denied the motion, finding that any such communication was covered by a "common-interest privilege." R-2865-82.

5.    Fairness hearing and final approval.

The District Court held a two-day final fairness hearing. R-2864; R-2865. Mason testified for the 93.5%-to-6.5% allocation, and Self-Funded Objectors' expert testified against it. R-2865-40–76, 200–33, 234–59. The court also heard arguments for and against the Settlement from the Subscribers, the BCBS Defendants, and all objectors.

The Department of Labor also objected to the Settlement. R-2812(13); R-2856. The DOL argued that ERISA plans were not represented by any class representative. R-2856(1)-18, 23–25. Further, the DOL observed that the allocation gave ERISA plans 0% but required a total release of any and all ERISA claims the plans might have against BCBS. R-2856(1)-11, 34–39. The District Court held a separate hearing on the DOL's objections. R-2866. After the fairness hearing, the parties submitted additional briefing for and against the allocation and the Settlement. R-2868; R-2869; R-2877; R-2880; R-2881.

Almost a year later, the District Court approved the Settlement. R-2931. The court approved the 93.5%-to-6.5% allocation, presuming it was reasonable based on the recommendations of Fully Insured Subclass counsel. R-2931-36. The court did not acknowledge or purport to apply the "careful judicial scrutiny" required by

18

*Holmes*. R-2931-56. The court instead simply adopted Mason's analysis and found the allocation was economically reasonable. R-2931-37–38, 57–59. Despite the uncontested evidence that self-funded accounts are insured by BCBS for dental, vision, and stop-loss insurance, the court found the Self-Funded Subclass "purchased only administrative services" from BCBS, not "insurance." R-2931-57. And despite evidence that fully insured and self-funded customers use the same BCBS network and BCBS's negotiated pricing with those providers, the court found self-funded accounts could offset any higher prices paid to BCBS by "directly negotiat[ing] discounts with provider networks." R-2931-58. Further, the court approved the foreshortened subclass period, finding the Self-Funded Subclass "did not become involved in the lawsuit until late 2019" despite their inclusion in the very first-filed *Cerven* complaint. R-2931-38, 60–61. Although the BCBS Defendants acknowledged in 2013 that the *Cerven* injunction class definition encompassed self-funded plans (R-120-61), the court found that *Cerven* "simply gave no notice to Defendants whatsoever that they would have to defend against alleged misconduct in the ASO market." R-2931-61. The court also approved without question Mason's 50% late-to-the-party discount to further justify the allocation. R-2931-38, 59–60.

The District Court also granted class counsel's fee petition (R-2733) in full. The court awarded over $626 million in fees and over $40 million in expenses. R-

2932. At the end of its ruling, the District Court indicated that it had received an *in camera* report from the Special Master, dividing the fee award between Fully Insured Subclass counsel and Burns. R-2932-5. Self-Funded Objectors had no notice of this secret fee allocation or its contents and still have no idea what it says. Nonetheless, the District Court approved it. *Id.*

      6.   <u>The appeals</u>.

Self-Funded Objectors appealed, along with other objectors including Home Depot. R-2940; R-2942. This Court has consolidated all the appeals. Once the appeals were docketed here, Fully Insured Subclass counsel tried several gambits to avoid merits review. First, claiming the appeals were frivolous, they moved this Court to shorten the Appellants' time for filing their opening briefs. No. 22-13051, Doc. Nos. 26, 43, 46, 58, 98. When that didn't work, they moved the District Court to require the Appellants to post a $113 million appeal bond to hedge against administrative costs and potential market losses to the Settlement Fund. R-2996. The Settlement itself, however, postpones the Effective Date until all appeals and certiorari review have ended and places the Settlement Fund in interest-bearing escrow pending appeal. R-2610(2)-28–29, 42–44.

## SUMMARY OF THE ARGUMENT

Under this Court's precedents and amended Rule 23(e), a facially inequitable settlement allocation creates an inference of unfairness. This inference triggers careful judicial scrutiny and imposes a substantial burden on the allocation's proponents to demonstrate and document its fairness. Here, the allocation of 6.5% of the Settlement to more than 50% of the class, especially in combination with a complete release of their damages claims from the beginning of time, created just such an inference of unfairness. But the allocation's proponents failed to carry their burden to present a factual record rebutting this inference. The District Court erred by failing to recognize the allocation's facial unfairness, failing to apply the requisite careful scrutiny standard or require the allocation's proponents to carry their burden, and ultimately approving the allocation based on an inadequate record and a number of erroneous factual findings. As a result, the District Court allowed the Fully Insured Subclass to sell out the Self-Funded Subclass in violation of Rule 23(e). These errors merit reversal.

Additionally, Self-Funded Subclass claimants were members of the relevant class from the beginning of the litigation. Defendants admitted this. Indeed, the original *Cerven* complaint included self-funded plans in its estimate of total Blue membership and made clear that their inclusion was necessary to achieve complete

relief. Yet, the District Court found that the *Cerven* complaint did not include self-funded plans. And then it relied on this clearly erroneous finding to approve a double discount of the Self-Funded Subclass's claims. All of this was reversible error.

As soon as the subclasses were created, a fundamental intra-class conflict existed between them. Both subclasses had an interest in excluding the other's members from the damages allocation and maximizing the take for themselves and their counsel. Evidencing the effects of this conflict, original counsel for the entire Subscriber class selected the Self-Funded Subclass counsel with whom they ultimately negotiated an unsupported and unsupportable 93.5% allocation to the Fully Insured Subclass and a 6.5% allocation to the Self-Funded Subclass. The best way to avoid any conflict would have been a distribution on the same basis to all members of the Subscriber class. And the only reliable evidence presented to the District Court supported just such a distribution—using premiums and premium equivalents or excluding claims costs for both fully insured and self-funded groups to estimate the amount of antitrust injury to each class member.

## STANDARD OF REVIEW

Before granting approval of a settlement, a district court must determine that the settlement is "fair, reasonable, and adequate after considering" several factors, including whether "the relief provided for the class is adequate" and whether "the proposal treats class members equitably relative to each other." FED. R. CIV. P. 23(e)(2); *Johnson v. NPAS Sols.*, 975 F.3d 1244, 1262 (11th Cir. 2020). The same "legal principles apply 'with as much force'" to approval of a settlement allocation, requiring "careful judicial scrutiny." *Holmes*, 706 F.2d at 1147–48 (citation omitted). At the settlement stage, defendants have "no interest in how the class members apportion and distribute a damage fund among themselves," *Allapattah Servs. v. Exxon*, 333 F.3d 1248, 1258 (11th Cir. 2003) (citing *Boeing v. Van Gemert*, 444 U.S. 472, 481 n.7 (1980)), but merely in securing a complete release of claims. And plaintiffs' counsel's "interest in getting paid the most for its work representing the class comes into conflict with the class'[s] interest in securing the largest possible recovery for its members." *Johnson*, 975 F.3d at 1252–53 (cleaned up). Thus, the district court must serve as an independent check to provide "careful judicial scrutiny into whether the settlement allocation is fair to the absent members of the class." *Holmes*, 706 F.2d at 1148.

