Nos. 22-13051, 22-13052, 22-13118 & 22-13120

# United States Court of Appeals for the Eleventh Circuit

IN RE BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION
(MDL 2406)

———————————

On Appeal from the U.S. District Court
for the Northern District of Alabama, Southern Division
No. 2:13-cv-20000-RDP

———————————

**DEFENDANTS-APPELLEES' RESPONSE BRIEF**

———————————

Karin A. DeMasi
Evan R. Chesler
Lauren R. Kennedy
Helam Gebremariam
David H. Korn
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

*Counsel for Defendant-Appellee Blue Cross Blue Shield Association
and the Defendant-Appellee Blue Plans Listed On Inside Cover*

*Additional Defendant-Appellee Blue Plans and Counsel
Listed On Subsequent Pages*

Karin A. DeMasi
Evan R. Chesler
Lauren R. Kennedy
Helam Gebremariam
David H. Korn
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019-7475
Tel: (212) 474-1000
Fax: (212) 474-3700
kdemasi@cravath.com
echesler@cravath.com
lkennedy@cravath.com
hgebremariam@cravath.com
dkorn@cravath.com

*Counsel for Defendants-Appellees Blue Cross Blue Shield Association; Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Arizona, Inc.; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of North Carolina, Inc.; BlueCross BlueShield of Tennessee, Inc.; California Physicians' Service d/b/a Blue Shield of California; CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.; Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Triple-S Management Corporation; Triple-S Salud, Inc.*

Craig A. Hoover
E. Desmond Hogan
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com

*Counsel for Defendants-Appellees
Elevance Health, Inc. f/k/a
Anthem, Inc., and all of its named
subsidiaries in this consolidated
action; Aware Integrated, Inc.;
Louisiana Health Service &
Indemnity Company (Blue Cross
and Blue Shield of Louisiana);
BCBSM, Inc. (Blue Cross and Blue
Shield of Minnesota); Blue Cross
and Blue Shield of South Carolina;
Horizon Healthcare Services, Inc.
(Horizon Blue Cross and Blue
Shield of New Jersey); Blue Cross &
Blue Shield of Rhode Island; Blue
Cross and Blue Shield of Vermont;
Cambia Health Solutions, Inc.;
Regence BlueShield of Idaho;
Regence BlueCross BlueShield of
Utah; Regence BlueShield (of
Washington); Regence BlueCross
BlueShield of Oregon*

Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
jzeiger@kirkland.com

*Counsel for Defendants-Appellees
Health Care Service Corporation,
an Illinois Mutual Legal Reserve
Company, including its divisions
Blue Cross and Blue Shield of
Illinois, Blue Cross and Blue
Shield of Texas, Blue Cross and
Blue Shield of New Mexico, Blue
Cross and Blue Shield of
Oklahoma, and Blue Cross and
Blue Shield of Montana; Caring
for Montanans, Inc., f/k/a Blue
Cross and Blue Shield of
Montana, Inc.; Highmark Health,
a Pennsylvania non-profit
organization; Highmark Inc.,
f/k/a Highmark Health Services;
Highmark West Virginia Inc.;
Highmark Blue Cross Blue Shield
Delaware Inc.; Highmark Western
and Northeastern New York Inc.*

Todd M. Stenerson
SHEARMAN & STERLING LLP
401 9th Street, N.W., Suite 800
Washington, DC 20004
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com

Adam H. Charnes
KILPATRICK TOWNSEND &
STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
Tel: (214) 922-7106
Fax: (214) 481-0517
acharnes@kilpatricktownsend.com

Gwendolyn C. Payton
KILPATRICK TOWNSEND &
STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA 96101
Tel: (206) 626-7714
Fax: (206) 623-6793
gpayton@kilpatricktownsend.com

*Counsel for Defendant-Appellee
Premera Blue Cross,
d/b/a Premera Blue Cross Blue
Shield of Alaska*


M. Patrick McDowell
BRUNINI, GRANTHAM,
GROWER & HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS 39201
Tel: (601) 948-3101
Fax: (601) 960-6902
pmcdowell@brunini.com

*Counsel for Defendant-Appellee
Blue Cross & Blue Shield of
Mississippi, a Mutual Insurance
Company*

Rachel Mossman Zieminski
SHEARMAN & STERLING LLP
2601 Olive Street, Suite 1700
Dallas, TX 75201
Tel: (214) 271-5777
Fax: (214) 271-5778
rachel.zieminski@shearman.com

*Counsel for Defendant-Appellee
Blue Cross Blue Shield of
Michigan Mutual Insurance
Company*


John Briggs
AXINN, VELTROP &
HARKRIDER, LLP
1901 L Street, N.W.
Washington, DC 20036
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com


Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite
3000
Birmingham, AL 35203
Tel: (205) 250-5000
Fax: (205) 250-5034
steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

*Counsel for Defendants-Appellees
Independence Hospital Indemnity*

Alan D. Rutenberg
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, DC 20007
Tel: (202) 672-5491
Fax: (202) 672-5399
arutenberg@foley.com

*Counsel for Defendant-Appellee
USAble Mutual Insurance
Company, d/b/a Arkansas Blue
Cross and Blue Shield and as Blue
Advantage Administrators of
Arkansas*


Robert K. Spotswood
Joshua K. Payne
Jess R. Nix
SPOTSWOOD SANSOM &
SANSBURY LLC
Financial Center
505 20th Street North, Suite 700
Birmingham, AL 35203
Tel: (205) 986-3620
Fax: (205) 986-3639
rks@spotswoodllc.com
jpayne@spotswoodllc.com
jnix@spotswoodllc.com

*Counsel for Defendant-Appellee
Capital Blue Cross*

*Plan, Inc.; Independence Health
Group, Inc.*


Kathleen Taylor Sooy
Tracy A. Roman
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com

Sarah Gilbert
Honor Costello
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Tel: (212) 223-4000
Fax: (212) 223-4134
sgilbert@crowell.com
hcostello@crowell.com

*Counsel for Defendants-Appellees
Blue Cross of Idaho Health
Service, Inc.; Blue Cross and Blue
Shield of Kansas, Inc.; Blue Cross
and Blue Shield of Kansas City;
Blue Cross and Blue Shield of
Nebraska; Blue Cross Blue Shield
of North Dakota; Blue Cross Blue
Shield of Wyoming*

Edward S. Bloomberg
John G. Schmidt Jr.
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY 14203
Tel: (716) 847-8400
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com

Anna Mercado Clark
PHILLIPS LYTLE LLP
620 Eighth Avenue, 38th Floor
New York, NY 10018
Tel: (212) 508-0466
Fax: (716) 852-6100
aclark@phillipslytle.com

*Counsel for Defendant-Appellee
Excellus Health Plan, Inc., d/b/a
Excellus BlueCross BlueShield*

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1, the undersigned counsel for Defendants-Appellees certify as follows:

1.      Defendant-Appellee Blue Cross Blue Shield Association (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

2.      Defendant-Appellee Blue Cross and Blue Shield of Alabama (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

3.      Defendant-Appellee Blue Cross and Blue Shield of Arizona, Inc. (a private non-governmental party) is a wholly owned subsidiary of Prosano, Inc. and no publicly held corporation owns 10% or more of its stock.

4.      Defendant-Appellee Blue Cross of Idaho Health Service, Inc. (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

5.      Defendant-Appellee Blue Cross and Blue Shield of Kansas, Inc. (a private non-governmental party) has no parent

corporation and no publicly held corporation owns 10% or more of its stock.

6.  Defendant-Appellee Blue Cross and Blue Shield of Kansas City (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

7.  Defendant-Appellee Blue Cross and Blue Shield of Massachusetts, Inc. (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

8.  Defendant-Appellee Blue Cross Blue Shield of Michigan (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

9.  Defendant-Appellee Blue Cross & Blue Shield of Mississippi (a private non-governmental party) is a Mutual Insurance Company. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

10.  Defendant-Appellee Blue Cross and Blue Shield of Nebraska (a private non-governmental party) is wholly owned by GoodLife Solutions, Inc., which is wholly owned by GoodLife Partners, Inc., a

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

mutual insurance holding company.  GoodLife Partners, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

11.    Defendant-Appellee Blue Cross and Blue Shield of North Carolina (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

12.    Defendant-Appellee Blue Cross Blue Shield of North Dakota, formerly known as Noridian Mutual Insurance Company (a private non-governmental party), is wholly owned by HealthyDakota Mutual Holdings.  HealthyDakota Mutual Holdings has no parent corporation and no publicly held corporation owns 10% or more of its stock.

13.    Defendant-Appellee Blue Cross & Blue Shield of Rhode Island (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

14.    Defendant-Appellee Blue Cross and Blue Shield of South Carolina (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

15.    Defendant-Appellee Blue Cross Blue Shield of Tennessee, Inc. (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

16.    Defendant-Appellee Blue Cross and Blue Shield of Vermont (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

17.    Defendant-Appellee Blue Cross Blue Shield of Wyoming (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

18.    Defendant-Appellee California Physicians' Service, d/b/a Blue Shield of California (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

19.    Defendant-Appellee Cambia Health Solutions, Inc., formerly known as The Regence Group, Inc. (a private non-governmental party), has no parent corporation and no publicly held corporation owns 10% or more of its stock.

20.    Defendants-Appellees    Regence    BlueShield;    Regence BlueCross BlueShield of Oregon; and Regence BlueCross BlueShield of

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

Utah (all private non-governmental parties) have as their parent corporation Regence Insurance Holding Corporation, which has Defendant-Appellee Cambia Health Solutions, Inc. as its parent. Cambia Health Solutions, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

21. Defendant-Appellee Regence BlueShield of Idaho, Inc. (a private non-governmental party) is managed by Defendant-Appellee Cambia Health Solutions, Inc. under a management and services agreement. Cambia Health Solutions, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

22. Defendant-Appellee Capital Blue Cross (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

23. Defendant-Appellee CareFirst, Inc. (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock. Defendants-Appellees Group Hospitalization and Medical Services, Inc. and CareFirst of Maryland, Inc., both private non-governmental parties, are wholly owned subsidiaries of CareFirst, Inc. and no publicly held corporation owns 10%

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

or more of their stock, respectively.  Group Hospitalization and Medical Services, Inc. and CareFirst of Maryland, Inc., through their subsidiary CareFirst Holdings, LLC, and its wholly owned subsidiary, CareFirst Consolidated, Inc., own in virtually equal shares CareFirst BlueChoice, Inc.  CareFirst BlueChoice, Inc. is a private, non-governmental party and no publicly held corporation owns 10% or more of its stock.

24.   Defendant-Appellee Elevance Health, Inc., formerly known as Anthem, Inc. (a private non-governmental party), has no parent corporation and no publicly held corporation owns 10% or more of its stock.

25.   Defendant-Appellee Anthem Blue Cross Life and Health Insurance Company and Defendant-Appellee Blue Cross of California, d/b/a Anthem Blue Cross, both private non-governmental parties, are wholly owned subsidiaries of WellPoint California Services, Inc., which is a wholly owned subsidiary of Anthem Holding Corp., which is a wholly owned subsidiary of Defendant-Appellee Elevance Health, Inc.  Elevance Health, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

26. Defendants-Appellees Anthem Health Plans, Inc., d/b/a Anthem Blue Cross and Blue Shield of Connecticut; Anthem Health Plans of Kentucky, Inc., d/b/a Anthem Blue Cross and Blue Shield of Kentucky; Anthem Health Plans of Maine, Inc., d/b/a Anthem Blue Cross and Blue Shield of Maine; Anthem Health Plans of New Hampshire, Inc., d/b/a Anthem Blue Cross and Blue Shield of New Hampshire; Community Insurance Company, d/b/a Anthem Blue Cross and Blue Shield of Ohio; and Rocky Mountain Hospital and Medical Service, Inc., d/b/a Anthem Blue Cross and Blue Shield of Colorado in Colorado and d/b/a Anthem Blue Cross and Blue Shield of Nevada in Nevada, are all private non-governmental parties and are wholly owned subsidiaries of ATH Holding Company, LLC, which is a wholly owned subsidiary of Defendant-Appellee Elevance Health, Inc.  Elevance Health, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

27. Defendant-Appellee Anthem Health Plans of Virginia, Inc., d/b/a Anthem Blue Cross and Blue Shield of Virginia, Inc. (a private non-governmental party) is a wholly owned subsidiary of Anthem Southeast, Inc., which is a wholly owned subsidiary of

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

Defendant-Appellee Elevance Health, Inc.  Elevance Health, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

28.  Defendant-Appellee Anthem Insurance Companies, Inc., d/b/a Anthem Blue Cross and Blue Shield of Indiana (a private non-governmental party) is a wholly owned subsidiary of Defendant-Appellee Elevance Health, Inc.  Elevance Health, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

29.  Blue Cross Blue Shield of Georgia, Inc. merged with Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., to form Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.  Defendant-Appellee Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. (a private non-governmental party) is a wholly owned subsidiary of Cerulean Companies, Inc., which is a wholly owned subsidiary of Anthem Holding Corp., which is a wholly owned subsidiary of Defendant-Appellee Elevance Health, Inc.  Elevance Health, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

30.  Defendant-Appellee Blue Cross Blue Shield of Wisconsin, d/b/a Anthem Blue Cross and Blue Shield of Wisconsin (a private non-

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

governmental party) is a wholly owned subsidiary of Crossroads Acquisition Corp., which is a wholly owned subsidiary of Anthem Holding Corp., which is a wholly owned subsidiary of Defendant-Appellee Elevance Health, Inc.  Elevance Health, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.  Blue Cross Blue Shield of Wisconsin is also the parent company of Compcare Health Services Insurance Corporation.

