Nos. 22-13051, 22-13052, 22-13118, & 22-13120

# In the United States Court of Appeals for the Eleventh Circuit

In re: Blue Cross Blue Shield Antitrust Litigation
(MDL 2406)

On Appeal from the United States District Court for the
Northern District of Alabama, Southern Division,
No. 2:13-CV-20000-RDP

## PLAINTIFFS-APPELLEES' RESPONSE BRIEF

David Boies
Adam Shaw
BOIES, SCHILLER &
FLEXNER LLP
333 Main Street
Armonk, NY 10504
dboies@bsfllp.com

Michael Hausfeld
Swathi Bojedla
HAUSFELD LLP
888 16th Street, N.W.
Suite 300
Washington, DC 20006
mhausfeld@hausfeldllp.com

Charles J. Cooper
Vincent J. Colatriano
Harold S. Reeves
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

Hamish P.M. Hume
Richard Feinstein
BOIES, SCHILLER &
FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
hhume@bsfllp.com
rfeinstein@bsfllp.com

Jesse Panuccio
BOIES, SCHILLER &
FLEXNER LLP
401 E. Las Olas Blvd.,
#1200
Fort Lauderdale, FL 33301
jpanuccio@bsfllp.com

Megan Jones
Arthur Bailey
HAUSFELD LLP
600 Montgomery Street,
Suite 3200
San Francisco, CA 94111
mjones@hausfeldllp.com
abailey@hausfeldllp.com

*Counsel for Plaintiffs-Appellees*
*(Additional Counsel Listed on Inside Cover)*

Chris T. Hellums
PITTMAN, DUTTON &
HELLUMS, P.C.
2001 Park Place N,
1100 Park Place Tower
Birmingham, AL 35203
chrish@pittmandutton.com

William A. Isaacson
PAUL WEISS
2001 K Street, NW
Washington, DC 20006-1047
wisaacson@paulweiss.com

David Guin
Tammy Stokes
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd. N.
Suite 600
Birmingham, AL 35203
davidg@gseattorneys.com
tammys@gseattorneys.com

Cyril V. Smith
ZUCKERMAN SPAEDER, LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
csmith@zuckerman.com

Gregory Davis
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
gldavis@knology.ne

Kathleen Chavez
FOOTE, MIELKE, CHAVEZ &
O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
kcc@fmcolaw.com

Mindee Reuben
LITE DEPALMA GREENBERG
1835 Market Street, Suite 2700
Philadelphia, PA 19103
Tel: (267) 314-7980
Fax: (973) 623-0858
mreubin@litedepalma.com

Nate Cihlar
Joshua Callister
STRAUSS & BOIES
4041 University Drive, 5th Floor Fairfax,
VA 22030 Tel: (703) 764-8700 Fax:
(703) 764-8704
ncihlar@straus-boies.com
jcallister@straus-boies.com

Patrick Cafferty
CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP
101 North Main Street, Suite 565
Ann Arbor, MI 48104
pcafferty@caffertyclobes.com

Carl S. Kravitz
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
ckravitz@zuckerman.com

Douglas Dellaccio
CORY WATSON CROWDER &
DEGARIS, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 32505
ddellaccio@cwcd.com

Edwin J. Kilpela, Jr.
Benjamin Sweet
DEL SOLE CAVANAUGH
STROYD LLC
200 First Avenue, Suite 300
Pittsburgh, PA 15222
ekilpela@dsclaw.com
bsweet@dsclaw.com

Robert M. Foote
FOOTE, MIELKE, CHAVEZ &
O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
rmf@fmcolaw.com

John Saxon
JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203-3314
jsaxon@saxonattorneys.com

Andrew Lemmon
LEMMON LAW FIRM
650 Poydras Street, Suite 2335
New Orleans, LA 70130
andrew@lemmonlawfirm.com

Bryan Clobes
Ellen Meriwether
CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP
1101 Market Street, Suite 2650
Philadelphia, PA 19107
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

Larry McDevitt
David Wilkerson
VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com

Charles T. Caliendo
GRANT & EISENHOFER
485 Lexington Avenue
New York, NY 10017
ccaliendo@gelaw.com

Brent Hazzard
HAZZARD LAW, LLC
447 Northpark Drive
Ridgeland, MS 39157
brenthazzard@yahoo.com

Warren T. Burns
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
wburns@burnscharest.com

Robert Methvin
James M. Terrell
MCCALLUM, METHVIN &
TERRELL, P.C.
The Highland Building
2201 Arlington Avenue South
Birmingham, AL 35205
rgm@mmlaw.net
jterrell@mmlaw.net

H. Lewis Gillis
MEANS GILLIS LAW, LLC
3121 Zelda Court
Montgomery, AL 36106
hlgillis@tmgslaw.com

David J. Hodge
MORRIS, KING & HODGE
200 Pratt Avenue NE
Huntsville, AL 35801
lstewart@alinjurylaw.com

Lawrence Jones
JONES WARD PLC
312 South Fourth Street, Sixth Floor
Louisville, KY 40202
larry@jonesward.com

Virginia Buchanan
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR,
P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
vbuchanan@levinlaw.com

Michael McGartland
MCGARTLAND & BORCHARDT
LLP
1300 South University Drive, Suite 500
Fort Worth, TX 76107
mike@attorneysmb.com

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

**Certificate of Interested Persons.** Pursuant to 11th Cir. R. 26.1 and 11th Cir. R. 26.1-2(b), and 26.1-3, Plaintiffs-Appellees hereby certify that the list of those interested in the outcome of this appeal in Appellant David G. Behenna's Principal Brief is complete, with the following additions:

1.  Bailey & Glasser, LLP, *Counsel for Plaintiffs-Appellees*

2.  Cochran, George W., *Counsel for Interested Party-Appellant*

3.  Colatriano, Vincent J., *Counsel for Plaintiffs-Appellees*

4.  HD Operations Holding Company, Inc., *Interested Party-Appellant*

5.  Home Depot Group Benefits Plan, *Interested Party-Appellant*

6.  The Home Depot, Inc. (HD), *Interested Party-Appellant*

7.  The Home Depot Medical and Dental Plan, *Interested Party-Appellant*

8.  McKinney, Rebekah Keith, *Counsel for Appellee*

9.  Mullins, M. Richard, *Counsel for Appellants*

10. Pacella, Mario Anthony, *Counsel for Plaintiffs-Appellees*

11. Snyder, Eric B., *Counsel for Plaintiffs-Appellees*

12. Strom Law Firm, *Counsel for Plaintiffs-Appellees*

13. Watson, McKinney, LLP, *Counsel for Plaintiffs-Appellees*

14. Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC, *Counsel for Defendants-Appellees*

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

**Corporate Disclosure Statement**. Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, Plaintiffs-Appellees submit this Corporate Disclosure Statement and state as follows:

1. Plaintiff-Appellee A. Duie Pyle, Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

2. Plaintiff-Appellee American Electric Motor Service, Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

3. Plaintiff-Appellee Avantgarde Aviation, Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

4. Plaintiff-Appellee Barr, Sternberg, Moss, Lawrence, Silver & Munson, P.C. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

5. Plaintiff-Appellee Bartlett, Inc. dba Energy Savers has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

6. Plaintiff-Appellee CB Roofing LLC has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

7. Plaintiff-Appellee Casa Blanca, LLC, has no parent corporation and no publicly held corporation owns ten percent or more of its stock

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

8. Plaintiff-Appellee Comet Capital has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

9. Plaintiff-Appellee Conrad Watson Air Conditioning Corporation has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

10. Plaintiff-Appellee Consumer Financial Education Foundation of America, Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

11. Plaintiff-Appellee Fort McClellan Credit Union has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

12. Plaintiff-Appellee Free State Growers, Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

13. Plaintiff-Appellee GC/AAA Fences, Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

14. Plaintiff-Appellee G&S Trailer Repair Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

15. Plaintiff-Appellee Galactic Funk Touring, Inc., has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

16. Plaintiff-Appellee Gaston CPA Firm, P.C. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

17. Plaintiff-Appellee Hibbett Retail, Inc., f/k/a Hibbett Sporting Goods, Inc., is a subsidiary of Hibbett, Inc. (Nasdaq: HIBB). Blackrock, Inc. (NYSE: BLK), owns ten percent or more of the stock of Hibbett, Inc.

18. Plaintiff-Appellee Hess, Hess & Daniel, P.C. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

19. Plaintiff-Appellee Iron Gate Technology, Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

20. Plaintiff-Appellee Jewelers Trade Shop has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

21. Plaintiff-Appellee Montis, Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

22. Plaintiff-Appellee Pearce, Bevill, Leesburg, Moore, P.C. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

23. Plaintiff-Appellee Pete Moore Chevrolet, Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

24. Plaintiff-Appellee Pettus Plumbing & Piping, Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

25. Plaintiff-Appellee Pioneer Farm Equipment, Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

No. 22-13051, *In re Blue Cross Blue Shield Antitrust Litigation*

26. Plaintiff-Appellee Rolison Trucking Co., LLC, has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

27. Plaintiff-Appellee Sadler Electric has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

28. Plaintiff-Appellee Sirocco, Inc., has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

29. Plaintiff-Appellee Vaughan Pools, Inc. has no parent corporation and no publicly held corporation owns ten percent or more of its stock.

Dated: February 10, 2023                     Respectfully submitted,

                                             /s/ Charles J. Cooper
                                             Charles J. Cooper

                                             *Counsel for Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees believe oral argument is not necessary, as this appeal raises no new questions of law, and the facts and legal arguments are fully presented in the briefs and the record. *See* FED. R. APP. P. 34(a)(2). Plaintiffs-Appellees respectfully request, consistent with the Court's November 2, 2022 Order, granting in part their motion for expedited treatment, Doc. 98-1, that if any oral argument is ordered, it be scheduled as expeditiously as the Court's schedule permits.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... vi

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION ..................................................................................... xiv

STATEMENT OF THE ISSUES .................................................................. 1

STATEMENT OF THE CASE ..................................................................... 2

I.    Proceedings Below ................................................................................ 2

    A.    Litigation Overview. ...................................................................... 2

    B.    Settlement/Mediation Efforts ........................................................ 6

    C.    The Settlement ............................................................................... 7

        1.    Settlement Classes ................................................................. 7

        2.    The Benefits Provided to the Settlement Classes. ................. 8

            a.    Settlement Fund ............................................................ 8

            b.    Structural Relief. ........................................................... 9

        3.    The Release ........................................................................ 13

        4.    The Plan of Distribution ..................................................... 14

            a.    Allocation Between Fully-Insured Class and
Self-Funded Sub-Class. .............................................. 14

            b.    Allocation between Employers and Employees. ............ 16

    D.    Preliminary Approval. .................................................................. 18

    E.    Class Notice .................................................................................. 18

    F.    Attorneys' Fees ............................................................................ 20

    G.    The Fairness Hearing .................................................................... 21

H.    Final Approval..................................................................23

II.    Standard of Review...............................................................25

SUMMARY OF ARGUMENT ................................................................26

ARGUMENT ......................................................................................32

I.    HOME DEPOT'S APPEAL IS MERITLESS ...............................32

     A.    The Settlement Provisions Releasing The Subscriber Class's
           Equitable Claims Do Not Violate Public Policy................36

           1.    The Conduct Permitted by the Release Is Not
                 "Clearly Illegal."........................................................39

           2.    The Cases Cited by Home Depot Do Not Support its
                 Argument. ...................................................................51

           3.    The Release Complies with the "Identical Factual
                 Predicate" Doctrine.....................................................56

     B.    The Subscriber Class Was Adequately Represented. .........65

II.    TOPOGRAPHIC'S APPEAL IS MERITLESS ............................75

     A.    The District Court's Approval Of The Allocation Plan Is
           Reviewed Under The Abuse Of Discretion Standard. .........80

     B.    The District Court Did Not Abuse Its Discretion In
           Approving The ASO Allocation ........................................81

           1.    *Holmes* Does Not Support Application of a Stricter Legal
                 Standard than That Set Forth in Rule 23(e)(2)(D)...................82

           2.    Topographic's Claims Of "Suspicious Circumstances"
                 are Meritless and Contradict Their Admission Below. ...........84

     C.    There are Material Differences Between Self-Insured and
           Fully-Insured Markets..........................................................87

D.    The District Court Properly Approved The Allocation Based On Adequate Evidence and Correct Findings. ....................................90

    1.    Topographic's Criticism of Dr. Mason's Analysis Is Meritless. ....................................................................................95

    2.    The District Court's Description of the Self-Funded Sub-Class Was Not a Clearly Erroneous Fact Finding ........... 102

E.    The Allocation Appropriately Reflects the Late Arrival Of The Self-Funded Sub-Class To the Case. ................................................. 104

    1.    The Allocation Reasonably Treated the Self-Funded Sub-Class as Subject to a Shorter Damages Period. ............... 105

    2.    Dr. Mason's Estimated Discount Factor Reasonably Reflected the Weaker Litigation Position of the Self-Funded Sub-Class ............................................................ 114

F.    The District Court Properly Rejected Topographic's Discovery Request ....................................................................................................116

G.    Topographic's Challenge To The Attorney Fee Allocation Is Meritless. .............................................................................................118

H.    Allocation Of The Settlement Fund Was Necessary And Appropriate. .........................................................................................120

III.    COCHRAN'S APPEAL IS MERITLESS ...................................................122

A.    The POD's Treatment of Employee Claims Is Fair And Reasonable, And Raises No Adequacy Of Representation Concerns. ......................................................................................122

B.    The District Court Did Not Abuse Its Discretion In Finding That ERISA Posed No Impediment To Settlement Approval. .........129

IV.    BEHENNA'S APPEAL IS MERITLESS .................................................133

A.    The District Court Followed Precedent Governing Fee Requests In Common Fund Cases .....................................................135

B.    Behenna's New "Bifurcated Fee" Proposal Is Both Forfeited

And Meritless. ....................................................................137

    1.    Behenna Forfeited his "Bifurcated Fee" Argument................139

    2.    Behenna's Fee Argument Is Meritless....................................139

CONCLUSION .....................................................................143

# TABLE OF AUTHORITIES

**Cases**                                                               **Page**

*AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*,
938 F.3d 1170 (11th Cir. 2019) ........................................................... 83

*Access Now, Inc. v. Southwest Airlines Co.*,
385 F.3d 1324 (11th Cir. 2004) .............................................. 119, 139

*Adams v. S. Farm Bureau Life Ins. Co.*,
493 F.3d 1276 (11th Cir. 2007) ......................................................... 63

*Alexander v. Nat'l Football League*, 1977 WL 1497
(D. Minn. Aug. 1, 1977) ..................................................................... 45

*Am. Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013) ............... 54, 55

*Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010) .................... 47, 48

*American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) ...................... 113

*American Safety Equipment Corp. v. J.P. Maguire & Co.*,
391 F.2d 821 (2d Cir. 1968) ............................................................... 54

*Arizona v. Maricopa County Medical Soc.*, 457 U.S. 330 (1982) ......................... 46

*Armstrong v. Board of School Directors of City of Milwaukee*,
616 F.2d 305 (7th Cir. 1980) ......................................................... 43, 45

*Bemis Bros. Bag v. United States*, 289 U.S. 28 (1933) ........................................ 113

*Bennett v. Behring Corp.*, 737 F.2d 982
(11th Cir. 1984) ........................................ 23, 27, 33, 34, 40, 41, 46, 95

*Berry v. Schulman*, 807 F.3d 600 (4th Cir. 2015) ........................................... 44, 61

*Blake v. JP Morgan Chase Bank NA*, 927 F.3d 701 (3d Cir. 2019) ...................... 114

*Calibuso v. Bank of Am. Corp.*, 299 F.R.D. 359 (E.D.N.Y. 2014) ......................... 45

*California v. Am. Stores*, 495 U.S. 271 (1990) ....................................................... 39

*Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768
(11th Cir. 1991) ........................................................................ 26, 136, 140

*Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986) ............ 67, 112, 113

*Carriuolo v. Gen. Motors Co.*, 823 F.3d 977 (11th Cir. 2016) ........................ 25, 26

*Carter v. Forjas Taurus, S.A.,* 701 F. App'x 759 (11th Cir. 2017) ...................... 102

*Chambers v. Whirlpool Corp.*, 980 F.3d 645 (9th Cir. 2020) ............................... 120

*China Agritech, Inc. v. Resh*, 138 S. Ct. 1800 (2018) ...................................113, 114

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ..........................81

*Cliff v. Payco General American Credits, Inc.*,
    363 F.3d 1113 (11th Cir. 2004) ..............................................................106, 113

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977)................................................34, 81

*Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546 (11th Cir. 1986) ...........................83

*Davis v. Bethlehem Steel Corp.*, 769 F.2d 210 (4th Cir. 1985) ............................114

*Day v. Persels & Assocs., LLC*, 729 F.3d 1309 (11th Cir. 2013)...........................93

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170
    (3d Cir. 2012)...............................................................................81, 118, 120

*Dial Corp. v. News Corp.*, 317 F.R.D. 426 (S.D.N.Y. 2016)..................................33

*Evansville Greenway & Remediation Tr. v. S. Ind. Gas & Elec. Co.*,
    2010 WL 1737875 (S.D. Ind. Apr. 28, 2010)...................................................117

*Faught v. Am. Home Shield Corp.*, 668 F.3d 1233
    (11th Cir. 2011)................................................. 83, 134, 136, 137, 140, 141, 142

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)....................................................43

*Ferron v. Kraft Heinz Foods Co.*, 2021 WL 1617911
    (S.D. Fla. Jan. 19, 2021) ..................................................................................92

*FMC Corp. v. Holliday*, 498 U.S. 52 (1990) ........................................................108

*Fox Midwest Theatres v. Means*, 221 F.2d 173 (8th Cir. 1955).............................54

*Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60 (1992)................................113

*Friederichsen v. Renard*, 247 U.S. 207 (1918)....................................................113

*FTC v. Phoebe Putney Health Sys. Inc.*, 568 U.S. 216 (2013)...............................39

*FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992)..................................................56

*Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970) ..............................117, 118

*George v. Acad. Mort. Corp.*, 369 F. Supp. 3d 1356 (N.D. Ga. 2019) ................140

*Gold Cross EMS, Inc. v. Children's Hosp. of Ala.*,
    79 F. Supp. 3d 1316 (S.D. Ga. 2015) ............................................................117

*Grant Thornton v. Syracuse Sav. Bank*, 961 F.2d 1042 (2d Cir. 1992)................116

*Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628 (11th Cir. 2015).............26, 58, 63

*Grunin v. Int'l House of Pancakes*, 513 F.2d 114
(8th Cir. 1975)..............................................................33, 40, 41, 42, 46

*Guthrie v. Evans*, 815 F.2d 626 (11th Cir. 1987) ....................................83

*Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481 (3d Cir. 2017)..................95

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968).................96

*Harrison v. Culliver*, 746 F.3d 1288 (11th Cir. 2014)...........................118

*Heffner v. Blue Cross & Blue Shield of Ala., Inc.*,
443 F.3d 1330 (11th Cir. 2006) .........................................................83

*Herrera v. Charlotte School of Law*, 818 F. App'x 165 (4th Cir. 2020)..............115

*Hill v. State St. Corp.*, 794 F.3d 227 (1st Cir. 2015) ............................119

*Holmes v. Cont'l Can Co.*, 706 F.2d 1144
(11th Cir. 1983)................................... 25, 29, 80, 81, 82, 83, 118, 122

*Howard v. McLucas*, 782 F.2d 956 (11th Cir. 1986)........................83, 96

*Hurley v. Moore*, 233 F.3d 1295 (11th Cir. 2000)................................139

*In re Agent Orange*, 818 F.2d 179 (2d Cir. 1987) ................................115

*In re American Express Merchants' Litigation*,
634 F.3d 187 (2d Cir. 2011) ...............................................................54

*In re Androgel Antitrust Litig. (No. II)*,
2015 WL 9581828 (N.D. Ga. Dec. 30, 2015) .................................117

*In re Blue Cross Blue Shield Antitrust Litig.*,
2018 WL 7152887 (11th Cir. Dec. 12, 2018)....................................1

*In re Cendant Corp. Sec. Litig.*, 404 F.3d 173 (3d Cir. 2005)................71

*In re Cendant Corp. Litig.*, 264 F.3d 201
(3d Cir. 2001).............................. 80, 81, 90, 102, 122, 123

*In re Checking Account Overdraft Litig.*,
2022 WL 472057 (11th Cir. Feb. 16, 2022) ......................................70

*In re Chicken Antitrust Litigation*, 669 F.2d 228
(5th Cir. Unit B 1982)...........................................................49, 50, 81, 94

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195
(5th Cir. 1981).........................................................................58, 94, 115

*In re CP Ships Ltd. Sec. Litig.*, 578 F.3d 1306 (11th Cir. 2009) ............83

*In re Currency Conversion Fee Antitrust Litig.,* 263 F.R.D. 110
(S.D.N.Y. 2009) ....................................................................................33

*In re Equifax Inc. Customer Data Security Breach Litigation*,
2020 WL 256132 (N.D. Ga. 2020) ...................................................122

*In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247
(11th Cir. 2021)...........................................................................*passim*

*In re Gen. Am. Life Ins. Co. Sales Prac. Litig.*,
357 F.3d 800 (8th Cir. 2004) ..............................................................63

*In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir. 1997) ...........118

*In re Holocaust Victim Assets Litig.,* 424 F.3d 132 (2d Cir. 2005) .................80, 122

*In re Holocaust Victim Assets Litigation*, 413 F.3d 1836 (2d Cir. 2005)..............115

*In re Home Depot Inc.*, 931 F.3d 1065 (11th Cir. 2019) ...............134, 135, 136, 137

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009) .........71, 128, 129

*In re Life Time Fitness, Inc., Telephone Consumer Protection Act Litig.*,
847 F.3d 619 (8th Cir. 2017) ............................................................120

*In re Literary Works in Elec. Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011) ..............................................60, 61, 139

*In re Managed Care*, 756 F.3d 1222 (11th Cir. 2014) ...................27, 33, 34, 48, 62

*In re Managed Care Litigation*, 2010 WL 6532982
(S.D. Fla. Aug. 15, 2010)...........................................................55, 56

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016) ............................................................101

*In re N.J. Tax Sales Certificates Antitrust Litig.*,
750 F. App'x 73 (3d Cir. 2018) ........................................................115

*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008) .................84

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015)...............92

*In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104 (S.D.N.Y.),
*aff'd,* 117 F.3d 721 (2d Cir. 1997)....................................................80

*In re PaineWebber Ltd. P'ships Litig.,* 117 F.3d 721 (2d Cir. 1997).....................80

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
330 F.R.D. 11 (E.D.N.Y. 2019).............................................125, 126

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) ...................................50

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016) ................................................................72, 73, 74

*In re Pet Foods Prod. Liability Litig.*, 629 F.3d 333 (3d Cir. 2010) .........63, 71, 129

*In re Smith*, 926 F.2d 1027 (11th Cir. 1991)..............................................................55

*In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094 (D. Kan. 2018)................................................................122

*In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968 (8th Cir. 2018) ...............................................................................71

*In re Teleglobe Commc'ns Corp.*, 493 F.3d 345 (3d Cir. 2007) ............................117

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013)....................................................33

*In re Tremont Secs. Law, State Law and Ins. Litig.*, 699 F. App'x 8 (2d Cir. 2017) ......................................................................115

*In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) ...............................................................33

*In re Visa Check/Mastermoney Antitrust Litig.*, 396 F.3d 95 (2d Cir. 2005)..........33

*In re Volkswagen 'Clean Diesel' Prods. Liability Litig.*, 895 F.3d 597 (9th Cir. 2018) .......................................................................115, 116

*Int'l Union v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007)...................71, 101

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996).......................................................43, 45

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) ..........135

*Johnson v. NPAS Sol., LLC*, 975 F.3d 1244 (11th Cir. 2020) ................................95

*Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454 (1975)............................20, 114

*Kilgoar v. Colbert Cty. Bd. of Educ.*, 578 F.2d 1033 (5th Cir. 1978) ....................59

*Knisley v. Network Assocs., Inc.*, 312 F.3d 1123 (9th Cir. 2002)........................119

*Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322 (1955).................................55

*Leverso v. SouthTrust Bank of Ala., N.A.*, 18 F.3d 1527 (11th Cir. 1994).............83

*Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005) ....................95

*Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142 (9th Cir. 2000) ..........116

*Main Line Theatres, Inc. v. Paramount Film Distrib. Corp.*,
  298 F.2d 801 (3d Cir. 1962) ...............................................................44

*Makro Cap. of Am. v. UBS AG*, 543 F.3d 1254 (11th Cir. 2008) .................106, 107

*Mars Steel Corp. v. Continental Illinois Nat. Bank & Tr. Co.*,
  834 F.2d 677 (7th Cir. 1987) ...........................................................116

*Marshall v. Nat'l Football League*, 787 F.3d 502 (8th Cir. 2015) .........................95

*Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367 (1996) .................................58

*McKnight v. Uber Technologies*,
  2019 WL 3804676 (N.D. Cal. Aug. 13, 2019) ...................................122

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
  161 F.3d 443 (7th Cir. 1998) ..............................................................49

*Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857 (D.C. Cir. 2008) .......................106, 107

*Melito v. Experian Mktg. Sol., Inc.*, 923 F.3d 85 (2d Cir. 2019) ...........................61

*Midrash Sephardi, Inc. v. Town of Surfside*,
  366 F.3d 1214 (11th Cir. 2004) ......................................................139

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*,
  702 F.3d 1312 (11th Cir. 2012) ........................................................60

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) .............................95

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
  473 U.S. 614 (1985) ...........................................................51, 52, 53

*Moulton v. U.S. Steel Corp.*, 581 F.3d 344 (6th Cir. 2009) ...................................44

*Murray v. Auslander*, 244 F.3d 807 (11th Cir. 2001) ...........................................83

*Nat'l Distillers & Chem. Corp. v. Brad's Mach. Prods., Inc.*,
  666 F.2d 492 (11th Cir. 1982) ........................................................107

*Nelson v. County of Allegheny*, 60 F.3d 1010 (3rd Cir. 1995) .............................107

*Nyland v. Moore*, 216 F.3d 1264 (11th Cir. 2000) ...............................................139

*Piambino v. Bailey*, 757 F.2d 1112 (11th Cir. 1985) .............................................83

*Pickett v. Iowa Beef Processors*, 209 F.3d 1276 (11th Cir. 2000) .........................70

*Poertner v. Gillette Co.*, 618 F. App'x 624 (11th Cir. 2015) ................................140

*Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266 (11th Cir. 2000) ...............121

*Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010) ......................33

*Pruitt v. United States*, 274 F.3d 1315 (11th Cir. 2001)........................................106

*Raie v. Cheminova, Inc.*, 336 F.3d 1278 (11th Cir. 2003)..............................113, 114

*Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95 (5th Cir. 1974)..............................51, 52

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) ........................119

*Reynolds v. Roberts*, 207 F.3d 1288 (11th Cir. 2000) ...............................................83

*Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682 (2d Cir. 1977).......33, 42, 45, 46

*Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) .................................95

*Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228 (11th Cir. 2000) .................83

*Schwartz v. Dallas Cowboys Football Club*,
    157 F. Supp. 2d 561 (E.D. Pa. 2001)..................................................................51

*Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956 (7th Cir. 2013) ..................119

*State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065 (2d Cir. 1988) ........................96

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) .......................................93, 140

*Sterling v. Stewart*, 158 F.3d 1199 (11th Cir. 1998).................................................95

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011) ........... 80, 84, 115, 120, 122

*TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456 (2d Cir. 1982) ....................42

*Thomas v. Blue Cross and Blue Shield Ass'n*,
    594 F.3d 814 (11th Cir. 2010) ...........................................................................63

*Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438 (11th Cir. 1991)....................113

*TVPX ARS, Inc. v. Genworth Life and Annuity Ins. Co.*,
    959 F.3d 1318 (11th Cir. 2020) .......................................................58, 59, 60, 63

*United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*,
    2004 WL 2009413 (D.D.C. Aug. 12, 2004) ......................................................117

*United States v. Almeida*, 341 F.3d 1318 (11th Cir. 2003)............................117, 118

*United States v. Bergonzi*, 216 F.R.D. 487 (N.D. Cal. 2003)................................117

*Valley Drug Co. v. Geneva Pharmaceuticals*,
    350 F.3d 1181 (11th Cir. 2003) ................................. 66, 68, 69, 70, 71, 127, 128

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).............................................7

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005)............71, 81

*Waters v. Cook's Pest Control, Inc.*,
    2012 WL 2923542 (N.D. Ala. July 17, 2012) ...................................................140

*Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999).......134, 136

*White v. National Football League*, 822 F. Supp. 1389 (D. Minn. 1993)...............45

*Williams v. Mohawk Indus.*, 2010 WL 11500061
    (N.D. Ga. July 22, 2010)...................................................................140

*Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350 (11th Cir. 2009) .........................83

*Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239 (11th Cir. 2018) ....................26

*Wong v. Accretive Health, Inc.*, 773 F.3d 859 (7th Cir. 2014)...............................81

*Zarecor v. Morgan Keegan & Co.*, 801 F.3d 882 (8th Cir. 2015) ........................114

## Constitutions, Statutes, and Rules

15 U.S.C.
    § 15(a) ...................................................................................112
    § 15(b)........................................................................................8
    § 26..........................................................................................112

FED. R. CIV. P. 23 .....................................................................*passim*

FED. R. CIV. P. 26 ....................................................................117

## Administrative Authorities

Health Insurance Issuers Implementing Medical Loss Ratio (MLR)
    Requirements Under the Patient Protection and Affordable Care Act,
    75 Fed. Reg. 74864-01 (Dec. 1, 2010) ............................................100

## Other Authorities

4 NEWBERG ON CLASS ACTIONS § 13.13 (6th ed. 2022) ...................92, 93

4 NEWBERG ON CLASS ACTIONS § 13.32 (6th ed. 2022) .......................116

5 NEWBERG ON CLASS ACTIONS § 15:23 (6th ed. 2022) ...............119, 120

IIA Phillip E. Areeda, *et al.*, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application* (4th ed. 2015).........................78, 96

Administrative Services Only (ASO), THE BENEFITS GRP. ...................103

Caroline Banton, *Administrative Services Only (ASO): Definition, Pros & Cons*,
    INVESTOPEDIA (Oct. 25, 2021)......................................................103

Medical Loss Ratio, NAT'L ASS'N OF INS. COMM'RS (Oct. 26, 2022),
    https://bit.ly/3Xd3EqX.................................................................100

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 76, cmt. e.............117

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The District Court had subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a) because Plaintiffs-Appellees asserted claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of the Sherman Act, 15 U.S.C. §§ 1 and 2, and under 28 U.S.C. § 1332(d)(2)(A), because Plaintiffs-Appellees sought relief in a consolidated class action complaint alleging claims that exceeded $5,000,000 and at least one defendant is a citizen of a state different from that of at least one class member.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the District Court's August 9, 2022, Final Order and Judgment (R.2931) is a final order resolving all claims in the stand-alone Subscriber Track of this multi-district litigation, and was thus immediately appealable. *See Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 408 (2015); *Hall v. Hall*, 138 S. Ct. 1118, 1131 (2018). In addition, the Final Order and Judgment is an appealable final judgment under Federal Rule of Civil Procedure 54(b). Under Rule 54(b), a district court may enter an appealable judgment as to fewer than all claims or parties if the district court "expressly" determines that there is "no just reason for delay." The District Court made such an express determination here. R.2931:92(¶31).