**ARGUMENT**

## I.    The District Court failed to carefully scrutinize the settlement allocation.

Rule 23 and Eleventh Circuit precedent require a district court to scrutinize a proposed settlement allocation to ensure that it treats all members of the class equitably in relation to each other. When a settlement allocation is facially disproportionate, the district court must require its proponents to demonstrate and document the allocation's fairness. Here, the District Court failed to fulfill its fiduciary obligation of review, applying the wrong legal standard and approving a grossly disproportionate settlement allocation unsupported by evidence. Accordingly, this Court should reverse approval of the allocation.

### A.    Amended Rule 23(e) requires that subclasses be treated equitably.

Rule 23 was amended in 2018 to require district courts to consider certain enumerated factors before approving a final settlement. *See* FED. R. CIV. P. 23(e)(2), advisory committee's notes on 2018 amendments.  "This review provides a backstop that prevents unscrupulous counsel from quickly settling a class's claims to cut a check." *Fresno Cnty. Emps.' Ret. Assoc. v. Isaacson/Weaver Family Tr.*, 925 F.3d 63, 72 (2d Cir. 2019); *see also Briseño v. Henderson*, 998 F.3d 1014, 1025 (9th Cir. 2021) (holding that the revised Rule 23(e)(2)(C) imposes a heightened duty of scrutiny on the district court).

24

Rule 23(e)(2) contains both procedural and substantive fairness components. FED. R. CIV. P. 23(e)(2)(A)–(B); *see also id.* advisory committee's notes on 2018 amendments. Procedural concerns include whether "the class representatives and class counsel have adequately represented the class" and whether "the proposal was negotiated at arm's length." FED. R. CIV. P. 23(e)(2)(A)–(B). Substantive concerns include whether "the relief . . . is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" and other factors, and whether "the proposal treats class members equitably relative to each other." FED. R. CIV. P. 23(e)(2)(C)–(D). In considering the costs and risks associated with litigating a case, "courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results." FED. R. CIV. P. 23(e)(2) advisory committee's notes on 2018 amendments. Indeed, this Court requires consideration of the so-called *Bennett* factors, which include: "the likelihood of success at trial" and "the range of possible recovery." *Equifax*, 999 F.3d at 1273 (quoting *Bennett v. Behring*, 737 F.2d 982, 986 (11th Cir. 1984)). And consistent with the principles for reviewing the overall award's adequacy, "[m]atters of concern" in reviewing a settlement's equity "could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the

25

apportionment of relief." FED. R. CIV. P. 23(e)(2) advisory committee's notes on 2018 amendments.

No circuit court has yet considered what Rule 23(e)(2)(D) specifically requires. But the rule's text requires—and the advisory committee's notes confirm— that a district court must adequately consider whether "the proposal treats class members equitably relative to each other," FED. R. CIV. P. 23(e)(2)(D), in view of the relative strengths of their claims, their likely range of their respective recoveries, and the scope of any release contemplated by the settlement.

### B.   The District Court has a fiduciary role to scrutinize a proposed settlement allocation to ensure it satisfies Rule 23(e)(2)'s standards.

In reviewing a settlement, the district court "takes on a type of fiduciary role" and "works to ensure the settlement is 'noncollusive in nature.'" *Equifax*, 999 F.3d at 1265 (quoting 4 WILLIAM B. RUBENSTEIN, NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 13:40 (5th ed. 2021)); *see also Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279–80 (7th Cir. 2002). This fiduciary role "stem[s] directly from the language of" Rule 23(e). *United States v. Miami*, 614 F.2d 1322, 1331 (5th Cir. 1980).

"[C]ourts, in their 'role as a fiduciary . . . for the unrepresented class members,' must apply 'careful scrutiny . . . to guard against settlements that may benefit the class representatives or their attorneys at the expense of absent class members[.]'" *Managed Care Advisory Grp., LLC v. CIGNA Healthcare*, 939 F.3d 1145, 1162 (11th Cir. 2019) (quoting *Miami*, 614 F.2d at 1331); *see also Reynolds*, 288 F.3d at 279 (recognizing the problem of "lawyers for the class who may . . . place their pecuniary self-interest ahead of that of the class").

In *Holmes v. Continental Can Company*, this Court required "careful scrutiny" of a settlement allocation like this that benefits different sub-sections of the class unequally. 706 F.2d at 1148; *see also* MOORE'S FED'L PRACTICE, MANUAL FOR COMPLEX LITIG. § 21.61 at 311 (4th ed. 2004). Proponents of an allocation always bear the burden of "developing a record demonstrating that the settlement distribution is fair, reasonable and adequate." *Holmes*, 706 F.2d at 1147. But when an allocation "explicitly provides for preferential treatment" of some class members over others, "a substantial burden" falls on the allocation's proponents "to demonstrate and document its fairness." *Id.* at 1147. Such a "disparity in benefits" may demonstrate "either substantive unfairness or inadequate representation." *Id.* at 1148; *see also* NEWBERG, *supra*, § 13:56 (explaining that a facially inequitable distribution "may be a red flag that class counsel have sold out some of the class

27

members at the expense of others, or for their own benefit"). The allocation's proponents may only rebut the resulting "inference of unfairness" with "a factual showing that the higher allocations to certain parties are rationally based on legitimate considerations." *Holmes*, 706 F.2d at 1148. The opinions of class counsel are insufficient to justify a "disproportionate and facially unfair allocation." *Id.* at 1150. This is especially true where, as here, the defendant agreed to a lump sum settlement and the "intraclass distribution of the fund was left to the class and its representatives." *Id.* at 1146. Any disproportionate relief must thus be justified by an "adequately developed factual record." *Id.* at 1151.

The failure to exercise careful judicial scrutiny of a class action settlement allocation warrants reversal. *See Holmes*, 706 F.2d at 1147, 1151; *Reynolds*, 288 F.3d at 283 (reversing where, "the circumstances demanded closer scrutiny than the district judge gave it"); *Roes, 1-2 v. SFBSC Mgmt.*, 944 F.3d 1035, 1049–50 (9th Cir. 2019) (similar); *cf. Plummer v. Chem. Bank*, 668 F.2d 654, 660 (2d Cir. 1982). Relatedly, a district court errs when it approves a settlement based on no evidence or a clearly erroneous factual finding. *Holmes*, 706 F.2d at 1147; *Day v. Persels & Assocs.*, 729 F.3d 1309, 1326–27 (11th Cir. 2013).