31.    Defendant-Appellee Empire HealthChoice Assurance, Inc., d/b/a Empire BlueCross BlueShield (a private non-governmental party) is a wholly owned subsidiary of WellPoint Holding, Corp., which is a wholly owned subsidiary of Defendant-Appellee Elevance Health, Inc. Elevance Health, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

32.    Defendant-Appellee HMO Missouri, Inc., d/b/a Anthem Blue Cross and Blue Shield of Missouri (a private non-governmental party) is a wholly owned subsidiary of Defendant-Appellee RightCHOICE Managed Care, Inc. (a private non-governmental party).  RightCHOICE Managed Care, Inc. is a wholly owned subsidiary of Anthem Holding Corp., which is a wholly owned subsidiary of Defendant-Appellee

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

Elevance Health, Inc.  Elevance Health, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock. RightCHOICE Managed Care, Inc. is also the parent company of Healthy Alliance Life Insurance Company.

33.    Defendant-Appellee Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield (a private non-governmental party) is a subsidiary of Lifetime Healthcare, Inc., and no publicly held corporation owns 10% or more of its stock.

34.    Defendant-Appellee GuideWell Mutual Holding Corporation (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

35.    Defendant-Appellee Blue Cross and Blue Shield of Florida, Inc. (a private non-governmental party) is a wholly owned subsidiary of GuideWell Mutual Holding Corporation and no publicly held corporation owns 10% or more of its stock.

36.    Defendant-Appellee Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii) (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

37.    Defendant-Appellee Health Care Service Corporation (a private non-governmental party) is an Illinois Mutual Legal Reserve Company that operates through its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma and Blue Cross and Blue Shield of Montana.  It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

38.    Defendants-Appellees Highmark BCBSD Inc.; Highmark West Virginia Inc.; and Highmark Western and Northeastern New York Inc. are controlled affiliates of Defendant-Appellee Highmark Inc., formerly known as Highmark Health Services.  Highmark Inc.'s parent company is Defendant-Appellee Highmark Health, a Pennsylvania non-profit organization.  They are all private, non-governmental parties and no publicly held corporation owns 10% or more of their stock, respectively.

39.    Defendant-Appellee Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

40.    Defendant-Appellee    Independence    Hospital    Indemnity
Plan, Inc., formerly known as Independence Blue Cross (a private non-governmental entity) is a wholly owned subsidiary of Independence Blue
Cross, LLC, which is a wholly owned subsidiary of AmeriHealth, Inc.,
which is a wholly owned subsidiary of Defendant-Appellee Independence
Health Group, Inc.  Independence Health Group, Inc., a Pennsylvania
non-profit corporation, has no parent corporation and no publicly held
corporation owns 10% or more of its stock.

41.    Defendant-Appellee Louisiana Health Service & Indemnity
Company, d/b/a Blue Cross and Blue Shield of Louisiana (a private non-governmental party) has no parent corporation and no publicly held
corporation owns 10% or more of its stock.

42.    Defendant-Appellee BCBSM, Inc., d/b/a Blue Cross Blue
Shield of Minnesota (a private non-governmental party), has as its parent
corporation Defendant-Appellee Aware Integrated, Inc.  Aware
Integrated, Inc. has no parent corporation and no publicly held
corporation owns 10% or more of its stock.

43.    Defendant-Appellee Caring for Montanans, Inc. (a private
non-governmental party), formerly known as Blue Cross and Blue Shield

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

of Montana, Inc., has no parent corporation and no publicly held corporation owns 10% or more of its stock.

44.    Defendant-Appellee Premera and Premera Blue Cross, also d/b/a Premera Blue Cross Blue Shield of Alaska (a private non-governmental party), is a non-profit corporation organized under the laws of the State of Washington and has no parents, subsidiaries and/or affiliates that have issued shares or debt securities to the public.

45.    Defendant-Appellee Triple-S Salud, Inc. (a private non-governmental party) is a wholly owned subsidiary of Triple-S Management Corporation and no publicly held corporation owns 10% or more of its stock.

46.    Defendant-Appellee Triple-S Management Corporation (a private non-governmental party) is a wholly owned subsidiary of GuideWell Mutual Holding Corporation and no publicly held corporation owns 10% or more of its stock.

47.    Defendant-Appellee USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue Shield and as Blue Advantage Administrators of Arkansas (a private non-governmental party), has no

parent corporation and no publicly held corporation owns 10% or more of its stock.

48. Defendant-Appellee Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa) (a private non-governmental party) has no parent corporation and no publicly held corporation owns 10% or more of its stock.

49. Defendant-Appellee Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota) (a private non-governmental party) is a wholly owned subsidiary of Wellmark, Inc. and no publicly held corporation owns 10% or more of its stock.

The undersigned counsel for Defendants-Appellees further certify that the list of those interested in the outcome of this appeal in The Home Depot Appellants' Brief is complete, with the following addition:

**Prosano, Inc.**

## STATEMENT REGARDING ORAL ARGUMENT

This appeal raises no new questions of law, and the facts and legal arguments are adequately presented in the briefs and record. *See* Fed. R. App. P. 34(a)(2).  Consequently, Defendants-Appellees do not believe oral argument is necessary, unless, of course, it would aid the Court in reaching a decision.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT.......................................C-1

STATEMENT REGARDING ORAL ARGUMENT....................................i

TABLE OF CONTENTS .............................................................ii

TABLE OF CITATIONS ............................................................v

STATEMENT OF JURISDICTION..............................................x

STATEMENT OF THE ISSUES....................................................1

STATEMENT OF THE CASE ...................................................3

    I.    Factual Background and Procedural History.............................3

        A.    The Blue System..................................................3

        B.    The Antitrust MDL ...............................................4

            1.    2018 Standard of Review Decision ...........................5

            2.    Self-Funded Claims.................................................6

    II.    The Settlement ......................................................7

        A.    The Settlement Negotiations .................................7

        B.    The Settlement Terms and Relief.................................8

            1.    The Settlement Classes.................................8

                a.    The Rule 23(b)(3) Class .................................9

                b.    The Rule 23(b)(2) Class .................................10

        C.    The Settlement Release .....................................11

        D.    No Admission of Wrongdoing.........................................12

    III.    Final Approval of the Settlement .............................12

A.    The Present Objections ....................................... 12

B.    The Final Approval Order .................................. 13

STANDARD OF REVIEW ................................................ 16

SUMMARY OF THE ARGUMENT ..................................... 18

ARGUMENT ................................................................ 23

I.    The District Court Did Not Abuse Its Discretion in
      Approving the Settlement Release ........................... 23

      A.    The Settlement Properly Releases Future Claims
            with an Identical Factual Predicate to the
            Subscriber Actions ........................................... 24

            1.    Releases of Future Claims Are Lawful Where
                  the Released Claims Share an Identical
                  Factual Predicate to the Settled Litigation ............ 24

            2.    The District Court Did Not Abuse Its
                  Discretion in Concluding That the Release
                  Here Falls Within the Identical Factual
                  Predicate Doctrine ........................................ 29

            3.    The Propriety of the Release Is Not Impacted
                  by the Phrase, "Relating in Any Way To" ............... 31

      B.    There Is No "Antitrust Exception" to the Law
            Permitting Future Releases ............................... 33

      C.    The Settlement's Release Does Not Undermine
            Public Policy ................................................ 41

            1.    The Release Does Not Prevent Enforcement of
                  the Antitrust Laws ........................................ 41

            2.    This Court Has Already Considered and
                  Rejected Home Depot's Public Policy
                  Arguments in *Managed Care* ........................... 48

D.    The District Court Did Not Rely on its Provider-
Track Standard of Review Decision in Overruling
Home Depot's Public Policy Objection ............................... 50

II.    The ASO Damages Claims Period Cannot Begin in 2008 ........ 54

A.    ASOs that "Self-Insure" Were Not Members of
Putative Classes "Insured" by Blue Plans ....................... 55

B.    Self-Funded Objectors' Other Arguments Fail ............... 60

CONCLUSION ......................................................................... 68

# TABLE OF CITATIONS

## Cases

*Adams v. So. Farm Bureau Life Ins. Co.*,
  493 F.3d 1276 (11th Cir. 2007) ............................................................ 16

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013) ................................................................... 41, 47

*Am. Safety Equip. Corp. v. J.P. Maguire & Co.*,
  391 F.2d 821 (2d Cir. 1968) ............................................................ 47

*Am. Pipe & Constr. Co. v. Utah*,
  414 U.S. 538 (1974) ................................................................... 56

*Ass'n for Disabled Am., Inc. v. Amoco Oil Co.*,
  211 F.R.D. 457 (S.D. Fla. 2002) ............................................ 39

*Ault v. Walt Disney World Co.*,
  692 F.3d 1212 (11th Cir. 2012) ............................................ 16

*\*Bennett v. Behring Corp.*,
  737 F.2d 982 (11th Cir. 1984) .................................... 16, 51, 52

*Bradburn Parent Tchr. Store, Inc. v. 3M*,
  513 F. Supp. 2d 322 (E.D. Pa. 2007) .......................... 27

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ................................................................... 59

*California v. Am. Stores Co.*,
  495 U.S. 271 (1990) ................................................................... 42

*Caron v. NCL (Bahamas), Ltd.*,
  910 F.3d 1359 (11th Cir. 2018) ............................................ 66

*Carr v. Ocwen Loan Servicing*,
   2014 WL 12860083 (N.D. Ga. Apr. 25, 2014) ...................................... 31

*Cliff v. Payco Gen. Am. Credits, Inc.*,
   363 F.3d 1113 (11th Cir. 2004) ........................................... 55, 56, 59, 66

*Edstrom Indus., Inc. v. Companion Life Ins. Co.*,
   516 F.3d 546 (7th Cir. 2008) ............................................................... 65

*Greco v. Ginn Dev. Co.*,
   635 F. App'x 628 (11th Cir. 2015) ....................................................... 17

*Grunin v. IHOP*,
   513 F.2d 114 (8th Cir. 1975) ............................................................... 52

*Herrera v. Wyoming*,
   139 S. Ct. 1686 (2019) ........................................................................ 33

*In re Am. Express Merch. Litig.*,
   634 F.3d 187 (2d Cir. 2011) ................................................................ 47

*In re Chicken Antitrust Litig.*,
   669 F.2d 228 (5th Cir. 1982) ............................................................... 39

*In re Equifax Inc. Cust. Data Sec. Breach Litig.*,
   999 F.3d 1247 (11th Cir. 2021) ........................................................... 16

*\*In re Managed Care Litig.*,
   2008 WL 11333988 (S.D. Fla. Apr. 21, 2008) .............................. passim

*\*In re Managed Care Litig.*,
   2010 WL 6532982 (S.D. Fla. Aug. 15, 2010) ........................... 27, 37, 42

*\*In re Managed Care*,
   756 F.3d 1222 (11th Cir. 2014) .................................................... passim

*In re Nissan Motor Corp. Antitrust Litig.*,
   552 F.2d 1088 (5th Cir. 1977) ............................................................. 16

*In re Payment Card Interchange
  Fee & Merch. Disc. Antitrust Litig.,
  2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019)............................27, 37, 45

In re Prudential Ins. Co. of Am. Sales Prac. Litig.,
  261 F.3d 355 (3d Cir. 2001)...................................................................26

In re Smith,
  926 F.2d 1027 (11th Cir. 1991) ...........................................................35

In re Terazosin Hydrochloride Antitrust Litig.,
  2005 WL 8181045 (S.D. Fla. Apr. 20, 2005)........................................27

In re Visa Check/Mastermoney Antitrust Litig.,
  297 F. Supp. 2d. 503 (E.D.N.Y. 2003)............................................27, 32

Kazi v. PNC Bank, N.A.,
  2021 WL 965372 (N.D. Cal. Mar. 15, 2021) ..................................32, 33

Klehr v. A.O. Smith,
  521 U.S. 179 (1997) ..............................................................................34

Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.,
  140 S. Ct. 1589 (2020) ..........................................................................33

Makro Capital of Am., Inc. v. UBS AG,
  543 F.3d 1254 (11th Cir. 2008) .........................................55, 59, 61, 66

Martin v. Halifax Healthcare Sys., Inc.,
  621 F. App'x 594 (11th Cir. 2015)........................................................66

McClendon v. Ga. Dep't of Cmty. Health,
  261 F.3d 1252 (11th Cir. 2001) ............................................................39

Mcguire v. Intelident Solutions, LLC,
  2020 WL 10506642 (M.D. Fla. Sept. 2, 2020)......................................25

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.,
  161 F.3d 443 (7th Cir. 1998) ..............................................28, 34, 38, 39

Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC,
  702 F.3d 1312 (11th Cir. 2012) ...........................................................33

Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.,
  381 U.S. 311 (1965) ..............................................................................42

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,
  473 U.S. 614 (1985) ..............................................................................42

Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.,
  198 F.3d 823 (11th Cir. 1999) .............................................................34

*MSG, L.P. v. NHL,
  2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ......................27, 35, 40, 41

Redel's Inc. v. Gen. Elec. Co.,
  498 F.2d 95 (5th Cir. 1974) ......................................................43, 44, 45

Robertson v. NBA,
  556 F.2d 682 (2d Cir. 1977) .................................................................52

Se. Fla. Cable, Inc. v. Martin Cnty.,
  173 F.3d 1332, 1334 (11th Cir. 1999) .................................................33

TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.,
  959 F.3d 1318 (11th Cir. 2020) .....................................................32, 33

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,
  396 F.3d 96 (2d Cir. 2005).......................................................... passim

Waters v. Int'l Precious Metals Corp.,
  190 F.3d 1291 (11th Cir. 1999) ...........................................................17

Williams v. Gen. Elec. Cap. Auto Lease, Inc.,
  159 F.3d 266 (7th Cir. 1998) ...............................................................25

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) .................................................................. 42

**Statutes**

28 U.S.C. § 1291 ........................................................................... x

28 U.S.C. § 1331 ........................................................................... x

28 U.S.C. § 1337(a) ....................................................................... x

**Rules**

Fed. R. App. P. 34(a)(2) ................................................................. i

Fed. R. Civ. P. 15(c)(1)(B) ......................................................... 66

Fed. R. Civ. P. 15(c)(1)(C) ......................................................... 66

Fed. R. Civ. P. 15, Advisory Committee Note to 1966 Amendment ....... 55

Fed. R. Civ. P. 23(e)(2) ............................................................... 46

**Other Authorities**

Areeda & Hovenkamp, *Antitrust Law* (3d ed. 2004 & 2007 Supp.) ....... 40

## STATEMENT OF JURISDICTION

The District Court had federal question jurisdiction over the proceedings below pursuant to 28 U.S.C. §§ 1331 and 1337(a).