Appellants Topographic, Inc. and Employee Services, Inc., filed their timely notice of appeal on September 7, 2022. R.2940. Appellants Jennifer Cochran and

Aaron Craker filed their timely notice of appeal on September 7, 2022. R.2943. The

Home Depot Appellants filed their timely notice of appeal on September 8, 2022.

R.2942. Appellant David Behenna filed his timely notice of appeal on September 8,

2022. R.2944.

## STATEMENT OF THE ISSUES

Appellants in these four separate Appeals challenge the order granting final approval to the class action Settlement that resolved the claims of Subscriber Plaintiffs ("Subscribers") in this multidistrict antitrust litigation against the Blue Cross and Blue Shield Association ("BCBSA") and its members (collectively, "Blues" or "Defendants"), as well as the fee award.  The Appeals raise the following issues:

1.     The Home Depot Appellants ("Home Depot") raise the question whether the Settlement violates public policy because it includes a release of future antitrust class claims arising out of the Blues' continuation of pre-settlement conduct that was the subject of the litigation.

2.     Home Depot raises the question whether Rule 23(a)(4) required, as a matter of law, that the Rule 23(b)(2) injunctive relief class and the Rule 23(b)(3) damages class be represented by separate named plaintiffs and class counsel.

3.     Appellants Topographic, Inc., and Employee Services, Inc. ("Topographic") raise the question whether the District Court abused its discretion in approving a Plan of Distribution ("POD") allocating the $2.67 billion Settlement Fund between fully insured Subscriber Class members ("Fully Insureds") and Self-Funded Sub-Class members.

4.     Appellants Jennifer Cochran and Aaron Craker ("Cochran") raise the question whether the District Court abused its discretion when it approved a POD

allocating unclaimed and below-threshold employee shares to their claiming employers.

5.    Appellant David Behenna ("Behenna") challenges the District Court's fee award, arguing that it abused its discretion by performing a percentage of the common fund analysis, supplemented by a lodestar "cross-check" and additional factors, rather than by performing a "bifurcated fee" analysis.

## STATEMENT OF THE CASE[1]

## I.    Proceedings Below

### A.    Litigation Overview.

This litigation began 11 years ago, when plaintiffs who purchased health insurance filed a class action complaint alleging that Defendants had entered into an unlawful agreement to restrain trade in the market for full-service commercial health insurance by restricting Defendants' ability to compete with each other both when using Blue Cross and Blue Shield names and trademarks and when using other

---

[1] Record references are formatted R._:_. The first blank is the District Court docket number; any document sub-number is included in parentheses. The second blank is the page number, using the page number in the CM/ECF header; any paragraph number is here included in parentheses. Thus, "R.2931:5" refers to page 5 of docket entry 2931.

We cite to Home Depot's brief (Doc. 120) as "HD**PAGE**," to Topographic's brief (Doc. 121) as "Topographic**PAGE**," to Cochran's brief (Doc. 124) as "Cochran**PAGE**," to Behenna's brief (Doc. 122) as "Behenna**PAGE**," and to the amicus brief of various state insurance departments (Doc. 129) as "Amicus**PAGE**."

Capitalized terms not otherwise defined have the meaning given to them in the Settlement Agreement. R.2610(2):7-25.

names and marks. *Cerven v. Blue Cross and Blue Shield of North Carolina, et al.*, Case No. 5:12-CV-17 (W.D.N.C. Feb. 7, 2012) (R.2998(3):94-154).

*Cerven* was brought on behalf of purchasers of products in the "*fully insured*" market, R.2998(3):95 (¶2), 102 (¶30), 116-17 (¶82), 121 (¶95), 129 (¶117), 131 (¶¶123-24), 134 (¶132), and not on behalf of purchasers in the so-called "*self-funded*" market. R.2998(3):132-33 (¶129). *See* R.99(1):94 (¶394). With fully insured health insurance products, the insurer (the Blues) pays enrollees' medical costs, bears the risk that enrollees' health care claims will exceed premiums, controls the benefit structure, makes coverage decisions, and also provides administrative services, *e.g.*, processing medical bills and negotiating discounts with providers. R.2998(3):132-33 (¶129). By contrast, a self-funded product provides "administrative services only" ("ASO") and not health insurance coverage. *Id.* (The parties and the District Court have used the terms "ASO," "self-funded," and "self-insured" interchangeably to refer to the same product.) Purchasers of ASO products remain at risk for healthcare costs, and self-insure for those costs. Some may purchase "stop-loss" insurance products, but such stop-loss insurance is not a health insurance product. R.2845(1):3; Amicus8.

Other purchasers of commercial health insurance products soon thereafter filed over 40 similar class actions around the country. Neither *Cerven* nor any of the follow-on suits were brought by or on behalf of a plaintiff who had purchased an

ASO product.  Nor did any allege that ASO products were the relevant product market.  While Subscribers eventually conducted discovery concerning ASO products, they did so only to establish the distinction between the product markets for health insurance coverage and ASO products; prior to the retention of Self-Funded Sub-Class Counsel in 2019, no discovery or expert analysis was ever conducted into ASO damages.  R.2865:114.  As Judge Proctor explained at the Fairness Hearing, "when ASOs got introduced into this, that was news to me.  At no point at any time did the Blues or the subscribers suggest to me that ASOs were ever part of a target of this litigation."  R.2865:157.

In December 2012, these Subscriber Actions were consolidated by the Judicial Panel on Multidistrict Litigation, along with related Provider actions alleging that similar restraints had resulted in lower payments to healthcare providers.  R.2610(6):4 (¶8).  The JPML transferred the consolidated actions to the Northern District of Alabama before Judge Proctor, who appointed experienced antitrust litigators David Boies and Michael Hausfeld to serve as interim co-lead counsel for Subscribers.  R.61.  The Subscriber and Provider actions proceeded on separate tracks and were governed by separate master complaints.  The Subscribers filed a Subscriber Track Consolidated Class Action Complaint in July 2013. R.85; R.99(1).

The ensuing litigation was "extraordinarily complex, protracted, and hard-fought."  R.2641:3.  The District Court resolved over a dozen motions to dismiss,

R.205; R.2733(1):26, and held well over 100 discovery conferences, status conferences, and other hearings.  R.2610(6):5 (¶12).  The parties briefed over 150 discovery motions, R.2641:3, and Subscribers successfully challenged hundreds of thousands of privilege assertions. R.2610(6):6 (¶16). Subscribers reviewed over 15 million pages of documents and multiple terabytes of structured data produced in discovery, conducted over 120 depositions, and defended 16 depositions of class representatives. R.2610(6):5-6 (¶¶13-15); R.2641:3.

After several rounds of summary judgment motions, R.2610(6):7-8 (¶¶19-22), the District Court in 2018 granted Subscribers' motion for summary judgment on the standard of review, ruling "that Defendants' aggregation of a market allocation scheme together with certain other output restrictions is due to be analyzed under the *per se* standard of review."  R.2063:59.  The decision did not analyze the Blues' use of Exclusive Serve Areas ("ESAs") in isolation, but as part of an aggregation of restraints.  The Court also held that there was a dispute of material fact over Defendants' affirmative defense as to whether they act as a single economic enterprise with respect to their management of Blue Marks. R.2063:35, 59. The District Court certified its order under 28 U.S.C. § 1292(b), after finding that there was a substantial ground for difference of opinion with respect to its decision, R.2202, but this Court declined interlocutory review.  *In re Blue Cross Blue Shield Antitrust Litig.*, 2018 WL 7152887 (11th Cir. Dec. 12, 2018). *See* R.2610(6):9 (¶23).

### B.    Settlement/Mediation Efforts.

For over five years, the litigants were concurrently engaged in settlement negotiations with the assistance of three separate mediators: Judges Layn Phillips and Gary Feess and Special Master Edgar Gentle. R.2610(6):10 (¶30). Over the course of three years, Special Master Gentle conducted over 150 meetings and held innumerable conference calls and virtual meetings with the parties. R.2610(12):3-8 (¶¶3-22).

The parties ultimately sought to negotiate a comprehensive settlement that would resolve the claims not only of Fully Insureds, but also of purchasers of ASO plans who were not then before the Court. Accordingly, in July 2019, Subscribers approached Warren Burns to serve as counsel for a proposed subclass comprising Self-Funded Accounts and their employees. R.2610(7):3 (¶3). In September 2019, he became counsel to what became the Self-Funded Sub-Class, with Hibbett Sports, Inc., ("Hibbett") named as subclass representative. *Id.* Mr. Burns and his team immersed themselves in the factual record, sought and received additional discovery, and retained independent experts to assist them in assessing the terms of possible settlements and in determining and negotiating a fair allocation of any settlement fund to the Self-Funded Sub-Class. R.2610(7):3-4 (¶¶5-7).

As the Special Master attested, settlement negotiations were "conducted at arm's length and in good faith," and were "often extremely contentious."

6

R.2610(12):13-14 (¶35). "Counsel consistently exhibited the highest degree of professionalism," and they advocated for their respective clients "tenaciously and vigorously." *Id.*

These efforts ultimately bore fruit.  In November 2019, the parties agreed on a term sheet. R.2610(12):8. Over the following year, the parties diligently worked, under the continuing supervision of the Special Master, to negotiate the terms of the Settlement, which was signed in October 2020. R.2610(2).

### C.   The Settlement.

#### 1.   Settlement Classes.

The Settlement Classes include a damages and *divisible* injunctive relief class under Rule 23(b)(3) ("(b)(3) class" or "Damages Class"), as well as an *indivisible* injunctive relief class under Rule 23(b)(2) ("(b)(2) class" or "Injunctive Relief Class").  "Indivisible" relief applies "as to all of the class members or to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). "Divisible" relief is the sort of individualized relief available when each "class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.* (emphasis in original).  Subscribers also sought certification of a "Self-Funded Sub-Class" comprising ASO entities and their employees.[2] This subclass was separately

---

[2] Together, the various classes are sometimes referred to herein as the "Settlement Class[es]" or the "Subscriber Class[es]".

represented by subclass counsel Burns and subclass representative Hibbett. R.2610(2):21-22 (¶¶1(dddd), 1(eeee)).

There is overwhelming overlap in membership between the (b)(2) and (b)(3) classes,[3] both of which are defined primarily to include both (a) persons or groups insured by Blue plans, and (b) self-funded groups that had ASO contracts with a Blue plan (and their employees). The primary differences between the classes are that beneficiaries and dependents of covered employees are included in the (b)(2) class but not the (b)(3) class. The class period for each class ended on the Settlement's Execution Date of October 16, 2020. Within both classes, the settlement class period for Fully Insureds begins on February 7, 2008, which is four years before the *Cerven* complaint was filed—reflecting the Sherman Act's four-year statutory limitations period. 15 U.S.C. § 15b. For Self-Funded Sub-Class members, the class period begins on September 1, 2015, R.2610(2):23 (¶1(nnnn)), approximately four years before Self-Funded Accounts joined settlement negotiations in September 2019. The reason for the difference is that no claims were advanced by any Self-Funded Accounts until they were added to the case in October 2020.

### 2.    The Benefits Provided to the Settlement Classes.

### a.    Settlement Fund.

The Settlement establishes a Settlement Fund of $2.67 billion, which will (1)

---

[3] For the class and subclass definitions, *see* R.2609(1):72-73(¶¶317-319).

pay all (b)(3) class members entitled to a distribution in accordance with the Plan of Distribution, R.2610(2):44-45 (¶27); (2) fund a $100 million Notice and Administration Fund, R.2610(2):16-17 (¶1(ggg)), 43 (¶29); and (3) pay Court-awarded attorneys' fees and expenses, together not to exceed 25% of the fund. R.2610(2):45-47 (¶28). Apart from a right to receive any residual balance of the Notice and Administration Fund, Defendants have no reversionary interest in the Settlement Fund. R.2610(2):47-48 (¶30).

### b. Structural Relief.

The Settlement requires Defendants to make structural reforms that will increase competition between BCBSA members. The District Court characterized these reforms as "historic," "substantial," and "truly exceptional," R.2931:3, 40, and concluded that these "hard-won changes to Defendants' rules" would "create[e] opportunities for more competition in the market for the purchase and administration of health insurance and provid[e] the potential for a more competitive environment in which the Settlement Class may achieve greater consumer choice, better product availability, and increased innovation." R.2931:11. *See* R.2931:40 (Settlement "will provide for materially greater competition in the field of health care financing").

**Elimination of Restrictions on Non-Blue Competition.** The Settlement requires the Blues to "eliminate and no longer enforce" their so-called "National Best

Efforts Requirement," and to refrain from adopting any equivalent requirement. R.2610(2):31 (¶10).  The "NBE Requirement" had required each Blue to generate no less than two thirds of its national health revenues from Blue-branded businesses, thereby restricting their ability to compete using non-Blue ("Green") brands. R.2610(10):7-9 (¶¶22-32).

The NBE rules were far and away Defendants' "most pernicious competitive restraints," R.2812(7):6 (¶14), and, as the District Court found, "[b]y eliminating the NBE rule, accounts are now potentially able to receive bids from every Blue Plan in the country—*i.e.*, a Blue-branded bid from the local Blue Plan, and unconstrained Green bids from any other Plan." R.2931:63.  Every Blue Plan will now be free to compete throughout the country using a non-Blue brand, with no caps or restraints on such competition.  *See* R.2931:12 (eliminating NBE will "unleash[] Green competition, which will directly benefit the class.").

**Promotion of Competition for National Accounts.** The Settlement secures relief that will promote significant competition for large national accounts. *First*, Qualified National Accounts (employers with more than 5,000 employees meeting certain geographic dispersion criteria, together comprising at least 33 million Members) may now request a so-called "Second Blue Bid" ("SBB"), a second, previously prohibited bid from the Blue Plan of their choice.  R.2610(2):33-34 (¶15). *Second*, for accounts with Independent Health Benefit Decision Locations in more than one

Blue Plan's Service Area, each such location may request a bid from the Blue Plan in its Service Area to cover that location's employees. R.2610(2):33 (¶14.b). *Third*, when a multi-Service Area National Account seeks bids, and the Blue Plan covering its Service Area decides to bid the Account under a non-Blue brand, the right to bid the Account under the Blue brand must be "ceded" to another Blue Plan, thereby increasing competition for that account. R.2610(2):33 (¶14.a). "All three of these provisions," the Court found, "will produce increased choice for these self-funded accounts and increased competition in the market for self-funded accounts." R2931:13.

**Local Best Efforts Revision**. The Local Best Efforts ("LBE") rule requires a certain percentage of each Blue's healthcare-related revenue within its Service Area to be generated using the Blue Marks. The Settlement provides that the geographic area used to assess LBE compliance be no larger than a State, and caps the requirement at a maximum of 80% of revenue. R.2610(2):31 (¶11). *See* R.2931:65 (discussing effect of LBE limitation).

**Revisions to Acquisition Policies.** BCBSA currently controls whether any Blue Plan may be acquired. The Settlement restricts that by ensuring that Defendants impose only "legal and reasonable conditions on the acquisition of a [member plan], … [and] only to the extent that those conditions are reasonably necessary to prevent impairment of (1) the value of the Blue Marks, or (2) the competitiveness or

11

efficiency of the Blue Branded business or of the Blue Marks." R.2610(2):36 (¶17). It also allows a potential acquirer to challenge any rejection of (or imposition of a condition on) a proposed acquisition before the Monitoring Committee (discussed below), followed by binding arbitration. *Id*.

**Revisions to Contracting Restrictions.**  The Settlement removes a variety of restrictions that Defendants had imposed on contracting between Provider-Vendors and Self-Funded Accounts, and requires using non-discriminatory fee schedules for medical and surgical claims for Self-Funded Accounts, on the one hand, and Insured Groups, on the other. R.2610(2):31-32 (¶12).

**Most Favored Nation Clause Revisions**. The Settlement restricts the ability of Blues to include so-called "Most Favored Nation" or "Most Favored Nation-Dif-ferential" clauses in their provider contracts.  *See* R.2610(2):36-37 (¶18).  Blue Plans entering into MFN Differentials in certain situations must demonstrate to the Moni-toring Committee that the provision does not violate the Settlement. R.2610(2):36-37 (¶18.b).

**Monitoring Committee.** The Settlement establishes a Monitoring Committee to oversee compliance with the Settlement, to mediate certain disputes, and to review certain rules changes by the Blues. R.2610(2):37-39 (¶20).  The Monitoring Com-mittee "affords the Settlement Classes and the court substantial assurance of the Set-tling Defendants' compliance with the Settlement."  R.2931:15.

12

### 3.    The Release.

Upon the Settlement's Effective Date, Settlement Class members who have not opted out of the (b)(3) class release all claims "based upon, arising from, or relating in any way to" (i) the "factual predicates of the Subscriber Actions" as described in the relevant Subscriber Track complaints; (ii) "any issue raised in any of the Subscriber Actions by pleading or motion"; or (iii) "mechanisms, rules, or regulations" adopted by Defendants that are "within the scope" of the Settlement's structural relief provisions and are "approved through the Monitoring Committee Process." R.2610(2):19 (¶1.uuu)).  The parties agreed that the Release would be interpreted "to the fullest extent permitted by law." R.2610(2):49 (¶32).

Settlement Class members who opt out of the (b)(3) Damages Class still "release all claims for indivisible injunctive or declarative relief." R.2939:1-2.  Opt-outs retain the right to assert claims for damages and divisible, individualized injunctive relief.  At the Court's insistence, the nature of the SBB relief as individualized injunctive relief, and the operation of the Release as it relates to that relief, was clarified and a supplemental opt-out opportunity was provided to ASOs. R.2897.  Thus, the right retained by opt-outs, including Home Depot, to pursue claims for individualized relief "may include the right to pursue in litigation more than one Blue bid based upon an Opt-Out's individual business and the facts and circumstances of the individual claims." R.2939:2.

### 4.    The Plan of Distribution.

Counsel for Subscribers, aided by economists and under the supervision of seasoned allocation mediator Kenneth Feinberg, formulated a Plan of Distribution ("POD") that equitably distributes the Net Settlement Fund between, first, Fully Insureds and Self-Funded Sub-Class members and, second, between employers and employees.

### a.    Allocation Between Fully Insureds and Self-Funded Sub-Class.

To ensure that ASOs received an equitable share of the Settlement Fund, Self-Funded Counsel engaged Dr. Joseph Mason, "an experienced antitrust economist, a chaired professor at LSU, and a fellow at the Wharton School," R.2931:37, to analyze the data and determine an appropriate allocation. R.2610(7):5 (¶10).[4]  Dr. Mason and his team had unfettered access to all discovery materials and data produced by Defendants. R.2865:217-218.  Dr. Mason relied on revenue data, for both Fully Insureds and the Self-Funded Sub-Class, in Defendants' internal reports. R.2865:47-48.  He also held extensive discussions with Defendants to enhance his understanding of their data and records.  R.2865:217-218.  Dr. Mason ultimately developed four separate allocation analyses to support Self-Funded Counsel in the allocation

---

[4] Fully Insureds consulted Dr. Aries Pakes of Harvard University, who spent years working on the damages analysis for this litigation, to provide his view as to the appropriate allocation.

negotiations. R.2812(9):14-19 (¶¶36-51); R.2610(7):5 (¶10).

Counsel also sought the assistance of Mr. Feinberg to facilitate the determination of an appropriate allocation. R.2610(7):4-5 (¶9).  Mr. Feinberg reviewed information concerning the relative volume of payments and the differing strengths of claims for Self-Funded Accounts and Fully Insureds. As noted, the Settlement's Self-Funded Sub-Class period is shorter than the overall class period, resulting in seven more years of damages for Fully Insureds.  Further, the premiums paid by Fully Insureds—which underlies any estimate of antitrust overcharges—dwarf the administrative fees paid by Self-Funded Sub-Class members.  Based on these and other factors, Subscriber Counsel presented estimates of appropriate allocations for ASOs ranging from 3.4% to 6.8% of the Net Settlement Fund, while Self-Funded Counsel presented estimates ranging from 7.6% to 16%.  R.2610(8):6 (¶12).

After months of negotiation, counsel agreed to allocate 6.5% of the Net Settlement Fund to Self-Funded claimants ("Self-Funded Net Settlement Fund"), and 93.5% to Fully Insured claimants ("FI Net Settlement Fund").  R.2610(8):6 (¶13). Mr. Feinberg opined that this allocation treated both groups equitably relative to each other. R.2610(8):6-7 (¶14). Mr. Feinberg noted that: (1) the negotiated number, as would be expected, fell near the low end of Self-Funded Counsel's estimates and near the high end of Subscriber Counsel's estimate; and (2) the differing class periods and differing amounts of premiums versus ASO fees supported the allocation.

R.2610(8):6-7 (¶14). He also noted that the fact that the allocation "resulted from protracted negotiations between sophisticated counsel" supported its reasonableness. R.2610(8):6-7 (¶14).

### b. Allocation between Employers and Employees.

The POD distributes both the FI Net Settlement Fund and the Self-Funded Net Settlement Fund on a pro rata basis based upon the amount of premiums (or, in the case of ASOs, administrative fees) paid by or attributable to claimants. The Settlement Classes include both individual insureds and those who receive employer-sponsored coverage. For employer-sponsored coverage, employees generally share the economic burden of paying for coverage, through direct cost-sharing and/or reductions in other compensation. R.2610(9):8 (¶12). Class Counsel attempted to account for this cost-sharing and worked closely with Defendants to analyze available premium and ASO fee data. R.2610(9):15 (¶23). Because the Blues do not regularly receive or maintain data on cost-sharing between employers and employees, R.2610(9):14-15 (¶23), Counsel made reasonable approximations of the employer/employee split in determining appropriate pro rata shares.

The POD uses "Default" contribution percentages to approximate employee contributions ranging from 15%-34% for various scenarios and types of coverage. The Default contribution percentages are based on several factors, including: (1) annual data from Kaiser Family Health Foundation on employee out-of-pocket

contributions; (2) the fact that some employees make no out-of-pocket contributions; (3) evidence suggesting that even those employees may bear some economic burden through reductions in other compensation; (4) potential standing challenges that could be faced by employees relative to employers; and (5) the fact that under the POD, the employer retains the value of premiums for employees who do not claim or whose claims fall under the $5 minimum claim threshold. R.2610(5):12-13 (¶19f). The POD also allows claimants who may not wish to use their Default contribution percentage to select an "Alternative" option and submit documentation reflecting a different percentage. R.2610(5):13-16 (¶19h-l); 19 (¶26). Any claimant electing the Alternative option will have their claim reviewed by the Settlement Administrator for final determination.

Class Counsel engaged Darrell Chodorow and the Brattle Group to evaluate the POD's economic reasonableness. R.2610(6):12 (¶34). Mr. Chodorow reviewed the Default contribution percentages and concluded, based on the economic litera-ture and market conditions, that these estimates are reasonable. R.2610(9):19-24 (¶¶31-41), 28-29 (¶¶49-51). There were no objections to these Default percentages.

The POD requires the Claims Administrator to attribute a portion of premiums or ASO fees paid by an employer to each of its employees. R.2610(5):10-11 (¶19(b)), 19 (¶26). Where an employee does not make a claim, the premium and/or ASO fee for that employee is attributed to the employer for purposes of calculating

17

its pro rata shares. R.2610(5):11 (¶19(c)). Mr. Chodorow also reviewed this aspect of the POD and found it was reasonable. R.2610(9):23 (¶38).

Mr. Feinberg likewise concluded, after reviewing Mr. Chodorow's declaration and other supporting documentation, and relying upon his own extensive experience in complex allocation matters, that the POD is "reasonable and the tools used by Class Counsel are realistic and appropriate under the circumstances." R.2610(8):8 (¶19).

### D.    Preliminary Approval.

In October 2020, Subscriber-Plaintiffs moved for Preliminary Approval of the Settlement.  R.2610.  The motion was supported by detailed declarations submitted by experts Dr. Daniel Rubinfeld, R.2610(10), Dr. Ariel Pakes, R.2610(11), and Darrell Chodorow, R.2610(9), as well as declarations by Settlement Class Lead Counsel, R.2610(6), Self-Funded Sub-Class Counsel, R.2610(7), and mediators Feinberg, R.2610(8), and Gentle. R.2610(12).

After conducting a day-long hearing in November 2020, the Court issued a 68-page decision preliminarily approving the Settlement, preliminarily certifying the Settlement Classes, and approving a comprehensive notice plan. R.2641.

### E.    Class Notice.

Direct notice was sent to over 100 million class members. R.2812(2):3.  It was complemented by a robust consumer media campaign, including digital, print, radio,

18

and television efforts, which reached more than 85% of potential Settlement Class members.  R.2812(2):17.  The Claims Administrator also made extensive efforts to ensure class members were aware of their rights under the Settlement, R.2812(2):23-25, including: the creation of a website viewed by nearly 15 million unique visitors, R.2812(2):25-28; the establishment of a dedicated call center that received over a million calls, R.2812(2):28-31; and the hiring of agents who responded to over 100,000 information requests, R.2812(2):31.

The response was extraordinary.  A total of 7.1 million claims, representing roughly 7 percent of the class, had already been submitted by the time of the Fairness Hearing. R.2864:30.  Since that time, claims submitted have exceeded 8 million. R.3029(1):2. In sharp contrast, of the over 100 million class members, only 2,049 elected to opt out, while only 40 timely objections were submitted on behalf of 123 objectors.  R.2812(2):31.

The Court subsequently ordered that supplemental notice be provided to Self-Funded entities clarifying that the Settlement's SBB relief was individualized relief provided to (b)(3) class members. R.2897.  The Court approved a supplemental notice informing Self-Funded entities that, should they opt out of the (b)(3) class, they would retain the right to seek both damages *and* individualized injunctive relief (which could include SBB-type relief). R.2897.

This supplemental notice was provided to more than 170,000 Self-Funded

entities, and supported by an extensive email and media outreach campaign. R.2914(1):4 (¶14). Thirty-nine additional entities elected to opt-out. R.2914(1):7 (¶27).