C.    **Here, the settlement allocation was facially unfair, and the District Court failed to apply careful judicial scrutiny.**

The dramatic disparity of this settlement allocation and the starkly dissimilar claims periods for the respective subclasses in exchange for the exact same "from the beginning of time" release should have triggered careful scrutiny under Rule 23(e)(2) and *Holmes*.

The allocation benefits the Self-Funded and Fully Insured Subclasses differently, requiring careful judicial review. *Holmes*, 706 F.2d at 1148; *see also* FED. R. CIV. P. 23(e)(2)(D). Here, members of the Self-Funded Subclass make up more than 50% of the class and yet received only 6.5% of the Settlement. Moreover, in submitting claims against this miniscule share of the Settlement, the Self-Funded Subclass could only submit claims for amounts paid to the Blues since September 1, 2015, despite being bound to a release of identical substantive and temporal scope to that of Fully Insured claimants, who could submit claims for amounts paid beginning in 2008. R-2715(1)-6–7; R-2931-38. The lopsided allocation was facially unfair. *See* FED. R. CIV. P. 23(e)(2)(D) & advisory committee's notes on 2018 amendments; *Petruzzi's v. Darling-Delaware*, 880 F. Supp. 292, 299 (M.D. Penn. 1995) (refusing to approve allocation that "provide[d] compensation to 50% of the class but require[d] the entire class to release its claims against the settling defendant"); *see also In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322,

29

1329 (5th Cir. Unit A 1981) (approving a "share-and-share-alike formula" for claimants who were affected differently by statute of limitations but subject to the same complete release).

Under *Holmes*, this facially inequitable treatment created an "inference of unfairness." 706 F.2d at 1148. The District Court was thus required under *Holmes* to carefully scrutinize the evidentiary basis of the allocation and to ensure that the allocation's proponents carried their "substantial burden . . . to demonstrate and document [the allocation's] fairness." *Id.* at 1147.

The presence of other "suspicious circumstances" heightened the District Court's fiduciary obligation to carefully review the allocation. *Reynolds*, 288 F.3d at 284. Such circumstances include the fact that Fully Insured Subclass counsel effectively selected the attorney who ultimately represented the adverse Self-Funded Subclass, the short timeframe of Burns's representation before the allocation, the brevity of the allocation negotiation, the remarkable claim of common interest privilege as to communications between Fully Insured counsel and the expert for the Self-Funded Subclass, and the absence of serious negotiation on behalf of the Self-Funded Subclass for an allocation outside the Fully Insured Subclass's starting negotiation range. *See supra* p. 10–11, 17; R-2610(8)-¶12. Moreover, at the District

Court's prompting, Fully Insured Subclass counsel admitted on the record that a complete release from the Self-Funded Subclass was necessary to achieve any settlement with BCBS. R-2864-15; R-2865-137. This highlights the incentive to quickly compromise the newly formed subclass's damages claims to maximize the take for the Fully Insured Subclass's counsel and their clients.

The District Court erred by failing to acknowledge, much less apply, the careful scrutiny standard Rule 23(e)(2) and *Holmes* require for reviewing such a facially unfair settlement allocation. R-2931-56. Rather, in contravention of those standards, the District Court determined that the allocation could "pass muster so long as 'it has a reasonable, rational basis,' particularly if 'experienced and competent' class counsel support it." *Id.* The court failed to recognize that the allocation's facial inequity created a presumption of unfairness and that it was thus obligated to apply "careful judicial scrutiny" and to require the allocation's proponents to "demonstrate and document [the allocation's] fairness." *Holmes*, 706 F.2d at 1147–48. This Court should thus reverse. *Johnson*, 975 F.3d at 1251 n.2.

Relatedly, the District Court erred by approving the allocation of attorneys' fees between Fully Insured Subclass counsel and Self-Funded Subclass counsel based on a secret fee allocation submitted *in camera*. R-2932-5. As the Seventh

Circuit reasoned, "conceal[ing] [fee] applications" via *in camera* submission "paralyzes objectors," despite the need for "beady-eyed scrutiny [of fee applications] by the district judge." *Reynolds*, 288 F.3d at 286; *cf. Johnson*, 975 F.3d at 1252–54 (holding that requiring objections to a fee award before class counsel has filed their fee petition "handicap[s]" objectors and prevents the district court from "properly play[ing] its fiduciary role"). Here, Self-Funded Objectors were not able to review the secret allocation of fees to learn whether the 93.5%-to-6.5% allocation also gives Fully Insured Subclass counsel a grossly disproportionate share of fees. This error is reversible. *Johnson*, 975 F.3d at 1251 n.2.

### D. **The District Court approved the allocation based on inadequate evidence and erroneous factual findings.**

The District Court failed its fiduciary obligation to prevent sellout of the subclass. Instead of applying "careful judicial scrutiny" and requiring the settlement allocation's proponents to "demonstrate and document its fairness," *Holmes*, 706 F.2d at 1147–48, the District Court approved the allocation based on no evidence and erroneous factual findings.

1.     The District Court erred by approving an allocation without evidentiary support.

In preliminarily approving the settlement allocation, the District Court relied only on mediator Feinberg's statement that the allocation treated class members equitably and Fully Insured Subclass counsel's assurances to that effect. R-2641-52. Feinberg's declaration and counsel's assurances, which are "an insufficient basis upon which to approve [a] disproportionate and facially unfair allocation" under *Holmes*, 706 F.2d at 1151, are also the two main supports for the District Court's final approval of the settlement allocation. R-2931-18. Yet, without citing any other support, the District Court asserted that the allocation rested on "numerous factors including the strengths of the respective claims, the substantially shorter Self-Funded Class Period, and the fact that premiums paid for fully-insured coverage dwarf the administrative fees charged for self-insured coverage." *Id.* (quoting Mot. for Final Approval, R-2812(1)-35). Feinberg's and counsel's opinions do not present or represent evidence supporting any of those factors.

Indeed, Feinberg's opinion was not that of an expert but of a mere mediator without expertise in health insurance, antitrust economics, or any other relevant field. R-2610(8)-9–18. He cursorily cited unspecified "expert analysis and evidence" from "both sides" but did not point to specific revenue or profit numbers or any other data supporting the allocation. R-2610(8)-¶12. Instead, Feinberg repeated what he

33

had been told about "potential statute of limitations issues and the relative size of the administrative fees paid by Self-Funded Claimants vs. the premiums paid by FI Claimants." *Id.* But he did not discuss any evidence "demonstrat[ing] and document[ing]" those factors. *Holmes*, 706 F.2d at 1147. There is none. The unsubstantiated statement of a mediator provides no evidentiary basis for approving a facially disproportionate settlement allocation.