The District Court's Final Approval Order, entered on August 9, 2022 and amended on September 7, 2022, is a final, appealable order under 28 U.S.C. § 1291 because it resolved and dismissed with prejudice all Subscriber Class claims.    (*See* Defendant-Appellee's Response to Jurisdictional Questions at 1–2 (Oct. 25, 2022) (Doc.72).) Each Appellant is a member of one or more Settlement Classes and each Appellant filed a timely objection to the approval of the Subscriber Settlement in the District Court.  (*Id.* at 2–4.)  Appellants filed timely appeals.  (*See* Doc.1 (Sept. 7, 2022 notice of appeal by Topographic, Inc. and Employee Services, Inc.); Doc.6 (Sept. 8, 2022 notice of appeal by Home Depot); Doc.8 (Sept. 7, 2022 notice of appeal by Jennifer Cochran and Aaron Craker); Doc.10 (Sept. 8, 2022 notice of appeal by David Behenna).)

## STATEMENT OF THE ISSUES

Defendants-Appellees address two issues, one raised by Home Depot U.S.A., Inc. ("Home Depot") (Doc.120), and one raised by Topographic, Inc. and Employee Services, Inc. (together "Self-Funded Objectors") (Doc.121).[1]

**Home Depot Appeal:**  Home Depot opted out of the Rule 23(b)(3) Class but remains a member of the mandatory Rule 23(b)(2) Class that released certain future claims.

1.    Did the District Court abuse its discretion in approving a class action settlement that releases future antitrust claims where all released claims share an identical factual predicate to the settled litigation?

**Self-Funded Objectors' Appeal:**  Self-Funded Objectors are "ASO" accounts that self-insure and purchase "administrative services only" from Blue Plans.

---

[1] With respect to the other issues raised by Appellants (*see* Doc.120 at 54–60; Doc.122; Doc.124), Defendants-Appellees refer to the District Court's well-reasoned Final Approval Order (R.2931), and note that Plaintiffs-Appellees' brief addresses all arguments.

1

2.    Did the District Court abuse its discretion in finding ASO damages claims do not relate back to a 2012 complaint brought by fully-insured members that did not include ASOs in the case or putative class?

# STATEMENT OF THE CASE

## I.    Factual Background and Procedural History

### A.    The Blue System

Defendants-Appellees are Blue Cross Blue Shield Association ("BCBSA"), the undersigned Blue Cross and Blue Shield Plans ("Blue Plans" and, together with BCBSA, the "Blues") and various affiliated entities.  (R.2931 at 1.)[2]

BCBSA owns and licenses the Blue Cross and Blue Shield federal trademarks ("Blue Marks") to the locally operated Blue Plans. (R.2616 ¶¶357, 395.)  These license agreements grant each Blue Plan the right to use the Blue Marks within a defined geographic service area (known as an exclusive service area or "ESA"), consistent with how the Plans historically operated at common law.  (R.120 at 14–15.)  Blue Plans then use the Blue brands to contract with local healthcare providers, on the one hand, and subscribers, on the other, to offer healthcare benefit products to Blue members nationwide—something no individual Blue

---

[2] Citations in the format "R.__at__" refer to docket entries in the District Court record, indicating the document and page number.  All page numbers refer to the document's internal pagination unless otherwise noted.

3

Plan could do on its own given the Blues' common law trademark history.[3] (*See* R.2616 ¶2; R.120 at 14–15, 30–31.) The Blue system, and the rules supporting it, enable Blue Plans to provide health insurance coverage and administrative services to millions of people in the United States and to compete with large national health insurers such as Aetna, Cigna and UnitedHealthcare. (*See* R.120 at 30–31.)

## B.   The Antitrust MDL

Starting in 2012, dozens of complaints challenging various Blue rules were filed by subscribers and providers across the country. The first complaint was *Cerven v. Blue Cross & Blue Shield of N.C.*, No. 5:12-cv-00017-RLV-DCK (W.D.N.C.), Doc.1 ("*Cerven* Complaint"), which was filed on February 7, 2012, on behalf of fully-insured subscribers (*i.e.*, subscribers that purchase health insurance products from Blue Plans). A number of other complaints were soon filed, some brought by fully-insured subscribers and others brought by providers. These complaints all challenged certain core Blue rules, including the system of ESAs and

---

[3] The Blues offer coverage nationwide through the BlueCard Program, which allows members of one Plan to receive in-network treatment in another Plan's ESA. (R.120 at 30–31.) This program has numerous procompetitive benefits, and Plaintiffs-Appellees have not challenged it. (*See id.*; R.2616.)

National Best Efforts ("NBE"),[4] and alleged that those rules violated the Sherman Act, 15 U.S.C. §§ 1–2, and related state laws.  (R.1 at 1.)

In 2013, these actions were consolidated into a multi-district litigation ("MDL") and transferred to the Northern District of Alabama.  (*Id.* at 3.)  Following consolidation, the MDL proceeded on two tracks:  the Subscriber-track (claims by putative classes of fully-insured Blue members), and the Provider-track (claims by putative classes of various types of hospitals, physicians and other professionals).  (*See* R.61.)

### 1.    *2018 Standard of Review Decision*

In 2018, the District Court was asked to set the standard of review for the antitrust claims in the Subscriber- and Provider-track cases.  The District Court found the combination of ESAs and NBE was to be analyzed under the *per se* standard of review, but "expresse[d] no view about whether the ESAs alone qualify as a *per se* Sherman Act violation." (R.2063 at 22, 59.)

---

[4] NBE ensured that Plans were committed to developing Blue-branded business by requiring each Plan to derive a certain percentage of its national health insurance revenue under the Blue brands.  (R.1353-1 at 10–11 (¶25).)

5

After issuing its decision, the District Court acknowledged there was "substantial ground for difference of opinion", and certified the decision for interlocutory review. (R.2203 at 1; R.2931 at 47.) This Court denied the request for leave to file an interlocutory appeal. (No. 18-90020-E, R.42-2.)

### 2. *Self-Funded Claims*

On November 2, 2020, almost nine years after the *Cerven* Complaint was filed, Subscribers filed a Fourth Amended Complaint. (R.2616.) This complaint added, for the first time, a putative class of claims by self-funded subscribers. (*Id.* at 2, ¶2.) Self-funded accounts are also referred to as "ASOs". Unlike fully-insured subscribers, ASOs are entities that purchase "administrative services only" from a Blue Plan, such as access to the Plan's provider networks and claims processing services. (*Id.* ¶2.) Importantly, ASOs do not purchase health insurance; rather, they spread their own risk and self-finance the cost of their members' care, while purchasing services from Blue Plans to facilitate their members' healthcare coverage. (*See id.*) No prior Subscriber-track complaint had asserted any claims on behalf of self-funded subscribers. (*See* R.85; R.244; R.843; R.1082.)

6

## II.    The Settlement

### A.    The Settlement Negotiations

In 2015, three years into the litigation, Subscriber-Plaintiffs and the Blues began settlement discussions.  (R.2931 at 3.)  The parties engaged a mediator—and then, in 2017, a Special Master—to oversee "scores" of regular mediation sessions.  (*Id.*) Over the course of five years, Subscriber-Plaintiffs and the Blues conducted "protracted, complicated, and challenging" negotiations in an effort to resolve the "extraordinarily complex" Subscriber claims.  (*Id.* at 2–3.)

In 2019, separate counsel joined the negotiations on behalf of a plaintiff who would serve as the representative of a sub-class of ASOs (the "Self-Funded Subclass").  (*See id.* at 4.)   Self-Funded Subclass counsel asked for and received from Subscriber-Plaintiffs access to the discovery record in the litigation, along with relevant briefing on class certification and summary judgment.  (*Id.*) Self-Funded Subclass counsel engaged their own independent experts to analyze potential damages claims on behalf of the Self-Funded Subclass and—together with Subscriber Class counsel—engaged a neutral third party to mediate the

allocation of the monetary relief between fully-insured and Self-Funded Subclass members. (*Id.*)

On October 16, 2020, the Subscriber Class representatives, the Self-Funded Subclass representative and the Blues entered into a Settlement Agreement. (R.2610-2.)    The District Court granted Subscriber-Plaintiffs' motion for preliminary approval of the Settlement on November 30, 2020. (R.2641.)    The District Court explained that the Blues had agreed to pay $2.67 billion (the "Settlement Fund") and to make "historic and substantial" structural changes to the Blues' businesses, including total elimination of NBE. (*Id.* at 1, 4, 7.)

## B.    The Settlement Terms and Relief

### 1.    *The Settlement Classes*

The Settlement resolves claims on behalf of two classes of Blue subscribers:  (1) an indivisible injunctive relief class under Rule 23(b)(2) (the "Rule 23(b)(2) Class"); and (2) a damages and divisible injunctive relief class under Rule 23(b)(3) (the "Rule 23(b)(3) Class") (together, the "Settlement Classes"). (R.2610-2 ¶¶1(v), 1(pp).)  Each Settlement Class includes both fully-insured subscribers and ASOs. (*Id.*)    The Rule 23(b)(3) Class contains the Self-Funded Subclass with its own class

representative and class counsel. (*Id.* ¶1(v); R.2931 at 8–9.) Subscribers negotiated an approximately 12-year class period for fully-insured subscribers, from February 7, 2008—four years prior to the filing of the *Cerven* complaint—through October 16, 2020, for members of both the Rule 23(b)(2) and Rule 23(b)(3) Settlement Classes. (R.2610-2 ¶1(nnnn); R.2931 at 7–8.) The Self-Funded Subclass, through its separate counsel, negotiated an approximately five-year class period, from September 1, 2015, through October 16, 2020. (R.2610-2 ¶1(nnnn); R.2865 at 197:16–198:3.)

### a. *The Rule 23(b)(3) Class*

With respect to the $2.67 billion Settlement Fund, after deducting attorneys' fees, expenses and costs, 93.5% is allocated to damages awards to the fully-insured members of the Rule 23(b)(3) Class, and 6.5% is allocated to damages awards to the Self-Funded Subclass. (*See* R.2610-2 ¶¶1(oooo), 28; R.2931 at 10, 35–36.) Additionally, certain Self-Funded Subclass members in the Rule 23(b)(3) Class will receive the right to request a "Second Blue Bid" when seeking a new contract for ASO services. (*See* R.2931 at 6, 40.)

9

### b.  *The Rule 23(b)(2) Class*

The Settlement also requires significant structural changes to the Blues' business.  (*Id.* at 3.)  This relief includes:  (i) elimination of NBE (R.2610-2 ¶10); (ii) changes surrounding Blue Plan bidding for national accounts, including provisions concerning certain large multi-Service Area accounts (*id.* ¶14(a)), and accounts with Independent Health Benefit Decision Locations (*id.* ¶14(b)); (iii) limitations on the conditions that can be imposed to disallow acquisition of Blue Plans (*id.* ¶17); and (iv) provisions addressing other aspects of the Blues' business, including Self-Funded Account contracting with Non-Provider Vendors and/or Specialty Service Provider Vendors (*id.* ¶12), and Most Favored Nations Clauses (*id.* ¶18).  The Settlement also created a Monitoring Committee and compliance process to oversee compliance with the Settlement, mediate certain disputes related to the Settlement, and assess whether new BCBSA rules and regulations related to the Settlement relief comply with the Settlement's terms.  (*Id.* ¶¶1(xx), 1(zz), 20; R.2931 at 14–15.) Finally, the Settlement acknowledges the continuation of ESAs in light of these significant changes.  (R.2610-2 ¶13.)

10

## C.    The Settlement Release

The Settlement provides that Settlement Class Members release all

claims, including future claims, against the Blues that are:

> based upon, arising from, or relating in any way to: (i) the factual predicates of the Subscriber Actions (including but not limited to the Consolidated Amended Class Action Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; (ii) any issue raised in any of the Subscriber Actions by pleading or motion; or (iii) mechanisms, rules, or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10 through 18 approved through the Monitoring Committee Process during the Monitoring Period.

(R.2610-2 ¶1(uuu).) Settlement Class Members retain the right to assert

certain claims relating to coverage, benefits and administration of claims

arising in the ordinary course of business if they are not "based in whole

or in part on the factual predicates of the Subscriber Actions or any other

component of the Released Claims discussed in this Paragraph". (*Id.*)

Although Rule 23(b)(2) Class members released any "claims for

indivisible injunctive or declarative relief against the Releasees" based

on the same factual predicates as the Subscriber Actions (defined in the

Settlement Agreement (*see* R.2610-2 ¶1(uuuu))) (R.2939 at 1–2), those

who opted out of the Rule 23(b)(3) Class may continue to pursue "any claims for individualized declaratory or injunctive relief" (*id.* at 2).