### F.    Attorneys' Fees.

The parties agreed that Subscriber Counsel would be permitted to seek a fee and expense award "up to a combined total of 25% of $2.67 billion (i.e., $667,500,000.00)." R.2610(2):45 (¶28). The negotiations that produced this agreement began only after the parties had reached an agreement in principle as to the monetary and equitable relief that would be provided to the class. R.2641:5; R.2610(12):14 (¶37).

Subscriber Counsel ultimately filed a detailed fee petition explaining why Rule 23(h), the "*Johnson* factors,"[5] and the lodestar cross-check confirmed their presumptively reasonable request for an award of attorneys' fees representing 23.47% of the common fund. R.2733(1). The request was supported by (1) a declaration by Co-Lead Counsel detailing the colossal effort required to successfully litigate this case, R.2733(2); (2) the declaration of Special Master Gentle, who attested to the substantial contributions of capital that Counsel had made during years of litigation and catalogued the process he followed in regularly auditing Counsel's time and expenses, R.2733(5); and (3) expert reports prepared by Professors Charles Silver,

---

[5] *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

of the University of Texas School of Law, R.2733(3), and Brian Fitzpatrick, of Vanderbilt Law School, R.2733(4), each of whom concluded that the requested fee award was eminently reasonable.

### G.    The Fairness Hearing.

In September 2021, Subscriber Plaintiffs moved for final approval. R.2812. The court conducted a Fairness Hearing in October 2021 spanning two full days, hearing arguments from the parties in support of the Settlement and from objectors (including Home Depot, Topographic, and Behenna).  R.2859.

The Court thoroughly considered all objections.  A number of opt-outs from the Damages Class, including Home Depot, had objected to the scope of the Release as it applied to members of the (b)(2) class.  The Court responded that language clarifying the Release could be included in any order approving the Settlement. As noted, the Court ultimately clarified that "a Self-Funded Account opt-out does not release any claims for individualized declaratory or injunctive relief, which may include the right to pursue in litigation more than one Blue bid based upon an Opt-Out's individual business and the facts and circumstances of the individual claims." R.2939:2.  That this language satisfied every objector, with the lone exception of Home Depot, is a testament to the Court's diligent efforts to address objector concerns.

The Court made especially extensive efforts to accommodate Topographic,

permitting it to conduct limited discovery, granting its motion to compel the attendance of Dr. Mason at the Fairness Hearing, and allowing its counsel both to cross-examine Dr. Mason and to present the testimony of its own witness. R.2841. The Court provided Topographic's counsel with substantial time at the hearing to support its objections. But when Topographic's own witness took the stand, it became clear that his opinion and methodology were wholly unreliable; indeed, he did not believe that the allocation of antitrust damages should be based on the relative amounts of overcharges paid by the two groups. R.2865:258.[6]

Although the Department of Labor ("DOL") did not oppose the Settlement, the Court added a third day to the Fairness Hearing to address DOL's concern that the Settlement might affect duties that employers or plan fiduciaries might have under the Employee Retirement Income Security Act of 1974 ("ERISA"). R.2866. As the hearing presentations confirmed, the Settlement does nothing to alter the facts that all ERISA duties still apply and all ERISA fiduciaries must comply with those duties. R.2866:23; R.2931:76.

At the conclusion of the hearing, the Court offered objectors yet another

---

[6] *See also* R.2865:249 (expert had no experience allocating damages); R.2865:250; R.2865:251-252 (expert was aware of document indicating that fully insured business was ten times as profitable as self-funded business, and acknowledged this document was inconsistent with his contention that the Blues valued self-funded and fully insured lives the same).

opportunity to air their concerns.  R.2870.  Both Home Depot and Topographic availed themselves of this opportunity, and submitted another 70 pages of briefing.

### H.    Final Approval.

On August 9, 2022, the Court issued a 92-page order approving the Settlement and overruling objections, R.2931, and a separate order approving Subscriber Counsel's attorney's fees and expenses, R.2932.

The Court found that the proposed Settlement Classes satisfied the requirements of Rules 23(a), 23(b)(2), and 23(b)(3).  R.2931:27-28.  The Court then thoroughly analyzed the Settlement using the factors established under Rule 23(e)(2) and in *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984), and determined that it was fair, reasonable, and adequate. R.2931:29-44.  The Court offered reasoned and detailed responses to the objections.  R.2931:44-80.  It found "that the arrangement that will exist upon implementation of the Settlement is not clearly illegal," R.2931:47, given the significant procompetitive structural reforms made to the Blue system by the Settlement. R.2931:47-48.  It overruled Home Depot's objection that public policy prohibits, as a matter of law, antitrust settlements that prospectively release class claims of antitrust violations.  R.2931:50-56.  The Court found that public policy does not bar such a release where, as here, any future claims released under the Settlement would "by definition arise from continued adherence to the existing arrangements that are 'the factual predicates of the Subscribers Actions' or

the injunctive relief provided under the Agreement." R.2931:55-56. It also rejected the argument that the Release was overbroad inasmuch as it authorizes the Monitoring Committee to add newly adopted restrictions to the scope of the Release, finding that "the only new rules and regulations that may be subject to the release are those based on an identical factual predicate and related to the injunctive relief provided" under the Settlement. R.2931:54.

With respect to Topographic's objections, the Court drew on expert reports and testimony in concluding that the 6.5% allocation to the Self-Funded Sub-Class was fair, reasonable, and adequate. R.2931:37; R.2931:57-59. The Court also agreed that "the ASO market is significantly more competitive than its counterpart," supporting a lower allocation for the Self-Funded Sub-Class, and that "the allocation is justified by the different time periods for the classes and the uncertainty regarding litigation outcomes." R.2931:37. The Court noted that the allocation was "negotiated at arm's length under the auspices of Ken Feinberg, the country's leading authority on allocations of large settlements and compensation funds … [who] confirmed that the allocation is reasonable." R.2931:35.

The Court also approved the POD's method of estimating the employer/employee contribution percentages. R.2931:19-20; 87. With respect to DOL's ERISA concerns, the Court noted that DOL had not opposed the Settlement, and it confirmed that the POD "relate[s] solely to what an employer or employee receives

under the Settlement, and do[es] not in any way purport to dictate or address what, if any, obligations employers may have as fiduciaries of ERISA plans, or how an allocation may impact their use of any funds received." R.2931:19. The court made clear: "all ERISA duties still apply, all ERISA fiduciaries must comply with those duties, and this Settlement does nothing to change or alter ERISA rights." R.2931:76.

Finally, after a comprehensive analysis, the Court approved the fee petition, finding that the requested fee award was a reasonable common fund award. The Court noted that the request for an award of attorneys' fees representing 23.47% of the common fund fell below the 25% benchmark established by this Court, R.2931:69-70, and that the reasonableness of that percentage was confirmed by, *inter alia*, consideration of the *Johnson* factors, R.2931:70-72, and the performance of a lodestar cross-check, R.2931:72-73. The Court overruled Behenna's objection that the fee request should be analyzed under a fee-shifting rubric and limited to Counsel's lodestar. R.2931:69.

## II.    Standard of Review

This Court reviews a district court's decisions to certify settlement classes and approve a class action settlement and plan of distribution for abuse of discretion. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 981 (11th Cir. 2016); *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983). A "district court abuses its

25

discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *Carriuolo,* 823 F.3d at 981 (citations omitted). This deferential standard reflects not only that settlements are favored, but also that trial courts "generally have a greater familiarity with the factual issues and legal arguments in the lawsuit, and therefore can make an evaluation of the likely outcome were the lawsuit to be fully tried." *Greco v. Ginn Dev. Co.*, 635 Fed. App'x 628, 631 (11th Cir. 2015) (internal citation omitted). The abuse of discretion standard also governs review of the District Court's fee award, *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 770 (11th Cir. 1991), and its evidentiary rulings, *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1245 (11th Cir. 2018).

## SUMMARY OF ARGUMENT

All four Appeals suffer from a common defect: Appellants cannot demonstrate that the District Court abused its discretion in approving the Settlement or in awarding fees from the common fund that the Settlement created.

1.    Home Depot, alone among 100 million class members, contends that the Settlement violates a supposed "public policy" categorically prohibiting settlements that include "prospective antitrust releases" of class members' rights to seek injunctive relief against the continuation of conduct challenged as anticompetitive in the underlying action. Home Depot's invented categorical rule would effectively

26

preclude the settlement of *any* antitrust class action seeking equitable relief, which explains why it cannot cite a single decision applying, or even mentioning, such a rule. To the contrary, decisions of this and other courts hold that such settlements are permissible (indeed, are to be encouraged) provided they (1) do not perpetuate conduct that is clearly illegal, *Bennett*, 737 F.2d at 988, and (2) release only those claims that fall within the "factual predicates" of the underlying litigation.

This Settlement complies with both limitations. As Home Depot conceded below, and the District Court found, the Settlement does not perpetuate clearly illegal conduct. And, contrary to Home Depot's suggestion, nothing in the Settlement immunizes Defendants from all future antitrust challenges; not only do the Blues remain subject to suits by non-class members, but Home Depot itself, as an opt-out from the (b)(3) class, remains free to bring claims for treble damages and divisible injunctive relief.

The District Court also correctly found that the Release complies with the "identical factual predicate" doctrine, since it precludes only claims premised upon the continuation of conduct challenged in this litigation, and does not release claims challenging "[a]ny new agreement or anticompetitive restraint that is above and/or beyond those within the scope of the Settlement." R.2931:54. *See In re Managed Care*, 756 F.3d 1222, 1236 (11th Cir. 2014). Home Depot argues that the Release is invalid because it covers claims relating "in any way" to this litigation's factual

predicates, but it cites no decision that so holds, and it ignores numerous decisions involving settlements incorporating releases that use the same (or broader) formulations. Home Depot's complaints about the Monitoring Committee fare no better: that committee is designed to, and will, *protect* the class by ensuring that Defendants do not adopt new arrangements that would impair the Settlement's structural reforms. In any event, Home Depot's speculation about how the Release may operate in hypothetical future scenarios should be addressed only if and when such a controversy actually arises.

Home Depot's back-up argument is another, equally meritless, categorical rule, this one relating to Rule 23(a)(4)'s requirement that a settlement class be adequately represented. It argues that the District Court was barred from approving the Settlement because of the "unacceptable risk" of conflicts between the (b)(2) and (b)(3) classes, a risk that mandated separate class representatives and counsel. Home Depot suggests that the existence of a conflict requiring separate representation must be *presumed as a matter of law* whenever a class seeks both equitable and monetary relief. Home Depot ignores that the (b)(2) and (b)(3) classes here have essentially identical membership, were injured in the same ways by the same conduct, and share a common interest in maximizing both monetary and structural relief. There is no conflict in the interests of the classes, let alone the kind of "fundamental" conflict "going to the specific issues in controversy" that raises adequacy of representation

28

concerns. *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1275 (11th Cir. 2021).

2.    Topographic, alone among almost 170,000 corporate Self-Funded Sub-Class members, challenges the Settlement's allocation of monetary relief between the Self-Funded Sub-Class and Fully Insureds.  Such an allocation, however, need only be "rationally based on legitimate considerations," *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983), and the District Court correctly held that the allocation here amply satisfies that standard, especially considering that it was (1) the product of extensive arm's-length negotiations conducted by separate subclasses with independent representation and support from expert analysts; and (2) found to be entirely reasonable by experienced mediator Kenneth Feinberg.  While Topographic now baselessly accuses the class representatives and the District Court of "sell[ing] out" the Self-Funded Sub-Class, it neglects to mention that it acknowledged below, and the District Court found (R.2931:57), that the allocation was *not* the product of collusive or otherwise wrongful activity.

The 6.5% allocation to the Self-Funded Sub-Class was based on the significant differences in the strength of the claims of that subclass when compared to the claims of Fully Insureds, stemming from differences in the markets for those products.  As confirmed by the Self-Funded Sub-Class's own expert's analysis, Defendants generated far higher profits from fully insured business than from self-insured

business, which often generated little or no profit.  Fully insureds therefore have a much stronger claim that Defendants' anticompetitive conduct led to overcharges. Topographic's own expert not only failed to conduct an overcharge analysis, he testified that the relative overcharge amounts paid by the two groups were *irrelevant* to the allocation analysis.  Topographic seeks to replace an allocation that takes into account the relative strengths of claims with one that does not, contrary to the guidance of Rule 23(e)(2)(D).

No self-insureds asserted claims in this litigation before they joined the Settlement.  The damages period for the Self-Funded Sub-Class is thus shorter than the period for Fully Insureds.  Topographic seeks to rewrite history, arguing that the original *Cerven* complaint, and subsequent developments in the litigation, put Defendants on notice that self-insureds were always part of the litigation.  But as the District Court correctly concluded, nothing in *Cerven* or any other development in this consolidated litigation put Defendants on notice that "they would have to defend against alleged misconduct in the ASO market."  R.2931:61.  Accordingly, because the Settlement allocation takes appropriate account of genuine differences in the strength of fully insured and self-insured claims, it treats class members "equitably relative to one another" in compliance with Rule 23(e)(2)(D).

3.    Cochran, alone among the tens of millions of employee class members, challenges the POD provisions allocating to employers the premium shares of

employees who make no claim or whose claims fall below the $5 minimum threshold. Cochran argues that because the premium shares for non-claiming employers are treated differently, employees were treated inequitably and were inadequately represented. The provisions governing the treatment of employee premiums, like the rest of the POD, were constructed after careful deliberation and analysis and subjected to layers of comprehensive scrutiny. That treatment is justified by multiple considerations, including economic evidence concerning the relative contributions of employers and employees to healthcare coverage, and the relative strengths of their claims. Not only does Cochran fail to seriously challenge these considerations, she ignores that the POD's designation of employers as residual claimants allowed the POD to *increase* employees' Default allocation percentages. Cochran cannot demonstrate that the POD treats employees inequitably. And despite her attempts to elevate the POD's economically reasonable distinctions in allocating relief among class members into a conflict of interest between class members, Cochran cannot demonstrate the existence of any conflict, much less a "fundamental" one.

Equally meritless is Cochran's suggestion that the POD sanctions or encourages ERISA violations by employers. The District Court carefully considered this issue, and it concluded, correctly, that the Settlement does not purport to affect any ERISA rights, to release any ERISA claims, or to relieve employers of their ERISA obligations. R.2931:78-79.

31

4. Finally, *pro se* Appellant Behenna, alone among 100 million class members, appeals the fee award. But he abandons the argument he made below and that the District Court properly rejected—that the Settlement does not qualify for common-fund treatment and should be treated as a fee-shifting case. He instead makes a different argument, premised upon a convoluted "bifurcated fee analysis" of his own invention. This argument has been forfeited, but is meritless in any event. Unlike the District Court's fee analysis—which scrupulously followed this Court's controlling precedents—Behenna's "analysis" is refuted by precedent, logic, and common sense.

## ARGUMENT

## I.   HOME DEPOT'S APPEAL IS MERITLESS

Home Depot's lead argument is that the District Court abused its discretion in approving the Settlement because it includes a standard provision releasing claims for declaratory and injunctive relief against certain "pre-settlement conduct" (HD34) challenged by Subscribers but permitted by the Settlement to continue. According to Home Depot—the lone objector making this argument—the "public policy" encouraging private litigation to enforce the antitrust laws categorically prohibits settlements that include "prospective antitrust releases" (HD25, 27) of class members' rights to seek injunctive relief against continuation of such allegedly anticompetitive "ongoing conduct" (HD20).

If public policy truly categorically barred such "prospective antitrust releases" in antitrust class action settlements, one would expect to see the doctrine firmly established in precedent, for such settlements are common.[7]  But Home Depot cannot cite a single decision rejecting (or refusing to enforce) an antitrust class settlement because it included such a release. To the contrary, every court to consider the issue, including this Court, has rejected Home Depot's categorical rule; instead, every court has approved (or enforced) settlements releasing class claims against the defendants' continuation of challenged pre-settlement conduct.

It is not difficult to understand why no court has adopted Home Depot's radical rule: it would effectively preclude settlement of any antitrust class action seeking equitable relief.  If parties were forbidden to enter into any compromise permitting continuation of any feature of the defendant's allegedly anticompetitive conduct, the only permissible "settlement" would be one of unconditional surrender, with injunctive relief eliminating every challenged feature of the defendant's conduct.  The parties' only alternative under Home Depot's "all or nothing" public

---

[7] *See Managed Care*, 756 F.3d at 1226; *Bennett*, 737 F.2d at 986; *Grunin v. Int'l House of Pancakes*, 513 F.2d 114 (8th Cir. 1975); *Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682 (2d Cir. 1977); *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 429-30 (S.D.N.Y. 2016); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *3 (N.D. Cal. Apr. 3, 2013); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 116-17 (S.D.N.Y. 2009), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 508 (E.D.N.Y. 2003), *aff'd*, 396 F.3d 95 (2d Cir. 2005).

policy rule would be to litigate the class's claims for equitable relief to final judgment. The class's claims for monetary relief could possibly be compromised, as Home Depot acknowledges (HD30), but that is all. Genuine "settlements"—compromises—of antitrust class actions seeking injunctive relief would be all but extinct. *See Bennett*, 737 F.2d at 986 ("[C]ompromise is the essence of settlement.").

To be sure, private suits are an essential weapon in the arsenal Congress created to enforce the antitrust laws. But Home Depot's extreme conception of the public interest in private antitrust enforcement collides irreconcilably with "the strong judicial policy favoring settlement," including in complex antitrust cases. *Id. See Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) (noting "overriding public interest in favor of settlement" of class actions). In reality these public policy considerations comfortably coexist, for the path to settling antitrust class actions is well-marked by two established guardrails ensuring that a settlement cannot be used to license future clear antitrust violations: A settlement may not release class claims against the defendants' continuation of pre-settlement conduct that is clearly "illegal." *Bennett*, 737 F.2d at 987. And a settlement can release class claims only against continuation of the pre-settlement conduct challenged in the underlying litigation, as opposed to new, unrelated conduct. *Managed Care*, 756 F.3d at 1236. Home Depot, unable to escape this Court's precedents, pleads that this "should not be Circuit law." (HD39). But it is. And it should be if the law is to allow parties to antitrust class

34

actions to settle their disputes.

Here, the District Court held, correctly, that the Settlement falls well within these well-established guardrails.  It concluded that, in light of the procompetitive structural reforms required under the Settlement, the post-Settlement Blue system would not be clearly illegal.  R.2931:46-48.  And it concluded that the Release satisfied the "identical factual predicate" doctrine designed to ensure that releases reach only future claims predicated on conduct challenged in the litigation.  R.2931:52-56. Home Depot cannot demonstrate that the Court abused its discretion in so concluding and approving the Settlement.

Home Depot's back-up argument is another categorical rule of its own invention. It argues that the District Court was barred from approving the Settlement because of supposed "conflicts" in the interests of the (b)(2) and (b)(3) classes that mandated separate class representatives and counsel.  Home Depot suggests that the existence of a conflict requiring separate representation must be *presumed as a matter of law* whenever a class seeks both equitable and monetary relief.  HD55-60.  No case holds that.  To the contrary, this Court's precedents establish that only real, concrete, and "fundamental" conflicts "going to the specific issues in controversy" raise adequacy of representation concerns under Rule 23(a)(4).  *Equifax*, 999 F.3d at 1275.  Here, there were no conflicts, let alone fundamental conflicts, between the interests of the (b)(2) and (b)(3) classes. The classes have virtually complete overlap

35

in membership and, as the District Court found, were injured in the same ways by the same anticompetitive conduct and policies. Home Depot does not dispute these findings. The members of both classes thus shared a common interest in maximizing both monetary and structural relief.

### A.    The Settlement Provisions Releasing The Subscriber Class's Equitable Claims Do Not Violate Public Policy.

Home Depot's attack on the Release must be considered in context. The Settlement was reached through "protracted, complicated, and challenging" negotiations that took place alongside multidistrict litigation that was itself "extraordinarily complex, protracted, and hard-fought." R.2931:2-3. It secures "historic and substantial" structural changes in the Blue system that the District Court found will "creat[e] opportunities for more competition in the market for the purchase and administration of health insurance and provid[e] the potential for a more competitive environment in which the Settlement Class may achieve greater consumer choice, better product availability, and increased innovation." R.2931:3, 11. This "transformative, procompetitive injunctive relief," R.2931:68, thus "substantially increase[s] the value of the Settlement to the Class Members," R.2931:39-40.[8] Home Depot does not challenge these findings as clearly erroneous or as an abuse of discretion.

---

[8] *See* R.2931:48 ("there have been material changes to the Blues' going-forward system which add significant procompetitive features"); R.2931:49 (elimination of the NBE rule "is a significant change that … will drastically alter the forward-looking landscape").

Of course, like any negotiated compromise, the Settlement did not achieve everything that Subscribers had hoped to obtain had they fully prevailed at trial, such as the wholesale elimination of the Blues' ESAs.  Nevertheless, in the judgment of class representatives and counsel, the pro-competitive structural reforms won through negotiation, which materially transform the operation of even those practices and policies that were not wholly eliminated, outweighed the risks, the costs, and the years of delay of continuing the litigation to a final judgment.[9]

In exchange for providing historic monetary and injunctive relief to Subscribers, the Blues, like any rational defendants, insisted on a release.  The Release is limited to claims predicated on the conduct and practices challenged in this litigation, and does not reach new conduct or practices.  Moreover, the Release allows Home Depot, and any others who opt out of the (b)(3) class, to bring suit seeking treble damages for *any* antitrust violation (past, present, or future) and individualized injunctive relief (including additional Blue bids) "based upon an Opt-Out's individual business and the facts and circumstances of the individual claims," R.2939:2, even as they enjoy the benefit of the Settlement's hard-won structural reforms.[10]  The

_____

[9] *See* R.2931:42 (finding "it is clear that the factual record in this matter was sufficiently developed to allow Class Counsel to make a reasoned judgment as to the merits of the Settlement"): R.2931:31-33, 86 (findings regarding risks, costs, and delays of further litigation, concluding that those factors "strongly support final approval").

[10] Home Depot seeks to sow doubt about the arguments it might be able to

Release also does not protect the Blue system from any future antitrust challenge, including one based entirely on pre-Settlement conduct, brought by a person or entity who is not a member of any Settlement class. It is thus manifestly inaccurate to suggest that the Settlement immunizes the Blues against challenges to the going-forward system.

After subjecting this compromise to the review called for under Rule 23(e) and this Court's precedents, painstakingly examining the voluminous materials submitted in the approval proceedings, and thoroughly considering the tiny number of objections to the Settlement, the District Court found that the Settlement was fair, reasonable, and adequate and did not sanction a going-forward Blue system that was clearly illegal. Again, Home Depot does not challenge these findings; indeed, it conceded below that the going-forward regime created by the Settlement is not clearly illegal. R.2875:10-11. Nor does Home Depot suggest that Subscribers realistically could have bargained for greater relief or obtained the relief they did in exchange for a narrower release. These facts alone remove any doubt about whether

---

make in future opt-out litigation. HD32. But the District Court made clear that opt-outs do not release "*any* claims for individualized declaratory or injunctive relief." R.2939:2 (emphasis added). And the Court clarified that opt-outs are not barred by the Release from asserting any arguments regarding an alleged antitrust violation, but were instead only barred from obtaining a particular type of remedy (indivisible injunctive or declaratory relief). *See* R.2865:23-24 ("It's not releasing a claim. It's whether you can pursue that particular remedy."); R.2865:25 ("It may be a limitation upon certain relief that can be sought under a release, but it's not a waiver of a claim.").

the District Court abused its discretion in approving the Settlement, and underscore the radical nature of Home Depot's arguments.

### 1.    The Conduct Permitted by the Release Is Not "Clearly Illegal."

Home Depot is quite correct that federal antitrust laws are designed to protect "the fundamental national values of free enterprise and economic competition," *FTC v. Phoebe Putney Health Sys. Inc.*, 568 U.S. 216, 225 (2013), and that private litigation is a critical component in the nation's antitrust enforcement regime.  HD23-24. *See California v. Am. Stores*, 495 U.S. 271, 284 (1990).

Indeed, this litigation is Exhibit A in support of Congress' belief in the virtues of private antitrust enforcement.  Without the benefit of governmental investigations or enforcement actions, Subscribers litigated this "extraordinarily complex, protracted, and hard-fought" case for almost a decade, R.2931:2, and ultimately secured a historic settlement providing for both extraordinary monetary relief and transformative pro-competitive structural reforms to the Blue system.  The private antitrust enforcement regime worked as intended here.

Home Depot nonetheless insists that this historic achievement must be set aside on public policy grounds because the Settlement releases the Class's declaratory and injunctive claims challenging the continuation of some features of the conduct at issue in this litigation.  But not only does Home Depot fail to cite a single decision rejecting an antitrust class action settlement on that basis, it completely

39

dismisses or misreads uniform precedent, including from this Court, confirming that settlements just like this one are allowable.

a.    This Court's decision in *Bennett*, 737 F.2d 982, squarely holds that so long as an antitrust settlement does not perpetuate challenged practices that are *clearly illegal*, it does not violate public policy.  There, a class of homeowners alleged that deed restrictions requiring the payment of fees under a lease for common recreational facilities "amount[ed] to a *per se* illegal tying agreement" under the Sherman Act.  *Id.* at 984.  After years of litigation, a settlement was reached providing for cash payments and non-monetary relief, including methods for class members to seek future reductions in recreation fees and for homeowner associations to negotiate for the purchase of recreation facilities.  *Id.* at 985.  But because the settlement did not terminate all of the challenged restrictions, several objectors argued that public policy dictated that "the settlement should be set aside because it perpetuates a violation of the Sherman Antitrust Act by tying in separate recreational and maintenance leases to the purchase of a single family home."  *Id.* at 986.

This Court held that even assuming there was "some merit" to the contentions that the alleged tying arrangements "constitute[d] antitrust violations," the settlement should be approved.  "[U]nless the illegality of an arrangement … is a *legal certainty*, the mere fact that certain of its features may be perpetuated is no bar to approval."  *Id.* (emphasis added) (citing *Grunin*, 513 F.2d 114).  Because the district

court "reasonably concluded that the plaintiff class would have difficulty succeeding on the merits," *id.* at 987, the "illegality of [the] arrangement" perpetuated by the settlement was not "a legal certainty," and the settlement thus did not violate public policy. *Id.* And because the district court found the settlement "to be in the best interests of the class," it did not abuse its discretion in approving it, especially considering "the strong judicial policy favoring settlement." *Id.* at 986-87.

*Bennett* is no outlier. Rather, it accords with decisions from other circuits holding that antitrust settlements allowing the continuation of challenged conduct do not thereby violate public policy. In *Grunin*, the Eighth Circuit affirmed the approval of a class settlement brought by franchisees challenging multiple features of their franchise agreements. The objectors argued that the settlement could not be approved because it "perpetuate[d] antitrust violations" by not relieving the franchisees from all of the challenged features of their agreements. 513 F.2d at 123. While agreeing that "a court cannot lend its approval to any contract or agreement that violates the antitrust laws," the Eighth Circuit held that neither it nor the trial court had the right or duty to decide the merits of the antitrust claim. *Id.* Rather, so long as the illegality of the arrangement perpetuated by the settlement "[was] not a legal certainty"—*i.e.*, the terms of the settlement were not "illegal *per se*"—the settlement could be approved. *Id.* at 124. *See also id.* ("[U]nless the terms of the agreement are *per se* violations of antitrust law, we must apply a 'reasonableness

41

under the totality of the circumstances' standard" to settlement approval.).

Similarly, in *Robertson v. National Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977), the Second Circuit affirmed the approval of a class settlement that modified but did not wholly eliminate certain NBA practices and rules alleged to restrain competition. The court rejected the argument "that the settlement agreement cannot be approved because it perpetuates for ten years two 'classic group boycotts'" that violated the Sherman Act. *Id.* While acknowledging "that a settlement that authorizes the continuation of clearly illegal conduct cannot be approved," the "alleged illegality of the settlement agreement [was] not a legal certainty." *Id.* (citing *Grunin*, 513 F.2d at 124). The court noted that the challenged practices had not previously been determined to be illegal *per se*, and stressed that the settlement agreement, "[which] must be looked at as a whole," provided significant structural relief: while it did not completely eliminate the challenged practices, it "radically modified" some of them, "virtually eliminated" others, and "modified" still others. *Id.* In short, "the settlement authorized no future conduct that is clearly illegal." *Id.* *See TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982) (discussing *Robertson*).