Relatedly, the District Court erred under *Bennett* by accepting the Fully Insured Subclass's unsupported statement that "the strengths of the respective claims" supported the allocation. R-2931-18 (quoting Mot. for Final Approval, R-2812(1)-35). The District Court was required to explicitly consider for Self-Funded Subclass members "the likelihood of [their] success at trial" and "the range of possible recovery." *Equifax*, 999 F.3d at 1273 (quoting *Bennett*, 737 F.2d at 986); *see also Corrugated Container*, 643 F.2d at 213 (holding that the district court "must establish the range of possible damages that could be recovered at trial"). And it could not approve the allocation in the absence of evidence establishing the range of possible recovery. *See Mirfasihi v. Fleet Mortg.*, 356 F.3d 781, 786 (7th Cir. 2004) (reversing allocation where the district court "made no estimate of the value of the legal claims" of the subclass who received 0% of monetary fund); *Staton v. Boeing*, 327 F.3d 938, 975–76 (9th Cir. 2003) (reversing 16:1 allocation ratio for lack of

direct evidence supporting plaintiffs' counsel's opinion on the strength of subclass's claims); *Day*, 729 F.3d at 1327–28 (vacating final judgment in absence of evidence establishing range of possible recovery).

But the District Court did not make any findings about the strengths of the Self-Funded Subclass's claims. R-2931-18. Nor did it make any findings or cite any evidence establishing the subclass's likely recovery. Indeed, there was none. The Feinberg declaration stated in a footnote that Fully Insured counsel's 3.4% to 6.8% negotiation range relied on an analysis by their damages expert, Ariel Pakes. But Pakes did not separately analyze the possible recovery for the Self-Funded Subclass. He simply "underst[oo]d" that the subclass's damages were "6.5% of total damages" and then "used that fraction to estimate damages" to Self-Funded Subclass members. R-2610(11)-¶7. Such circular analysis is not evidence. And the District Court's failure to demand more and make the requisite findings was reversible error.

Mason's report and testimony also did not provide an adequate evidentiary basis for approving the allocation. The District Court erred by relying on them. First, the report merely provided post-hoc justifications for the unsupported and unsupportable 93.5%-to-6.5% ratio, which was based on the improper gross-to-net comparison of fully insured premiums to self-funded administrative fees. Second,

Mason could not identify the specific data sources for his calculations, fundamentally undermining his reliability.

Mason's opinions offered no more than post-hoc justifications for a pre-approved allocation. It is clear from Burns's and Feinberg's declarations that they understood the comparison of fully insured "premiums" to "administrative fees" paid by self-funded plans to be the dominant evidentiary factor rendering the allocation fair and reasonable. R-2610(7)-¶10; R-2610(8)-¶12. And Mason's opinions rested on the same assumption—that self-funded plans purchase only administrative services from BCBS. *See* R-2825(1)-¶20 (assuming that fully insured accounts purchase "administrative services" and "claims cost certainty" while self-funded accounts purchase "only 'administrative services.'"); *see also id.* ¶37 ("[A]verage revenue per ASO member represents revenue associated with administrative services."). Yet, Mason's report offered no more evidence for this assumption than the declarations that preceded it, fatally infecting his analysis. *See* R-2825(1)-¶20.

Second, Mason's opinions were unreliable because he used data he did not understand. And the BCBS quarterly financial and enrollment reports upon which he relied were not in the record, not provided to Objectors, and not reviewed by the

District Court. In *Holmes*, this Court deemed the opinion of plaintiffs' attorney to be an insufficiently reliable "basis upon which to approve the disproportionate and facially unfair allocation," reasoning that such reliance "offer[ed] the same host of dangers that underlies the evidentiary rule against the admissibility of hearsay testimony." 706 F.2d at 1149–50, 51. Likewise here Mason's testimony is not reliable because he lacks sufficient knowledge of the data underlying his opinions. *See* FED. R. EVID. 702(b) (obligating the district court to ensure that an expert's testimony is "based on sufficient facts or data"); *ZF Meritor v. Eaton*, 696 F.3d 254, 293–94 (3d Cir. 2012) (affirming exclusion of testimony where expert "did not know who initially calculated the . . . figures" on which he relied and did not "know the methodology used to create [them] or the assumptions on which [they] were based").

Mason could not answer what data was included in his "self-funded revenue" number because he is "not the expert on this data." R-2865-219. Nor did his report explain what revenue streams were included in the data he used for all four of his self-described proxies. Mason admitted that he could not say "exactly what's in [each revenue] bucket." R-2865-231. Instead, he "relied upon the Blues" to tell him "what revenue [was] touched by [the] horizontal territorial restraints." *Id.* The best he could say was that he "underst[ood] this revenue [to] cover some of these categories expressed in general terms." *Id.*

Mason's post-hoc justifications for the 6.5% allocation, based on data he did not understand, are inadequate to support approval of the facially unfair settlement allocation. *See Holmes*, 706 F.2d at 1151; *ZF Meritor*, 696 F.3d at 293–94.

2.    The District Court erred by failing to justify its reliance on Mason's opinions.

Subclass Objectors' experts rigorously contested the validity of Mason's assumptions. But the District Court erred by failing to substantively address these challenges. When a district court relies on an expert methodology to approve the calculation of settlement damages, it is "compelled to consider the validity of the estimate" and, if it finds the estimate to be valid, "to explain why." Failure to do so constitutes reversible error. *Corrugated Container*, 643 F.2d at 215; *see also Sharp Farms v. Speaks*, 917 F.3d 276, 294 (4th Cir. 2019) (district court erred by rejecting with "conclusory statements" objectors' "serious charges of collusion").

The District Court relied upon Mason's credentials without discussing the validity of his methodology. R-2931-37, 57. The court did not cite any evidence supporting his opinions or review any evidence underlying them because that evidence (the BCBS quarterly reports) is not in the record. Nor did it substantively address the evidence that was in the record—BDO's and Corley's detailed

38

description of self-funded products, their place in the commercial insurance market, and the services and features common to both self-funded and fully insured products that produce revenue and market power for BCBS. R-2998(1)-48, 101. The District Court did not discuss Corley's expert report at all, and it dismissed BDO's report in a single, conclusory sentence. R-2931-58. This alone was reversible error. *Corrugated Container*, 643 F.2d at 215 & n.30; *Sharp Farms*, 917 F.3d at 294.