### D.     No Admission of Wrongdoing

Finally, the Settlement provides that nothing in its terms is to "be construed as an admission of liability or wrongdoing", which Defendants-Appellees continue to "expressly deny".  (R.2610-2 ¶9(a).)

## III.   Final Approval of the Settlement

### A.     The Present Objections

As relevant to these Appeals, on July 28, 2021, Self-Funded Objectors objected to the proposed Settlement.  (R.2812-19 at ECF 75–116.)  Self-Funded Objectors are ASOs that challenge the allocation of the Settlement Fund as inequitable.  They argued the "claims periods" must be "equal" between fully-insured and Self-Funded Subclass members, on their insistence that Self-Funded claims *also* relate back to the original *Cerven* complaint.  (*Id.* at ECF 90–96.)

On September 3, 2021, Appellant Home Depot, which opted out of the Rule 23(b)(3) Class but remained a member of the Rule 23(b)(2) Class, objected to the Settlement.  (R.2812-20 at ECF 7–55.)  Home Depot argued that the Settlement's release of the Rule 23(b)(2) "class members'

rights to pursue future equitable and injunctive relief would violate the public policy established by the antitrust laws." (*Id.* at ECF 19–32.)

### B.    The Final Approval Order

On August 9, 2022, the District Court entered an order granting final approval to the Settlement ("Final Approval Order"). (R.2931.) The District Court examined the Settlement and found it satisfies Rule 23(e) because it is fair, reasonable and adequate. (*Id.* at 26.) In particular, the District Court found that: Settlement Class Members, including the Self-Funded Subclass, were adequately and "vigorously represented"; the Settlement was "extensively negotiated" at arm's length "with the assistance of experienced mediators and . . . subject matter experts"; the Settlement provides adequate relief, as it gives "immediate and substantial benefits to tens of millions of Class Members" that Subscriber-Plaintiffs were uncertain to secure in litigation; and Settlement Class Members were treated equitably as compared to one another. (*Id.* at 30–33, 35–38.)

The District Court carefully considered and overruled all objections. It rejected Self-Funded Objectors' argument that the Settlement allocation is inequitable, finding instead that "the distribution plan is

13

fair, adequate, and reasonable". (*Id.* at 56–59.)  Additionally, the District Court found that "the allocation is justified by the different time periods for the classes" because "[t]he *Cerven* complaint plainly did not contemplate ASOs being part of that case", and, thus, the Self-Funded Subclass could not "get the benefit of the *Cerven* filing date". (*Id.* at 59–61.)

The District Court likewise rejected Home Depot's objection that the Settlement's release of future claims is impermissible, instead concluding that, consistent with established caselaw, the Settlement properly releases claims with an "identical factual predicate" to the Subscriber Actions.  (*Id.* at 50–56.)

The District Court also overruled a separate objection by Home Depot that the Settlement would perpetuate illegal conduct, instead finding that "the post-Settlement Blue System will not be clearly illegal" based upon the "material changes to the Blues' going-forward system which add significant procompetitive features", and "the uncertainty" surrounding the Court's 2018 standard of review decision.  (*Id.* at 46–48.) The District Court also referred to a separate decision issued the same day in which it concluded that ESAs alone, without NBE (which the Blues

eliminated, consistent with the Settlement), were to be evaluated under the rule of reason. (*Id.* at 47.) This decision was issued in the Provider-track, with a full record before the District Court. Appellants, including Self-Funded Objectors and Home Depot, filed timely appeals.

## STANDARD OF REVIEW

This Court reviews a district court's approval of a class action settlement for abuse of discretion. *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012).[5]  Because "[d]etermining the fairness of the settlement is left to the sound discretion of the trial court", this Court "will not overturn [its] decision absent a *clear* showing of abuse of that discretion". *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).  This deferential standard of review is "informed by the strong judicial policy favoring settlement". *Id.*; *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977).

A district court abuses its discretion only "if it applies an incorrect legal standard, follows improper procedures . . . or makes findings of fact that are clearly erroneous." *Adams v. So. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1285 (11th Cir. 2007).  "[Q]uibbling with a settlement's terms is not a part of an abuse of direction review." *In re Equifax Inc. Cust. Data Sec. Breach Litig.*, 999 F.3d 1247, 1274 (11th Cir. 2021).  As this Court has repeatedly emphasized, "the abuse of discretion standard

---

[5] Unless otherwise noted, all internal quotation marks are omitted and all emphases are added.

allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." *See, e.g.*, *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1293 (11th Cir. 1999); *see also Greco v. Ginn Dev. Co.*, 635 F. App'x 628, 631 (11th Cir. 2015).

## SUMMARY OF THE ARGUMENT

The District Court carefully reviewed the Settlement and concluded that it was fair, reasonable and adequate, particularly given the substantial litigation risks facing Subscribers. The Settlement appropriately balances relief for the class (*i.e.*, substantial monetary damages and broad changes to the Blues' businesses), with finality for the Blues (*i.e.*, release of certain claims predicated on pre-settlement conduct). The District Court did not abuse its discretion in approving the Settlement, and each of Appellants' arguments to the contrary is wrong.

***First***, Home Depot argues that the Settlement release violates public policy because it prevents Rule 23(b)(2) Class members from bringing future antitrust challenges to the Blue system. However, a settlement may release future claims that share an "identical factual predicate" to settled litigation. That is precisely what the release here does, and the District Court did not abuse its discretion in reaching this conclusion. (Section I.A.1–2.)

This is true, notwithstanding that the release covers claims that "relat[e] in any way to" the Subscriber Actions. Releases of claims that "relate in any way to" settled litigation are still cabined to the factual

18

predicate of the underlying matter, which is the critical touchstone of the analysis. Indeed, courts routinely approve releases of claims that "relate in any way to" the factual predicates of settled litigation, and the District Court did not abuse its discretion in doing the same. (Section I.A.3.)

Home Depot also argues that the District Court erred because the caselaw permitting future releases does not apply in antitrust cases. But Home Depot does not cite a single case holding that, and for good reason: it is not the law. Indeed, the logic underpinning future releases—promotion of settlement, with all of the attendant efficiencies—applies with full force in antitrust cases. For this reason, Home Depot's criticism of the cases cited by the District Court—that none provides an *antitrust-specific* rationale—also misses the mark. What matters is that the released claims share an identical factual predicate to the settled litigation, not the type of case being settled or claims being released. (Section I.B.)

Unable to prevail on the law, Home Depot mischaracterizes the release. According to Home Depot, this release violates public policy because it prevents enforcement of the antitrust laws. Not so. Although the Settlement fully releases certain claims of Settlement Class

19

Members—including the right of Rule 23(b)(2) Class members to assert "claims for indivisible injunctive or declarative relief against the Releasees" based on the same factual predicates as the Subscriber Actions—subscribers *who are not* Settlement Class Members remain free to pursue whatever challenges to the Blue system they want, including disputing the very conduct at issue and released in the Settlement. (Section I.C.1.)  This Court has also already considered and rejected Home Depot's public policy arguments in *In re Managed Care*, 756 F.3d 1222 (11th Cir. 2014).  (Section I.C.2.)

Finally, Home Depot argues that its public policy concerns are "not negate[d]" by the District Court's August 2022 standard of review decision in the Provider-track holding that the rule of reason applies to claims challenging the Blues' ESAs alone.  But the District Court did not mention its Provider-track standard of review decision in overruling Home Depot's objections about the release.  Rather, the Court referenced that decision in overruling an entirely separate objection that the Settlement perpetuates a *per se* violation of the Sherman Act, determining that the post-Settlement Blue system is not "clearly illegal" within the meaning of governing caselaw.  This decision, while plainly

correct, was entirely unrelated to the Court's decision to overrule Home Depot's public policy arguments about the scope of the release. (Section I.D.)

*Second*, Self-Funded Objectors argue that the Self-Funded Subclass's damages period should have extended back to 2008 because the Self-Funded Subclass's claims "relate back" under FRCP 15(c) to the original *Cerven* action, filed in 2012. That too fails because Self-Funded Objectors have not shown that the Court's factual finding that the claims do not relate back was clearly erroneous.

Self-Funded Objectors acknowledge that "[t]he critical issue in Rule 15(c) determinations is whether *the original complaint* gave notice to the defendant of the claim now being asserted." Applying that standard, the District Court correctly held that "[t]he *Cerven* complaint simply gave no notice to Defendants whatsoever that they would have to defend against alleged misconduct in the ASO market." The Court found as a matter of fact that, "under a fair reading of the *Cerven* Complaint, ASOs are excluded from both the proposed damages and the injunction classes." That was right—and certainly not clearly erroneous—because the plain language of the *Cerven* class definitions does not include ASOs,

21

and other allegations in the *Cerven* Complaint confirm that ASOs were not part of the *Cerven* action.  (Section II.A.)

Self-Funded Objectors' other arguments likewise fail.  Self-Funded Objectors contend that the Blues' statement in a 2013 motion to dismiss shows they understood that Self-Funded claims were at issue in *Cerven*. Even if that were true, it would be irrelevant.  Relation back does not turn on "actual" or subjective notice; rather, it turns on whether the prior complaint, on its face, gave notice of Self-Funded claims.  It did not. Self-Funded Objectors also argue that *all* members of the Self-Funded Subclass are members of the putative injunctive relief class in *Cerven* because *some* self-funded entities purchase stop-loss insurance.  But the *Cerven* class definition includes persons or entities who were "insured", referring to a risk-sharing health insurance product.  Stop-loss insurance is not health insurance; it is a general back-stop against excessive loss. Nor is stop-loss insurance mentioned anywhere in the *Cerven* Complaint. Moreover, the Self-Funded Subclass does not uniformly purchase stop-loss insurance.  Rather, the defining characteristic of an ASO is that it self-insures.  (Section II.B.)

## ARGUMENT

## I.   The District Court Did Not Abuse Its Discretion in Approving the Settlement Release

After nearly a decade of litigation, the parties reached a Settlement that involved a massive monetary payment and "historic" changes to the Blues' businesses.  (*Supra* at 7–12.)  As a condition of settlement, the Blues required preservation of their lawful and defensible ESAs and a standard release in cases of this sort—including a release of future claims related to the factual predicates of the settled litigation.  (*Id.*) This release is to "be interpreted and enforced broadly and to the fullest extent permitted by law."  (R.2610-2 ¶32.)  Make no mistake:  without these provisions, there would have been no Settlement.

Nevertheless, Home Depot argues the District Court "erred by approving a compulsory and perpetual release of the 23(b)(2) class members' rights to seek declaratory and injunctive relief."  (HD.23.)[6] According to Home Depot, the Settlement's release prevents future enforcement of the antitrust laws and, therefore, "violates public policy". (*Id.*)  But Home Depot misstates the law regarding future releases, and

---

[6] Numbers following brief citations refer to internal pagination.

23

misconstrues the District Court's findings about this release. Its appeal is meritless.

## A. The Settlement Properly Releases Future Claims with an Identical Factual Predicate to the Subscriber Actions

In approving the Settlement, the District Court followed established precedent to hold that releases of future antitrust claims are permissible where the released claims share an "identical factual predicate" to the settled litigation. (R.2931 at 50–56.) The District Court did not err in finding the release here to be squarely within this caselaw and permitted by Rule 23. Home Depot's opposing arguments are incorrect.

### 1. Releases of Future Claims Are Lawful Where the Released Claims Share an Identical Factual Predicate to the Settled Litigation

As the District Court recognized, "federal class action settlements routinely include releases waiving future claims". (R.2931 at 53.) Such releases are lawful and within the bounds of Rule 23, so long as the released claims arise from an "identical factual predicate" as the settled litigation. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir. 2005) (affirming antitrust class settlement and noting that "class

action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct"); *Williams v. Gen. Elec. Cap. Auto Lease, Inc.*, 159 F.3d 266, 274 (7th Cir. 1998) (affirming injunction barring claims "based on the identical factual predicate" as the settled litigation and noting that "it is not at all uncommon for settlements to include a global release of all claims past, present, and future, that the parties might have brought against each other"); *In re Managed Care Litig.*, 2008 WL 11333988, at *5 (S.D. Fla. Apr. 21, 2008), *report and recommendation adopted*, 2008 WL 11333876 (S.D. Fla. May 14, 2008); *Mcguire v. Intelident Solutions, LLC*, 2020 WL 10506642, at *4–5 (M.D. Fla. Sept. 2, 2020), *report and recommendation adopted*, 2020 WL 10506644 (M.D. Fla. Sept. 28, 2020) (finding settlement fair and reasonable where release encompassed unpleaded claims "arising out of the identical factual predicate as the settled claims"); (R.2931 at 53–54). This "legal construct[] allow[s] plaintiffs to release claims that share the same integral facts as settled claims", even if those claims have not yet been asserted. *Wal-Mart*, 396 F.3d at 106. The permissibility of such releases is "well established". *Id.* at 107.

25

The rule permitting future releases makes good sense, as courts around the country have recognized. "Practically speaking, [c]lass action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability." *Id.* at 106; *see also In re Prudential Ins. Co. of Am. Sales Prac. Litig.*, 261 F.3d 355, 366–67 (3d Cir. 2001) (affirming enforcement of "very broad" settlement release and explaining that refusal to enforce would "seriously undermine the possibility for settling any large, multi-district class action" because "[d]efendants in such suits would always be concerned that a settlement of the federal class action would leave them exposed to countless suits . . . despite settlement"). "[B]road releases . . . tend to serve, rather than disserve, the public interest, which favors and encourages the settlement of claims between parties and [thus] permits them to release future damages as part of a settlement agreement." *Managed Care*, 2008 WL 11333988, at *9.