*Bennett*, *Grunin*, and *Robertson* decisively reject the very proposition urged by Home Depot—that public policy prohibits antitrust class action settlements releasing the class's equitable claims against continuation of conduct challenged in the

42

underlying action.  Or, put another way, that an antitrust class action settlement that does not eliminate *each and every* feature of challenged conduct violates public policy.  And in the District Court, Home Depot dealt itself a fatal self-inflicted wound under *Bennett*, *Grunin*, and *Robertson,* for it conceded that the post-Settlement Blue system would not be clearly illegal: "Uncertainty exists regarding the illegality of the go-forward [Blue] system both as a factual matter and a legal matter." R.2875:4-5. Thus, the District Court did not err, much less abuse its discretion, in rejecting Home Depot's public policy attack on this Settlement.[11]

> b.     Home Depot does not address these directly relevant—and, in the case of *Bennett*, controlling—decisions until almost 30 pages into its argument. HD51-53.  Its attempt to distinguish them is singularly unconvincing.  Its primary argument about *Bennett* is that because this Court's opinion does not explicitly mention a "future release," the settlement in that case may not have included such a

---

[11] Home Depot portrays the public policy encouraging private antitrust litigation as uniquely sacrosanct in all of American law, but the *Bennett/Grunin/Robertson* "clearly illegal" standard has been applied to the approval of class action settlements arising in other areas of the law implicating important public policy concerns. In *Armstrong v. Board of School Directors of City of Milwaukee*, 616 F.2d 305 (7th Cir. 1980), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998), the Seventh Circuit applied that standard in affirming approval of a settlement of a school desegregation action.  Relying on *Grunin* and *Robertson*, the court held that the rights of absent class members and "the interests of the public as a whole" were protected under a standard requiring the rejection of settlements that "either initiate[] or authorize[] the continuation of clearly illegal conduct." *Id.* at 313, 319. *See also Isby v. Bayh*, 75 F.3d 1191, 1197 (7th Cir. 1996).

release. HD51.  This argument is risible.  *Bennett* specifically addressed whether a settlement that "perpetuated" an alleged illegal tying arrangement would violate public policy.  Such a settlement would *necessarily* include an agreement by the class to forego any future legal challenges to that arrangement, or contemplate some other mechanism (such as *res judicata*, see *infra* at 57-62), that would preclude such challenges; otherwise, far from the alleged antitrust violation being "perpetuated," the plaintiffs would be free to pocket the settlement money and enjoy the benefits of the equitable relief, and then turn around *the very next da*y and bring a suit seeking to eliminate the practices they had just agreed could continue.  *See Berry v. Schulman*, 807 F.3d 600, 616 (4th Cir. 2015) ("the release of claims that form the basis of litigation is the *raison d'être* of any settlement").[12]  Home Depot cannot credibly explain why an antitrust defendant would settle a class action on such terms, let alone how any objector could seriously argue that such a plaintiff-friendly bargain some-how violated public policy designed to protect the plaintiff class.[13]

---

[12] *Cf. Main Line Theatres, Inc. v. Paramount Film Distrib. Corp.*, 298 F.2d 801, 803 (3d Cir. 1962) ("[A] defendant offering a sum in settlement of a suit asking … for an injunction against certain conduct, would not understand that a similar demand could be asserted the day after settlement."); *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 350-51 (6th Cir. 2009).

[13] Home Depot attempts to distinguish *Bennett* because the settlement there provided class members a future opportunity to attempt to *negotiate* the termination of certain features of the alleged tying arrangement.  HD51-52.  But this Court did not rely on that provision in rejecting the argument that the settlement violated public policy because it "perpetuated" conduct alleged to violate antitrust law.  And Home

Home Depot faults *Grunin* and *Robertson* for holding that a settlement permitting continuation of challenged conduct can violate public policy only if the continued conduct amounts to a *per se* violation of antitrust law.[14] HD52-53. Noting that "[c]onduct proved to violate the rule of reason violates antitrust law just as surely as conduct that violates a *per se* rule," HD49, Home Depot argues that an antitrust settlement violates public policy if "a future challenger *might* prove" the continued conduct violates antitrust law under the rule of reason. HD50 (emphasis

---

Depot never explains why having a *potential* chance to *negotiate* an end to aspects of an allegedly illegal arrangement distinguishes this case from *Bennett* in any meaningful sense; both cases involve a release of claims against certain conduct previously alleged to violate the antitrust laws.

Home Depot also suggests that *Bennett* is distinguishable because it did not involve a mandatory (b)(2) class. HD52. But again, nothing in this Court's opinion turned on whether the class allowed opt-outs. And the fact that the Settlement here involves a (b)(2) class does not change the analysis. Rule 23(e) expressly allows, under court supervision and appropriate safeguards, "the claims, issues, or defenses of a certified class … [to] be settled, voluntarily dismissed, or compromised." As discussed, releases are a *sine qua non* of the compromise of complex class action litigation. By its terms, therefore, Rule 23(e) allows for the release of claims for indivisible injunctive relief held by members of a mandatory (b)(2) class. If the claims of the (b)(2) class had been resolved in a final judgment after a merits trial, Home Depot would be fully bound by that judgment even though it had no opportunity to opt out of the class. The result should be no different when those claims are resolved through a settlement that complies in every respect with Rule 23(e). Notably, the settlement approved in *Robertson* involved the certification of a mandatory Rule 23(b)(1) class. 556 F.2d at 685.

[14] Other decisions likewise equate per se illegality with the "clearly illegal" standard. *See White v. Nat'l Football League*, 822 F. Supp. 1389, 1425-26 (D. Minn. 1993); *Alexander v. Nat'l Football League*, 1977 WL 1497, at *21 (D. Minn. Aug. 1, 1977); *Calibuso v. Bank of Am. Corp.*, 299 F.R.D. 359, 372 (E.D.N.Y. 2014). *Cf. Armstrong*, 616 F.2d at 305; *Isby*, 75 F.3d at 1197.

added).[15]  Given that proving an antitrust violation under the rule of reason requires a fact-intensive evidentiary demonstration that "under all the circumstances of the case the restrictive practice imposes an *unreasonable* restraint on competition," *Arizona v. Maricopa County Medical Soc*., 457 U.S. 330, 343–344 (1982) (emphasis added), the outcome of litigating such a claim is, by definition, uncertain. It follows, then, that Home Depot's public policy rule is categorical: it *always* prohibits *any* class action settlement releasing equitable claims against the continuation of pre-settlement conduct, no matter how uncertain, or even dubious, the claims may be on the merits.  Under Home Depot's radical public policy straitjacket, either the parties to an antitrust class action must litigate the equitable claims to the bitter end or defendants must agree to eliminate all challenged practices. Compromise is forbidden. But that is not the law.

        c.     Home Depot pleads, finally, that *Grunin* and *Robertson* were wrongly decided and "should not be this Circuit's law."  HD52-53.  As previously noted, this Court in *Bennett*, 737 F.2d at 987, expressly relied upon *Grunin,* as did the Second Circuit in *Robertson,* 556 F.2d at 686.  The core teaching of all three decisions is the same, and is dispositive here.

---

[15] *Bennett*, as well as both *Grunin* and *Robertson*, emphasized that a court analyzing whether to approve a settlement is neither required nor authorized to decide the merits of the post-settlement regime's legality.  Home Depot itself acknowledged this settled principle below. R.2875:9-10. *See Bennett*, 737 F.2d at 987; *Robertson*, 556 F.2d at 686; *Grunin*, 513 F.2d at 123-24.

d.    Home Depot criticizes the District Court's partial reliance on its Provider Track ruling that the rule of reason standard would apply to the Providers' challenge to the post-Settlement Blue system.  HD46-49.  Home Depot argues that the Blues' national account allocation rules "go[] beyond" the preservation of the ESAs and have little to do with the claims raised in the Provider litigation.  HD47.  But Home Depot's public policy argument is, again, categorical; it admits of no distinctions between the release of equitable claims premised upon alleged *per se* violations and equitable claims premised upon alleged rule of reason violations.  According to it, the Release (and thus the Settlement) of *any* such equitable claims—certain or uncertain, strong or weak, *per se* or rule of reason—is forbidden.

In any event, Home Depot ignores that the District Court cited its Provider Track ruling as *confirming* its decision that the post-Settlement Blue system is not clearly illegal. *That* decision was based on the court's analysis of the entire suite of structural reforms required under the Settlement, including significant procompetitive changes to the rules regarding bidding on ASO national accounts.  And, as noted, *supra* at 43, Home Depot expressly conceded that the going-forward Blue system would *not* be clearly illegal.[16]  That fact alone compels the rejection of its public

---

[16] Of course, even if the District Court had held that the post-Settlement system could be challenged under a *per se* standard of review, the Blues still could assert the defense, as they did below, that they act as a common economic enterprise with respect to the management of Blue trademarks. *See Am. Needle, Inc. v. Nat'l*

policy argument.

      e.     The District Court's rejection of Home Depot's public policy attack is also firmly supported by decisions upholding settlements releasing future claims premised upon the continuation of pre-settlement conduct.  R.2931:53-54 (discussing cases).  In *Managed Care*, this Court affirmed a decision holding plaintiffs in contempt for violating the terms of a class settlement by filing antitrust actions asserting claims that had been released.  The plaintiffs argued that the district court's interpretation of the settlement to cover their post-settlement lawsuit "would result in an agreement that releases future claims, in contravention of public policy." 756 F.3d at 1231.  This Court held that the claims asserted in the post-settlement litigation "arose out of the claims at issue" in the underlying class action and were thereby released, even though the plaintiffs had sought to "base the new claims on certain conduct post-dating the Effective Date" of the settlement.  *Id.* at 1236.  Because those post-settlement acts "merely constitute[d] a continuation of the conspiracy alleged in [the prior class action, the defendant's] purported bad acts are best seen as new, overt acts within an ongoing conspiracy, rather than new claims in and of themselves."  *Id.*  They were thus covered by the release, even though it reached

---

*Football League*, 560 U.S. 183 (2010). The District Court held that this defense could not be resolved on summary judgment because it rested on disputed issues of material fact. R.2063:35.  No decision holds that the Subscribers are precluded from settling a case when faced with a potential defense of this kind.

only claims arising on or before the settlement's effective date.

Home Depot tries to distinguish *Managed Care* on two grounds. First, it says that the case involved a "release of future claims based on past conduct occurring by or before the settlement's effective date." HD40. Not so. As discussed, *Managed Care* involved the release of claims premised upon *post*-Settlement conduct that continued pre-Settlement practices—the very type of release that Home Depot claims is prohibited by public policy. *See* HD34-35.[17] Its second distinction is that *Managed Care* was a settlement *enforcement* decision, not a settlement *approval* decision. HD 40-41. Home Depot never explains, however, why the public policy considerations that it says bar *approval* of a settlement release would not also bar *enforcement* of any such release that slipped past the approval process.

Also instructive is *In re Chicken Antitrust Litigation*, 669 F.2d 228 (5th Cir. Unit B 1982), in which the former Fifth Circuit affirmed the approval of an antitrust settlement's allocation of a settlement fund. In rejecting the argument by direct purchasers that the allocation was unfair because it permitted indirect purchasers to recover, the Court stressed the defendants' insistence upon "total peace" from future litigation, and their concomitant need for a "complete release from all significant

---

[17] Home Depot's attempted distinction (HD38-39) of *MCM Partners, Inc. v. Andrews-Bartlett & Assoc.*, 161 F.3d 443, 447-48 (7th Cir. 1998), fails for the same reason. The Seventh Circuit there rejected an argument that a release was "void as against public policy" because it released future antitrust claims premised upon the continuation of pre-settlement conduct.

potential plaintiffs," including indirect purchasers who might bring future claims. *Id*

at 238. *See id.* at 234. Contrary to Home Depot's assertion, HD37, the "complete

release" of future claims that the defendants insisted upon was not limited to dam-

ages claims. The Court emphasized that indirect purchasers "held many potential

claims against defendants which required releases before total peace could be ob-

tained," and specifically noted that indirect purchasers could still pursue claims for

"injunctive relief" absent a release. 669 F.2d at 238.

Contrary to Home Depot's assertion, *In re Payment Card Interchange Fee*

*and Merchant Discount Antitrust Litigation*, 2019 WL 6875472, *22-26 (E.D.N.Y.

Dec. 16, 2019), is also squarely on point. There, the district court approved an anti-

trust settlement, specifically rejecting the argument that public policy prohibited a

release barring future claims for injunctive relief arising out of "certain rules chal-

lenged in the litigation and other rules that are substantially similar." *Id*. at *24. The

court drew a sharp distinction between releases reaching only claims arising out of

pre-settlement conduct challenged in the underlying action, which are permissible,

and releases reaching future claims arising out of new unrelated conduct, which are

not. Although "releases are acceptable where the future claims release[d] are those

based on a continuation of conduct at issue and underlying the original claims," "the

public policy considerations differ" for settlements involving "impermissibly broad

releases that release[] all types of claims, including 'future' entirely unrelated

50

antitrust claims not circumscribed to an identical factual predicate or to claims that arose out of the alleged conduct or related conduct that could have been alleged" in the action. *Id. at* \*25-26.[18] The court dismissed as "inapposite" cases in which such broad releases were suggested to violate public policy. *Id.*

The cases dismissed in *Payment Card* as "inapposite" are the very cases that Home Depot relies upon most heavily here: *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95 (5th Cir. 1974), and *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 639 n.19 (1985). We turn to those cases, and other equally inapposite authority upon which Home Depot relies.

### 2.   The Cases Cited by Home Depot Do Not Support its Argument.

a.   Home Depot contends that *Redel's* compels reversal. *Redel's* is not even close. It did not involve a litigation settlement release at all, much less a release of claims premised upon the continuation of specific known conduct. Rather, it involved the interpretation of a "general release provision" in a franchise

---

[18] The court in *Payment Card*, as well as the District Court, R.2931:55, cited one decision rejecting an antitrust settlement release on public policy grounds in a manner that is illustrative because it is inapposite here. *Schwartz v. Dallas Cowboys Football Club*, 157 F. Supp. 2d 561 (E.D. Pa. 2001), rejected a release of future antitrust claims challenging practices that were not at issue in the underlying lawsuit. *Id.* at 578. The court acknowledged that the release *could "properly" bar* future claims concerning practices that *were* at issue in the action. *Id.* (emphasis added). *See id.* at 576 (distinguishing between releases of "future antitrust claims that arise out of conduct challenged by the plaintiff" and releases that "extend[] far beyond the conduct challenged in the litigation").

agreement in which the franchisee released the franchisor "from all claims, demands, contracts, and liabilities ... as of the date of the execution of this [franchise] agreement." 498 F.2d at 97. The issue was whether that general release barred claims for price discrimination the defendant franchisor was alleged to have committed both before and after executing the agreement.

The Court held that the release's "unambiguous" language showed that it was intended to apply only retrospectively, and so protected the franchisor from any and all liabilities, including antitrust liability, for conduct that predated the agreement. But the Court rejected the contention that the release applied prospectively, both because the release's language foreclosed that result and because, in any event, public policy considerations would prevent the "prospective application of a general release to bar private antitrust actions arising from subsequent violations[.]" *Id*. at 98. *Redel's* stands for the unremarkable proposition that public policy prohibits enforcement of a general release granting one party an unrestricted *license* to commit future antitrust violations against the other party. The decision has nothing at all to do with standard releases in settlement agreements compromising antitrust class actions.

Home Depot also relies heavily on *dicta* buried deep in a footnote in *Mitsubishi,* 473 U.S. at 639 n.19. The Supreme Court held that an *arbitration* clause in an international sales agreement could be enforced to compel the international

arbitration of a Sherman Act claim.  The sales agreement also had a choice of law provision calling for application of Swiss law "in all respects," and certain *amici* argued that the provision could be interpreted by the arbitral panel to require decision "under Swiss law rather than the U.S. Sherman Act," thus denying the antitrust claimant its federal statutory rights. *Id.* Relying in part on *Redel's*, the Court observed that if "choice-of-forum [arbitration] and choice-of-law [Swiss] clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies ..., we would have little hesitation in condemning the agreement as against public policy." *Id.*  Thus, as with the general release at issue in *Redel's,* public policy also prohibits enforcement of other types of contract provisions that operate effectively "as a prospective waiver"—*i.e.*, as a release—of a party's right to seek relief for any future antitrust violations that the other party may commit.  Like *Redel's*, *Mitsubishi* has no bearing on the validity of standard releases provided as an essential component of the settlement of complex antitrust class actions.[19]

Tellingly, Home Depot can point to no decision of this or any other court suggesting that *Redel's* or *Mitsubishi* requires the invalidation of a release in an

---

[19] As the foregoing discussion shows, *Redel's* and *Mitsubishi* also differ from the Settlement here because those decisions involved  provisions that would operate to completely foreclose the ability of one party to seek *any relief* for *any* future antitrust violation committed by the other party.  But Home Depot, as an opt-out from the (b)(3) class, is not foreclosed *at all* from pursuing claims not only for treble damages for any future *or past* antitrust violation by the Blues, but also for individualized equitable relief.

antitrust class settlement. Even more telling is the fact that this Court's controlling decision in *Bennett*, which post-dated *Redel's*, did not even cite that decision, and that its controlling decision in *Managed Care*, which post-dates both *Redel's* and *Mitsubishi*, cites neither decision.[20]

      b.    Home Depot cites *American Safety Equipment Corp. v. J.P. Maguire & Co.*, 391 F.2d 821 (2d Cir. 1968), as a case that "condemned future antitrust releases," HD26, but that decision did not address antitrust class action settlements or releases. It addressed only whether certain antitrust claims were appropriate for arbitration, 391 F.2d at 827-28, and its conclusion that they were not has been effectively overruled by modern decisions holding parties to their arbitration agreements in antitrust cases. *See Am. Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 231 (2013).

Home Depot says that *In re American Express Merchants' Litigation*, 634 F.3d 187 (2d Cir. 2011), supports its categorical public policy rule, but that decision, like *Mitsubishi* and *American Safety*, addresses wholly unrelated questions regarding the enforceability of arbitration agreements. Moreover, although Home Depot

---

[20] *Redel's* cites *dicta* in an early Eighth Circuit decision, *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955): "Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy." But the Eighth Circuit in its subsequent *Grunin* decision made clear that settlements that release challenged pre-settlement conduct are permissible so long as the conduct is not clearly illegal.

claims that *American Express* was "reversed on different grounds," HD24 n.91, it neglects to mention that in reversing the Second Circuit, the Supreme Court rejected the argument that public policy considerations compelled the invalidation of an arbitration provision waiving class actions, even though the cost of arbitrating each individual antitrust claim would as a practical matter prevent the resolution of such claims altogether. *Italian Colors*, 570 U.S. at 231. And while Home Depot also references general statements from *In re Smith*, 926 F.2d 1027, 1029 (11th Cir. 1991), regarding public policy considerations as they relate to settlements, HD27, 34, nothing in that decision, which *reversed* a district court decision rejecting a settlement as against public policy, supports Home Depot's radical public policy rule.

Nor, finally, does *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 323 (1955) help Home Depot. HD24. The Supreme Court there considered the *res judicata* effect of a prior judgment rather than the preclusive effect of a release. In holding that the prior judgment did not bar a subsequent action, the Court stressed that there were "*new antitrust violations* alleged here ... *not present in the former action*," *id.* at 324-25, and that "there was a substantial change in the scope" of the conspiracy alleged previously, because five defendants in the subsequent action had not been parties to the previously challenged agreement, *id.* at 328-29 (emphasis added). *See In re Managed Care Litigation*, 2010 WL 6532982, at *12 (S.D. Fla. Aug. 15, 2010)

(distinguishing *Lawlor*).[21]

### 3. The Release Complies with the "Identical Factual Predicate" Doctrine.

The Settlement's Release provisions, like those contained in most modern complex class action settlements, are quite lengthy and contain their fair share of boilerplate. But those provisions, also like those in most other such settlements, operate in a basic, standard way: to bar class members from bringing future claims— and only those future claims—challenging the continuation of those pre-settlement practices and conduct that were at issue in the underlying litigation and with respect to which the parties have reached a comprehensive compromise.

The District Court confirmed as much when it held that "the *only* new rules and regulations that may be subject to the release are those based on an *identical factual predicate* and related to the injunctive relief provided by … the Settlement Agreement." R.2931:54 (emphasis added). To drive this point home, the Court emphasized that "[a]ny new agreement or anticompetitive restraint that is above and/or beyond those within the scope of the Settlement is not released and can be subject to a legal challenge." *Id. See* R.2931:56 ("any released claim here would

---

[21] For similar reasons, Home Depot's reliance on decisions addressing the limits of judicially-approved antitrust immunity doctrines is misplaced. HD30. *See FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 625 (1992). The Settlement does not preclude non-class members (including States, the Federal Government, and subscribers who fall outside the class definition) from seeking any type of relief for any post-Settlement violation that may occur.

by definition arise from continued adherence to the existing arrangements that are 'the factual predicates of the Subscribers Actions' or the injunctive relief provided under the Agreement"). Of course, as an opt-out from the (b)(3) class, Home Depot released no claims for treble damages and individualized injunctive relief that *are* based on the identical factual predicates of the claims litigated and settled below, let alone claims based on *new* post-settlement anticompetitive conduct.

None of this satisfies Home Depot. Emphasizing the word "identical" in the "identical factual predicate" doctrine, it offers an alternative to its categorical public policy argument, complaining that the Release here exceeds the identical factual predicate limitation because it bars future claims that "'relate in any way to' either 'the factual predicates of' or 'any issue raised in any of the Subscriber Actions.'" HD43 (quoting R.2610(2):19-20 (¶1.uuu)). It is wrong.

a.    Home Depot's argument is based on its misreading of a line of cases dealing with the application of *res judicata* to settlements. The question of whether and how *res judicata* principles might operate to bar any future hypothetical challenges to the post-Settlement system is different from the antecedent question of how Home Depot's appeal, which is premised on its contention that the Release, and therefore the Settlement, must be invalidated *ab initio*, should be resolved. That is particularly true when one considers the parties' clear intent that the Release be interpreted and enforced to reach as far, *but only as far*, as the law allows. *See*

57

R.2931:52 (quoting Release provision).  Even leaving that aside, the *res judicata*

precedents on which Home Depot rely actually *refute* its contention that the Release

"exceeds [the] parameters" of the identical factual predicate doctrine.  HD42.

　　　　　i.　Home Depot relies primarily on this Court's decision in

*TVPX ARS, Inc. v. Genworth Life and Annuity Ins. Co*., 959 F.3d 1318 (11th Cir.

2020), which reaffirmed that the doctrine of claim preclusion—that a claim is pre-

cluded if it "arises out of the same nucleus of operative facts, or is based upon the

same factual predicate, as a former action"—"app[lies] with equal force when con-

sidering the preclusive effect of a prior class action settlement agreement." 959 F.3d

at 1325. "[T]o determine the claims at issue in a prior [settled] action," the court thus

considers not only the prior operative complaint, but "the parties' settlement docu-

ments." *Id.* at 1326.  As *TVPX* emphasized, "a class release may not preclude a sub-

sequent action unless the released conduct arises out of the identical factual predicate

as the claims at issue in the [later] case."  *Id.* (citations and quotations omitted).[22]

---

[22] Under the identical factual predicate doctrine, a court may approve a settle-
ment that releases "not only those claims alleged in the complaint and before the
court, but also claims which could have been alleged by reason of or in connection
with any matter or fact set forth or referred to in the complaint." *In re Corrugated
Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) (internal quotation
omitted).  Indeed, the doctrine permits settlements that release even claims that the
court lacked the power to adjudicate. *Id.* (citations omitted).  *See Matsushita Elec.
Indus. Co. v. Epstein,* 516 U.S. 367, 376-77 (1996).  The doctrine thus allows a set-
tlement to resolve "all matters between the class members and released parties 'aris-
ing out of or related to the [l]itigation.'" *Greco v. Ginn Dev. Co.*, 635 F. App'x 628,
635 (11th Cir. 2015) (citing *Corrugated*, 643 F.2d at 221).

The Court then made the following observation, which Home Depot seizes upon:

> [A]n 'identical factual predicate' cannot exist unless the defendant was engaged in the same offending conduct during the prior action. *See Kilgoar v. Colbert Cty. Bd. of Educ.*, 578 F.2d 1033, 1035 (5th Cir. 1978) ('Subsequent conduct, even if it is of the same nature as the conduct complained of in a prior lawsuit, may give rise to an entirely separate cause of action.').

*Id.* at 1326-27.

This passage must be read in the context of the facts of both *TVPX* and *Kilgoar*. In both cases, the claims alleged to be precluded by prior settlements were based on factual predicates that were patently different from the facts underlying the claims in the prior cases. In *Kilgoar* the plaintiffs were former teachers who brought successive suits alleging that the defendant school board had refused to rehire them for unconstitutional retaliatory reasons. The teachers' claims in the latter suit were predicated on the school board's allegedly retaliatory refusal to accept a newly-hired superintendent's recommendation that they be rehired. Because the superintendent was not hired until *after* the events giving rise to the claims in the prior suit, the earlier settlement obviously could not have a preclusive effect on the latter claims. Although the "claims [were] of the *same nature* as those alleged in the [prior] suit" (retaliatory refusal to hire), the latter claims were based on entirely *different facts* and thus asserted "an entirely separate cause of action." 578 F.2d at 1035 (emphasis added).

Similarly, this Court in *TVPX* rejected an insurance company's argument that claims asserted in a 2018 suit by a class of policyholders "were premised on a continuation of the same conduct at issue [in] the 2004 settlement" of a prior class action. 959 F.3d at 1321. The latter suit alleged that the insurance company breached the terms of its policies by failing to calculate its "cost of insurance" rates in accordance with mortality tables, an allegation that nowhere appeared in the operative complaint in the prior action. Because the record did not disclose whether the insurance company had "engaged in the same offending conduct during the ... [prior case's] class period," the Court remanded the case for discovery on that issue. *Id*. at 1326.

Both *TVPX* and *Kilgoar* are thus entirely consistent with the District Court's holding below: Defendants are protected by the Release from future claims challenging their "continued adherence" to pre-settlement conduct at issue here, but class members are not precluded from challenging "any new agreement or anticompetitive restraint" that the Blues may engage in after the Settlement. R.2931.54.[23] *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir.

---

[23] Home Depot takes comfort in this Court's observation that "the passage of time may evoke *change of circumstances which preclude* the creation of an estoppel." *Miller's Ale House, Inc. v. Boynton Carolina Ale House*, *LLC*, 702 F.3d 1312, 1319 (11th Cir. 2012) (emphasis in original). We agree, of course, that a change of circumstances can occur—indeed, can *only* occur—with the passage of time. But as the District Court held, only if a future "change of circumstances" involves the Blues' adopting a *new* anticompetitive restraint will class members be permitted to challenge it.

2011) (claims regarding future use of copyrighted works allowed under settlement "falls squarely within the factual predicate" underlying action, especially where complaint sought injunctive relief that "contemplate[d] these alleged future injuries"); *Berry*, 807 F.3d at 616 (rejecting argument that release of future claims challenging new product that settlement allowed defendant to develop fell outside identical factual predicate doctrine); *Melito v. Experian Mktg. Sol., Inc*., 923 F.3d 85, 95-96 (2d Cir. 2019).

      ii.    Home Depot next argues that the Supreme Court's unremarkable observation that "marketplace realities ... can change dramatically from year to year" means that "changes in surrounding market conditions, rather than changes in a defendant's conduct," may give rise to a claim that would not be barred by claim preclusion. HD44 (quoting *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp.*, 140 S. Ct. 1589, 1596 (2020)).

To begin, Home Depot's unsupported speculation about the possibility that hypothetical future "market conditions" might render some hypothetical future claim challenging the continuation of the Blues' pre-Settlement conduct so materially different as to defeat the defense of claim preclusion is no reason to reject, *ab initio*, the standard Release in this Settlement. The application of the Release to any such future claim is properly addressed if and when such a claim is made in a live controversy.