Further, the District Court's failure to consider Self-Funded Objectors' expert evidence led it into a series of additional errors. First, the court erroneously accepted and adopted Mason's speculative conclusions about the greater competitiveness of the self-funded market. R-2931-58. For one, Mason's speculation that the greater availability of substitute products, including TPAs, means that self-funded subscribers "purchase from a more competitive market" than fully insured subscribers reveals his misunderstanding of the commercial health care market. R-2825(1)-¶22. Preferred provider networks drive employer decisions in selecting health plans. Corley Report, R-2998(1)-116. BCBS's singular competitive advantage is its nationwide network (and the provider discounts it features). *Id.* Thus, as Mason and the Fully Insured Subclass admit, R-2912(9)-¶65 & n.83; R-2865-90, TPAs generally do not compete with BCBS for large self-funded accounts, which represent a substantial percentage of the market because most businesses with

39

over 200 employees self-fund, R-2998(3)-40; *see also* R-2845(6)-2–3. Rather, the true substitute for large BCBS self-funded plans are large BCBS fully insured plans. R-2865-237–38.

Moreover, given that self-funded plans represent over 50% of BCBS's covered lives, Mason's claim that BCBS's self-funded business operates at a loss makes no sense. Corley reports that BCBS's ASO fees are "very comparable, and sometimes higher" than TPAs that do not own their own provider networks or have fully insured business but nonetheless "earn and report very healthy profits." R-2998(1)-108. Additionally, as former Anthem CFO Wayne DeVeydt testified in the Anthem-Cigna trial, BCBS accounting methods disguise the profitability of its self-funded business; although self-funded business may appear to be a loss leader on per member per month administrative fees, accounting for profit from unbundled services reveals its overall profitability. R-2845(4)-32–35.

Second, the District Court erred by finding, based on a misreading of one paragraph of Mason's report, that fully insured claimants "deserv[ed]" their 93.5% allocation because Self-Funded Subclass members had the "ability to directly negotiate discounts with provider networks" and thus "any overcharge" they paid on administrative fees was "likely offset by savings on claims costs." R-2931-58 (citing

R-2825(1)-¶54). No evidence supports that finding. Rather, both fully insured and self-funded accounts purchase access to the same BCBS network. This means claims costs are essentially identical for both types of plans, and increases in claim costs affect both equally. R-2998(1)-53, 116.

This is all the more true after passage of the ACA because its "medical loss ratio" limits the opportunity for BCBS to profit on the fully insured side. As Cigna's CEO David Cordani testified in the Anthem-Cigna trial, after the ACA, claims costs for fully insured and self-funded plans are increasingly aligned because the health insurer no longer "get[s] to unilaterally benefit" from "deliver[ing] better medical costs." R-2845(7)-2–3; *see also* R-2877(1)-6 (medical loss ratio "essentially limit[s] insurers to only the 2-3% profit baked into the pricing").

Furthermore, self-funded accounts buy essentially the same basket of services from BCBS as fully insured accounts, but administrative fees alone do not capture these additional revenue streams. Fully insured plans include claims costs plus a "retention" comprised of administrative fees, pooling charges (a similar concept to stop-loss), state premium taxes, and BCBS profit margin. R-2998(1)-105. Self-funded accounts separately purchase administrative services, stop-loss insurance, and dental, vision, and prescription products, each with a built-in profit load. R-

41

2998(1)-58, 109; 2845(4)-32, 34–35. Self-funded accounts accordingly save only a small part of the retention and thus an even smaller part of the total premium by switching from a fully insured plan to a self-funded one. R-2998(1)-105. The evidence shows that, excluding health claims, fully insured and self-funded revenue models "operate basically the same" and produce "comparable revenue streams to BCBS." R-2998(1)-106.

Moreover, the operative complaint alleges—and the Settlement's proponents argued—that BCBS's anticompetitive conduct drove up costs on both sides. R-2616-¶¶2, 10–12; R-2616-138; R-2812(1)-71. Indeed, the plan of distribution calculates self-funded claim payments based on the "fees paid for any Commercial Health Benefit Product, including the administration of medical, pharmaceutical, vision and dental plans as well as any amounts paid to the Settling Defendants for stop-loss insurance." R-2715(1)-¶24. Excluding these amounts from the allocation yet including them in the Self-Funded Subclass's claim calculation is absurd.

Third, the District Court mistakenly found that Self-Funded Objectors attacked only Mason's gross revenue proxy. R-2931-57. Objectors consistently argued that Mason's misunderstanding of the health insurance market and the data underlying his calculations tainted all Mason's proxies—and the District Court's

42

reliance on them. R-2865-190; R-2877-13. All four failed to account for revenues or profit margins on unbundled services sold to self-funded accounts, *see* BDO Supp. Report, R-2845(4)-9, which rendered them meaningless estimates of relative antitrust injury.

As Mason admitted, Blue Cross Blue Shield did not provide him data on profits for self-funded accounts or the unbundled services they purchase. R-2825(1)-¶42. What's worse is that BCBS data on self-funded profit "margin[s]" is available. R-2845(9)-4. The expert at the Anthem-Cigna trial cited numbers for Anthem's self-funded "margin" and its margin average for "insurance products," but those numbers were redacted from his testimony. R-2845(9)-4. In fact, despite the fact that the operative complaint alleged that BCBS's agreements "limit[ed] competition for commercial health benefit products," R-2616-¶10, which it defined to "includ[e] . . . medical, pharmacy, dental, and vision products and services" and "stop-loss" insurance, R-2616-138, Mason did not understand his mandate to include examination of profits on such unbundled services, R-2865-56–57. Only Self-Funded Objectors' experts—unconsidered by the District Court—estimated the injury to each class member based on the realities of the commercial health insurance market, including all products sold to self-funded accounts with a profit margin. R-2998(1)-63–75.

43

3.    <u>The District Court erred by approving the Settlement based on a clearly erroneous factual finding</u>.

Not only did the District Court approve the settlement allocation based on a deficient record, but it also clearly erred by finding that self-funded accounts only pay administrative fees. In *Day v. Persels & Associates*, this Court reversed approval of a settlement based on a clearly erroneous factual finding. 729 F.3d at 1326–27. Here, the District Court found that "Fully Insured Claimants . . . purchased insurance from Defendants" but "Self-Funded Sub-Class Claimants . . . purchased only administrative services." R-2931-57. The District Court evidently understood "administrative services" to mean only claim processing fees, not other unbundled services or dental, vision, and stop-loss insurance. *See* R-2931-61 ("Self-Funded [claimants] did not buy insurance from the Blues.").

Yet, as Self-Funded Objectors' experts detailed, BCBS generates self-funded revenues from a variety of unbundled services. R-2998(1)58, 109; R-2845(4)-7–8, 32–35. These fees are charged on top of standard administrative services fees. R-2998(1)-115. And Self-Funded Subclass members would have purchased stop-loss insurance and vision, dental, and pharmacy products, which the Settlement includes in BCBS's Commercial Health Benefit Product. R-2610(2)-8–9. Indeed, the Settlement's plan of distribution recognizes as much. R-2715(1)-¶24.