Applying these principles in the antitrust context,[7] courts routinely approve and enforce releases of future claims where the released claim

---

[7] Federal courts applying Rule 23 regularly approve antitrust class action settlements releasing claims related to the facts in the settled litigation, just as the District Court did here. *See, e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472,

involves a *continuation* of a defendant's *pre*-release conduct; by contrast, a release of future claims based on *new, different* conduct occurring *after* the settlement is not permissible. *See, e.g.*, *In re Managed Care Litig.*, 2010 WL 6532982, at *12 (S.D. Fla. Aug. 15, 2010) (finding release valid because it "only applies to claims that relate to the course of conduct that originated before the date" of the settlement, and not "new" violations "that arise from a brand new set of events and course of conduct than the one settled" in the prior litigation); *Payment Card*, 2019 WL 6875472, at *26 (noting cases finding releases void "largely contemplate impermissibly broad releases that released all types of claims, including 'future' entirely unrelated antitrust claims not circumscribed to an identical factual predicate or to claims that arose out of the alleged conduct or related conduct that could have been alleged"); *MSG, L.P. v. NHL*, 2008 WL 4547518, at *8 (S.D.N.Y. Oct. 10, 2008) (noting the "considerable support in the caselaw" for the proposition that releases

---

at *22–26 (E.D.N.Y. Dec. 16, 2019); *Bradburn Parent Tchr. Store, Inc. v. 3M*, 513 F. Supp. 2d 322, 346–47 (E.D. Pa. 2007); *In re Terazosin Hydrochloride Antitrust Litig.*, 2005 WL 8181045, at *2 (S.D. Fla. Apr. 20, 2005); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d. 503, 512–16 (E.D.N.Y. 2003), *aff'd*, *Wal-Mart*, 396 F.3d at 107–08.

may lawfully bar future antitrust claims "when the only 'prospective' application of the release in question is the continued adherence to a pre-release restraint"). There is "considerable caselaw" drawing and approving of this distinction, as the District Court noted. (R.2931 at 54–55.)

Indeed, this Court has previously enforced a class action release to bar future antitrust claims on these very grounds. *See In re Managed Care*, 756 F.3d 1222, 1236 (11th Cir. 2014) (holding class action release barred plaintiffs' antitrust claims challenging defendant's post-settlement conduct because that conduct "merely constitute[s] a continuation of the conspiracy alleged in [the settled litigation]"). And other circuits have likewise enforced releases barring antitrust claims based on a defendant's continued adherence to challenged pre-settlement conduct. *See, e.g.*, *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 161 F.3d 443, 448 (7th Cir. 1998) (enforcing release where claim challenging continuing conduct was "clearly based" on pre-release conduct).

### 2. The District Court Did Not Abuse Its Discretion in Concluding That the Release Here Falls Within the Identical Factual Predicate Doctrine

Consistent with this caselaw, the District Court did not abuse its discretion in approving the Settlement Agreement's broad release, because that release properly covers claims with an identical factual predicate as the Subscriber Actions.

The Settlement Agreement releases three categories of claims: those "based upon, arising from, or relating in any way to" (i) "the factual predicates of the Subscriber Actions"; (ii) "any issue raised in any of the Subscriber Actions"; and (iii) "mechanisms, rules or regulations" by the settling Defendants within the scope of the Settlement's injunctive relief provisions that are approved by the Monitoring Committee. (R.2931 at 50–52; R.2610-2 ¶1(uuu).) Each of these categories of claims "by definition arise from continued adherence to the existing arrangements that are the factual predicates of the Subscribers Actions or the injunctive relief provided under the Agreement". (R.2931 at 56.)

This is true even for category (iii) ("mechanisms, rules or regulations" within the scope of the injunctive relief provisions that are approved by the Monitoring Committee). As the District Court correctly

concluded, "[t]he Monitoring Committee is not empowered to approve, much less immunize from antitrust scrutiny, any new restraints, new arrangements, or future conduct adopted by the Blues that are not within the scope of the matters addressed in the provisions of the Settlement Agreement[.]"    (*Id.* at 53 (quoting R.2812-1 at 70); *see also* R.2610-2 ¶¶10–18, 20 (tasking Monitoring Committee with reviewing "actions to be taken adopting rules or regulations that are within the scope of Paragraphs 10–18", *i.e.*, the Settlement's injunctive relief provisions); *id.* ¶20(a)(iii) ("If the arbitrators find that the rule, regulation, or action is outside the scope of Paragraphs 10–18, the rule will not constitute a Released Claim.").)  As a result, even with respect to category (iii), "the only new rules and regulations that may be subject to the release are those based on an identical factual predicate and related to the injunctive relief provided by" the Settlement Agreement.  (R.2931 at 54.)

The District Court, therefore, did not abuse its discretion in finding this release falls squarely within the identical factual predicate doctrine.

### 3.    *The Propriety of the Release Is Not Impacted by the Phrase, "Relating in Any Way To"*

Home Depot argues that "the release here exceeds [the] parameters" of the identical factual predicate doctrine because, "[r]ather than requiring an *identical* factual predicate", the release covers future claims "relate[d] in *any* way to" the factual predicates of the Subscriber Actions.  (HD.43.)  But these words do not take the release outside the rule.

Releases that "relate in any way to" are still cabined to the factual predicate of the underlying litigation, which is the touchstone of the analysis.  *See Carr v. Ocwen Loan Servicing*, 2014 WL 12860083, at *5 (N.D. Ga. Apr. 25, 2014) ("The Court finds the proposed Release is appropriate.  The Release is not a general one, but is limited to claims 'arising in whole or in part from, or *in any way whatsoever relating to*, the February 16, 2013 Letter.'  The Release, in other words, would preclude only those claims that are 'based on the identical factual predicate as that underlying the claims' at issue here."); *see also Managed Care*, 2008 WL 11333988, at *9.  Not surprisingly, then, courts routinely approve class action releases of claims that "relate in any way to" the factual predicates of settled litigation.  *See, e.g.*, *TVPX ARS, Inc. v. Genworth Life & Annuity*

31

*Ins. Co.*, 959 F.3d 1318, 1322 (11th Cir. 2020) (discussing class action settlement releasing future claims "related to in any way" the facts or issues raised in the settled litigation); *Managed Care*, 756 F.3d at 1226 (enforcing class action release of claims "arising out of, or in any way related to any of the facts" of the settled litigation); *Visa*, 297 F. Supp. at 512–16 (approving release of claims "relating in any way to any conduct prior to January 1, 2004 concerning any claims alleged in the Complaint"), *aff'd*, *Wal-Mart*, 396 F.3d at 107–08.

In arguing for a different conclusion, Home Depot conflates two distinct questions:  whether a release is lawful and may be approved in the first instance (the question here), with whether a subsequently asserted claim falls within the scope of a *previously approved* release (a question that cannot be answered now).  (*See* R.2931 at 56 n.22.)  Home Depot's own cases prove this point.  (*See* HD.42–43.)  Of all the cases cited by Home Depot in this portion of its brief, only two involved applying a settlement release:  *TVPX* and *Kazi v. PNC Bank, N.A.*, 2021 WL 965372 (N.D. Cal. Mar. 15, 2021).[8]  Critically, both cases involved applying a

---

[8] The other cases do not even involve the application of a settlement release.  *See Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*,

release *that had already been approved*—not striking down a release at the approval stage, which is what Home Depot requests here. *TVPX*, 959 F.3d at 1325–28 (examining whether conduct alleged fell within the scope of a previously-approved release); *Kazi*, 2021 WL 965372, at *16–18 (same). And tellingly, the previously-approved *TVPX* release had almost the exact language Home Depot now contends is impermissible—it covered all claims "*related to in any way*" the facts or issues in settled litigation—and yet that release was approved. 959 F.3d at 1322.

### B.    There Is No "Antitrust Exception" to the Law Permitting Future Releases

Home Depot also argues the District Court erred because, it says, the law permitting future releases does not apply to antitrust

---

140 S. Ct. 1589, 1596 (2020) (defendant's failure to assert defense in prior action did not bar ability to assert it in subsequent action because the two suits "lacked a common nucleus of operative facts"); *Herrera v. Wyoming*, 139 S. Ct. 1686, 1698 (2019) (prior decision did not bar subsequent claim because decision relied on caselaw that was later repudiated); *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1317–21 (11th Cir. 2012) (plaintiffs' claim barred by issue preclusion due to prior judgment); *Se. Fla. Cable, Inc. v. Martin Cnty.*, 173 F.3d 1332, 1334, 1336–37 (11th Cir. 1999) (prior judgment had no *res judicata* effect on subsequent claim because the two actions did not arise from the same operative nucleus of fact).

settlements. (*See* HD.23–42.) Home Depot is wrong; the law does not treat antitrust settlements any differently than other settlements.

As an initial matter, Home Depot does not cite a *single* case holding that releases of future claims based on a defendant's continuing pre-release conduct are flatly prohibited in the antitrust context. Rather, the two cases Home Depot cites (*id.* at 34–35 n.122) concern the applicability of the statute of limitations, *not* the permissible scope of an antitrust class action settlement release. *See Klehr v. A.O. Smith*, 521 U.S. 179, 182 (1997); *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 826 (11th Cir. 1999).

Home Depot cites these cases in a misguided attempt to show that "continuing to sell under an existing competitive restraint" necessarily constitutes a *new* "future antitrust violation" that must fall outside the bounds of any valid release. (HD.35.) But courts considering this argument in the settlement release context have rejected it. *See, e.g.*, *MCM*, 161 F.3d at 448 (rejecting argument that "each act in furtherance of a conspiracy gives rise to a separate cause of action and, therefore, actionable violations based on [defendant's] post-Release conduct"); *Managed Care*, 756 F.3d at 1236 ("[A]ll facts necessary to state a cause

34

of action had occurred long before the Settlement Agreement took effect. The fact that Appellants seek to base the new claims on certain conduct post-dating the Effective Date does not change this conclusion. Because they merely constitute a continuation of the conspiracy alleged in [the settled litigation, Appellee's] purported bad acts are best seen as new, overt acts within an ongoing conspiracy, rather than new claims in and of themselves."); *MSG*, 2008 WL 4547518, at *8. Home Depot does not cite one case to the contrary.[9]

Unable to come up with any apposite cases of its own, Home Depot resorts to attacking the abundant caselaw cited by the District Court. (R.2931 at 53–55.) According to Home Depot, this plentiful caselaw is "neither binding nor persuasive" in the antitrust context (HD.35), even though many of the cited cases are antitrust cases.

---

[9] Nor is Home Depot helped by *In re Smith*, 926 F.2d 1027 (11th Cir. 1991), which it cites for the general proposition that settlements may not release "a continuing violation of federal statutory law". (HD.34.) To start, *Smith* involved this Court *reversing* the district court's decision to disallow a settlement as against public policy. *Id.* at 1029–30. Furthermore, Home Depot fails to acknowledge this Court's clear guidance in *Smith* that "[s]ettlements are void against public policy . . . *only if they directly contravene a state or federal statute or policy*", a concern absent here. *Id.* at 1029; (*see infra* Section I.D).

35

*First*, Home Depot argues that *Managed Care*, 2008 WL 11333988, and *Wal-Mart*, 396 F.3d 96, are not informative, because those decisions discuss waiver of future claims through the lens of "due process principles" and do not discuss "whether substantive antitrust policy independently bars a prospective release to protect the public interest in competition".   (HD.36, 37–38.)   But that is precisely the point: "substantive antitrust policy" has nothing to do with the analysis.  As set forth above, "[t]he law is well established . . . that class action releases may include claims not presented and even those which could not have been presented *as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct*."  *Wal-Mart*, 396 F.3d at 107; *see also Managed Care*, 2008 WL 11333988, at *5 ("Although it is well established that 'federal class action settlements routinely include releases waiving future claims,' *only those claims that arise from an 'identical factual predicate' as the settled litigation* may be released by the terms of a class action settlement agreement.").  The type of lawsuit being settled, or the kind of claims being released, is irrelevant.  Indeed, *Wal-Mart* was an antitrust case, and the court nevertheless upheld the broad settlement release in that case.  396 F.3d at 106–09.

36

***Second***, Home Depot criticizes the District Court's citations to *Managed Care*, 2010 WL 6532982, and *Payment Card*, 2019 WL 6875472, because these cases supposedly do not explain "*why*" the law ought to distinguish between releases of new and distinct conduct, on the one hand, and continued adherence to pre-release conduct, on the other, where alleged antitrust violations are concerned. (HD.38–39.) Again, Home Depot's critique misses the mark. These decisions do not articulate an antitrust-specific rationale because the type of case does not matter. Instead, what matters is whether the release concerns a continuation of pre-release conduct stemming from the same factual predicate—as the release here does—or whether it involves entirely "new" distinct events that arose for the first time post-settlement. *See Managed Care*, 2010 WL 6532982, at *12 (enforcing future release because it "only applies to claims that relate to the course of conduct that originated before the date of the [settlement]" and "[i]n no way . . . immunize[s] [the defendant] from liability against new" claims "that arise from a brand new set of events and course of conduct than the one settled"); *Payment Card*, 2019 WL 6875472, at *26 (noting cases finding releases void due to antitrust policy "largely contemplate impermissibly broad releases that released

37

all types of claims, including 'future' entirely unrelated antitrust claims not circumscribed to an identical factual predicate or to claims that arose out of the alleged conduct or related conduct that could have been alleged"). Proving this point, both *Managed Care* and *Payment Card* involved releases of future antitrust claims, and this is the distinction both courts drew and applied.