But even if one assumes that Home Depot's "market conditions" proposition is sound in the context of claim preclusion, it does not extend to the context of a class settlement expressly releasing future claims challenging the pre-settlement conduct at issue in the underlying case. Settlements of complex class actions would be few and far between if the protection of a release was dependent not only on the post-settlement conduct of the defendant, but also on external factors, like changing market conditions, entirely beyond the defendant's (or anyone's) control. No case even hints at such an untenable rule.

iii.    We note finally that the *res judicata* cases on which Home Depot relies are lethal to its public policy argument. For if the principles of *res judicata* independently apply to preclude a claim challenging a continuation of the same conduct at issue in a class action that settled, how can public policy prohibit a release negotiated by the parties to the settlement from doing the same thing?

b.    Home Depot makes much of the fact that the Release covers future claims that "relate[] in any way" to the factual predicates of and issues raised in this case.  HD43-44.  But such expansive language is standard in settlements of complex cases, as defendants seek to ensure that the release extends to the maximum extent permitted by law.[24]  And, again, this Court has made clear that the law allows

---

[24] *See Managed Care*, 756 F.3d at 1226 (releasing actions "by reason of, arising out of, or *in any way* related to any" matter referenced in settled litigation)

a release to reach "all matters between the class members and released parties 'aris-ing out of or *related to the litigation*.'" *Greco*, 635 F. App'x at 635 (citation omitted) (emphasis added).  Home Depot points to no decision invalidating a release based on its inclusion of such language.  That such commonplace language was used in this Settlement thus provides no occasion for its invalidation, especially considering the District Court's holding that the Release reaches only the Blues' "continued ad-herence" to challenged pre-settlement conduct, and not any "new" alleged anticom-petitive restraint "above and/or beyond" the practices at issue here.  R.2931:54.

        c.    Home Depot's attack on the Release's application to "mechanisms, rules, or regulations" approved by the Monitoring Committee fares no better.  HD45. The Settlement establishes a Monitoring Committee to provide additional, going-forward protections to the Subscriber Class.  An important feature of the Monitoring Committee's remit is to ensure that Defendants do not adopt new rules or arrange-ments that would have the effect of impairing or altering their agreed-upon procom-petitive structural reforms.  The Committee is charged with reviewing actions "adopting rules or regulations that are within the scope of Paragraphs 10-18," R.2610(2):37-38 (¶20); namely, actions taken to address matters relating to the

---

(emphasis added); *Thomas v. Blue Cross and Blue Shield Ass'n*, 594 F.3d 814, 817 (11th Cir. 2010); *TVPX*, 959 F.3d at 1326; *Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1282 (11th Cir. 2007); *In re Gen. Am. Life Ins. Co. Sales Prac. Litig.*, 357 F.3d 800, 803 (8th Cir. 2004); *In re Pet Foods Prod. Liability Litig.*, 629 F.3d 333, 339 (3d Cir. 2010).

Settlement's structural relief provisions. It is not empowered to approve, much less release or immunize from antitrust scrutiny, any new restraints, new arrangements, or future conduct that are outside the scope of those provisions. R.2931:53-54. Thus, only a claim relating to a rule, regulation, or action that is within the scope of Paragraphs 10-18 can be released. R.2610(2):38-39 (¶20(a)(iii)).

The Settlement also provides for the mediation and arbitration of disputes involving Monitoring Committee activities, and further provides that disputes on whether new rules are within the scope of the Release can by resolved by the District Court. *Id.* This provision, ignored by Home Depot, provides further assurance that the Release will not reach conduct other than "continued adherence to the existing arrangements," R.2931:56, notwithstanding Home Depot's unsupported speculation about what the Monitoring Committee may do in the future. *See* R.2931:56 n.22 ("Whether any particular claim has an identical factual predicate and/or falls within the scope of the release is of course merely hypothetical, and currently unanswerable …. If the court is presented with such a claim, it will be in a position to make an appropriate determination.").

*** 

Home Depot concludes its public policy argument with this cheap shot: "The Subscriber representatives may be content to allow the Blues' ongoing restraints to continue indefinitely with no determination whether they unreasonably suppress

64

competition. But forcing the entire class of Blue subscribers to do so—forever—violates legislative policy." HD53-54. It was Home Depot, a Fortune 50 company, that for decades was content to suffer the Blues' ongoing restraints in supine silence. And then for almost another decade, Home Depot was content to watch, again silently, from its lounge chair as the Subscriber representatives it disparages committed enormous amounts of their time, financial resources, and expertise to challenging the Blues' restraints in this massive multidistrict litigation. Now, after years of "extraordinarily complex, protracted, and hard-fought" litigation, R.2931:2, Home Depot breaks its silence to object that "public policy" required Subscriber representatives to go for broke, to continue to expend their time, resources, and expertise to litigate to final judgment the class's equitable claims, no matter how risky, how costly, or how prolonged, because the Subscriber representatives were forbidden to release *any* of the class's equitable claims against *any* of the Blues' challenged conduct on *any* terms short of total capitulation by the Blues.

That is not the law.

## B.    The Subscriber Class Was Adequately Represented.

After devoting ninety percent of its brief to its meritless public policy attack on the Release, Home Depot closes with the equally meritless argument that the District Court abused its discretion in finding that the interests of the Subscriber Class—specifically, the interests of the (b)(2) Injunctive Relief Class—were

adequately and fairly represented by the Subscriber Class's named representatives and counsel, as required by Rule 23(a)(4) and due process. HD54-60.[25]  Quoting this Court's decision in *Valley Drug Co. v. Geneva Pharmaceuticals*, 350 F.3d 1181, 1189 (11th Cir. 2003), Home Depot says that the Class's representation was inadequate because "'substantial conflicts of interest exist between the representatives and the class.'"  HD55. Yet it offers no facts, or even a theory, as to just what those conflicts might be.  Rather, the (b)(2) class's representation, according to Home Depot, was inadequate *per se*—inadequate *as a matter of law*—because "the same named plaintiffs and counsel represented both the Rule 23(b)(2) and (b)(3) classes." HD54.  Rule 23(a)(4) required, it argues, that the (b)(2) class be separately represented by a subscriber and counsel "who [were] not also financially interested in the 23(b)(3) class." HD22. Like its categorical public policy rule, Home Depot's categorical inadequacy of representation rule is not the law.

1.    The District Court bifurcated the Subscriber Class, certifying a (b)(2) "Injunctive Relief Class" and a (b)(3) "Damages Class." R.2931:81-82. The membership of the (b)(2) and (b)(3) classes is virtually identical; both are defined essentially to include individuals or groups, including ASOs like Home Depot, that contracted with the Blues during class periods that ended in October 2020.  R.2931:81-

---

[25] Home Depot does not suggest that due process principles and Rule 23(a)(4) operate differently with respect to this question, and it bases its argument on decisions applying Rule 23(a)(4).  We will do the same.

82.[26]  As the District Court found in determining that the Subscriber Class was adequately represented, "Subscriber Class representatives here 'share the same interests as absent class members, assert claims stemming from the same event[, which] are the same or substantially similar to the rest of the class, and share the same types of alleged injuries as the rest of the class.'" R.2931:30 (citations omitted). Home Depot does not dispute these findings. Thus, Home Depot's insistence on separate (b)(2) class representatives makes no sense. There is no subscriber who could represent the interests only of the (b)(2) class who does not also have an interest in the recovery obtained through the (b)(3) class.

2.    Home Depot derives its categorical inadequacy rule primarily from this Court's decision in *Valley Drug* and the Second Circuit's decision in *Payment Card*. Neither case remotely supports such a categorical rule.

The *Valley Drug* plaintiffs brought an antitrust action challenging allegedly collusive agreements that settled patent litigation between the manufacturer

---

[26] The only difference between the classes is that nonmember beneficiaries of group plans (*i.e.*, dependents of covered employees) are included in the (b)(2) class but not the (b)(3) class. R.2610(2):10-11(¶1.v); 9(¶1.pp); *see* R.2931:81-82. By definition, therefore, all of the (b)(2) class members also have an interest in maximizing the monetary relief provided to the (b)(3) class, either directly, as purchasers of one of Defendants' plans during the class periods, or derivatively, as dependent family members or other beneficiaries under such a plan. Indeed, defining the (b)(2) class to include only those who had actually suffered antitrust injury as a result of the challenged conduct ensured that the members of the (b)(2) class would have antitrust standing to seek injunctive relief. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 112 (1986).

(defendant Abbott Laboratories) of a patented brand-name drug (Hytrin) and two generic drug manufacturers. The named plaintiffs, Valley Drug and another regional drug wholesaler, argued that the settlements unlawfully extended Abbott's monopoly on Hytrin sales, causing the class economic injury. The district court certified a class consisting of "all entities who purchased Hytrin … directly from Abbott" during the period in which the settlements kept competing generic drugs off the market. 350 F.3d at 1186. The question before this Court was whether the district court abused its discretion in refusing to allow defendants to take "discovery on the important issue of whether some class members [had] separate, antagonistic interests from the named representatives." *Id.* at 1187.

In reversing the district court, this Court first noted the settled rule that "minor conflicts alone" will not disqualify a named plaintiff as an adequate class representative under Rule 23(a)(4).  *Id.* at 1189. Rather, "the conflict must be a '*fundamental*' one going to the specific issues in controversy." *Id*. (emphasis added). And "a fundamental conflict exists where some party members claim to have been *harmed* by the same conduct that *benefited* other members of the class." *Id*. (emphasis added). Accordingly, Rule 23(a)(4) "preclude[s] class certification where the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class members." *Id*. at 1190.

The record before this Court contained persuasive evidence that national drug

wholesalers, which accounted for over half of the class's total claims, appeared to have "experienced a net *gain* from the absence of generic drugs in the market" for Hytrin. *Id.* (emphasis added). Because it was "highly likely under such circumstances that the economic interests of these putative class members would be substantially in conflict with the interests of the [*regional* drug wholesaler] named representatives," the district court should have permitted discovery into the "potentially antagonistic" interests of the *national* wholesalers and their putative representatives. *Id.* at 1193-1195. The Court was careful to note, however, that if such discovery showed that "no fundamental conflict actually exists" because the national wholesalers also suffered a loss, then the named plaintiffs may well be able to "meet their burden ... under Rule 23(a)(4)." *Id.* at 1192.

The principles at work in *Valley Drug* were reaffirmed by this Court in two recent cases. *Equifax*, 999 F.3d at 1275, involved a settlement of class claims of 147 million consumers whose private personal information was accessed as a result of a massive data breach. An objector contended that the district court abused its discretion in certifying a single class, arguing that the class representatives could not adequately represent the entire class because some class members had state statutory damages claims and some did not. This Court affirmed the finding that unitary representation of the class was adequate. Given that the claims of all plaintiffs "arise out of the same unifying event," that "all plaintiffs seek redress for the same injury,"

and that the data breach "harmed all class members and made none better off," the difference in class members' state law claims did not rise to the level of "a 'fundamental' conflict" warranting separate subclasses and counsel. *Id.* at 1275-76 (quoting *Valley Drug*, 350 F. 3d at 1189). *See Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000).

Likewise, in *In re Checking Account Overdraft Litig.*, 2022 WL 472057, *3 (11th Cir. Feb. 16, 2022), this Court rejected an objection to certification of a single class of bank customers whose damages claims for excess overdraft fees varied in value because the claims of a large majority, but not all, were subject to contractual provisions requiring individualized arbitration. The Court held that because the difference in value of the claims was uncertain and speculative, "it's not clear that the proposed subclasses have a fundamental conflict related to the specific issues in controversy." *Id.* at *4. Accordingly, the district court did not abuse its discretion in "find[ing] dispositive the fact that the plaintiffs were all injured in the same way by the same conduct and had an overriding shared interest in obtaining the largest cash settlement possible." *Id.* at *5.

3. The lessons of this Court's decisions applying Rule 23(a)(4) are clear: for a conflict to disqualify a class representative and counsel, it must be based on differences in economic interests between the named class representatives and absent class members that are (1) *concrete and real*, not uncertain and speculative, and

(2) so clear and substantial that the conflict can fairly be characterized as "funda-mental ... to the specific issues in controversy." *Valley Drug*, 350 F.3d at 1189. And the existence of a disqualifying fundamental conflict cannot be found in a class whose members "were all injured in the same way by the same conduct" and thus have a shared interest in maximizing the remedies, both equitable and monetary.[27] Finally, if there is a solid evidentiary basis for concern that such a conflict is lurking within the proposed class, the district court has a duty to examine any such "potential conflict" to ensure that it either does not exist or is too minor to warrant the compli-cations inherent in certifying separate subclasses and representatives.[28]

Home Depot's categorical inadequacy argument satisfies *none* of these stand-ards for showing a fundamental conflict, or even the potential for such a conflict. It does not offer even a speculative and uncertain basis for concern that the interests of the (b)(2) class members collide with those of the Subscriber Class's representatives

---

[27] *See Pet Foods*, 629 F.3d at 347 (rejecting inadequate representation argu-ment based on differences in allocation percentages where "[m]any class members are members of both allocation groups"); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009). *Cf. In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 976 (8th Cir. 2018); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 111 (2d Cir. 2005).

[28] *See Int'l Union v. Gen. Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007) ("[I]f every distinction drawn (or not drawn) by a settlement required a new subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk fragmenting the class beyond repair."); *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005) (discussing drawbacks of excessive subclassing). *Cf. Equifax*, 999 F.3d at 1277 n.21.

and counsel. It seeks rather the prophylactic disqualification of the Subscriber Class representatives and counsel to protect against the supposedly "intolerable" and "unacceptable" risk of conflicts that, it says, are inherent in the Subscriber Class, despite the District Court's undisputed findings that all class members, including named representatives, assert the same claims, seeking the same types of relief, from the same types of injuries, caused by the same anticompetitive conduct.  R.2931:30. In demanding that the (b)(2) class be separately represented by a subscriber "who was not also financially interested in the 23(b)(3) class," HD22, Home Depot is asking for something that does not exist, for there is no such subscriber. *See* note 26, *supra*. In short, this Court's cases provide no support for Home Depot's argument against unitary representation of the (b)(2) and (b)(3) classes.

Which brings us to the out-of-circuit case on which Home Depot relies, heavily: *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 827 F.3d 223 (2d Cir. 2016). Like this case, *Payment Card* involved an antitrust settlement with two settlement classes, a (b)(2) class and a (b)(3) class. That is where any resemblance between *Payment Card* and this case ends.

Plaintiffs in *Payment Card* were retail merchants who brought a Sherman Act action alleging that the defendants established certain "network rules" that resulted in supracompetitive rates for "interchange fees" charged to merchants for credit card purchases. The district court approved a settlement that bifurcated the plaintiff

merchants along remedial and temporal lines: The (b)(3) class included merchants who accepted Visa and MasterCard during a six-year period ending in November 2012, but who either were no longer in business, no longer accepted the cards, or had declining credit card sales. They would be eligible to receive a share of $7.25 billion in monetary relief. The (b)(2) class was largely merchants who began accepting, or will in the future accept, Visa or MasterCard *after* November 2012.  They "would get injunctive relief in the form of changes to ... network rules" until the relief expired in July 2021. *Id*. at 229. In return, all class members released their claims against the defendants, perpetually, for continuation of the challenged conduct.

The Second Circuit held that there were conflicts between members of the (b)(2) and (b)(3) classes that "were glaring as to matters of fundamental importance," rendering unitary representation of the class inadequate.  Merchants in the (b)(3) class, who were "pursuing *solely* monetary relief, ... would want to maximize cash compensation for past harm," while merchants in the (b)(2) class, who were "seeking *only* injunctive relief ... would want to maximize restraints on network rules to prevent harm in the future." *Id*. at 233 (emphasis added). Even within the (b)(2) class, there were clear conflicts. "[V]ast numbers of [(b)(2)] class members" derived no benefit at all from the settlement's primary injunctive relief—the ability to surcharge customers who use Visa or MasterCard—either because the merchant

operated in a state where such surcharges were unlawful or because surcharging was not a commercially viable option. *Id*. at 238. And the (b)(2) class's injunctive relief was short-lived; it expired in July 2021, leaving members of the (b)(2) class that came into existence after that date with literally *no relief* at all (although they were bound by the release).

As the court noted: "Unitary representation of separate classes that claim distinct, competing, and conflicting relief create unacceptable incentives for counsel to trade benefits to one class for benefits to the other in order somehow to reach a settlement." *Id*. at 234. The court left no doubt that it thought counsel had succumbed to these "unacceptable incentives," and that the district court should have required separate representation for the (b)(2) class. *See id.* at 234; *id*. at 241 (Leval, J., concurring).

The conflicts of interest between the (b)(2) and (b)(3) classes in *Payment Card* were indisputably concrete, real, numerous, and "glaring as to matters of fundamental importance." *Id.* at 233. The classes were defined by different time periods, had little overlap in membership, and sought "distinct, competing, and conflicting relief"—a recipe for inadequate unitary representation. Nothing in the decision, however, suggests that such conflicts are to be *presumed as a matter of law* whenever a class seeks both injunctive and monetary relief. Nor does it suggest that unitary representation must be deemed *per se* inadequate for (b)(2) and (b)(3) classes in all

cases, to safeguard against phantom conflicts for which there is not a wisp of evidence. Again, here the membership of the (b)(2) and (b)(3) classes is essentially unitary, and both classes seek and will benefit from the same relief, to remedy the same injury, caused by the same wrongdoing. There is no conflict in their interests, let alone one that is fundamental to the issues in the case.

Home Depot finally contends that the failure to require representation by an injunctive-relief-only subscriber—again, a mythical creature—"presents an unacceptable risk of trading off the interests of (b)(2) class members *and the public* in market-wide injunctive relief in exchange for dollars." HD59 (emphasis in original). But in the real world of this actual case, Judge Proctor found that "[a]s significant as the monetary amount of $2.67 billion is, *the truly exceptional aspect of this settlement is the structural relief agreed upon*." R.2931:40 (emphasis added). And even if the public interest in obtaining market-wide injunctive relief had not been fully advanced by the Settlement (and it was), the fact remains that governmental entities, including the Department of Justice, the Federal Trade Commission, and the State Attorneys General, are excluded from the (b)(2) class definition and retain their right to pursue the interests of the public.

## II.    TOPOGRAPHIC'S APPEAL IS MERITLESS.

From February 2012 to October 2020, the only class representatives in this case were Fully Insureds, and the only classes they sought to have certified were

classes of Fully Insureds.  Although the case had been pending for almost a decade, and although Defendants' self-insured customers included most of the largest and wealthiest corporations in the country, not a single self-insured customer came forward to bring a claim on behalf of itself or any other self-insured entities.  In order to reach a settlement, however, Defendants insisted that all of their self-insured customers be added to the case and included in the list of entities providing a release.  Accordingly, a separate representative and counsel were identified and recruited to represent the interests of the Self-Funded Sub-Class in allocation negotiations.

The Settlement includes meaningful structural relief for the Self-Funded Sub-Class in the form of, *inter alia*, the SBB provisions discussed above.  In addition, Self-Funded Settlement Counsel negotiated at arm's length with Subscriber Settlement Counsel for an allocation of the Settlement Fund to be paid to the Self-Funded Sub-Class.

Virtually the entire Self-Funded Sub-Class has accepted as fair and reasonable the 6.5% allocation negotiated by its representative and counsel.  Almost 170,000 self-funded entities are members of the subclass, all of whom received notice of both the settlement and the 6.5% allocation.  R.2914(1):4(¶14).  These subclass members include some of the largest, most sophisticated, and well-resourced companies in the country.  Yet only three members of the subclass objected to the allocation, and only the two Topographic appellants have appealed its approval.

Topographic's assessment of the fairness of the allocation is thus an extreme outlier. But it is worse than that. Topographic accuses the class representatives and counsel who negotiated the allocation on behalf of the subclasses of "sell[ing] out the Self-Funded Sub-Class," in a coordinated breach of their fiduciary and ethical obligations. Topographic21. Topographic even charges that the District Court, too, breached "its fiduciary obligation to prevent sellout of the subclass," by failing to "apply[] 'careful judicial scrutiny' and ... approv[ing] the allocation based on no evidence and erroneous factual findings." Topographic32. And although Topographic does not accuse them directly, Special Master Gentle and Mediator Feinberg presumably were also in on the "sellout," given their important roles in facilitating the negotiations and mediating the allocation decision, respectively.

Topographic bases these false charges on the argument that the District Court was wrong to approve an allocation based on a comparison of (a) the premiums paid to Defendants by Fully Insureds with (b) the ASO fees and other amounts paid to Defendants by self-insureds. It argues that a large portion of the premiums paid to Defendants by Fully Insureds is used by Defendants to pay healthcare provider costs, and these amounts should be excluded from any comparison; alternatively, it argues that the money paid to providers by the Self-Funded Sub-Class should be included in any comparison.

Topographic is wrong. In an antitrust case alleging an overcharge, the starting

point for the overcharge analysis is the total amount paid by the plaintiffs to the defendants, making the above comparison relevant.[29]  Nevertheless, the record shows that the allocation was *not* principally based on just this comparison.  If it had been, the allocation to the Self-Funded Sub-Class would have been much smaller.  The premiums paid to Defendants by Fully Insureds during the damages period available to such customers totaled $1.9 trillion.  R.2825(1):15 (¶39).  By contrast, the payments made to Defendants by the Self-Funded Sub-Class during the damages period available to those customers was only $67 billion.  *Id.*  Thus, an allocation that looked only at the comparison to which Topographic objects would have allocated 3.4% to the Self-Funded Sub-Class, rather than 6.5%.[30]

As shown below, the District Court was presented with numerous different metrics that would have resulted in allocations to the Self-Funded Sub-Class ranging from 1.7% to just under 10.7%.  R.2931:37-38.  Any fair analysis must look at the different levels of profitability between the fully insured and self-insured lines of business.  That analysis shows Defendants generated far higher profits from the fully insured business than from the self-insured business, which often generated little to

---

[29]  IIA Phillip E. Areeda, *et al.*, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶392a (4th ed. 2015) ("Areeda") ("usual measure of damage is the difference between the illegal price that was actually charged and the price that would have been charged 'but for' the violation").

[30]  $1.9 trillion + $67 billion = $1.967 trillion, of which $1.9 trillion is 96.4% and $67 billion is 3.4%.

no profit at all.[31]  Those higher profits from the fully insured business reflect the fact that Defendants typically have enjoyed much higher market share in that business. Thus, the Fully Insureds' claims of antitrust injury caused by Defendants' anticompetitive activity are much stronger than those of the Self-Funded Sub-Class. R.2825(1):9-12(¶¶20-30).  That difference is critical: the 2018 amendments to Rule 23(e)(2)(D) make clear that treating class members "equitably relative to each other" involves taking "appropriate account of differences among their claims."  FED. R. CIV. P. 23, advisory committee's note to 2018 amendment.

Topographic's appeal directly contradicts this principle.  It is based on the premise that there is no difference between the self-insured and fully insured markets, and thus no difference in the relative strength of the antitrust claims held by self-insured and fully insured customers.  As the District Court found, that premise is false, R.2931:58, and Topographic presented no evidence supporting it.  To the contrary, Topographic presented an expert who, having prepared a 28-page report advocating an allocation of 50% or more to the Self-Funded Sub-Class, admitted he thought the relative amount of any overcharges paid by self-insureds versus those paid by fully insureds was *irrelevant* to the allocation question:

> Q.  Sir, do you believe that the allocation of damages should be based on the relative amounts of overcharges

---

[31]  R.2931:58; R.2868(1):3-4; R.2868(2):3; R.2812(12):2-3; R.2812(11):2-3; R.2868(3):4; R.2868(4):7; R.2868(5):6; R.2812(10):3; R.2868(6):3; R.2868(7):3-5.

that the two groups of customers paid?

A. No.

R.2865:258.

This tells the Court all it needs to know about Topographic's appeal.

### A.    The District Court's Approval Of The Allocation Plan Is Reviewed Under The Abuse Of Discretion Standard.

Rule 23(e)(2)(D) provides that a proposed class settlement that binds class members must be "fair, reasonable, and adequate after considering whether … the proposal treats class members equitably relative to each other." As noted, this determination calls upon the court to take "appropriate account of differences among [class member] claims." FED. R. CIV. P. 23, advisory committee's note to 2018 amendment.  Precedent makes clear that negotiated plans of allocation need not be perfect, nor the best conceivable allocation, nor even the same allocation the court would have ordered if the issue had been litigated to judgment.  An allocation need only be "rationally based on legitimate considerations." *Holmes*, 706 F.2d at 1148; *see also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 328 (3d Cir. 2011) (en banc).

District courts have "broad supervisory powers" to "allocate the proceeds among the claiming class members," *Sullivan*, 667 F.3d at 328 (internal quotations and citations omitted); *In re Holocaust Victim Assets Litig.,* 424 F.3d 132, 146 (2d Cir. 2005); *In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 133 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  That is because the review of a POD is "intensely

80

fact-based," particularly where the court is faced with "competing expert opinions on the proper way to determine and allocate damages." *In re Cendant Corp. Litig.*, 264 F.3d 201, 253-54 (3d Cir. 2001).

Given this standard's flexibility, approvals of PODs are reviewed for abuse of discretion. *Chicken Antitrust*, 669 F.2d at 241; *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 866 (7th Cir. 2014); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284 (9th Cir. 1992).

Appellate review should be particularly deferential when, as here, allocation negotiations were conducted by separate subclasses with separate counsel and class representatives. "[S]ubclassing can resolve conflicts of interest that might prevent representative plaintiffs from adequately representing the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 189-90 (3d Cir. 2012). Moreover, "absent fraud, collusion, or the like," *Cotton*, 559 F.2d at 1330, the "trial judge 'should be hesitant to substitute its own judgment for that of counsel.'" *Equifax,* 999 F.3d at 1274 (citations omitted); *see Wal-Mart*, 396 F.3d at 116).

## B.     The District Court Did Not Abuse Its Discretion In Approving The ASO Allocation.

Topographic argues that this Court's decision in *Holmes*, 706 F.2d 1144, imposes a more stringent standard for approving allocation plans that benefit subclasses differently, and also argues there were "suspicious circumstances" here that triggered this standard. Topographic is wrong on both points.

### 1. *Holmes* Does Not Support Application of a Stricter Legal Standard than That Set Forth in Rule 23(e)(2)(D).

Topographic argues that *Holmes* mandates a heightened "careful scrutiny" standard when an allocation is "facially unfair," which Topographic claims is the case whenever it "benefits different sub-sections of the class unequally." Topographic27. But *Holmes* did not purport to set forth a standard that differs from the rational basis review employed in every decision by this Circuit and by every other Circuit—let alone a rule that would require application of a hitherto unknown standard called "careful scrutiny" any time an allocation gives different relief to different subclasses. *Holmes*, 706 F.2d at 1148 (allocations must be "rationally based on legitimate considerations.").

Instead, in the language Topographic lifts from *Holmes*, this Court observed that "[a]lthough there is *no rule that settlements benefit all class members equally*, ... a disparate distribution favoring the *named plaintiffs* requires careful judicial scrutiny into whether the settlement allocation is fair to the absent members of the class." *Id.* (emphasis added); *see also id.* at 1147 ("careful scrutiny" is "necessary to guard against settlements that may benefit the *class representatives* or their attorneys at the expense of absent class members."). That observation recognized that an allocation favoring named plaintiffs over absent class members should not be rubber-stamped. In subsequent citations to *Holmes*, this Court has never suggested that it mandates the elaborate burden-shifting framework Topographic

82

advocates.  Topographic27.[32]

Factually, *Holmes* bears no resemblance to this case.  In *Holmes,* the eight named plaintiffs took over 50% of the damages, leaving the other half to the remaining 118 class members.  Yet unitary class counsel failed to introduce *any* evidence to support that "facially unfair" allocation.  706 F.2d at 1149-50 & n.5.  Here, the class representatives recover the same as their other class members.  And here, unlike *Holmes*, the Self-Funded Sub-Class was separately represented by counsel and a class-representative designee (Hibbett) in arm's-length allocation negotiations.  Further, unlike *Holmes*, ample evidence was presented to the District Court supporting the allocation.

Contrary to Topographic's argument, the rational basis standard for reviewing a POD does not change when different amounts are distributed to different subclasses.  Unequal does not mean inequitable.  Indeed, unequal is often necessary to

---

[32] *See Equifax*, 999 F.3d at 1265; *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1178 (11th Cir. 2019); *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011); *In re CP Ships Ltd. Sec. Litig.*, 578 F.3d 1306, 1311 (11th Cir. 2009); *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1360 (11th Cir. 2009); *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1344-45 (11th Cir. 2006); *Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001); *Reynolds v. Roberts*, 207 F.3d 1288, 1301 n.24 (11th Cir. 2000); *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1239-40 (11th Cir. 2000); *Leverso v. SouthTrust Bank of Ala., N.A.*, 18 F.3d 1527, 1530 (11th Cir. 1994); *Guthrie v. Evans*, 815 F.2d 626, 627 (11th Cir. 1987); *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1554 (11th Cir. 1986); *Howard v. McLucas*, 782 F.2d 956, 961 (11th Cir. 1986); *Piambino v. Bailey*, 757 F.2d 1112, 1139 n.68 (11th Cir. 1985).

ensure equitable. "It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008). "Courts generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable ...." *Sullivan*, 667 F.3d at 328 (citation omitted).

### 2. Topographic's Claims of "Suspicious Circumstances" Are Meritless and Contradict Their Admission Below.

Topographic's baseless assertion of "suspicious circumstances" flatly contradicts what it told the District Court at the Fairness Hearing—as shown in this colloquy with Topographic's counsel:

> MR. RICHIE: … –[T]here are both procedural and substantive components to treating the subclasses equitably. And so showing that a settlement is fair, reasonable, and adequate. And there's another element to that, which is not the product of collusion. *I certainly don't think this is a collusive settlement*, but we don't have the --
>
> THE COURT: There's no indication at all --
>
> MR. RICHIE: No, no. There's not.
>
> THE COURT: -- in any area code of the United States that this is a collusive settlement.
>
> MR. RICHIE: No, no, no. I want to be clear on that up front.