44

Thus, the District Court's finding that Self-Funded Subclass claimants "purchased administrative services only," not "insurance" or other ancillary services, is clearly erroneous. R-2931-57. This "erroneous finding . . . was central" to the District Court's approval and is thus reversible error. *Day*, 729 F.3d at 1327.

*    *    *

In sum, the District Court approved the allocation on an inadequate record. It failed to apply the "careful judicial scrutiny" required by *Holmes* and to ensure the allocation's proponents satisfied their "substantial burden" to "demonstrate and document" the fairness of the facially inequitable allocation. And the Court failed to protect the Self-Funded Subclass from the sellout of its claims that amended Rule 23(e) was intended to prevent. Moreover, careful scrutiny of the 93.5%-to-6.5% allocation in light of Self-Funded Objectors' expert evidence—the only evidence in the record—would reveal that the allocation should have been closer to 50%-50%.

### E.   <u>The District Court erred in preventing Self-Funded Objectors from discovering Fully Insured Subclass counsel's input into the Mason Report</u>.

Finally, the District Court erred by ruling that the Self-Funded Subclass could not obtain communications between counsel for Fully Insured Subclass counsel and Mason because a common-interest privilege applied. R-2865-82.

45

When multiple clients "share a common interest about a legal matter," attorney-client privilege may protect communications from one client to the attorney of another. *United States v. Almeida*, 341 F.3d 1318, 1324 (11th Cir. 2003) (citation omitted). The privilege does not apply when two parties have adversarial positions. *Id.* at 1324–25; *Garner v. Wolfinbarger*, 430 F.2d 430 F.2d 1093, 1103–04 (5th Cir. 1970). The party claiming the privilege bears the burden of demonstrating it applies. 1 McCormick on Evidence § 91.1 (8th ed. 2020); *see also In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 922 (8th Cir. 1997).

Counsel on either side of an allocation are adversaries, not parties with a common interest. Allocation is a "zero sum situation" where "a gain to one party entails a corresponding loss for the other parties," thus "generat[ing] antagonistic interests and conflicting concerns." *Holmes*, 706 F.2d at 1160; *see also Dewey v. Volkswagen*, 681 F.3d 170, 188–89 (3d Cir. 2012) (characterizing this relationship as a "fundamental intra-class conflict"). And this Court held in *Equifax* that "the parties" on either side of this kind of intra-class conflict "remain in adversarial positions until the district court approves the settlement." 999 F.3d at 1264.

Self-Funded Subclass members were denied access to communications between Fully Insured Subclass counsel and Mason, even though Mason was

purportedly *their* expert, hired for the purpose of negotiating a division of the Settlement fund with an adverse subclass. Self-Funded Objectors suspected that those communications might explain why the Self-Funded Subclass's own expert was the only expert advocating for a 6.5% or smaller allocation. The District Court inexplicably held that any such communications between Mason and Fully Insured Subclass counsel were protected by a common-interest privilege. R-2865-82.

This was a clearly erroneous misapplication of the common-interest privilege. The Fully Insured and Self-Funded Subclasses had antagonistic interests in increasing their respective shares of the settlement allocation, thus decreasing the other group's share. *See Holmes*, 706 F.2d at 1160; *Dewey*, 681 F.3d at 188–89; *Equifax*, 999 F.3d at 1264. Thus, the Fully Insured and Self-Funded Subclasses did not share a common interest, and no common-interest privilege applied to protect Mason's communications with Fully Insured Subclass counsel. Objectors, members of the Self-Funded Subclass for whom Mason was retained, were Mason's clients. They were entitled to see his communications with adverse counsel. The District Court's finding otherwise was clearly erroneous.

**II.    The District Court abused its discretion by approving the Self-Funded damages period.**

In approving the Settlement and overruling Self-Funded Objectors' argument that the allocation was unfair, the District Court approved a damages claims period for the Self-Funded Subclass that was less than half that for Fully Insured claimants—5 years versus 12.5 years. R-2931-38. Its approval rested on a clearly erroneous factual finding—that the *Cerven* complaint did not adequately notify Defendants that the claims of Self-Funded Subclass members were part of the case. R-2931-61. Additionally, the District Court impermissibly relied on this erroneous factual finding—that the Self-Funded Subclass arrived late to the litigation—to reduce the Subclass's damages allocation twice.

**A.    <u>The District Court clearly erred by finding that the *Cerven* complaint did not notify Defendants that it asserted claims on behalf of self-funded class members.</u>**

First, Defendants had notice that they would have to defend against claims brought on behalf of self-funded accounts from the outset of this litigation. This is because the *Cerven* complaint included claims for injunctive relief brought on behalf of self-funded plans. The District Court's finding that the Self-Funded Subclass's subsequent pursuit of damages relief did not relate back was clearly erroneous.

48

In *Cliff v. Payco Gen'l American Credits*, this Court extended Federal Rule of Civil Procedure 15(c)(1)(B)'s application to determine whether an amendment seeking to add a plaintiff to the original complaint relates back. 363 F.3d 1113, 1131–32 (11th Cir. 2004); *Makro Capital of Am. v. UBS AG*, 543 F.3d 1254, 1259–60 (11th Cir. 2008). District courts have subsequently interpreted *Cliff* to impose three requirements for relation back in this context: (1) that the amended claim arose out of the same conduct, transaction, or occurrence set out in the original pleading, (2) that the original complaint provided adequate notice of the new plaintiff(s), and (3) that amendment would not unfairly prejudice defendants. *King v. Cessna Aircraft*, No. 03-20482-CIV, 2010 WL 5253526, at *10 (S.D. Fla. Sept. 13, 2010); *Grand Lodge of Pa. v. Peters*, 560 F. Supp. 2d 1270, 1274 (M.D. Fla. 2008). "[T]he critical issue in Rule 15(c) determinations is whether the original complaint gave notice to the defendant of the claim now being asserted." *Makro*, 543 F.3d at 1260 (quoting *Davenport v. United States*, 217 F.3d 1341, 1345 n.8 (11th Cir. 2000)).

Here, the District Court concluded that ASOs did not fall within the *Cerven* complaint's damages class because "[t]he *Cerven* complaint plainly did not contemplate ASOs being part of that case or the relevant class." R-2931-61. As a result, the District Court reasoned, the complaint "simply gave no notice to Defendants whatsoever that they would have to defend against alleged misconduct

49

in the ASO market." *Id.* The District Court concluded that "ASOs cannot get the benefit of the *Cerven* filing date." *Id.* As a result, the District Court approved a damages claims period for Fully Insured accounts that was more than twice as long as that of self-funded claimants—12.5 years versus 5 years. R-2931-59.