***Third***, Home Depot argues that *MCM*, 161 F.3d 443—which Home Depot concedes "was an antitrust case"—is distinguishable because the release in that case "does not attempt to release claims for future violations". (HD.38.) That is wrong. While it is true that the settlement in *MCM* released "any and all claims" arising "from the beginning of the world to April 25, 1992", the Seventh Circuit nonetheless held that it barred claims challenging conduct *after* April 25, 1992 because that conduct was based on "continued adherence" to a pre-settlement alleged conspiracy. 161 F.3d at 446–48. As the court explained: "MCM contends that Andrew-Bartlett's refusal to deal with MCM from July 1992 until October 1994, based on an alleged continued adherence to the April 1992 agreement, gives rise to non-barred causes of action. However, this claim is clearly based on pre-April 25, 1992 conduct and, as such, is expressly

barred by the Release." *Id.* at 448.  In other words, Andrews-Bartlett's post-release conduct was covered by the release because it was a *continuation* of pre-release conduct, rather than truly "new" alleged antitrust violations.  That was the meaningful distinction the court drew in *MCM*, and that is why the District Court cited the case.  (R.2931 at 55.)

**Finally**, Home Depot argues that some cases cited by the District Court are "irrelevant" (*see* HD.36–37), but that is only because Home Depot takes those cases out of context.  Each of these cases stands for the plainly correct proposition that releases of future claims in class action settlements are both common and unobjectionable, and that is why the District Court cited them.  (R.2931 at 53.)  *See, e.g.*, *McClendon v. Ga. Dep't of Cmty. Health*, 261 F.3d 1252, 1254 (11th Cir. 2001) (setting forth a release of future claims); *Ass'n for Disabled Am., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 471 n.10 (S.D. Fla. 2002) (collecting cases and observing, "federal class action settlements routinely include releases waiving future claims"); *In re Chicken Antitrust Litig.*, 669 F.2d 228, 239 (5th Cir. 1982) (noting that the "release of future claims [is] an important element of antitrust settlement[s]").  Home Depot's criticisms of these cases—*e.g.*, that they did not involve specific challenges to the releases at issue

39

(HD.36–37)—are irrelevant to the point for which the District Court cited them.

Ultimately, there is good reason why the law permitting future releases does not contain the antitrust exception that Home Depot urges. The logic underpinning that law—promotion of settlement, with all of the attendant efficiencies (*see supra* Section I.A.1)—applies with full force in antitrust cases. As the "leading antitrust treatise" put it, settlement of antitrust cases is "especially valuable" because "many business practices can be simultaneously efficient and beneficial to consumers but also challengeable as antitrust violations." *MSG*, 2008 WL 4547518, at *8 (quoting Areeda & Hovenkamp, *Antitrust Law* ¶320a, at 282 (3d ed. 2004 & 2007 Supp.)). "[T]he logical corollary" of prohibiting "releases of conspiracies alleged to continue post-release" is that "parties can never settle antitrust claims predicated on ongoing violations even if they are based on the same kind of acts repeated in the subsequent period." *Id.* That would contravene "well-settled principles favoring settlement as a

40

matter of public policy". *Id.*; *see also Managed Care*, 2008 WL 11333988, at \*9; *Wal-Mart*, 396 F.3d at 106.[10]

## C.   The Settlement's Release Does Not Undermine Public Policy

### 1.   *The Release Does Not Prevent Enforcement of the Antitrust Laws*

Despite this caselaw, Home Depot argues that the Settlement contravenes public policy because it "release[es] the right to enforce the antitrust laws against continuing or new competitive restraints". (HD.23–27.)  The release does no such thing, and the caselaw Home Depot cites is not on point.

Home Depot argues that an agreement cannot confer on a defendant immunity from the antitrust laws. (*See id.* at 23–24, 27.)  But that is not what the release here does.  Rather, the Settlement Agreement releases the claims of a defined class of plaintiffs that purchased certain

---

[10] If, as Home Depot suggests, Congress had intended to categorically proscribe releases of future antitrust claims with an identical factual predicate to the settled litigation (*see* HD.23–24, 27), Congress could have done so expressly.  But "to say that Congress must have intended whatever departures from th[e] normal limits [to] advance antitrust goals is simply irrational." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233–34 (2013).  "[N]o legislation pursues its purposes at all costs." *Id.* at 234.

products from Blue Plans during a particular time period (*i.e.*, the Settlement Class Members).[11]  Subscribers who are not Settlement Class Members have not released any claims, and remain free to pursue whatever challenges to the Blue system they want—including disputing the very conduct at issue and released in the Subscriber Settlement. Home Depot's caselaw does not address this situation.[12]

Nor does the propriety of the Settlement release hinge on the opt-out plaintiffs' "right to seek 'individualized' relief", as Home Depot

---

[11] There should be no mistake that Rule 23(b)(2) Class members have forever released their right to pursue any "claims for indivisible injunctive or declarative relief against the Releasees" based on the same factual predicates as the Subscriber Actions.  (R.2939 at 1–2.)  That is what Settlement Class Members gave up in exchange for the "historic" injunctive relief set forth in this Settlement.  (R.2931 at 3); *see Wal-Mart*, 396 F.3d at 106; *see also Managed Care*, 2010 WL 6532982, at *7.

[12] Rather, its cases involve a litany of other, unrelated issues including:  the validity of an arbitration clause that would have effectively precluded the plaintiff from bringing an antitrust claim in the first instance, *see Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985); whether divestiture is a form of injunctive relief under the Clayton Act, *see California v. Am. Stores Co.*, 495 U.S. 271, 275, 284 (1990); whether an injunction can be issued where the plaintiff has not shown actual injury, *see Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130–32 (1969); and whether an action by the FTC tolls the statute of limitations for a private antitrust action, *see Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 316–22 (1965).

suggests.[13]  (*See id.* at 32–34.)  As just described, that is only one way in which the Blues remain subject to the antitrust laws.  In addition, there are *other* potential plaintiffs—*i.e.*, non-Settlement Class Members—who may bring any claims they believe are worth pursuing, including claims for indivisible injunctive relief.  It is simply not true that the Blues are perpetually immune from the antitrust laws as a result of this Settlement.

Home Depot also relies heavily on *Redel's Inc. v. General Electric Co.*, 498 F.2d 95 (5th Cir. 1974), to press its public policy argument.  In *Redel's*, the former Fifth Circuit held that a general release in a franchise agreement did not bar certain antitrust claims arising thereafter,

---

[13] Home Depot says its right to pursue individualized relief is "illusory".  (HD.32.)  Not so—as is evident by the numerous opt-out suits the Blues already face.  Home Depot essentially seeks this Court's advisory blessing of arguments it might someday make in a hypothetical opt-out case it might one day bring.  As set forth above, this conflates *approval* of the release with subsequent *application* of the release.  Those are two distinct issues.  Home Depot's related argument that the release is improper because, over time, "new facts" and "changes in surrounding market conditions" might give rise to a new claim (*id.* at 43–44) is wrong for the same reason:  it is a question about *application* of the release that is properly addressed if and when a claim is asserted in a live controversy.

including because of public policy concerns.  *Id.* at 99–100.  *Redel's*, a nearly 50-year-old case, does not control.

**First**, unlike the release here, the release in *Redel's* applied only to "claims . . . *as of the date of the execution of this agreement*".  *Id.* at 98. Looking at "the unambiguous language", the court determined "that the parties did not intend the release to apply prospectively".  *Id.* at 98–99. The court reached this conclusion as a matter of contract interpretation before even discussing public policy.  This language is very different than the language here, where the parties expressly released future claims, to the fullest extent allowed by law.  (*See* R.2610-2 ¶¶1(uuu), 32.)

**Second**, the release in *Redel's* did not arise from a settlement; rather, it was included in a pre-suit franchise agreement.  The analysis in *Redel's* therefore does not implicate the considerable caselaw cited above finding settlement releases of future antitrust claims valid and lawful.  (*See supra* Section I.A.1.)  Nor does it implicate the countervailing public policy considerations in favor of such settlements, including the broad releases of future claims that such settlements often entail.  Moreover, the *Redel's* court's primary public policy concern was that the release could "immunize parties with superior economic power

44

from the penalties and restraints imposed by the enforcement of our antitrust laws". 498 F.2d at 100. As explained above, the Blues are not so immune. (*See supra* at 41–43.)

**Third**, the release in *Redel's* was overbroad, as other courts have recognized: it released "all claims", without regard to whether those claims shared an identical factual predicate to specific pre-release conduct. *See Payment Card*, 2019 WL 6875472, at *26; *see also Redel's*, 498 F.2d at 100 (noting the problem where "a general release fails to disclose to the releasing party the factual predicate for an antitrust claim or indeed, the fact that antitrust claims are even embraced by the release"). And there certainly was no limitation based on an identical factual predicate to antitrust claims asserted in a settled litigation because, as just described, *there was no settled litigation. See id.* That makes *Redel's* entirely different.

**Fourth**, not only did the release in *Redel's* not arise from a settlement, it also did not involve a *class action* settlement with the additional structural protections that posture affords. Among other things, Rule 23(e)(2) requires the district court to determine whether a proposed settlement is fair, reasonable and adequate before approval.

Fed. R. Civ. P. 23(e)(2).  In connection with that process, the court may hear objections to the settlement, including objections to the scope of the release (as occurred here).  Home Depot argues these protections are insufficient to overcome public policy concerns because the court falls short of issuing "a merits ruling that any challenged restraint comports with antitrust law".  (HD.29.)  But Home Depot starts with the wrong premise.  The very concerns motivating the *Redel's* court—*e.g.*, an overbroad release and the risk that a defendant could commit future, unrelated antitrust violations with both impunity and immunity—are expressly addressed here through the class settlement approval process required by Rule 23.  Moreover, through the Final Approval Order, the District Court expressly retained jurisdiction "for the purpose of construing, enforcing, and administering the terms of the Settlement Agreement", such that the parties can seek judicial relief in the event the Settlement Agreement is violated.  (R.2931 at 89–90); *see also Managed Care*, 756 F.3d at 1236 ("Although Appellants were barred from asserting new claims premised on violations of the Settlement Agreement, they could have sought relief from such violations . . . through a motion in the district court to enforce the Settlement Agreement and Approval

46

Order."). None of those protections existed in *Redel's*.

Finally, Home Depot claims that "[o]ther circuits have condemned future antitrust releases" because "they undermine private enforcement to the *public* detriment". (HD.26.) But none of the out-of-circuit cases Home Depot cites involved a settlement release, and they do not support Home Depot's position. *See Am. Safety Equip. Corp. v. J.P. Maguire & Co.*, 391 F.2d 821, 826–28 (2d Cir. 1968) (finding arbitration clause invoked in antitrust case unenforceable); *In re Am. Express Merch. Litig.*, 634 F.3d 187, 199 (2d Cir. 2011) (holding class action waiver in arbitration agreement unenforceable as a matter of public policy because the cost of individually arbitrating antitrust claims would be prohibitive), *rev'd*, *Italian Colors Rest.*, 570 U.S. at 233–34 (noting that the public policies underlying "the antitrust laws do not guarantee an affordable procedural path to the vindication of every claim"). In any event, as set forth above, there is nothing unique about the fact that this release occurs in the antitrust context. The analysis is the same and the release is permissible. (*See supra* Section I.A.)

47

### 2. *This Court Has Already Considered and Rejected Home Depot's Public Policy Arguments in* Managed Care

Home Depot's position that public policy "prohibits release of the right to enforce antitrust laws against continuing restraints of trade" (HD.34–42) has already been rejected by this Court in *Managed Care*, 756 F.3d 1222.

In *Managed Care*, this Court considered whether the district court abused its discretion in finding plaintiffs in contempt for violating a previously-approved class action settlement release that barred all claims that "ar[ose] out of, or in any way [were] related to any of the facts, acts, events, transactions, occurrences, courses of conduct, representations, omissions, circumstances or other matters referenced in the [settled litigation]." *Id.* at 1226. The district court found that plaintiffs' new antitrust claims were barred by the release, and when plaintiffs refused to withdraw their complaint, the court issued an order of contempt and sanctions. *Id.* at 1230. On appeal, plaintiffs argued that the district court erred because the release did not apply to their new claims challenging conduct post-dating the settlement's effective date, including because any release of future claims would contravene public

policy. *Id.* at 1231. In support of this position, plaintiffs asserted the *very arguments* that Home Depot makes here, namely, that *Redel's* precludes "any prospective waiver of antitrust liability . . . as against public policy". Brief for Appellants at 32, *Managed Care*, 756 F.3d 1222 (No. 12-14013), 2012 WL 4335018, at *32.

This Court disagreed. Despite plaintiffs' public policy arguments, this Court held that the release barred plaintiffs' antitrust claims because the claims "echo[ed] the earlier allegations" stated in the settled litigation and the defendant's post-settlement conduct "merely constitute[d] a continuation of the conspiracy alleged in [the settled litigation]". *Managed Care*, 756 F.3d at 1236. In other words, plaintiffs' claims were not "new claims in and of themselves" and, therefore, release of such claims through a class action settlement was entirely permissible. *Id.*

Home Depot tries to distinguish *Managed Care* by arguing it involved "a release of future claims based on *past conduct occurring by or before its effective date*", and that this is "narrower than the release here", which releases "claims that arise *after* the Effective Date". (HD.40–41.) Home Depot is wrong. Although the release in *Managed Care* by its

49

terms applied to claims "arising on or before the Effective Date", 756 F.3d at 1226, this Court nevertheless found it to bar even those claims challenging pre-settlement conduct that continued post-settlement. *See id.* at 1236. Home Depot's emphasis on the "on or before the Effective Date" language is therefore misplaced.[14]

### D. The District Court Did Not Rely on its Provider-Track Standard of Review Decision in Overruling Home Depot's Public Policy Objection

Finally, Home Depot argues that the District Court's August 2022 standard of review decision for the Provider-track cases—in which the Court held the rule of reason applies to claims challenging the Blues' ESAs alone—"does not negate the public policy violation posed by the prospective release." (HD.46–54.) Home Depot attacks a strawman.