R.2865:152-153 (emphasis added).

Further, the record demonstrates that extensive, adversarial, arm's length

negotiations led to the allocation, and no one was "sold out" during the process. The esteemed mediator, Kenneth Feinberg, described the mediation process, attesting:

> [B]ased on expert analysis and evidence produced in the litigation, both side presented estimates of appropriate allocations … R.2610(8):6 (¶12 and n.4);
>
> [T]he negotiated number falls towards the low end of Self-Funded Sub-Class Settlement Counsel's estimate, and the high end of Settlement Class Counsel's estimate ... one would expect an outcome in that range. R.2610(8):6-7 (¶14);
>
> The relative size of the Self-Funded Claimants' share makes sense given the statute of limitations and premiums vs. administrative fees issues… *Id.*;
>
> The fact that the division resulted from protracted negotiations between sophisticated counsel also supports its reasonableness. *Id.*

Mr. Feinberg further attested that the Self-Funded Subclass Settlement Counsel were "independent, tenacious advocates for the Self-Funded Sub-Class who negotiated at arm's-length." R.2610(8):5-6 (¶11). Prior to the mediation, they retained Dr. Mason, a respected antitrust economist who is a chaired professor at LSU, and a fellow at the Wharton School at the University of Pennsylvania, to analyze what would be an appropriate allocation to the Self-Funded Sub-class. R.2610(7):3-5 (¶¶3-12); R.2865:124; R.2812(19):185. Fully Insureds asked the same of their damages expert, Dr. Pakes. R.2610(8):6 (¶12 n.4).

Topographic accuses Dr. Pakes of "circular analysis" because his declaration adopts the 6.5% compromise achieved at mediation. Topographic35. That

declaration's purpose was to provide estimates of potential recoveries, not to explain the work done at the mediation.  Mr. Feinberg's declaration describes the work Dr. Pakes did for the mediation, and it was not circular:

> Settlement Class Counsel's original estimates were based on work performed by Dr. Ariel Pakes of Harvard University. Dr. Pakes' valuation estimates the ratio between the investment returns (in excess of a competitive return) of (a) the Blues' fully-insured business, and (b) their self-funded business. That ratio demonstrates that only 3.4% of the Settlement proceeds should be assigned to the Self-Funded Sub-Class.  Dr. Pakes then subjected his work to a 'robustness analysis' which indicates that – even making assumptions highly unfavorable to the fully-insured claimants—the shares fairly allocable to the self-funded plans would increase only to 6.8%, in line with the Settlement's negotiated amount.

R.2610(8):6 (¶12 n.4).

The allocation question "was a dispute that stretched over a period" of several months. *See* R.2865:124 (Mr. Burns: "it truly was a dispute. … I will tell you the parties were pretty far apart at the beginning and that it was only through multiple discussions, formal mediation, and back-channel communications with the mediator, Mr. Feinberg, that we were ultimately able to resolve it."; R.2865:139 (Mr. Boies' description of negotiation as "arm's length negotiations and aided by a very effective mediator").

The subclasses arrived at the allocation only after "presenting estimates" "based on expert analysis and evidence produced in the litigation," "after several

months of negotiations" and after Mediator Feinberg probed each class about "the factors that either supported or undermined their respective positions, including considerations relating to potential statute of limitations issues and the relative size of the administrative fees paid by Self-Funded Claimants vs. the premiums paid by [Fully Insured] Claimants." R.2610(8):6 (¶¶12-13).

Special Master Gentle also attested that both "Settlement Class Counsel and Self-Funded Sub-Class Settlement Counsel made able use of the economic analyses provided by their experts, took account of the full range of the potential claims that were held by members of the class when negotiating, and aggressively advocated" for class members "in order to maximize the relief obtained for the class." R.2610(12):13-14 (¶¶35-37). *See* R.2610(12):2-3 ("hard-fought, arms-length negotiations" led to the Settlement).

These circumstances were neither suspicious nor collusive.

### C.    There Are Material Differences Between Self-Insured And Fully Insured Markets.

Underlying all of Topographic's arguments is the false assertion that there is no material difference between the Fully Insureds and the Self-Funded Sub-Class. There are enormous differences. As the District Court correctly found: "the ASO market is significantly more competitive than its counterparts." R.2931:37. Because of the "differences in the markets," the Fully Insured Claimants "suffered a much greater antitrust injury" than the Self-Funded Sub-Class. R.2931:58. These

differences may explain why not one of the Blues' 170,000 self-funded customers brought a claim in this case during the eight years it was pending prior to the Settlement.

This Court should therefore reject Topographic's effort to equate the self-insured and fully insured markets. Defendants' internal documents show the fully insured business was anywhere from four to ten times more profitable than the self-funded business. R.2868(1):3-4 (BCBS-CA report predicting profits for fully insured business and losses for ASOs and stating "in an environment where corporate g&a is not driven by membership volume a fully insured member is worth 10 times a self funded member"); R.2812(11):2-3 (report estimating that, for the industry as a whole, fully insured business produced four times the profit that self-insured business did); R.2868(2):3 (Anthem Report: "Fully Insured business provides nearly 6 times as much Operating Gain PMPM as ASO."); R.2812(12):2-3 (report showing that fully insured line was more profitable than ASO by more than 4.25 to 1).

Other evidence showed that the self-funded business was often not profitable at all, and could instead be a loss leader or break-even line of business. R.2868(3):4 ("The Congressional Research Service reported that commercial ASO contracts are break-even deals on average ...."); R.2868(4):7 (2016 Anthem 10-K describing ASO as business with "lower margins" that had the potential to materially and adversely impact the company's profits if more business moved from fully insured to self-

insured); R.2868(5):6 (report noting that "many Plans have opted to set prices such that the self-funded business makes some contribution to overhead, but does not fully cover fixed costs."); R.2812(10):3 (report noting that administering networks "is a low margin business. Traditional functions such as claims and enrollment administration will generate very little profit or become loss leaders"); R.2868(6):3 (report describing market-based approach to setting ASO fees "which does not cover all our costs."); R.2868(7):3-5 (report that self-funded business was "not profitable", whereas fully insured business is "profitable" and is a "[m]ajor sweet spot for underwriting").  Topographic's actuarial expert testified that he was aware of the evidence showing this difference in profitability, but never investigated it.  R.2865:250-253, and 255-257.

There is a reason large companies choose to self-insure: it is a cheaper way to provide health insurance to employees than buying traditional, fully insured plans. That is why more large companies make this choice each year, as Topographic admits.  Topographic7.

Thus, the central premise underlying Topographic's appeal is false.  This falsity was on full display at the Fairness Hearing.  Topographic's expert presented a report seeking to justify an allocation to self-insured customers of 50% or more. R.2812(19):118, 144-45.  But when asked whether he believed "that the allocation of damages should be based on the relative amounts of overcharges that the two

groups of customers paid," he said "No."  R.2865:258. He likewise admitted he made no effort to calculate any overcharges by either fully insured or self-insured customers.  R.2865:249.

The District Court acted within its discretion in overruling Topographic's objection.  As the court explained: "Overcharges are what this case is about." R.2931:58.  The fact that Defendants' fully insured business was far more profitable than their self-insured business means that fully insured customers had stronger claims that Defendants' anticompetitive conduct was causing them to pay overcharges.  Faced with these facts and competing expert opinions, the District Court had ample discretion to accept the negotiated allocation.  *Cendant*, 264 F.3d at 254.

## D.     The District Court Properly Approved The Allocation Based On Adequate Evidence and Correct Findings.

Whether it applies Topographic's fabricated "careful scrutiny" standard or Rule 23(e)(2)'s "fair, reasonable and adequate" standard, this Court should affirm the District Court's approval of the allocation.  The District Court's decision was based upon careful review of the substantial evidence supporting the allocation between Fully Insureds and the Self-Funded Sub-Class.  R.2931:35-38; R.2931:56-61. It also discusses the extensive process and arm's-length negotiations that led to this allocation.  R.2931:4-5, 17-21.  Both the process and the evidence relied on by the District Court fully support its decision.

The District Court found a number of facts supporting the allocation:

- "[N]ot a single Self-Funded Account sought to file suit during the eight years between the *Cerven* complaint and the settlement." R.2931:61, n.25.

- "Because ASOs did not become involved in the lawsuit until late 2019, they did not face the same litigation expenses, burdens, and perils as the rest of the Class." R.2931:59.

- "For some Blues, fully insured business runs anywhere from as much as four to ten times more profitable than ASO business." R.2931:37, 58 (citing evidence found at R.2868(1):3-4; R.2868(2):3; R.2812(12):2-3; and R.2812(11):2).

- "For some Blues, ASO business may in fact be break-even or even a loss leader." R.2931:58 (citing evidence found at R.2868(3):4; R.2868(4):7; R.2868(5):6; R.2812(10):3; R.2868(6):3 and R.2868(7):3-5).

- "Because of the availability of substitute products … the ASO market is significantly more competitive than its counterparts." R.2931:37 (citing evidence found at R.2865:41-44).

- "The differences in the markets -- along with the differences in Class Periods -- mean that the Fully Insured Claimants suffered a much greater antitrust injury." R.2931:58.

- "The economic reasonableness of the allocation was confirmed by Dr. Mason, an experienced antitrust economist." R.2931:57.

- "Dr. Mason utilized four proxies to analyze the reasonableness of the allocation," and those proxies yielded four possible allocations, ranging from 1.7% to less than 10.7%. R.2931:57-59.

- "In their argument, [Topographic] targeted only the first of those four proxies." R.2931:57.

- The other three proxies yielded allocations of (a) "<10.7%," *id.* at 58, (b) "<3.9% – 6.3%," *id.* at 59, and (c) "3.4-3.8%." *Id.*

- "These unchallenged proxies support a finding that a 6.5% allocation for the Self-Funded Class is fair, adequate, and reasonable." R.2931:59.

In light of these findings and the ample, clearly-cited evidence supporting them, Topographic's startling charge that the District Court abetted the "sellout of the subclass" by "approv[ing] the allocation based on no evidence," Topographic32, is appalling. Topographic points to the preliminary approval decision, where the Court relied on declarations submitted by Mr. Feinberg, Subscriber Settlement Counsel, and Self-Funded Sub-Class Settlement Counsel. Topographic33. Citing *Holmes*, Topographic claims these declarations were an "insufficient basis" for approval. But as shown above, *Holmes* dealt with the final approval of a settlement where class representatives were receiving far more than absent class members without any evidentiary support at all. It has no application here. The sworn declarations from Mr. Feinberg, a well-respected and neutral mediator, Special Master Gentle, and counsel for both sides of an extensive, arm's-length negotiation, were a more than sufficient basis to grant preliminary approval. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015); *Ferron v. Kraft Heinz Foods Co.*, 2021 WL 1617911, at *4 (S.D. Fla. Jan. 19, 2021); 4 NEWBERG ON CLASS ACTIONS

92

§ 13.13 (6th ed. 2022).

In any event, ample additional evidence was presented to and considered by the Court for final approval that further supported the allocation's reasonableness. *See* R.2931:35-38; R.2931:56-61 (citing record evidence); R.2825(1) (Mason report); R.2825(1)(Exs.1-7) (Mason exhibits); R.2868(1):3-4; R.2868(2):3; R.2812(12):3; R.2812(11):2-3; R.2868(3):4; R.2868(4):7; R.2868(5):6; R.2812(10):3; R.2868(6):3; R.2868(7)3-5.[33]

Unable to sustain its assertion that there was *no* evidence supporting the allocation, Topographic pivots to arguing there needed to be *better* evidence, insisting that the District Court "could not approve the allocation in the absence of evidence establishing the range of possible recovery." Topographic34. But the District Court *did* have such evidence; Topographic just disagrees with what it showed. The District Court had (a) evidence from Subscribers' damages expert, Dr. Pakes, stating that the range of potential recoveries for all Subscribers was likely somewhere "from $18.6 billion to $36.1 billion," R.2931:40, and (b) evidence from Dr. Mason showing the ratio of recoveries by the Self-Funded Sub-Class to those by Fully Insureds

---

[33] This case is therefore nothing like *Day v. Persels & Assocs.*, 729 F.3d 1309, 1327 (11th Cir. 2013), where this Court vacated a settlement premised on a "factual finding that has *no* support in the record." Likewise, *Staton v. Boeing Co.*, 327 F.3d 938, 975-76 (9th Cir. 2003), is easily distinguished because it vacated a settlement that awarded a subgroup sixteen times greater damages based on nothing more than counsel representations that they had "the strongest claims."

yielded a percentage of between 1.7% and 10.7%, R.2931:57-59. This was sufficient evidence to uphold the 6.5% allocation.

Topographic appears to be insisting that the allocation could not be approved without an expert providing a full-fledged damages opinion for the Self-Funded Sub-Class of a kind that could be accepted by a jury at trial. That is not what the law requires, and it would be absurd if it did. Eleventh Circuit precedent has "approved the practice of negotiating a formula for distributing settlement proceeds to sub-classes" instead of invariably requiring an economic analysis of each subclass's damages, particularly when the subclasses are independently represented. *Corrugated Container*, 643 F.2d at 219. *See also Chicken Antitrust*, 669 F.2d at 240-41.

The estimation of damages in this case was an exceptionally complex undertaking; it took years of work and millions of dollars in expert fees to produce an expert report assessing damages for Fully Insureds solely in Alabama. R.2733(2):23-26 (¶¶70-79), 40 (¶129). To provide one or more equivalent reports for the nationwide damages that could have been claimed by all members of the Self-Funded Sub-Class would have taken additional years and additional millions of dollars to produce. No case holds that such an undertaking is necessary to approve a settlement allocation. Adopting Topographic's position of more and undefined economic analysis would render the already costly settlement process extraordinarily burdensome, in contravention of the "'strong judicial policy favoring settlement.'"

*Equifax*, 999 F.3d at 1273 (quoting *Bennett*, 737 F.2d at 986); *see also Johnson v. NPAS Sol.*, 975 F.3d 1244, 1263 (11th Cir. 2020); *Halley v. Honeywell Int'l, Inc.*, 861 F.3d 481, 492 (3d Cir. 2017); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005).[34]

### 1. Topographic's Criticism of Dr. Mason's Analysis Is Meritless.

Topographic argues that Dr. Mason improperly compared premiums paid by fully insured customers to ASO fees. Topographic14. But that was true only for one of Dr. Mason's four proxy methods for analyzing the allocation issue—his "gross revenue" proxy. R.2825(1):15 (¶39). That proxy compared the $1.9 trillion in premiums paid by fully insured customers with the $67 billion in ASO fees paid by self-

---

[34] Topographic cites *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004), for the proposition that district courts should "estimate the litigation value of the claims of the class and determine whether the settlement is a reasonable approximation of that value." But *Mirfasihi* did not address a situation involving separately represented subclasses who engaged in an arm's-length negotiation over how to divide a settlement that, in its totality, all sides agreed was reasonable. Nor did it involve a subclass that entered the case only at the very end, to become part of the settlement. There is no case addressing such facts that holds that a full-fledged expert opinion is needed for the new subclass before a settlement allocation may be approved. And under this Court's precedent, a settlement can be approved "even though little formal discovery ha[s] been conducted." *Sterling v. Stewart*, 158 F.3d 1199, 1203-04 (11th Cir. 1998) (rejecting "vigorous scrutiny" standard applied in some jurisdictions and holding that a process requiring "extensive document discovery, depositions, and interviews" would "set a high burden of proof, much higher than that set forth in *Cotton*"). *See also Rodriguez*, 563 F.3d at 965; *Marshall v. Nat'l Football League*, 787 F.3d 502, 518 (8th Cir. 2015).

insured customers. That comparison shows that self-insureds paid only 3.4% of the total paid by both groups. Dr. Mason then applied a 50% discount to the self-insureds (discussed below), to arrive at a 1.7% implied allocation using this first proxy.

Topographic argues it is improper to compare amounts paid by fully insured customers to amounts paid by self-insured customers because a portion of the premiums paid by fully insured customers is used to pay healthcare costs charged by providers, whereas ASO fees are not. But that does not make such a comparison irrelevant to the allocation analysis. If the antitrust claims in this case were tried, the actual dollar amounts paid by each group of customers would be the starting point for any damages analysis.[35] The same percentage overcharge would thus translate into far higher damages for fully insured customers than for self-insured customers. Likewise, a jury would readily grasp that Defendants had reaped a much larger overcharge in premiums of almost $2 trillion than in ASO fees of $67 billion. Topographic ignores this, just as its expert did. That is a fatal flaw: "Overcharges are what this case is about." R.2931:58.

In any event, Topographic is wrong that Dr. Mason relied solely on his proxy comparing fully insured premiums to self-insured fees. His other three proxies did

---

[35] *See, e.g.*, *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 487 (1968); *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1077 (2d Cir. 1988); Areeda ¶392a.

not rely on this comparison.  Dr. Mason's second proxy did precisely what Topographic advocates: it subtracted the total costs of medical claims from fully insured premium revenue, and compared the remaining "net revenue" amount to revenue earned from self-insured business.  That resulted in an allocation to the Self-Funded Sub-Class of something less than 10.7%, R.2825(1):23 (¶¶40-41), far short of the 50% allocation Topographic seeks.  And, again, this second proxy fails to take into account that the fully insured business has been far more profitable for Defendants than the self-insured business, that the latter is far more competitive than the former, and that the ability of Fully Insureds to show antitrust injury and overcharges is thus far stronger than that of Self-Funded Sub-Class members.  Once those facts are considered, it becomes evident the allocation to the Self-Funded Sub-Class should be substantially less than 10.7%.

Topographic never addresses Dr. Mason's second proxy.  Its only implied criticism is its assertion that all of Dr. Mason's proxies "failed to account for revenues or profit margins on unbundled services sold to self-funded accounts," Topographic43, such as dental and vision insurance and stop-loss coverage.  But Dr. Mason's analysis uses the revenue information provided on Defendants' own financial reports, which reflected all the revenue Defendants received from both fully insureds and self-insureds.  The BCBS financials included numbers for "Premium Revenue," "Gross Revenue Incl Self-Funded," and "Net Revenue."   R.2825(1):14 (¶37 and

n.54). The reports defined "gross revenue" to include "fully insured premiums and premium equivalents for self-funded business." *Id.* Net Revenue was defined as gross revenue minus "self-funded benefit payments," *i.e.*, payments for medical costs. *Id.* Topographic cites no evidence, and there is none, for its assertion that these financial reports omitted revenues from "unbundled services sold to self-funded accounts," or that any such omission was material. Topographic43. Further, Topographic never explains how it could certify a Self-Funded Sub-Class based on variegated payments that some individual self-funded entities pay, but others do not.

Topographic also advances no specific criticisms regarding Dr. Mason's third and fourth proxies, both of which focused specifically on the relative profitability of fully insured versus self-insured business lines. His third proxy, an analysis of the operating-gain differential, relied on Defendants' own estimates of this relative profitability. It concluded that the self-insured business was at best the source of 3.9% to 6.3% of Defendants' profits. R-2825(1):16-19 (¶¶42-44). Topographic says nothing about this.

Dr. Mason's fourth proxy, the revenue-growth analysis, showed that "between 2008 and 2020, administrative revenue per included member increased approximately 20% while, over the same time, risk transfer revenue per included member [earned only from Fully Insureds] increased nearly 300%." R.2825(1):17-18 (¶¶45-49). Dr. Mason further found that risk-transfer revenue would normally grow with

benefits at an annual rate of approximately 5%, and ASO revenue would be expected to grow at the rate of inflation (which for the relevant period was approximately 1.6%). *Id.* This proxy yielded an allocation for the Self-Funded Sub-Class of approximately 3.4% to 3.8%. R.2825(1):18 (¶¶48-49). Topographic says nothing about this.

Topographic suggests Dr. Mason should have added the amounts that the Self-Funded Sub-Class paid to healthcare providers to the amounts they paid Defendants, and compared that sum to premiums paid by the Fully Insureds. Topographic6, 59. But the amounts self-insureds paid to healthcare providers could not properly be included in any damages analysis as there was no allegation in this case that such costs were inflated by Defendants' conduct. Further, Dr. Mason's second proxy performs the equivalent analysis by subtracting from fully insured premium amounts all healthcare costs paid by Defendants for Fully Insureds, and comparing that net number to self-insured payments made to Defendants. Topographic ignores that this second proxy did what Topographic advocates.

For the same reason, Topographic's invocation of the medical-loss ratio ("MLR") provisions of the Affordable Care Act is of no moment. Dr. Mason's second, third, and fourth proxies all excluded the payments made to healthcare providers to cover healthcare costs of Fully Insureds, and those proxies still showed an overcharge differential that substantially favored the Fully Insureds. R.2865:53-55.

Additional evidence showed that long after the MLR rules went into effect, the fully insured market remained far more profitable for Defendants than the self-insured market, and thus that Fully Insureds would have a much stronger claim for overcharges than self-insureds. R.2931:58; R.2868(1):3-4; R.2812(11):2-3; R.2868(3):4; R.2868(4):7; R.2868(6):3; R.2868(7):3-5.  Even Topographic's expert conceded that fully insured premiums were at least 20-35% higher than self-funded "premium equivalents."  R.2812(19):141-42.  Topographic also ignores (1) that the MLR rules did not take effect until 2011, and are thus irrelevant to almost 25% of the Fully Insured Class Period,[36] and (2) that for individuals and small groups, the MLR rules only required 80% of premiums to be spent on healthcare costs.[37]

Topographic criticizes Dr. Mason for not describing in minute detail all the components and "revenue streams" Defendants incorporated into their reported revenue numbers.  Topographic36-38.  These reports were Defendants' contemporaneous business records of reported revenue, and they expressly included "premium equivalents."  Dr. Mason spoke with Defendants about the data and its sources, and he had access to discovery databases, such that he was sufficiently informed to

---

[36] *See* Health Insurance Issuers Implementing Medical Loss Ratio (MLR) Requirements Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 74864-01 (Dec. 1, 2010).

[37] Medical Loss Ratio, Nat'l Ass'n of Ins. Comm'rs (Oct. 26, 2022), https://bit.ly/3Xd3EqX.

perform his analysis. R.2865:47-48; R.2865:217-218. Topographic makes no show-ing that Defendants' financial reports excluded "premium equivalents" or otherwise excluded any relevant revenue source.[38]

Topographic also argues that Dr. Mason's testimony was insufficiently relia-ble to pass muster under Federal Rule of Evidence 702. Topographic37. As shown above, that is not correct, as Dr. Mason had ample support for his opinions. More-over, Topographic's argument

> overlooks the differences between a full trial and a fairness hearing. In a trial, the judge must strictly screen expert opinions for 'evidentiary relevance and reliability' be-cause a jury often has difficulty assessing such evidence. In a fairness hearing, the judge does not resolve the par-ties' factual disputes but merely ensures that the disputes are real and that the settlement fairly and reasonably re-solves the parties' differences.

*Int'l Union v. Gen. Motors Corp.*, 497 F.3d at 636-37; *see In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 443 (3d Cir. 2016).

In contrast to Dr. Mason's rigorous analysis, Topographic's experts purported to construct a "typical" premium rate that a fully insured customer would pay and a

---

[38] Topographic's use of testimony from the Anthem trial is inapposite. Topo-graphic43. The Anthem trial concerned a contested merger, and the testimony merely showed that Defendants sometimes used "premium equivalents" for self-in-sured customers to enforce the Defendants' restrictions on how much revenue could be earned from outside an ESA or using a non-Blue brand. The testimony does not address the comparison of overcharges that could be claimed by Fully Insureds ver-sus self-insureds, and thus is irrelevant to the allocation issue here.

"typical" premium-equivalent rate a self-insured customer would pay—based on *guesswork*. R.2812(19):133-141. They conjured their "typical" rates out of thin air. They did not analyze Defendants' financial reports or other information contained in the discovery materials. They did not use any econometric or antitrust model. They asserted that the components of their purported "rates" would be equal for fully insureds and self-insureds, or would be X% to Y% higher for the fully insureds, with no data or analysis as to how they arrived at those percentages. *Id*. They also improperly treated payments self-insured customers paid directly to healthcare providers as if they were part of the damages analysis. And they failed to analyze what percentage of the amounts actually paid to Defendants constituted an overcharge. *Id*. When a court is "faced with competing expert opinions on the proper way to determine and allocate damages," "carefully consider[s] the expert advice," and chooses to "accept the plan submitted by the Lead Plaintiff's damages expert over the plan submitted by the [objectors'] expert," that judgment should not be disturbed on appeal. *Cendant*, 264 F.3d at 254; *Carter v. Forjas Taurus, S.A.*, 701 F. App'x 759, 767-68 (11th Cir. 2017) (per curium).

### 2. The District Court's Description of the Self-Funded Sub-Class Was Not a Clearly Erroneous Fact Finding.

Topographic claims the District Court made a clearly erroneous "factual finding" when it made the following observation near the beginning of its discussion of Topographic's objection:

> The Plan distinguishes between Fully Insured Claimants, who purchased insurance from Defendants, on the one hand, and Self-Funded Sub-Class Claimants who purchased only administrative services from Defendants, on the other.

R.2931:57.  *See* Topographic44

Topographic's argument is wrong again.  First, the District Court's statement is obviously just a general description of the defining difference between fully insureds and self-insureds, not a specific factual finding intended to rule out any possibility that Self-Funded Sub-Class members might sometimes purchase other services from Defendants.  Second, it is common parlance in the industry to refer to self-insureds as "ASO" customers—as customers who buy "Administrative Services Only."  *See* R.2868(3):2.[39]  Using such common phrasing to describe the two groups was entirely appropriate and accurate.

Likewise, the concern articulated by the *amicus* brief of ten insurance departments is misplaced.  *Amici* argue the District Court erred when it stated: "Those who are Self-Funded are just that—self-funded. That is, they did not buy insurance from

---

[39]    Administrative Services Only (ASO), THE BENEFITS GRP., https://bit.ly/3IoXZtT ("In an ASO arrangement, employers purchase specific administrative services from a third-party."); Caroline Banton, *Administrative Services Only (ASO): Definition, Pros & Cons*, INVESTOPEDIA (Oct. 25, 2021), https://bit.ly/3IfkDoh ("Administrative services only (ASO) [is] an agreement that companies use when they fund their employee benefit plan but hire an outside vendor to administer it.").

the Blues." Amicus1 (citing R.2931:61). *Amici* say this is wrong because self-funded plans "frequently purchase stop-loss insurance to limit their exposure," *id.*, and they express the concern that the decision below "could be misused to cast doubt on the authority to regulate stop-loss insurance products." *Id.* There is no such risk. The District Court was merely addressing whether the Self-Funded Sub-Class was included in the injunctive relief class in the *Cerven* complaint and has no effect on the regulatory authority of state insurance departments. The District Court made zero findings about stop-loss insurance, and thus its decision cannot be read to cast any doubt on the power of insurance departments to regulate such insurance. Stop loss insurance was irrelevant to the injunction class definition in *Cerven* because, as *amici* themselves acknowledge, stop-loss insurance "is not health insurance." Amicus8.

### E.   The Allocation Appropriately Reflects The Late Arrival Of The Self-Funded Sub-Class To The Case.

Topographic argues the District Court abused its discretion by approving an allocation based on a damages period that recognizes that the Self-Funded Sub-Class was not part of this case until 2020. According to Topographic, for the allocation to be reasonable, it was required to treat the self-insureds as if they had been in the case since the first complaint was filed by fully insureds in February 2012—even though they were not included in that complaint. Nothing compels this perverse result.

### 1. The Allocation Reasonably Treated the Self-Funded Sub-Class as Subject to a Shorter Damages Period.

Relying on "relation back" doctrine, Topographic argues that the Self-Funded Sub-Class must have the same damages period as the Fully Insureds–i.e., one having a start date four years before the February 2012 filing of the first complaint brought by fully insured subscribers in *Cerven*.  Topographic48-54.

As an initial matter, Topographic's argument confusingly cites both the abuse of discretion standard and the clearly erroneous standard.  Topographic48 (*compare* § II header *with* § II(A) sub-header).  There should be no confusion.  The question for this Court is not whether the District Court made a clearly erroneous finding in ruling that the addition of the Self-Funded Sub-Class to the consolidated complaint did not relate back to the filing of the *Cerven* complaint.  Instead, the question is whether the District Court abused its discretion in approving an allocation that treated the Self-Funded Sub-Class as having a shorter, five-year damages period instead of the longer, thirteen-year period used for Fully Insureds.  It did not.  The different damage periods reflect the fact that the Self-Funded Sub-Class did not join this case until October 2020, and so the POD simply reflects that the claims of that subclass would not have been permitted to relate back to the 2012 *Cerven* complaint if they had actually been litigated.