The District Court erred. Defendants themselves *admitted* their understanding that the claims of self-funded plans were at issue in *Cerven* when they argued in a "Motion to Dismiss Plaintiffs' Antitrust Conspiracy Claims" filed in September 2013 that *Cerven*'s "proposed nationwide class . . . encompasse[d] both large and small groups that self-insure." R-120-61. Thus, Defendants had actual notice of self-funded class members' claims and would not be unfairly prejudiced by a finding that their claims related back. *See Cliff*, 363 F.3d at 1132.

Indeed, the antitrust claims of self-funded plans were undeniably asserted in *Cerven*, regardless of whether only injunctive relief was initially sought on their behalf. Relation back is determined by what claims were asserted, not by the remedies pursued. *See* 6A FEDERAL PRACTICE AND PROCEDURE (WRIGHT & MILLER) § 1437 (3d ed. 2022 Update) ("[A]mendments . . . changing a demand for equitable relief to one for legal relief . . . have been held to relate back."); *Friederichsen v. Renard*, 247 U.S. 207, 210 (1918); *Bemis Bros. Bag v. United States*, 289 U.S. 28,

34 (1933). Injunctive relief and damages are types of remedies, not causes of action. *Friederichsen*, 247 U.S. at 210 ("The cause of action is the wrong done, not . . . the character of the relief sought[.]"); *see also Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 69, 75–76 (1992) (distinguishing between having a "cause of action" and whether a party is entitled to receive equitable relief *and* damages). The claims and causes of action of self-funded plans were placed at issue in *Cerven* regardless of what remedies were sought at that time.

        1.     <u>The *Cerven* Injunctive Relief Class included persons and entities covered by self-funded plans.</u>

*Cerven* sought injunctive relief on behalf of "[a]ll persons or entities who are currently insured by any health insurance plan that is currently a party to a license agreement with BCBSA that restricts the ability of that health insurance plan to do business outside of any geographically defined area." R-2998(3)-99. Thus, the definition has three prongs: a person or entity (1) insured (2) by any health insurance plan (3) that is a party to an anticompetitive license agreement with BCBSA. The District Court found that Self-Funded Subclass members did not satisfy the first prong because "they did not buy insurance from the Blues." R-2931-61. This was clearly erroneous. First, self-funded plans typically bought stop-loss insurance and other insurance products the settlement complaint and the Settlement later included in BCBS's Commercial Health Benefit Product. R-2616-138; R-2610(2)-8–9. The

District Court's factual finding otherwise was clearly erroneous. Second, *Cerven* could have defined the injunction relief class to include only entities or persons that "paid health insurance premiums . . . for . . . full-service commercial health insurance," as it did in defining the damages claims. R-2998(3)-100. But it did not, suggesting a broader understanding of "insured by." And pleadings must be construed to do justice to the pleader. FED. R. CIV. P. 8(e); 5 WRIGHT & MILLER § 1286 (4th ed. 2022 Update).

Additionally, the Self-Funded Subclass satisfies the second and third prongs of the *Cerven* complaint's injunctive claimant definition. Subclass members were insured by a health insurance plan because "health insurance plan" as used in the complaint means a BCBSA member. *See, e.g.*, R-2998(3)-98 ¶17 ("BCBS-NC is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in North Carolina."); R-2998(3)-102 ¶30 ("the member health insurance plans of BCBSA). And as alleged in the complaint, each BCBSA member was a party to a license agreement with BCBSA. R-2998(3)-144 ¶145.

The District Court also noted that "not a single Self-Funded Account sought to file suit during the eight years between the *Cerven* complaint and the settlement." R-2931-61 n.25. The obvious explanation is that self-funded entities, like Self-

Funded Objectors, who purchased insurance (including stop loss, dental, vision, and pharmacy products) from BCBS read *Cerven* and concluded their claims were already in the case and were tolled. *See Am. Pipe & Constr. v. Utah*, 414 U.S. 538, 551 (1974) (providing that when a class action complaint is filed, the statute of limitations is tolled as to all putative class members until certification). Indeed, Defendants understood this. R-120-61. Only the District Court read the *Cerven* complaint to "plainly" exclude self-funded claimants, R-2931-60–61, leading to its erroneous conclusion that they were sleeping on their rights, R-2931-60–61 & n.25.

2.    The *Cerven* Complaint Alleged Anticompetitive Behavior that Affected Every Type of Plan Participating in a Blue Network.

The scope and nature of the restraints alleged by the *Cerven* complaint also demonstrate that Defendants had notice of Self-Funded Subclass members' claims. The anticompetitive behavior the complaint alleged and sought to restrain via injunction affected all Blue member plans—fully insured and self-funded alike—and complete relief required inclusion of self-funded class members in the injunction claimant definition.

The *Cerven* complaint's allegations attacked the entire Blue structure and its geographic restraints across all plans. R-2998(3)-116 ¶81 (alleging that "any agreement between BCBSA and one of its member plans constitute[d] a horizontal

53

agreement"). The injunctive relief sought was intended to undo all these restrictions. R-2998(3)-146 ¶154 (seeking to enjoin "*any* [BCBS] agreements that restrict the territories or geographic areas in which *any* BCBSA member may compete" (emphasis added)). And the complaint made clear that the size of Blue membership—including self-funded members—was key to each Blue's maintaining its "provider network," an "essential" part of its product, and using the network to "exploit [its] monopoly power." R-2998(3)-135 ¶135; R-2998(3)-129 ¶118. Moreover, the complaint estimated Blue national membership at 100 million, R-2998(3)-98, putting BCBS on notice that self-funded class members' claims were at issue because (as Mason's exhibits confirm, R-2825-Ex.1) Blue membership approaches 100 million only if self-funded members are counted. In short, including Self-Funded Subclass members in the injunction class was necessary to obtain complete relief.

*     *     *

In sum, both the *Cerven* complaint's injunction claimant definition and the scope and nature of the relief it requested put Defendants on notice that the complaint asserted claims on behalf of the Self-Funded Subclass. The District Court's finding otherwise was clearly erroneous, meriting reversal. *See Day*, 729 F.3d at 1327.

54

## B. The District Court Erred by Approving the Allocation Based on an Unsupported 50% Discount.

Additionally, the District Court's approval of the additional arbitrary 50% discount was legally and factually unsupported.

In determining whether a settlement is adequate under Rule 23(e)(2)(C), courts typically estimate the value of a case if litigated to judgment and discount that value "by the risks that the class would face in securing that outcome." NEWBERG, *supra*, § 13:51; *see also In re Gen'l Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995); *Reynolds*, 288 F.3d at 284–85 (explaining that a discount factor allows the district court to "quantify the net expected value of continued litigation to the class").