The District Court did not address its Provider-track standard of review decision—and certainly did not "rel[y] upon this ruling" (*id.* at 46)—in overruling Home Depot's objection that the Settlement's release violates public policy. (*See* R.2931 at 50–56.) Indeed, the District

---

[14] Ironically, given the cases it cites, Home Depot also argues that *Managed Care* is not informative because it "is not a settlement approval decision", but rather "involved enforcement of an already-approved settlement". (HD.41.) Home Depot fails to explain why its purported public policy considerations would not also bar enforcement.

Court did not once raise its Provider-track ruling in the section of the Final Approval Order concerning the Settlement release.[15]    (*See id*.) Rather, the Court referenced the Provider-track decision only in overruling an entirely separate objection from Home Depot (not raised on appeal) that the Settlement "would perpetuate a *per se* violation of Section 1 of the Sherman Act."    (*Id*. at 46–48.)    In overruling that objection, the District Court correctly followed this Circuit's instruction that "unless the illegality of an arrangement under consideration is a legal certainty [*i.e.*, 'clearly illegal'], the mere fact that certain of its features may be perpetuated is no bar to approval."    (*Id*. at 46 (citing *Bennett*, 737 F.2d at 987).)[16]    The District Court cited its Provider-track decision to provide yet another reason the post-Settlement Blue system could not possibly be "clearly illegal", since conduct that must be

---

[15] Similarly, the District Court never said that the release does not violate public policy simply because "the rule of reason governs" and "rule of reason review" should be treated "lightly".    (HD.49–50.)    That connection is manufactured by Home Depot and did not factor into the District Court's analysis at all.

[16] The District Court expressly declined to declare a standard of review in the context of final approval because "to do so would actually involve issuing an advisory opinion on the merits of issues that are not currently before the court."    (R.2931 at 49.)

evaluated under a full rule-of-reason analysis could not be "clearly illegal" within the meaning of this Court's caselaw. (*Id.* at 47–48.) Notably, Home Depot does not challenge the District Court's conclusion—which was well-reasoned and certainly not an abuse of discretion—or pursue its prior objection on appeal.

Home Depot also insists that the District Court's citations to *Bennett*, *Grunin v. IHOP*, 513 F.2d 114 (8th Cir. 1975), and *Robertson v. NBA*, 556 F.2d 682 (2d Cir. 1977), were misplaced because they do not support the Court's supposed conclusion that "a future antitrust release poses no problem if the conduct shielded by the release is not 'clearly illegal.'" (HD.51.) As just described, the District Court reached no such conclusion—its analysis of the "clearly illegal" objection was entirely separate from its analysis of Home Depot's public policy objection. Again, the District Court did not cite these cases in the section of the Final Approval Order overruling Home Depot's public policy objection. (*See* R.2931 at 50–56.) This argument is nothing more than a backdoor attempt to raise a failed objection—one that Home Depot cannot pursue on appeal because the District Court, consistent with the caselaw, determined that the post-Settlement Blue system was not "clearly illegal"

without ever announcing the applicable standard of review on final approval, *exactly* as Home Depot argued it should. (*See* R.2812-20 at ECF 33–40.)

Home Depot also contends the Provider-track decision "did not hold" that "the Blues' agreements to allocate bids for National Accounts would escape *per se* condemnation." (HD.46.) But again, the District Court was not asked to—and did not—reach that conclusion on final approval. While the Blues firmly believe the ESA rules are properly subject to the rule of reason where National Accounts are concerned (and, therefore, vehemently disagree with the argument set forth in Section I.F.1 of Home Depot's brief), that is a separate question to be determined by other courts in other cases, when that question is properly before the court on a complete record, as it was before the District Court in the Provider-track. Home Depot has conceded as much. (*See id.* at 49 ("The point (at this stage) is not that these rules are illegal *per se*, but that this should be an open issue if challenged in post-Settlement litigation.").)

Finally, Home Depot argues that the release violates public policy because "whether a restraint violates antitrust law does not depend on

whether it is illegal *per se*", since the release would "allow[] defendants to *forever* avoid any . . . holding" that the post-Settlement Blue system is unlawful under any standard of review. (*Id.* at 52–53.) This is simply Home Depot repeating its mistaken argument that alleged antitrust restraints can never be subject to a prospective release and its unfounded claim that this release somehow immunizes the Blues from all antitrust scrutiny. That argument is refuted for the reasons above. (*See supra* Sections I.A–C.)

## II.   The ASO Damages Claims Period Cannot Begin in 2008

The District Court approved the allocation to the Self-Funded Subclass in part because it found a five-year damages claims period was reasonable. (R.2931 at 59–61.) Self-Funded Objectors argue that the damages period should have been more than twice that long—running back to 2008—because of supposed relation back to the 2012 *Cerven* Complaint. (Topographic.48.) Self-Funded Objectors are wrong because, as the District Court found, "[t]he *Cerven* complaint plainly did not contemplate ASOs being part of that case or the relevant class." (R.2931 at 61.) Thus, "ASOs cannot get the benefit of the *Cerven* filing date." (*Id.*)

### A. ASOs that "Self-Insure" Were Not Members of Putative Classes "Insured" by Blue Plans

Self-Funded Objectors argue that ASO claims relate back to the *Cerven* Complaint under Federal Rule of Civil Procedure 15(c). (Topographic.48–51.)  According to Self-Funded Objectors, "[t]he critical issue in Rule 15(c) determinations is whether the ***original complaint*** gave notice to the defendant of the claim now being asserted." (Topographic.49 (quoting *Makro Capital of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1260 (11th Cir. 2008)).)  That is the legal standard the District Court applied in overruling their objection.  (R.2931 at 61.)[17]

Courts apply that standard when an amended complaint changes plaintiffs because "the chief consideration of policy is that of the statute of limitations".  *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1132 (11th Cir. 2004) (quoting Fed. R. Civ. P. 15 advisory committee's note to 1966 Amendment) (cited at Topographic.49).  For absent class members,

---

[17] Although the District Court did not reach this additional requirement in overruling the objection, Self-Funded Objectors' own authority requires them to make a further showing:  that a reasonable defendant would have assumed "that the action would have been brought against it, *but for a mistake concerning the proper party's identity*." *Makro*, 543 F.3d at 1258.  Self-Funded Objectors make no attempt to show any "mistake" concerning the identity of plaintiffs in the *Cerven* Complaint—nor could they.

questions of the statute of limitations often turn on the class action tolling doctrine announced by the Supreme Court in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). Under *American Pipe*, "the commencement of the original class suit tolls the running of the statute for all purported members of the class". *Id.* at 553. Thus, to invoke *American Pipe* tolling, a plaintiff must demonstrate that it was a member of a putative class in a prior class action complaint. *Id.* at 554. This Circuit has explained that the same principles govern the Rule 15(c) analysis: relation back is not appropriate if it "would not accord with one of the rationales of *American Pipe*, that commencement of the class action adequately notifies the defendants 'not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment.'" *Cliff*, 363 F.3d at 1132–33 (cited at Topographic.49). Thus, allegations defining the class in the original complaint are the touchstone.

Applying that standard, the District Court held that "[t]he *Cerven* complaint simply gave no notice to Defendants whatsoever that they would have to defend against alleged misconduct in the ASO market." (R.2931 at 60–61.) In particular, the District Court found as a matter of

56

fact that "under a fair reading of the *Cerven* Complaint, ASOs are excluded from both the proposed damages and the injunction classes." (*Id.* at 61.) The District Court was right because the plain text of the *Cerven* Complaint does not include ASOs in the putative classes.

**First**, the District Court properly found the damages class alleged in the *Cerven* Complaint did not include ASOs. (*Id.* at 60.) The *Cerven* Complaint damages class included:

> All persons or entities who, from February 7, 2008 to the present (the "Class Period") have paid **health insurance premiums** to BCBS-NC **for individual or small group full-service commercial health insurance**.

(*Cerven* Compl. ¶21.) Unlike fully-insured class members, ASO accounts do not pay "health insurance premiums". (R.2616 ¶2.) ASO accounts are not "individual[s]" or "small group[s]", which are generally too small to self-fund. (*Cerven* Compl. ¶131.) And ASOs do not purchase "full-service commercial health insurance"; they purchase "administrative services only". (*Id.* ¶129.) Thus, the Self-Funded Subclass's damages claims cannot relate back to those brought on behalf of the *Cerven* damages class. On appeal, Self-Funded Objectors do not argue otherwise. (*See* Topographic.48–54 (no arguments about *Cerven* damages class).)

**Second**, the District Court correctly concluded that the injunctive relief class pleaded in *Cerven* also did not include ASOs.  (R.2931 at 61.)  The *Cerven* Complaint defined the injunctive relief class as:

> All persons or entities in the United States of America who are currently ***insured by any health insurance plan*** that is currently a party to a license agreement with BCBSA that restricts the ability of that health insurance plan to do business outside of any geographically defined area.

(*Cerven* Compl. ¶20.)  As the District Court reasoned, "[t]hose who are Self-Funded are just that—self-funded", and thus, ASO accounts are not "insured" by a "health insurance plan" under the *Cerven* injunction class definition.  (R.2931 at 61.)  A defining characteristic of ASOs is their decision to forego the purchase of "health insurance" and to instead self-insure.  (R.2616 ¶2.)

Other allegations in the *Cerven* Complaint confirm the District Court's conclusion that both of the putative classes in *Cerven* excluded ASOs.  (R.2931 at 61.)  The first paragraph in the *Cerven* Complaint stated that plaintiffs sought to recover for allegedly inflated "premiums".  (*Cerven* Compl. ¶1.)  "Premiums" are charged only for insurance products, not for administrative services.  (R.2616 ¶2.)  The *Cerven* Complaint then defined a relevant product market limited to "insurance

products", which excludes accounts that purchase ASO products. (*Cerven* Compl. ¶124.) Even more specifically, the *Cerven* Complaint expressly distinguished ASO products from fully-insured products, alleging that ASO products were outside of and not encompassed by the relevant product market of insured products for the case as a whole. (*Id.* ¶¶129, 131); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (explaining significance of defining a "relevant market" in antitrust litigation).

Thus, there is no error in the District Court's finding that the putative classes pleaded in the *Cerven* Complaint did not include ASOs and did not give the Blues reasonable notice that ASOs might participate in a potential *Cerven* judgment. *See Makro*, 543 F.3d at 1259; *see also Cliff*, 363 F.3d at 1132–33.

Contrary to Self-Funded Objectors' suggestion, there is little wonder why no ASO filed claims in *Cerven*, or at any other time prior to November 2020: ASO claims are especially weak and disadvantageous to pursue because the ASO market is extremely competitive. As Subscriber counsel explained at the Final Approval Hearing, ASO claims were not filed until the Fourth Amended Complaint because "ASOs had

59

more competition.  It was a more competitive market.  The ASOs generally had greater bargaining power . . . .  And even if you assumed that you were able to establish the same level of liability, the damages were considerably less.  The ASO business was less profitable." (R.2865 at 134:11–135:7.)  For example, ASOs have many options, other than Blue Plans, to purchase administrative services with or without purchasing full insurance services.  (*See id.*)  Indeed, because ASOs are large entities that often operate in multiple states, they also may purchase administrative services from any administrative services provider operating in one or more of those states.  (*See id.*)

### B.     Self-Funded Objectors' Other Arguments Fail

Self-Funded Objectors make a handful of other arguments for linking the ASO damages claims period to the *Cerven* Complaint.  None has merit.

***First***, Self-Funded Objectors claim the Blues admitted they had "actual notice" of ASOs' claims based on an argument in a 2013 motion to dismiss brief.  (Topographic.50.)  As an initial matter, "actual" or subjective notice, or the "understanding" of a particular defendant, is not the standard.  Self-Funded Objectors' own authority applies an objective

test based on the face of the prior complaint: what a "reasonable defendant" would have concluded "based solely on th[e] original complaint". *Makro*, 543 F.3d at 1260.

In any event, Self-Funded Objectors also are wrong because they quote only part of what the Blues argued in that motion to dismiss, and omit entirely how plaintiffs responded and what the District Court ruled. The Blues argued in 2013 that the MDL Subscriber-track consolidated complaint failed to state a claim because it contained mismatched, inconsistent allegations: that the putative injunctive relief class definition "encompasses both large and small groups that self-insure" in a way that "contradicts the only product market that plaintiffs . . . attempted to define", which expressly excluded ASOs. (R.120 at 49 (cited at Topographic.50).) In other words, the Blues explained that it would make no sense to include ASOs in a case where the complaint pleaded no allegations about an ASO market. That is no "admission" at all.