When an amendment seeks to add new plaintiffs to a pleading, the relation back doctrine applies only if (A) the new claims arise out of the same conduct set

out in the original pleading; (B) the defendant will not be prejudiced; and (C) the

defendant knew or should have known that it would have to defend against the

claims of the added plaintiff(s) "but for a mistake concerning the identity of the

proper party" in the original complaint. *Cliff v. Payco General American Credits,*

*Inc.*, 363 F.3d 1113, 1131 (11th Cir. 2004); *Makro Cap. of Am. v. UBS AG*, 543 F.3d

1254, 1259-60 (11th Cir. 2008); Topographic49 (citing cases).

With respect to the first requirement, "the key factor is whether the amended

claims arise from the same underlying facts as the original claims." *Pruitt v. United*

*States*, 274 F.3d 1315, 1319 (11th Cir. 2001). Here, factual allegations in the *Cerven*

complaint and each subsequent consolidated class complaint focused exclusively on

anticompetitive conduct in the market for full-service health insurance and its effects

on health insurance premiums. The complaint expressly defined "[t]he relevant

product market" as "the sale of *full-service commercial health insurance products*

to *individuals and small groups*," R.2998(3):131 (¶124) (emphasis added). As the

District Court found, "[t]he *Cerven* complaint mentions ASOs but only in the context

of distinguishing them from the proposed class and explaining that 'fully-insured

health insurance products and ASO products are only substitutes for those consum-

ers able to self-insure[.]'" R.2931:60 (quoting *Cerven* complaint ¶129). *Cf. Meijer,*

*Inc. v. Biovail Corp.*, 533 F.3d 857, 866 (D.C. Cir. 2008) (claim that defendants

"conspired to exclude new entrants into the market" did not relate back to complaint

premised on one defendant's unilateral attempt to exclude competitor); *Nat'l Distillers & Chem. Corp. v. Brad's Mach. Prods., Inc.*, 666 F.2d 492, 496 (11th Cir. 1982) (price-discrimination claim did not relate back to "price fixing violations alleged in the original complaint").

As to the second and third requirements, Defendants did not have fair notice that they would have to defend against claims by the Self-Funded Sub-Class "but for a mistake concerning the identity of the proper plaintiff" in the original complaint. *Makro*, 543 F.3d at 1260. Both the *Cerven* complaint and the subsequent eight years of litigation made clear that self-insured customers were *not* advancing claims against Defendants; there was no mistake in naming Plaintiffs. R.153:28 (plaintiffs emphasizing the "*exclusion* of administrative services only (ASO) products from the individual and small group fully insured product market"); R.2408:11. Further, Defendants would surely have been able to claim prejudice if claims added in 2020 were allowed to seek damages going back to 2008. *Nelson v. Cnty. of Allegheny*, 60 F.3d 1010, 1015 (3d Cir. 1995).

The District Court thus correctly held that self-insured customers were not included in either the *Cerven* damages class or in the *Cerven* injunction class, and therefore Defendants were not given fair notice they would have to defend against such claims. *Cerven* defined the damages class to consist of "[a]ll persons who, from February 7, 2008 to the present … have paid *health insurance premiums* to

BCBS-NC *for individual or small group full service commercial health insurance*."
R.2931:60 (quoting R.2998(3):7). This definition explicitly excludes self-insured
customers, who do not purchase "health insurance," *FMC Corp. v. Holliday*, 498
U.S. 52, 54 (1990), and do not pay "health insurance premiums." The same defini-
tion was used in the consolidated class complaints in the MDL.[40] Thus, for over
eight years, Defendants were on notice that only fully insured customers were seek-
ing damages.

*Cerven*'s definition of the injunction class also did not encompass the Self-
Funded Sub-Class. It covered "[a]ll persons or entities who are currently insured by
any health insurance plan that is currently a party to a license agreement with
BCBSA that restricts the ability of that health insurance plan to do business outside
of any geographically defined area." R.2998(3):99. As the District Court correctly
held, self-insured customers "did not buy insurance from the Blues." R.2931:61.
They are not "insured by a health-insurance plan."

Topographic argues that "self-funded plans typically bought stop-loss insur-
ance." Topographic51. But stop-loss insurance "is not health insurance." Amicus8;
R.938:3 ("Stop loss insurance is not medical insurance, it is a financial and risk man-
agement tool for businesses."). By contrast, *Cerven*'s definition of the injunction
class refers to entities who buy *health insurance* from the Defendants, just as *Cerven*

---

[40] R.85, R.99.1, R.244, R.897, and R.1082.

consistently used "insurance" as a reference to "health insurance," not as a reference to any other kind of insurance.  *See* R.2998(3):94-152 (¶¶2, 25, 29-31, 36-37, 106-110, 117, 121, 123-132, 135-37, 141, 142, 145, 147-149, 150, 153, 157, 159, 162, 165, 168, 180-81, 184, 189, and 192.)[41]  Topographic says stop-loss insurance was "later included in BCBS's Commercial Health Benefit Product," Topographic51, but the settlement complaint adopted broad definitions in order to effectuate the Settlement.  Those definitions cannot change the fact that the *Cerven* complaint clearly did not include "stop-loss insurance."  Nor did any of the subsequent consolidated complaints that preceded the settlement.

The *Cerven* and subsequent consolidated class complaints that preceded the Settlement did not include any self-insured customers as class representatives.  They did not plead any facts that would support claims based on conduct in the ASO market.  ASO services were mentioned in the *Cerven* complaint only to *distinguish* the market for health insurance from the market for ASO services and to explain why ASO services are not substitutes for health-insurance products.  R.2998(3):132-33 (¶129).

Topographic says Defendants admitted that self-funded claims were part of the *Cerven* complaint because Defendants' motion to dismiss the consolidated class

---

[41] For this reason, *amici*'s assertion that "stop-loss insurance is *not* reinsurance" is irrelevant.  Amicus3-4.  Stop-loss insurance may well be a form of insurance, but it is not health insurance, as *amici* concede, *id.* at 8.

complaint stated that the proposed injunction class "encompasse[d] both large and small groups that self-insure." Topographic50. That misinterprets what Defendants said. The reason Defendants made that assertion was to allow them to make an argument for dismissal based on the complaint's failure to allege anything about ASO products in its description of the product market. In response, Plaintiffs made clear the complaint was *not* seeking to include self-insured customers in the injunction class. R.153:28 (The original complaint "justif[ied] exclusion of administrative services only (ASO) products from the individual and small group fully insured product market because, among other things, ASO policy holders are large enough to self-insure."). Defendants then abandoned their argument that the injunctive-class product market included ASOs. R.173:29 (acknowledging that "the relevant market for *all* their claims is the one in which Defendants sell *health insurance*") (emphasis added).

The parties litigated this case for eight years as solely involving claims by fully insured customers. For example, the District Court acknowledged in its standard of review opinion that, in contrast to the Provider Plaintiffs, Subscribers had limited their claims to the market for commercial health insurance.[42] Similarly,

---

[42] R.2063:35 n.13 ("Provider Plaintiffs describe one facet of the alleged anti-competitive conspiracy as an agreement concerning healthcare financing services because the agreement allegedly concerns fully insured plans and Administrative Service Only ("ASO") plans. … In contrast, Subscriber Plaintiffs indicate that ASO

Subscribers' motion to certify an injunction class excluded purchasers of "Administrative Services Only or Administrative Service Contracts" from their class definition. R.2408:10-11. Defendants recognized that "Subscribers' proposed injunction class includes all fully-insured subscribers to Blue Plan products, including large groups and non-ASO national accounts." R.2490:116.

Topographic says "Subscribers' first set of discovery requests defined Commercial Health Plan Coverage to include both health insurance and 'administrative services.' R-364(2)-3." Topographic9. But that was a *joint* discovery request made with the Provider Plaintiffs who *did* include ASO/self-funded products in their product market. R.364(2); R.224:8. Subscribers' only interest in discovery conducted as to ASO products was to distinguish the markets for health insurance and ASO services. Likewise, Subscribers' expert reports all focused solely on fully insured markets and damages, and did not analyze self-insured markets. R.2411. As Judge Proctor noted at the Fairness Hearing, "when ASOs got introduced into this, that was news to me. At no point at any time did the Blues or the subscribers suggest to me that ASOs were ever part of a target of this litigation." R.2865:157; *see* R.2865:155.

Topographic asserts that the *Cerven* complaint "attacked the entire Blue structure and its geographic restraints across all plans," Topographic53, but the complaint

---

plans are not available substitutes for all Subscribers because they are not viable options unless the Subscriber … can afford to self-insure.").

addressed that structure only insofar as it generated "artificially inflated and supra-competitive premiums for individuals and small groups purchasing ... full-service commercial health insurance." R.2998(3):143 (¶142).

Topographic continues grasping at straws by noting that the *Cerven* complaint alleged that the size of Blue membership is relevant to Defendants' market power and estimated Blue national membership at 100 million—a number that would include ASO customers. Topographic54 (citing R.2998(3):135 (¶135); R.2998(3):129 (¶118); R.2998(3):98 (¶15)). But the paragraphs cited by Topographic explicitly target the market for full-service commercial health insurance, not the market for ASO services. R.2998(3):135 (¶135); R.2998(3):129 (¶118). And the "100 million" figure occurs in a generic description introducing BCBSA as a Defendant, not a substantive allegation about anticompetitive activity in the ASO market, or about the specific claims brought in the case. R.2998(3):98 (¶15).

Even if it were somehow possible to read *Cerven*'s injunction class as notifying Defendants they may face injunctive relief claims from self-insureds, *Cerven's* damages class indisputably did not include self-insureds, so nothing put Defendants on notice that they might face damages claims from self-insureds. Contrary to what Topographic says, damages and injunctive relief are two different claims under the Clayton Act: the first is authorized by Section 4 (15 U.S.C. § 15(a)), while the second is authorized by Section 16 (15 U.S.C. § 26). *See Cargill*, 479 U.S. at 111 (1986)

112

(analyzing differences between Section 4 and 16 claims); *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1452 (11th Cir. 1991). Being on notice of a claim under one of those statutes does not put a defendant on notice of the other.[43]

Further, in a class action where an entire subclass seeks to be added to a complaint almost a decade into the litigation, relation back should not be permitted where the new subclass cannot also show the statute of limitations on its claims was equitably tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). *See Cliff*, 363 F.3d at 1132-33 (relation back decision favorably citing Second Circuit decision applying *American Pipe* principles); Topographic53. *American Pipe* tolling applies only to "persons encompassed by the class complaint." *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1804 (2018). Litigants invoking *American Pipe* tolling must demonstrate that the earlier-filed complaint "explicitly included" the purportedly tolled claims; "[i]t is not enough for Appellants to rely on only [an] ambiguous class definition to support their argument for tolling." *Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1238 (11th Cir. 2003) (tolling inapplicable to claims

---

[43] Topographic cites cases holding that an amendment that shifts from equitable to legal relief can relate back, *see Friederichsen v. Renard*, 247 U.S. 207, 210 (1918); *Bemis Bros. Bag v. United States*, 289 U.S. 28, 34 (1933), and a case noting that the same cause of action can support both legal and equitable relief, *see Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 69, 75-76 (1992). Topographic50-51. But none of these cases treat claims under Sections 4 and 16 as relating back to one another–least of all in a context where they are brought by a subclass that was not part of the original complaint.

"different in kind" from original claims).  *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 467 (1975); *Zarecor v. Morgan Keegan & Co.*, 801 F.3d 882, 888 (8th Cir. 2015) (collecting cases); *Davis v. Bethlehem Steel Corp.*, 769 F.2d 210, 212 (4th Cir. 1985).  Supreme Court precedent also establishes that "*American Pipe* tolls the limitation period for *individual* claims" and does not "extend[] to otherwise time-barred class claims."  *China Agritech*, 138 S. Ct. at 1806 (emphasis added); *see also Blake v. JP Morgan Chase Bank NA*, 927 F.3d 701, 710 (3d Cir. 2019).

As shown above, the Self-Funded Sub-Class was not encompassed by the *Cerven* complaint.  *American Pipe* would therefore not recognize tolling for the Self-Funded Sub-Class.

### 2. Dr. Mason's Estimated Discount Factor Reasonably Reflected the Weaker Litigation Position of the Self-Funded Sub-Class.

Topographic also complains that Dr. Mason applied a 50% discount factor to the allocation percentages produced by his four proxies.  Topographic55.  As Dr. Mason explained, this discount reflected the fact that, absent a settlement, the Self-Funded Sub-Class would face many years of uncertain and expensive litigation to arrive at a stage of litigation comparable to where the Fully Insureds already were.  R.2865:202.  Moreover, the Self-Funded Sub-Class would face even greater risks than the Fully Insureds, given the relative weakness of their claims.  Given these facts, the 50% discount was reasonable.  R.2825(1):14-15.  Courts routinely approve

allocations that account for these factors. *Sullivan*, 667 F.3d at 328; *In re Holocaust Victim Assets Litig.*, 413 F.3d at 186; *In re Agent Orange*, 818 F.2d 179, 183-84 (2d Cir. 1987); *Corrugated Container*, 643 F.2d at 220.[44]

The 50% discount was used solely by Dr. Mason to adjust his four proxies, not by the Court to reduce some independently determined allocation, as Topographic wrongly suggests. Topographic55. Without any discount, Dr. Mason's proxy allocations would have suggested allocations to the Self-Funded Sub-Class of 3.4%, <20.4%, <7.8%-12.6%, and <6.4%-7.4%. R.2825(1):14-18. Especially when compared with Dr. Pakes' estimated range of 3.4% to a maximum of 6.8% (R.2610(8):6), those ranges would still have been consistent with the negotiated allocation of 6.5%.

Topographic is also wrong to complain that no similar discount was applied to claims of large, fully insured customers. Topographic57. These customers were not in the same position as the Self-Funded Sub-Class because they were involved in the same fully insured line of business that was the focus of the case prior to settlement, and that was more profitable than the self-insured business. Further,

> [d]eciding whether a settlement is fair is ultimately an amalgam of delicate balancing, gross approximations and rough justice, best left to the district judge, who has or can

---

[44] *See also Herrera v. Charlotte School of Law*, 818 F. App'x 165, 176 (4th Cir. 2020); *In re N.J. Tax Sales Certificates Antitrust Litig.*, 750 F. App'x 73, 83 (3d Cir. 2018); *In re Tremont Secs. Law, State Law and Ins. Litig.*, 699 F. App'x 8, 13-14 (2d Cir. 2017).

> develop a firsthand grasp of the claims, the class, the evi-
> dence, and the course of the proceedings—the whole ge-
> stalt of the case[.]

*In re Volkswagen 'Clean Diesel' Prods. Liability Litig.*, 895 F.3d 597, 611 (9th Cir. 2018) (quotation marks and citation omitted).

## F.    The District Court Properly Rejected Topographic's Discovery Request.

Topographic complains that the District Court denied its request for discovery into "Fully Insured Subclass counsel's input into the Mason Report."  Topographic45.  The general rule is that "'objectors are not entitled to discovery concerning settlement negotiations between the parties in the absence of evidence indicating that there was collusion between plaintiffs and defendants in the negotiation process." 4 NEWBERG ON CLASS ACTIONS § 13.32 (6th ed. 2022) (quoting *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 24, 28 (D.D.C. 2001)).[45]  Here, Topographic admitted below there was no collusion.  R.2865:152-153.

In any event, the District Court correctly ruled that the common interest privilege applies to communications between parties to a settlement after the settlement has been reached, R.2865:82, and that rule logically applies to the parties to an

---

[45] *See also Lobatz v. U.S. W. Cellular of Cal., Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000); *Grant Thornton v. Syracuse Sav. Bank*, 961 F.2d 1042, 1046 (2d Cir. 1992); *Mars Steel Corp. v. Cont'l Illinois Nat'l Bank & Tr. Co.*, 834 F.2d 677, 684 (7th Cir. 1987).

allocation resolution achieved through mediation.[46]  The common-interest privilege requires only "a substantially similar legal interest."  *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 365 (3d Cir. 2007).  It "does not require a complete unity of interests among the participants, and it may apply where the parties' interests are adverse in substantial respects."  *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003); *see* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 76, cmt. e ("The interests of the separately represented clients need not be entirely congruent."); *Gold Cross EMS, Inc. v. Children's Hosp. of Ala.*, 79 F. Supp. 3d 1316, 1326 (S.D. Ga. 2015).  What matters is that the clients "share a common interest about a legal matter."  *United States v. Almeida*, 341 F.3d 1318, 1324 (11th Cir. 2003).  Courts have thus recognized that the common-interest privilege applies to settlement communications.  *See In re Androgel Antitrust Litig. (No. II)*, 2015 WL 9581828, at *2 (N.D. Ga. Dec. 30, 2015); *Evansville Greenway & Remediation Tr. v. S. Ind. Gas & Elec. Co.*, 2010 WL 1737875, at *4 (S.D. Ind. Apr. 28, 2010); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 2004 WL 2009413, at *1, *6 (D.D.C. Aug. 12, 2004).

None of Topographic's cases say otherwise. Some endorse the irrelevant rule that "[i]n many situations in which the same attorney acts for two or more parties

---

[46] Topographic does not challenge the fact that communications between counsel and an expert regarding an expert report and expert opinions are privileged. FED. R. CIV. P. 26(b)(4)(B) & (C).

having a common interest, neither party may exercise the privilege in a subsequent controversy with the other." *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103 (5th Cir. 1970); *see also Almeida*, 341 F.3d at 1324. Others are even less relevant. *See In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 922 (8th Cir. 1997) (holding White House and First Lady could not invoke common interest privilege).[47]

Finally, Topographic has not attempted to show it suffered prejudice by being denied access to communications with Dr. Mason, and this Court "will not overturn discovery rulings unless it is shown that the District Court's ruling resulted in substantial harm to the appellant's case." *See Harrison v. Culliver*, 746 F.3d 1288, 1297 (11th Cir. 2014).

### G.    Topographic's Challenge To The Attorney Fee Allocation Is Meritless.

Topographic complains that the District Court approved an *in camera* Report from the Special Master discussing an allocation of the attorneys' fee among the many dozens of different law firms involved in litigating the case. Topographic31-32.[48] Topographic does not point to any objection it made to this approval before

---

[47] Other cases Topographic cites have nothing to do with the common-interest privilege. Topographic46. *See Equifax*, 999 F.3d at 1264; *Dewey*, 681 F.3d at 188-189; *Holmes*, 706 F.2d at 1160.

[48] After reviewing this submission, the District Court found that the Special Master had "conducted an innovative interview process which allowed each impacted Law Firm to describe for the Special Master what it did to advance the case and how its services might have been unique compared to those of others," and also

the District Court, and we can find no record of such an objection. Further, Topographic did not seek any post-judgment relief with respect to this issue. It thus has forfeited any right to appeal the approval. *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

As to the merits, Topographic does not object to the overall attorney fee award, and the allocation of that award among the many law firms that worked on the case cannot have any impact on what Topographic receives for its claims. Topographic therefore lacks standing to appeal the approval. *See Hill v. State St. Corp.*, 794 F.3d 227, 231 (1st Cir. 2015); *Silverman v. Motorola Sol., Inc.*, 739 F.3d 956, 957 (7th Cir. 2013); *Knisley v. Network Assocs., Inc.*, 312 F.3d 1123, 1126 (9th Cir. 2002). Topographic's own authority recognizes as much. *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 287-88 (7th Cir. 2002).

Topographic's argument also fails because the District Court had no obligation to conduct a hearing on the fee allocation, let alone a public hearing featuring objectors. The division of attorneys' fees among attorneys is not a topic addressed by Rule 23. When "the lawyers can decide among themselves how to split the aggregate fee," courts ordinarily "defer to that self-allocation and there is no need for

---

found that "the approach taken by the Special Master, in (1) compiling the time, capital and expense records that provided the data for the Report, and (2) weighting the data among the lawyers in the Report, was transparent and objective." R.2932:5(¶8).

formal judicial involvement."  5 NEWBERG ON CLASS ACTIONS § 15:23 (6th ed. 2022); *see Chambers v. Whirlpool Corp.*, 980 F.3d 645, 671 (9th Cir. 2020); *In re Life Time Fitness, Inc., Telephone Consumer Protection Act Litig.*, 847 F.3d 619, 623-24 (8th Cir. 2017).  Topographic's cases are inapposite because they address giving class members an opportunity to object to the overall fee award (which was provided here), not to the allocation of that award among participating counsel.

### H.    Allocation Of The Settlement Fund Was Necessary And Appropriate.

Topographic argues the "creation of the Self-Funded Subclass produced a conflict between the interests of the Fully Insured and Self-Funded Subclasses." Topographic58.  Topographic has it precisely backwards: it was the potential conflict between the interests of Fully Insured and self-funded class members that resulted in the creation of the Self-Funded Sub-class.  As Topographic's own authority holds, the very point of subclassing is to "resolve conflicts of interest that might prevent representative plaintiffs from adequately representing the class" by providing a structural assurance that potentially adverse interests are independently represented.  *Dewey*, 681 F.3d at 189-90.  Courts faced with that situation can either "do away with the distinction" between the two groups or "simply divide the groups into subclasses." *Id.*  That choice is committed to the discretion of the district court.  *See id.* at 182; *Sullivan*, 667 F.3d at 326.

Here, it would have been patently inequitable to distribute the Settlement "to

all class members on the same basis," Topographic58.  As shown above, the economics of the self-funded and fully insured markets are fundamentally different, and the Fully Insureds had stronger claims of suffering antitrust injury than did the self-insureds.  Moreover, the Self-Funded Sub-Class was not in the case until settlement, so (a) the Self-Funded Sub-Class damages period was different from that of Fully Insureds, and (b) there had been no damages discovery or expert work done for the Self-Funded Sub-Class.  As a result, the obvious differences in the "injuries" of the two groups and the scope of available remedies "warrant[ed] the creation of sub-classes." *Equifax*, 999 F.3d at 1276.  A failure to make an allocation would surely have provoked serious objections from the Fully Insureds and risked reversible error for any approval.  *See Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1281 (11th Cir. 2000) (remanding with directions to create subclasses because "injury claims target[ed] different defendant conduct" and "the type of proof required for each claim necessarily will differ").

Further, the data Dr. Mason analyzed implied that if there had been no allocation and self-insureds had simply submitted information on how much they spent for Defendants' services, the self-insureds would have been entitled to only 3.4% of the total dollar amount.  R.2825(1):15 (¶39).  Thus, the Self-Funded Sub-Class may well have been substantially worse off had there been "no allocation."

## III.    COCHRAN'S APPEAL IS MERITLESS

Like Topographic's appeal, the Cochran appeal challenges the District Court's approval of the POD.  Cochran's appeal, however, focuses on a different feature of the POD than Topographic's:  the decision to allocate to employers the premium shares of their employees who either make no individual claim or whose claims fall below the $5 minimum claim threshold.  Cochran's objection, which was filed by her father, serial objector George Cochran,[49] stands alone: although over 100 million court-approved notices were sent to potential Settlement Class Members, R.2812(2):3 (¶5), only Cochran objected to the allocation of unclaimed and below-threshold employee premiums to employers. R.2812(21). Cochran's objection is also meritless, for she does not come close to showing that the District Court abused its discretion in concluding that the POD adopted fair and reasonable methods to govern the treatment of unclaimed and below-threshold employee shares.  *See Holmes*, 706 F.2d at 1147; *Sullivan.*, 667 F.3d at 328; *In re Holocaust Victim Assets,* 424 F.3d at 146; *Cendant*, 264 F.3d at 254.

### A.    The POD's Treatment of Employee Claims Is Fair And Reasonable, And Raises No Adequacy Of Representation Concerns.

It would be difficult to find a class settlement POD that was constructed with

---

[49] *See, e.g., In re Equifax Inc. Customer Data Security Breach Litigation*, 2020 WL 256132, at *41 (N.D. Ga. 2020); *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1104 (D. Kan. 2018); *McKnight v. Uber Technologies*, 2019 WL 3804676, at *5 (N.D. Cal. Aug. 13, 2019).

as much careful deliberation, or subjected to as many layers of comprehensive scrutiny, as the one here.  This is no less true with respect to the POD's treatment of employer-employee premiums as it is with respect to the allocation between fully insured Subscribers and self-funded plans.  Class Counsel engaged Darrell Chodorow of The Brattle Group to assist in developing the full POD, including its provisions concerning default premium and ASO fee percentages for employers and employees. R.2610(9):5 (¶5).  Based on evaluation of numerous factors, Counsel selected "Default" allocation percentages to approximate relief for employers and employees.  R.2610(9):19-20 (¶31), 29 (¶51).  Mr. Chodorow reviewed those percentages, including the proposal that unclaimed and below-threshold employee premium shares would be allocated to employers, and found those aspects of the POD to be economically reasonable.  R.2610(9):19-20 (¶31), 23 (¶38), 24 (¶40), 29 (¶51).  Then, Mr. Feinberg independently reviewed the allocation between employers and employees and concluded that it "is reasonable and the tools used by Class Counsel are realistic and appropriate under the circumstances." R.2610(8):8 (¶19).  After multiple rounds of pre-hearing briefing, expert testimony, a Fairness Hearing, and post-hearing briefing, the District Court overruled Cochran's objection.

Given this level of scrutiny, Cochran must clear an especially high bar to demonstrate that the District Court abused its discretion in reaching the "intensely fact-based" decision to approve the POD. *Cendant*, 264 F.3d at 254. Cochran fails

to clear that bar.

While the precise contours of Cochran's arguments on appeal are difficult to discern, the crux of her argument concerns the fact that the POD allocates to Fully Insured employer claimants the premium fee shares of their employees who do not themselves make a claim or whose claims fall below the $5 minimum threshold. Cochran3-4. But Cochran does not argue that this allocation of unclaimed and below-threshold employee premiums to employers is itself inequitable or unreasonable. Rather, Cochran argues that it is inequitable for the POD to adopt this allocation method for *employees* while at the same time providing that the premium shares of *employers* who do not make a claim will be reallocated to the general Settlement Fund, to be distributed to all Fully Insured claimants on a pro rata basis. Cochran12-13. This supposed "double-standard," Cochran4, allegedly demonstrates that employees were not adequately represented. Cochran9-15, 22-29. Cochran's argument fails on multiple levels.

When Subscribers were assessing how to distribute the Settlement Fund equitably and efficiently, they concluded that Default contribution percentages were needed to ensure that millions of claims could be processed without requiring employers and employees to submit years of documentation about their respective costs of coverage. As part of that assessment, Class Counsel and their expert advisors considered, among other things: (1) economic evidence concerning the costs borne

124

by employers versus employees in purchasing coverage; (2) the fact that some employees pay no out-of-pocket costs for employer-sponsored coverage and others pay all or a portion of such costs; and (3) the relative strengths and weaknesses of the antitrust claims of employers and employees, as relating to the same premiums paid. *See* R.2610(5):11-13 (¶19(f)(i-vi)); R.2610(9):12 (¶18).  Class Counsel also considered the logistics of the claims process, including ways to ensure that as many claiming employees as possible could meet the minimum claim threshold while also providing equitable treatment of all claimants.

As a result of that painstaking assessment, the POD designated employers as residual claimants for unclaimed and below-threshold employee premiums.  This feature actually allowed the POD to set *higher* Default allocation percentages for employees than would have otherwise been possible, thus ensuring that claiming employees had a greater chance of exceeding the $5 threshold (and hence receiving payment rather than having it revert to the employer).  As Mr. Chodorow recognized, far from harming employees, this allowed for "a higher allocation [to employees] without necessarily harming [employers] relatively." R.2610(9):23 (¶38).

Cochran does not seriously challenge any of these considerations that led to the POD's treatment of unclaimed and below-threshold employee premiums.  Nor could she, since that treatment, based on economic evidence and evaluation of the relative strength of various claimants' potential claims, was entirely reasonable. *In*

125

*re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 40 (E.D.N.Y. 2019).  And despite Cochran's suggestions to the contrary, the POD did not operate to discourage employees from making claims; out of over 8 million timely claims, nearly 6 million have been made by employees, as compared to approximately 270,000 by employers. R.3029(1):2.

Thus, the POD's allocation of employee premiums was manifestly fair and reasonable.  And the POD properly treats the allocation of premiums attributable to non-claiming *employers* differently.  The premium shares of employers and employees are not similarly situated.  Employers generally bear more of the economic burden, and also have the more direct claim under the antitrust laws, which favor direct purchasers over indirect purchasers.  Further, each employer generally has at least some form of claim for premiums paid on behalf of each employee.  Given all that, it is fair and reasonable to allocate to an employer any amounts not claimed by that employer's employees.  By contrast, given the relative weakness and indirectness of particular employee claims, and given that a particular employee generally has zero economic burden for the premiums paid on behalf of other employees, it would not be fair and reasonable to allocate an unclaimed employer amount to whichever of that employer's employees happen to submit claims.