Here, the District Court approved the 6.5% allocation to the Self-Funded Subclass after applying an arbitrary, retrospective 50% discount on top of the truncated class period. R-2931-59; R-2825(1)-¶¶35, 39, 40, 43, 49, 50. The District Court admitted that it assumed and relied upon the "time [the Self-Funded Subclass] avoided" in litigation in validating both Mason's overcharge analysis and his use of the 50% discount. R-2931-37, 58. The court reasoned that the Self-Funded Subclass did not incur "the same litigation expenses, burdens, and perils as the rest of the

Class" and "benefitted from the work the Fully Insured counsel had performed." R-2931-59.

The District Court did not apply "careful judicial scrutiny" and require the allocation's proponents to "demonstrate and document [the] fairness" of applying a 50% discount factor to the Self-Funded Subclass alone. *Holmes*, 706 F.2d at 1147–48. There was no evidentiary support for halving the Self-Funded Subclass's damages allocation a second time; the discount was just another post-hoc justification for the 6.5% allocation. Indeed, Fully Insured counsel defended the 50% discount for the first time their final reply brief. R-2880-56–57. But a discount factor is intended to account for time remaining until judgment, not time that has already elapsed. RUBENSTEIN, *supra*, § 13:51; *Gen'l Motors*, 55 F.3d at 806. Yet Mason cited no authority for applying a discount factor retrospectively to account for differing time periods spent by distinct classes in litigation. R-2825-¶35 & nn.51–53. That was the purpose of the differing class periods. Indeed, the result of the District Court's approval of the Settlement based on Mason's double discount was a release with the same substantive and temporal scope for all claimants, despite a damages allocation that halved the Self-Funded Subclass's recovery once, and then halved it again. *Cf. Corrugated Container*, 659 F.2d at 1329.

And the District Court also failed to address Self-Funded Objectors' argument that Mason did not apply the same 50% discount factor to large fully insured plans who also got the full 12.5-year claims period. But those claimants were not explicitly added to the litigation until November 2020. R-2865-148. And the same justifications cited by the District Court for applying the 50% discount to the Self-Funded Subclass's claims (saved litigation expense and risk) would thus apply to large fully insured claimants. Applying the 50% discount factor to one and not the other was unfair and unreasonable, and the District Court did not justify that disparate treatment.

The District Court erred in three ways: (1) by approving the application of a 50% discount factor based on its clearly erroneous finding that self-funded plans arrived late to the litigation, (2) by approving the facially inequitable treatment of self-funded accounts in the application of the 50% discount factor, absent legal or factual support, and (3) by failing to scrutinize the unequal treatment of the Self-Funded Subclass and fully insured claimants. All three require reversal. *See Day*, 729 F.3d at 1327; *Sharp Farms*, 917 F.3d at 294; *Holmes*, 706 F.2d at 1147, 1151.

## III.    No allocation was necessary.

The unnecessary creation of the Self-Funded Subclass produced a conflict between the interests of the Fully Insured and Self-Funded Subclasses. This conflict could have been avoided by replacing the allocation with a system that distributed the Settlement to all class members on the same basis.

When one group of class plaintiffs has "an interest in excluding [a second group]" from certain settlement benefits and the second group has an interest in being included, there is "a fundamental intra-class conflict." *Dewey*, 681 F.3d at 188–89. Such a conflict existed here as soon as it was decided that all fully insured claimants and the Self-Funded Subclass would both be included in the Settlement but would be treated differently. As discussed above, the last-minute timing of the creation of a subclass (and selection of subclass counsel for it by the very fully insured lawyers who had the conflict) only exacerbated the conflict. The better way to resolve such a conflict would have been to "do away with [any] distinction" between the two groups and "allow all members of the class" to seek a distribution on the same basis. *Id.* at 189; *see also Corrugated Container*, 659 F.2d at 1329 (approving a "share-and-share-alike formula").

Here, a gross-gross or net-net comparison would have allowed exactly that. A proper gross-gross comparison would have compared premiums for the fully insured class members to the very same "premium equivalents" that BCBS uses for the Self-Funded Subclass members in the day-to-day operation of its business. R-2845(3)-2–3. This method provides a good approximation of relative damages because it accounts for the impact of BCBS's anticompetitive restraints on both fully insured and self-funded claimants. *See* R-2998(1)-71–75. Because fully insured and self-funded plans use the same BCBS network, BCBS has "affected both types of plans equally." R-2998(1)-116. Thus, considering premiums and premium equivalents— or excluding claims costs for both types of plans—would represent a reasonable basis on which to distribute the Settlement. This would allow all Subscriber class claimants to make claims against the Settlement fund using the same calculation.

## CONCLUSION

Accordingly, Self-Funded Subclass Objectors ask the Court to vacate the Final Judgment Order approving the settlement allocation for, among other reasons, lack of evidence supporting it. Applying careful scrutiny to the record evidence shows that BCBS's anticompetitive conduct impacted the Fully Insured and Self-Funded Subclasses equally. The allocation should be closer to 50%-50%, but no allocation is necessary.

Dated: December 12, 2022

Respectfully submitted,

/s/ Scott Burnett Smith
Scott Burnett Smith

*Counsel for Appellants Topographic, Inc. and Employee Services, Inc.*

OF COUNSEL:

Scott Burnett Smith
BRADLEY ARANT BOULT CUMMINGS LLP
200 Clinton Avenue West, Suite 900
Huntsville, AL 35801-4900
Telephone: (256) 517-5100
Facsimile: (256) 517-5200
ssmith@bradley.com

Michael R. Pennington
J. Thomas Richie
Emily M. Ruzic
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800
mpennington@bradley.com
trichie@bradley.com
eruzic@bradley.com

Virginia N. Adamson
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division St, Suite 700
Nashville, Tennessee 37203
Telephone: (615) 252-3885

Facsimile: (615) 252-6380
jadamson@bradley.com

Richard D. Nix
Henry D. Hoss
M. Richard Mullins
Mark D. Spencer
MCAFEE & TAFT A PROFESSIONAL CORPORATION
Eighth Floor, Two Leadership Square
211 N. Robinson
Oklahoma City, OK 73102
Telephone: (405) 235-9621
Facsimile: (405) 235-0439
richard.nix@mcafeetaft.com
henry.hoss@mcafeetaft.com
richard.mullins@mcafteetaft.com
mark.spencer@mcafeetaft.com

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 12,361 words.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6).

Dated: December 12, 2022              Respectfully submitted,


                                      /s/  Scott  Burnett  Smith
                                      Scott Burnett Smith


                                      *Of Counsel for Appellants*

62

### CERTIFICATE OF SERVICE

I hereby certify that on December 12th, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. Counsel for all parties are registered CM/ECF users and will be served with the foregoing document by the Court's CM/ECF System.

Dated: December 12, 2022          Respectfully submitted,

/s/ Scott Burnett Smith
Scott Burnett Smith

*Of Counsel for Appellants*