Self-Funded Objectors then omit Subscriber-Plaintiffs' contemporaneous response to the Blues' motion to dismiss: that the original complaint "justif[ied] exclusion of administrative services only (ASO) products from the individual and small group fully insured product

61

market because, among other things, ASO policy holders are large enough to self-insure". (R.153 at 11.)  It was clear to the authors of the complaint that ASOs were not part of it, and Subscribers made that equally clear to the Blues and to the Court, in no uncertain terms.  Self-Funded Objectors further ignore that the Blues' 2013 argument did not carry the day because the District Court denied the motion to dismiss. (*See* R.215.)[18]  As Subscriber counsel stated at the Final Approval Hearing, until ASO claims were brought in the Fourth Amended Complaint, "our complaint was limited not merely to fully insured plans, but was limited to individuals and small groups so that it was absolutely clear that ASOs were not included.  And indeed, when the complaint talks about ASOs, it talks about why they are not in the market, why they are distinguishable from the fully insured plans."  (R.2864 at 14:7–24.) Thereafter, throughout the MDL litigation since 2013, Subscriber-Plaintiffs consistently have taken the position that ASOs were not part

---

[18] *See also* R.2865 at 163:19–21 (Blues' counsel explaining "we did . . . have questions on this point.  And plaintiffs, as masters of their complaint, defined it.").

of any of the putative classes until the filing of the November 2020 Fourth Amended Complaint.[19]

*Second*, Self-Funded Objectors argue that ASOs were included in the *Cerven* injunctive relief class because some ASO entities purchase stop-loss insurance. (Topographic.51.) Under Self-Funded Objectors' own authority, "[s]top loss insurance is not medical insurance, it is a financial and risk management tool" that is "designed to protect self-insured employers from catastrophic losses." (R.2845-01 at ECF 2–3.) Because ASOs self-insure "without a health insurance provider in the mix, the employer is entirely responsible for all qualifying medical costs." (*Id.* at ECF 3.) Additional expenses are covered by the stop-loss policy once the self-funded "employer's out-of-pocket is capped at an agreed amount." (*Id.* at ECF 3–4.) "[T]his coverage comes in the form of reimbursement, so employers are still responsible for initial payment." (*Id.* at ECF 4.)

---

[19] *See* R.2864 at 14:7–24 (Subscriber counsel stating that "[t]hroughout the litigation, we made clear that it was only the fully insured. . . . I don't think that you can in any way fairly read either the actual text of the complaint itself or the conduct of this litigation as including the ASOs.").

The *Cerven* Complaint alleges nothing whatsoever about stop-loss insurance, expressly or impliedly. The term "stop-loss" does not appear once in the *Cerven* Complaint. And there is nothing in *Cerven* to suggest that those "insured" by Blue Plans captured ASOs who self-insured while also purchasing stop-loss insurance as a backstop. After all, as alleged in C*erven*, the defining characteristic of an ASO is that it self-insures: "when a consumer purchases an administrative services only ('ASO') product, . . . the entity from which the consumer purchases that product provides administrative services only." (*Cerven* Compl. ¶129.) To the extent Self-Funded Objectors argue something different now, no notice of such allegations was provided in the *Cerven* Complaint, and thus there is no basis for relation back.[20]

---

[20] Though it requests "reversal" of one sentence in the Final Approval Order, the amicus curiae brief filed by the Oklahoma Insurance Department and others ("Amici") in fact supports the reasonableness of the Settlement. Amici argue that states have "the authority to regulate stop-loss insurance products" (Amici.1), but the District Court's decision below had nothing to do with that issue. The question addressed by the District Court was whether ASOs were "insured" by "health insurance plans" as those terms were used in the *Cerven* Complaint. No one—not Self-Funded Objectors, not Amici, not anyone—made arguments or presented evidence below about whether stop-loss insurance qualifies under some state laws as a form of "insurance", "reinsurance" or anything else. Moreover, Amici's authority explained that, "unlike traditional

Further, even if some individual ASOs purchase stop-loss insurance, many members of the Self-Funded Subclass do not. Thus, stop-loss insurance cannot be the missing link that relates all Self-Funded Subclass members' claims back to the *Cerven* Complaint. Self-Funded Objectors concede that ASOs do not uniformly purchase stop-loss insurance or "other insurance products". (Topographic.51.) Self-Funded Objectors instead rely on a line in the Fourth Amended Complaint in which the Self-Funded Subclass states that "[a] Self-Funded Account that purchases . . . stop-loss coverage remains a Self-Funded Account" and is not automatically excluded from the Subclass on that basis. (Topographic.51 (citing R.2616 at 136).) That does not mean Self-Funded Subclass members, as a group, purchase stop-loss insurance, and Objectors cite nothing to suggest that they do. That, too, is fatal to their objection. *See Martin v. Halifax Healthcare Sys., Inc.*, 621 F. App'x 594,

---

group-health insurance, stop-loss insurance is akin to reinsurance in that it does not provide coverage directly to plan members or beneficiaries." *Edstrom Indus., Inc. v. Companion Life Ins. Co.*, 516 F.3d 546, 550 (7th Cir. 2008) (cited at Amici.2, 4.) Whatever the regulatory treatment of stop-loss insurance under state law (which neither the Settlement nor the Final Approval Order affects), ASOs that purchase only stop-loss insurance are not like the putative class members alleged in the *Cerven* Complaint.

599 n.4 (11th Cir. 2015) (noting a plaintiff has the burden to cite "supporting evidence for [an] assertion on appeal").

*Third*, Self-Funded Objectors argue that, regardless of which putative classes brought the claims, the allegations in *Cerven* affect the entire "Blue membership", including ASOs, because they "attacked the entire Blue structure".  (Topographic.53–54.)  Again, that is the wrong analysis.  It is not enough that a new claim "arose out of the conduct, transaction or occurrence set out . . . in the original pleading" under Rule 15(c)(1)(B).  Self-Funded Objectors' own authority says that, under Rule 15(c)(1)(C), the original complaint also must give notice that *these plaintiffs* were pursuing such a claim.  *See Makro*, 543 F.3d at 1260; *Cliff*, 363 F.3d at 1132–33.  The *Cerven* Complaint did not.

Further, the fact that the *Cerven* Complaint and the later ASO complaint challenged the same Blue rules does not mean that their claims arose from the same alleged conduct.  The *Cerven* Complaint did not claim that Blue rules allocated markets for ASO services, restrained the sale of ASO-related products or inflated fees paid for ASO-related services.  *See Caron v. NCL (Bahamas), Ltd.*, 910 F.3d 1359, 1368 (11th Cir. 2018) (when "new claims 'involve separate and distinct conduct,' such

66

that the plaintiff would have to prove 'completely different facts' than required to recover on the claims in the original complaint, the new claims do not relate back"). Instead, the *Cerven* Complaint explained that ASO markets are different (*Cerven* Compl. ¶¶129, 131) and sought rules changes that would have affected classes other than ASOs (*id.* ¶20).

Moreover, there is nothing to Self-Funded Objectors' observation that "the [*Cerven*] complaint estimated Blue national membership at 100 million", which is true "only if self-funded members are counted". (Topographic.54.) That figure was pleaded as background and context to describe the Blue system as a whole; it did not purport to identify or describe the putative classes in *Cerven* in any way. (*See Cerven* Compl. ¶15.) In light of the numerous, clear differences between the allegations in the *Cerven* Complaint and the claims of the Self-Funded Subclass, it was well within the District Court's discretion to find the Self-Funded Subclass's damages claims period could not be based on the *Cerven* Complaint. This Court should affirm.

## CONCLUSION

For the foregoing reasons, Defendants-Appellees respectfully request that this Court affirm the District Court's approval of the Subscriber Settlement.

Dated:  February 10, 2023

Respectfully submitted,

/s/ Karin A. DeMasi
Karin A. DeMasi

Karin A. DeMasi
Evan R. Chesler
Lauren R. Kennedy
Helam Gebremariam
David H. Korn
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019-7475
Tel: (212) 474-1000
Fax: (212) 474-3700
kdemasi@cravath.com
echesler@cravath.com
lkennedy@cravath.com
hgebremariam@cravath.com
dkorn@cravath.com

*Lead Counsel for the Blue Cross
Blue Shield System*

*Counsel for Defendants-Appellees
Blue Cross and Blue Shield
Association; Blue Cross and Blue
Shield of Alabama; Blue Cross and
Blue Shield of Arizona, Inc.; Blue
Cross and Blue Shield of Florida,
Inc.; Blue Cross and Blue Shield of
Massachusetts, Inc.; Blue Cross and
Blue Shield of North Carolina, Inc.;
BlueCross BlueShield of Tennessee,
Inc.; California Physicians' Service
d/b/a Blue Shield of California;
CareFirst, Inc.; CareFirst of
Maryland, Inc.; Group*

69

*Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.; Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Triple-S Management Corporation; Triple-S Salud, Inc.*

/s/ Craig A. Hoover
Craig A. Hoover

Craig A. Hoover
E. Desmond Hogan
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com

/s/ Jeffrey J. Zeiger
Jeffrey J. Zeiger

Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
jzeiger@kirkland.com

*Counsel for Defendants-Appellees Health Care Service Corporation,*

70

*Counsel for Defendants-Appellees Elevance Health, Inc. f/k/a Anthem, Inc., and all of its named subsidiaries in this consolidated action; Aware Integrated, Inc.; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence BlueShield of Idaho; Regence BlueCross BlueShield of Utah; Regence BlueShield (of Washington); Regence BlueCross BlueShield of Oregon*

/s/ Adam H. Charnes
Adam H. Charnes

Adam H. Charnes
KILPATRICK TOWNSEND &
STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
Tel: (214) 922-7106
Fax: (214) 481-0517
acharnes@kilpatricktownsend.com

/s/ Gwendolyn C. Payton
Gwendolyn C. Payton

*an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Health, a Pennsylvania non-profit organization; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark Blue Cross Blue Shield Delaware Inc.; Highmark Western and Northeastern New York Inc.*

/s/ Todd M. Stenerson
Todd M. Stenerson

Todd M. Stenerson
SHEARMAN & STERLING LLP
401 9th Street, N.W., Suite 800
Washington, DC 20004
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com

Rachel Mossman Zieminski
SHEARMAN & STERLING LLP
2601 Olive Street, Suite 1700
Dallas, TX 75201
Tel: (214) 271-5777
Fax: (214) 271-5778
rachel.zieminski@shearman.com

Gwendolyn C. Payton
KILPATRICK TOWNSEND &
STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA 96101
Tel: (206) 626-7714
Fax: (206) 623-6793
gpayton@kilpatricktownsend.com

*Counsel for Defendant-Appellee
Premera Blue Cross,
d/b/a Premera Blue Cross Blue
Shield of Alaska*

*/s/ M. Patrick McDowell*
M. Patrick McDowell

M. Patrick McDowell
BRUNINI, GRANTHAM,
GROWER& HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS 39201
Tel: (601) 948-3101
Fax: (601) 960-6902
pmcdowell@brunini.com

*Counsel for Defendant-Appellee
Blue Cross & Blue Shield of
Mississippi, a Mutual Insurance
Company*

*/s/ Alan D. Rutenberg*
Alan D. Rutenberg

Alan D. Rutenberg
FOLEY & LARDNER LLP

*Counsel for Defendant-Appellee
Blue Cross Blue Shield of Michigan
Mutual Insurance Company*

*/s/ John Briggs*
John Briggs

John Briggs
AXINN, VELTROP &
HARKRIDER, LLP
1901 L Street, N.W.
Washington, DC 20036
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
Regions Harbert Plaza
1901 6th Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5000
Fax: (205) 250-5034
steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

*Counsel for Defendants-Appellees
Independence Hospital Indemnity
Plan, Inc.; Independence Health
Group, Inc.*

*/s/ Kathleen Taylor Sooy*
Kathleen Taylor Sooy

Kathleen Taylor Sooy
Tracy A. Roman

72

3000 K Street, N.W., Suite 600
Washington, DC 20007
Tel: (202) 672-5491
Fax: (202) 672-5399
arutenberg@foley.com

*Counsel for Defendant-Appellee
USAble Mutual Insurance
Company, d/b/a Arkansas Blue
Cross and Blue Shield and as
Blue Advantage Administrators of
Arkansas*

*/s/ Jess R. Nix*
Jess R. Nix

Robert K. Spotswood
Joshua K. Payne
Jess R. Nix
SPOTSWOOD SANSOM &
SANSBURY LLC
Financial Center
505 20th Street North, Suite 700
Birmingham, AL 35203
Tel: (205) 986-3620
Fax: (205) 986-3639
rks@spotswoodllc.com
jpayne@spotswoodllc.com
jnix@spotswoodllc.com

*Counsel for Defendant-Appellee
Capital Blue Cross*

*/s/ John G. Schmidt Jr.*
John G. Schmidt Jr.

Edward S. Bloomberg

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com

Sarah Gilbert
Honor Costello
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Tel: (212) 223-4000
Fax: (212) 223-4134
sgilbert@crowell.com
hcostello@crowell.com

*Counsel for Defendants-Appellees
Blue Cross of Idaho Health Service,
Inc.; Blue Cross and Blue Shield of
Kansas, Inc.; Blue Cross and Blue
Shield of Kansas City; Blue Cross
and Blue Shield of Nebraska; Blue
Cross Blue Shield of North Dakota;
Blue Cross Blue Shield of
Wyoming.*

John G. Schmidt Jr.
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY 14203
Tel: (716) 847-8400
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com

Anna Mercado Clark
PHILLIPS LYTLE LLP
620 Eighth Avenue, 38th Floor
New York, NY 10018
Tel: (212) 508-0466
Fax: (716) 852-6100
aclark@phillipslytle.com

*Counsel for Defendant-Appellee*
*Excellus Health Plan, Inc., d/b/a*
*Excellus BlueCross BlueShield.*

# CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4, this document contains 12,996 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word and 14-point Century Schoolbook font.

Dated: February 10, 2023          */s/ Karin A. DeMasi*
                                  Karin A. DeMasi

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on February 10, 2023. Counsel for all parties are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Karin A. DeMasi*
Karin A. DeMasi