Cochran does not suggest that it would be reasonable for the supposed disparity in treatment she complains about to be remedied by requiring non-claiming

employer premiums to be allocated to claims made by that employer's employees. Cochran instead suggests that the solution is to allocate the premiums attributable to non-claiming employees back to the general Settlement Fund, to be distributed, pro rata, to *all* Fully Insured claimants. *See* Cochran13 ("*But for* the single exception of awarding unclaimed funds to employers, any money not claimed by employees would be reallocated to all claimants on a pro-rata basis.") (emphasis in original). The POD's rejection of that option can hardly be characterized as unreasonable, especially because this decision allowed the Default percentages for claiming employees to be increased.[50]

Unable to demonstrate that the POD treats employee claimants inequitably, Cochran retreats to an inadequate representation argument. Cochran confuses the POD's "apportionment of relief among class members," which properly "takes appropriate account of differences among their claims" (*see* Advisory Committee Notes to Rule 23), with a conflict between members of the class. Cochran26-29 (citing *Valley Drug*, 350 F.3d at 1189). But as discussed previously, *id.*, for a supposed conflict of interest to implicate Rule 23's adequacy of representation requirement, it must be based on differences in the economic interests between class representatives and unnamed class members that are not only concrete and real, as opposed to

---

[50] *See* R.2610(9):13-14(¶¶19-20) (Chodorow declaration discussing considerations showing why treating employer as residual claimant is "economically fair").

127

uncertain and speculative, but so clear and substantial as to fairly be characterized as "'fundamental'... to the specific issues in controversy." *Valley Drug*, 350 F.3d at 1189. *See Equifax*, 999 F.3d at 1275.

No such conflict exists here. Not even Cochran suggests that employers were benefitted by the Blues' anticompetitive conduct while employees were harmed, or vice versa. Class Representatives sought redress from Defendants for the same unlawful conduct as was suffered by all class members, whether they were individuals, employers, or employees, *i.e.*, anticompetitive overcharges on premiums.

Cochran nonetheless claims the District Court abused its discretion in not creating subclasses with separate representation. Cochran26-29. The Third Circuit rejected a similar argument in *Ins. Brokerage Antitrust Litig.*, 579 F.3d at 272. There, as here, objectors argued that the district court abused its discretion in approving a POD allocating different percentages of settlement funds to different groups, without creating subclasses with separate representation. *Id.* at 270. Like Cochran, the objectors contended that "the increased recovery of one sub-class was achieved at the expense of another subclass' diminished recovery." *Id.* The district court overruled the objection, reasoning "that simply because the relief varied among the different groups of class members did not demonstrate that there were conflicting or antagonistic interests within the class." *Id.* at 272.

The Third Circuit agreed, finding that "subclasses are only necessary when

members of the class have divergent interests and the District Court found that no such divergent interests existed between the allocation groups." *Id. See also Pet Foods*, 629 F.3d at 346. Here, too, the District Court made clear that the class representatives "share the same interests as absent class members, assert claims stemming from the same event[, which] are the same or substantially similar to the rest of the class, and share the same types of alleged injuries as the rest of the class." R.2931:30.

Cochran, in short, has nothing to offer the Court except speculation, rhetoric, and hyperbole to support her contention that fundamental conflicts between the interests of employers and employees required subclassing and separate representation. She can demonstrate neither fundamentally antagonistic interests in the interests of employees and employers, who raise the same basic claims on behalf of the premiums they jointly paid, and who were impacted in the same way by the Blue's antitrust violations. Nor can she show that the POD actually treats employees inequitably in any way.[51]

## B.    The District Court Did Not Abuse Its Discretion In Finding That ERISA Posed No Impediment To Settlement Approval.

Cochran's submission to the District Court made a passing reference to her

---

[51] Unlike the difference between self-insureds and fully insureds, who are customers in different markets with very different competitive dynamics and profitability for Defendants, employees and employers share in the same premiums for the same products in the same market. The reason for creating a sub-class with separate allocation counsel for self-insureds did not exist for employees.

concern that the Settlement would create a "disincentive" for employers to notify their employees of their right to submit a claim, and that this disincentive "may" violate employers' fiduciary obligations under ERISA. R.2812(21):10.  Cochran now seeks to expand that passing reference into six-plus pages of argument that borrows liberally from the Department of Labor's ("DOL") separate submission to the District Court.  Cochran15-22.  Even if Cochran had adequately raised below the ERISA concerns she seeks to inject into her appeal, the argument is meritless.

DOL carefully studied the Settlement and—after asking questions regarding the Settlement's interaction with ERISA, including the issue raised by Cochran on appeal, *see* R.2812(13):2-12—it neither opposed the Settlement nor moved to intervene below.  And it has elected not to appear before this Court, as *amicus* or otherwise, to air *any* concerns regarding the District Court's resolution of the questions it had posed.  R.2931:76. That DOL, the agency with "primary responsibility" for administering and enforcing ERISA (R.2812(13):3), has considered but chosen not to press Cochran's ERISA argument, underlines that the District Court did not abuse its discretion in rejecting that argument.

Cochran's argument amounts to speculation that the POD *may* trigger employers' ERISA obligations and *may* result in breaches of those obligations. R.2931:76-79 (refusing to disapprove Settlement based on "hypothetical questions" about whether it affects ERISA rights or duties). As the District Court explained,

130

nothing in the Settlement affects ERISA rights or obligations or the resolution of disputes over those rights or obligations, so there is no reason to believe that rights guaranteed by ERISA cannot be safeguarded and vindicated by the existing duties and enforcement mechanisms created by that statute. R.2931:76-79. Cochran makes no attempt to refute the District Court's "simple answer"—that "employers and ERISA plans are responsible for complying with applicable ERISA and DOL guidance, and nothing in the Settlement or the [POD] relieves them of those obligations." R.2931:79. *See* R.2931:76 ("ERISA plan rights are not affected by the Settlement" and the Settlement "does not release any claims that an ERISA plan may have against an employer").[52]

This was obviously correct, and even more obviously was not an abuse of discretion. Nowhere does Cochran explain why the District Court's treatment of the ERISA question was an abuse of its discretion. Nor does Cochran explain why her proffered hypothetical ERISA breaches would be a reason to reject the Settlement. She fails to connect her hypothetical ERISA concerns to her assertion that the Settlement should not have been approved, or to cite any authority supporting that

---

[52] Cochran's suggestion that ERISA plans were not adequately represented, Cochran21, is baseless for several reasons, *see* R.2812(1):144-46, including the one relied upon by the District Court (that "several Class Representatives are both employers (plan sponsors) and their plans' named fiduciaries," R.2931:76-77), a fact which Cochran never confronts. Fundamentally, because the Settlement does not purport to address or affect ERISA rights and obligations, there was no need for ERISA plans to have separate representation.

proposition.

The mere *possibility*, and speculation, that employers might breach their ERISA duties could not rationally have been a basis for disapproving the Settlement. Cochran has cited no evidence suggesting that the Settlement either will cause such breaches or has caused employers to be ignorant of, or confused about, their ERISA duties; she relies instead on naked conjecture. *See, e.g.,* Cochran15 (asserting that distribution scheme "disincentiv[izes]" employers from notifying employees of their rights and thereby "*may*" cause employers to breach their ERISA obligations) (emphasis added).

A primary component of Cochran's ERISA argument appears to be her contention that because of their ERISA obligations, employers "should have made a reasonable effort to forward the class notice to every participating employee." Cochran17. *See also* Cochran15. But Cochran ignores that Subscribers' notice plan took extraordinary steps to provide *actual notice* of the Settlement to *all* class members, including tens of millions of employees. No one has suggested, much less demonstrated, that the notice plan approved by the District Court did not achieve that objective, or that it failed to comply with Rule 23, due process, or any other applicable standards. Even leaving that dispositive fact aside, Cochran fails to cite *any* authority for the proposition that a Settlement must be rejected if the notice provided to certain class members did not require (how, Cochran does not say) those

class members to take steps to notify *other* class members of the Settlement.[53]

In sum, Cochran does not come close to demonstrating that the Settlement will necessarily cause ERISA violations. Her assertion that the Settlement may generate questions for employers who are required to comply with legal obligations untouched by the Settlement (even if true) was no basis for the District Court to reject the Settlement; it certainly is no basis for this Court to conclude that the District Court abused its discretion.

## IV.    BEHENNA'S APPEAL IS MERITLESS

The final appeal comes from *pro se* objector David Behenna, the lone

---

[53] Cochran does not dispute the District Court's concern, expressed at the Fairness Hearing, that introducing the resolution of hypothetical ERISA disputes into the POD would threaten to bog the claims resolution process down and could delay the distribution of funds. R.2866:25-26. But she does attempt to distract the Court's attention from this undeniable concern by pointing to supposed administrative concerns raised by the process that the POD establishes for those employees (and employers) who do not wish to take advantage of the POD's Default premium allocation percentages. Asserting that this alternative claims process is "laden with extraordinarily burdensome obstacles," Cochran breathlessly complains that it "contains no fewer than *seven steps*." Cochran23 (emphasis in original). But no class member is required to undertake this alternative process as there is a Default process that is itself abundantly fair. Further, even a cursory examination of Cochran's description reveals that the alternative process is straightforward: claimants are informed of their right to submit evidence, that evidence is submitted and considered, and a determination is made concerning an appropriate premium allocation. *Id.* Regardless of how Cochran counts the steps in this process or how many adjectives she uses to describe it, Cochran cites no authority suggesting that this alternative claims process is unduly burdensome or unreasonable.

appellant challenging the District Court's fee award of $626.6 million.[54]  This Court

reviews a fee award "for abuse of discretion." *Faught v. American Home Shield*

*Corp.*, 668 F.3d 1233, 1242 (11th Cir. 2011).  "The district court 'has great latitude

in formulating attorney's fees awards subject only to the necessity of explaining its

reasoning so that [the Court of Appeals] can undertake [its] review.'" *Waters v. Int'l*

*Precious Metals Corp.*, 190 F.3d 1291, 1293 (11th Cir.1999). A court must explain

its decision with a level of specificity "proportional to the specificity of the fee op-

ponent's objections." *In re Home Depot, Inc.*, 931 F.3d 1065, 1089 (11th Cir. 2019).

Behenna urged the District Court to limit the fee award to Subscriber Coun-

sel's lodestar of $194 million, arguing that the "settlement does not qualify for com-

mon fund treatment" because the "federal antitrust statutes pursuant to which Plain-

tiffs brought their complaint are fee-shifting statutes." R.2812(20):107; R.2864:212;

R.2931:67.  As the District Court recognized, R.2931:68-69, Behenna's argument

directly contradicts this Court's settled precedent establishing that, for purposes of

awarding fees pursuant to a common fund settlement, it is "of no consequence" that

the claims being resolved arose under a fee-shifting statute. *Equifax*, 999 F.3d at

1279 n.24.  Such fees are not awarded pursuant to the statute under which the claims

---

[54] Only 15 individual class members, all proceeding *pro se*, objected to the fee petition. The overwhelming majority (12 of 15) complained that the proposed award was excessive, without offering substantive argumentation. Only Behenna has appealed the award.

arose, but pursuant to the settlement. *Id.  See Home Depot*, 931 F.3d at 1082. The District Court correctly concluded that here, as in *Home Depot* and *Equifax*, "the parties' settlement involved a common fund settlement, and '[w]here there has been a settlement, the basis for the statutory fee award has been discharged, and it is only the fund that remains.'" *Equifax*, 999 F.3d at 1279 n.24.

Behenna offers an entirely new argument on appeal—a convoluted "bifurcated fee analysis" of his own invention. Because he did not make this new argument below, it is forfeited.  But even if it were properly before the Court, Behenna's new bifurcation proposal is squarely at odds with the well-established standards for assessing fee awards in common fund settlements, standards that the Court below applied scrupulously.

## A.    The District Court Followed Precedent Governing Fee Requests In Common Fund Cases.

Subscriber Counsel filed a lengthy fee petition in support of their presumptively reasonable request for an award of attorneys' fees representing 23.47% of the $2.67 billion common fund. R.2733(1):12-13.  Counsel explained in thorough detail why both the "*Johnson* factors"[55] and the lodestar cross-check confirmed the reasonableness of their fee request. It was also supported by (1) a joint declaration by Co-Lead Counsel detailing the history of the colossal, near-decade-long effort by the

---

[55] *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).

scores of attorneys who litigated and ultimately resolved this case, R.2733(1); (2) the declaration of Special Master Gentle, who attested to the substantial contributions of capital that Counsel made during the litigation and described the process that he regularly used to audit Counsel's time and expense reports, R.2733(5); and (3) expert reports independently prepared by Professors Charles Silver, of the University of Texas School of Law, R.2733(3), and Brian Fitzpatrick, of Vanderbilt Law School, R.2733(4).

The District Court carefully analyzed the request and its supporting materials, finding as an "unassailable fact" that the "Settlement created a common fund of $2,670,000,000," R.2931:68-69. The Court followed well-settled Circuit precedent establishing that "[a]ttorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." R.2931:69. And "[i]n this Circuit, courts typically award between 20–30%, known as the benchmark range." *Home Depot*, 931 F.3d at 1076. "[T]he median of this 20% to 30% range, *i.e.*, 25%, [is] a 'bench mark' percentage fee award…" *Camden*, 946 F.2d at 775*; see Equifax*, 999 F.3d at 1281; *Faught*, 668 F.3d at 1242-43; *Waters*, 190 F.3d at 1294.  The District Court thus concluded that the requested award of 23.47% of the Settlement Fund fell "well within the reasonable range, particularly given the fact the claimed fees do not account for the value of the substantial injunctive relief also secured by the Settlement." R.2931:70 (*quoting Home Depot*, 931

F.3d at 1076).

Because the requested fee did not exceed 25% of the common fund, the District Court was not required to conduct any further analysis, R.2931:70 (citing *Faught*, 668 F.3d at 1242), but it nevertheless went on to analyze the fee request using the *Johnson* factors and to perform a "lodestar cross-check." R.2931:70-73. The *Johnson* factors confirmed the reasonableness of the requested fee, R.2931:70–72; *see also* R.2932:1-5 (¶¶2–7), and the lodestar cross-check multiplier of 3.23 was "fully consistent with the multipliers that courts have found reasonable in similarly complex mega-fund cases." R.2931:73. And the Court offered a reasoned and comprehensive response to Behenna's argument that this is not a common fund case and that the fee award should be limited to Counsel's lodestar because the Sherman Act is a fee-shifting statute. R.2931:67-69.

### B.    Behenna's New "Bifurcated Fee" Proposal Is Both Forfeited And Meritless.

Behenna's appeal should be summarily dismissed, for he has abandoned his argument below that the fee should have been calculated under a statutory fee-shifting analysis, and he failed to raise below his novel "bifurcated fee" argument. Indeed, his bifurcated fee argument has never been presented, as far as we can tell, to any court, anywhere. It is not difficult to understand why.

According to Behenna, the District Court abused its discretion by failing to isolate the portion of the requested fee attributable to work related to the Settlement's

injunctive relief and to assess it separately from the portion of the fee attributable to work related to the monetary relief. "[T]he District Court should have bifurcated its fee analysis into two components: A reasonable fee for Plaintiffs' Counsel's billings related to injunctive relief and, two, a reasonable attorneys' fee related to the monetary relief." Behenna9. The appropriate fee for the injunctive relief must be assessed, says Behenna, under the lodestar methodology. Behenna12-13. After thus "isolating the injunctive relief lodestar," which Behenna says accounts for $146 million of Counsel's total lodestar of $194 million, Behenna17, the District Court should have "treat[ed] it as if it had been fee-shifted as part of its fee analysis," *id.*[56] The remaining $48 million of Counsel's total lodestar is thus the portion attributable to the monetary relief. Behenna25. Then the injunctive relief lodestar of $146 million must be deducted from the total fee request of $626.5 million to determine the amount of the fee request attributable to monetary relief ($480.5 million). *Id.* And when the $480.5 million fee request for the monetary relief is divided by the monetary relief lodestar of $48 million, the result is a lodestar cross-check multiplier of 10 (rather than the 3.23 multiplier calculated by the District Court), *id.*, which shows that the fee award was unreasonably excessive. Q.E.D.

---

[56] We hasten to note that Behenna apparently argues at times that Counsel are not entitled to any compensation at all for the portion of the lodestar attributable to their effort to obtain injunctive relief; Counsel, he says, somehow "bargained away in the settlement the right to pursue payment from Defendants for the injunctive relief-related billings." Behenna9.

### 1.    Behenna Forfeited his "Bifurcated Fee" Argument.

Behenna's argument to this Court is entirely different from the argument presented to, and rejected by, the District Court. This Court has "repeatedly held that 'an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court.'" *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (quoting *Walker v. Jones*, 10 F.3d 1569, 1572 (11th Cir. 1994)). *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1222 n.8 (11th Cir. 2004); *Hurley v. Moore*, 233 F.3d 1295, 1297 (11th Cir. 2000); *Nyland v. Moore*, 216 F.3d 1264, 1265 (11th Cir. 2000); *Literary Works*, 654 F.3d at 255 n.8.

### 2.    Behenna's Fee Argument Is Meritless.

The law in this circuit, and every circuit, is clear that courts are not required to perform the tortuous bifurcated fee analysis described by Behenna whenever a settlement provides both common fund monetary relief and equitable relief. As an initial matter, in a case in which both monetary and equitable remedies are available and sought, the vast bulk of counsel's time and effort is no more (or less) related to one remedial measure than the other, and attempting to allocate billings between them would be arbitrary at best. And even if such an allocation were readily possible, the exercise would defeat Behenna's purpose here, for it would result in a *higher* fee award, one comprised of *both* a fee of 23.47% of the $2.67 billion common fund to

compensate Counsel for the monetary recovery *and on top that fee*, a percentage of Counsel's $194 million lodestar to compensate counsel for the injunctive relief. *See Faught*, 668 F.3d at 1243-44.

This Court and other courts of appeals have consistently instructed that the "non-monetary benefits conferred upon the class by the settlement" are to be included among the factors that the district courts consider when performing the fee analysis in common fund cases. *See, e.g., Camden*, 946 F.2d at 775 ("non-monetary benefits conferred upon the class by the settlement" are among "[t]he factors which will impact upon the appropriate percentage to be awarded as a fee … in common fund cases"); *Poertner v. Gillette Co.*, 618 F. App'x. 624, 628–629 (11th Cir. 2015) (courts "[may] consider … other pertinent factors, including any non-monetary benefits conferred upon the class ... in determining the reasonableness of a fee award"). *See also Staton*, 327 F.3d at 974. The District Court thus did not abuse its discretion by taking account of the value of the injunctive relief obtained for the class in assessing the overall reasonableness of Subscriber Counsel's request for a common fund fee in this case. R.2931:70-71. *See George v. Acad. Mort. Corp.*, 369 F. Supp. 3d 1356, 1379 (N.D. Ga. 2019); *Waters v. Cook's Pest Control, Inc.*, 2012 WL 2923542, at *18 (N.D. Ala. July 17, 2012); *Williams v. Mohawk Indus.*, 2010 WL 11500061, at *13 (N.D. Ga. July 22, 2010).

Behenna apparently got the idea for his bifurcated fee analysis from this

Court's decision in *Faught.* He says it employs a "comparable" bifurcated fee analysis. Behenna16; *see also* Behenna43. It does not. The settlement in *Faught*—unlike the Settlement here—specifically provided for two separate and distinct fee awards: first, Plaintiffs' counsel were authorized to request 25% of the common fund as compensation for obtaining monetary relief for the class; second, defendants agreed to pay class counsel a separate $1.5 million fee, which "did not come from the money set aside for the class," to compensate them for obtaining significant equitable relief. 668 F.3d at 1243. The district court in that case (the same court, incidentally, presiding here) used the percentage method to evaluate the common fund fee award and a fee-shifting analysis to evaluate the separate $1.5 million fee shifting payment. *Id.*

This Court affirmed, rejecting the argument that the district court should have added the $1.5 million payment to the 25% fee award and analyzed the resulting unified award solely under the common fund method. Emphasizing that "the $1.5 million payment [was] designed to compensate the class counsel for the non-monetary benefits they achieved for the class … to which the 25% [common fund] fee is not applied," this Court held that the district court did not err in evaluating the settlement's separate fee provisions separately. *Id.* at 1243-44. *Faught* thus holds that when the parties negotiate a settlement providing for counsel to receive two separate and distinct fee awards, one paid out of the common fund and the other paid directly by defendants, it is appropriate to evaluate the awards separately. Nothing in *Faught*

suggests that when a settlement calls for a single fee to be awarded as a percentage of a common fund, as here, the court is required to employ the bizarre, bifurcated fee analysis that Behenna describes. To the contrary, *Faught* makes clear that attorneys' fees "awarded from a common fund *shall be based upon a reasonable percentage of the fund* established for the benefit of the class." *Id.* at 1242-43 (emphasis added).[57]

Behenna's remaining points in support of his bifurcated fee analysis, to the extent we understand them, are a disjointed pastiche of arguments so facially meritless that they do not warrant response.[58]

---

[57] Behenna thinks that it is somehow pertinent that the parties here *could* have negotiated an agreement like the one at issue in *Faught*, "*could* have negotiated a fee-shifting payment for the injunctive relief lodestar," and "*could* have made this demand after the parties concluded the monetary relief negotiations." Behenna15 (emphasis added). Perhaps they theoretically could have. But they did not.

[58] For example, he disagrees with the District Court's (entirely sound) analysis of each of the 12 *Johnson* factors. Behenna26-43. But he did not offer any response below to the lengthy analysis of the *Johnson* factors in Counsel's fee petition and, in any event, the District Court was not even required to analyze the *Johnson* factors, as the fee award falls below the 25% benchmark award that is presumptively reasonable under this Court's precedents. R.2931:70 (citing *Faught*, 668 F.3d at 1242). Similarly, Behenna makes a confused argument that the Settlement's so-called "quick pay" provision somehow transformed the Settlement into one involving a fee shifting arrangement rather than a common fund (Behenna20-23). Behenna ignores that the "quick pay" funding was merely a fully secured advance on any common fund fee that was ultimately awarded, an advance that would have to be repaid, with interest, if any final fee awarded was less than the amount of the advance or if the Settlement did not otherwise become effective. R.2610(2):45-46(¶28.d). *See* R.2641:46.

* * *

In sum, Behenna fails to show that the District Court abused its discretion in approving Subscriber Counsel's request for attorneys' fees.  To the contrary, the record amply supports the District Court's findings that the fee award appropriately reflects not only Counsel's enormous investment of time, skill, and other resources on behalf of the Subscriber Class in intense litigation for nearly a decade, but also the enormously valuable relief that Counsel secured on behalf of the Class, relief that includes one of the largest monetary recoveries ever achieved in a private anti-trust class action settlement and a package of transformative structural relief that will reshape competition in the health insurance industry for years to come.

## CONCLUSION

For the foregoing reasons, all four Appeals before the Court are meritless, and the Court should affirm the District Court's Final Approval Order and Fee/Expense Award in all respects.

Dated: February 10, 2023

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper
Vincent J. Colatriano
Harold S. Reeves
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9660
ccooper@cooperkirk.com

143

David Boies – ***Co-Lead Counsel***
Adam Shaw
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
dboies@bsfllp.com

Michael Hausfeld – ***Co-Lead Counsel***
Swathi Bojedla
HAUSFELD LLP
888 16th Street, N.W.
Suite 300
Washington, DC 20006
mhausfeld@hausfeldllp.com
sbojedla@hausfeld.com

Jesse Panuccio
BOIES, SCHILLER &
FLEXNER LLP
401 E. Las Olas Blvd., #1200
Fort Lauderdale, FL 33301
jpanuccio@bsfllp.com

Megan Jones
Arthur Bailey
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
mjones@hausfeldllp.com
abailey@hausfeldllp.com

William A. Isaacson
PAUL WEISS
2001 K Street, NW
Washington, DC 20006-1047
wisaacson@paulweiss.com

Richard Feinstein
Hamish P.M. Hume
Adam R. Shaw
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW
Washington, DC 20015
rfeinstein@bsfllp.com
ashaw@bsfllp.com
hhume@bsfllp.com

Chris T. Hellums
PITTMAN, DUTTON & HELLUMS,
P.C.
2001 Park Place N, 1100 Park Place
Tower
Birmingham, AL 35203
chrish@pittmandutton.com

Cyril V. Smith
ZUCKERMAN SPAEDER, LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
csmith@zuckerman.com

David Guin
Tammy Stokes
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd. N.
Suite 600
Birmingham, AL 35203
davidg@gseattorneys.com
tammys@gseattorneys.com

Gregory Davis
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
gldavis@knology.net

Mindee Reuben
LITE DEPALMA GREENBERG
1835 Market Street, Suite 2700
Philadelphia, PA 19103
Tel: (267) 314-7980
Fax: (973) 623-0858
mreubin@litedepalma.com

Patrick Cafferty
CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP
101 North Main Street, Suite 565
Ann Arbor, MI 48104
pcafferty@caffertyclobes.com

Kathleen Chavez
FOOTE, MIELKE, CHAVEZ &
O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
kcc@fmcolaw.com

Nate Cihlar
Joshua Callister
STRAUSS & BOIES
4041 University Drive, 5th Floor Fairfax,
VA 22030 Tel: (703) 764-8700 Fax:
(703) 764-8704
ncihlar@straus-boies.com
jcallister@straus-boies.com

Carl S. Kravitz
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
ckravitz@zuckerman.com

Bryan Clobes
Ellen Meriwether
CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP
1101 Market Street, Suite 2650
Philadelphia, PA 19107
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

145

Douglas Dellaccio
CORY WATSON CROWDER &
DEGARIS, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 32505
ddellaccio@cwcd.com

Edwin J. Kilpela, Jr.
Benjamin Sweet
DEL SOLE CAVANAUGH STROYD
LLC
200 First Avenue, Suite 300
Pittsburgh, PA 15222
ekilpela@dsclaw.com
bsweet@dsclaw.com

Robert M. Foote
FOOTE, MIELKE, CHAVEZ &
O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
rmf@fmcolaw.com

Daniel Gustafson
Daniel C. Hedlund
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

John Saxon
JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203-3314
jsaxon@saxonattorneys.com

Larry McDevitt
David Wilkerson
VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com

Charles T. Caliendo
GRANT & EISENHOFER
485 Lexington Avenue
New York, NY 10017
ccaliendo@gelaw.com

Robert Eisler
GRANT & EISENHOFER
123 Justison Street
Wilmington, DE 19801
reisler@gelaw.com

Brent Hazzard
HAZZARD LAW, LLC
447 Northpark Drive
Ridgeland, MS 39157
brenthazzard@yahoo.com

Lawrence Jones
JONES WARD PLC
312 South Fourth Street, Sixth Floor
Louisville, KY 40202
larry@jonesward.com

146

Andrew Lemmon
LEMMON LAW FIRM
650 Poydras Street, Suite 2335
New Orleans, LA 70130
andrew@lemmonlawfirm.com

Robert Methvin
James M. Terrell
MCCALLUM, METHVIN & TER-
RELL, P.C.
The Highland Building
2201 Arlington Avenue South
Birmingham, AL 35205
rgm@mmlaw.net
jterrell@mmlaw.net

H. Lewis Gillis
MEANS GILLIS LAW, LLC
3121 Zelda Court
Montgomery, AL 36106
hlgillis@tmgslaw.com

David J. Hodge
MORRIS, KING & HODGE
200 Pratt Avenue NE
Huntsville, AL 35801
lstewart@alinjurylaw.com

Virginia Buchanan
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR,
P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
vbuchanan@levinlaw.com

Michael McGartland
MCGARTLAND & BORCHARDT
LLP
1300 South University Drive, Suite 500
Fort Worth, TX 76107
mike@attorneysmb.com

Warren T. Burns
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
wburns@burnscharest.com

*Counsel for Plaintiffs-Appellees*

147

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit established by the Court's Order of January 30, 2023, Doc. 144, granting "Appellees' Motion to Exceed Word Limit" filed on January 4, 2023, Doc. 139, and extending the word limit to 35,000 words, because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 34,627 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).

Dated: February 10, 2023

/s/ Charles J. Cooper
Charles J. Cooper
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. Those counsel for Appellants, Appellees, and Amicus who are registered ECF users will be served by the ECF system.

Dated: February 10, 2023

/s/ Charles J. Cooper
Charles J. Cooper
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

*Counsel for Plaintiffs-Appellees*