IN THE UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

---

USCA Case No. 22-13051

On Appeal from the United States District Court,
Northern District of Alabama
Case No. 2:13-cv-20000

---

*In re: Blue Cross Blue Shield Antitrust Litigation*

---

## THE HOME DEPOT APPELLANTS' REPLY BRIEF

FRANK M. LOWREY IV
Georgia Bar No. 410310
RONAN P. DOHERTY
Georgia Bar No. 224885
E. ALLEN PAGE
Georgia Bar No. 640163
BONDURANT MIXSON &
ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309-3417
(404) 881-4100
lowrey@bmelaw.com
doherty@bmelaw.com
page@bmelaw.com


*Attorneys for Appellants Home Depot U.S.A., Inc., et al.*

USCA Case No. 22-13051
*In re: Blue Cross Blue Shield Antitrust Litigation*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

### Certificate of Interested Persons

Pursuant to 11th Cir. R. 26.1-2(b), the Home Depot Appellants ("Home Depot") certify that they believe the Certificate of Interest Persons is complete.

### Corporate Disclosure

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, Home Depot submits this Corporate Disclosure Statement and states as follows:

1.     Appellant Home Depot U.S.A., Inc. is wholly owned by HD Operations Holding Company, Inc., which is wholly owned by The Home Depot, Inc., a publicly traded company. No publicly traded corporation owns 10% or more of the stock of The Home Depot, Inc.

2.     The Home Depot Group Benefits Plan and The Home Depot Medical and Dental Plan are related HD entities. Neither plan is publicly traded.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ..................................................................1

    Certificate of Interested Persons.....................................................1

    Corporate Disclosure .....................................................................1

TABLE OF CONTENTS.........................................................................i

TABLE OF CITATIONS ..................................................................... iii

ARGUMENT AND AUTHORITY ........................................................1

    I.    The Settlement's compulsory perpetual release violates public
        policy. ..................................................................................1

        A.    The Settling Parties ignore the Supreme Court's repeated
            warning that prospective waivers of antitrust remedies
            violate public policy.....................................................2

        B.    The Settling Parties cannot distinguish *Redel's*..........6

        C.    The release cannot be approved on the rationale that it
            does not apply to "clearly illegal" conduct..............12

        D.    The release cannot be approved under the identical-
            factual-predicate limitation. ......................................15

            1.    The plain language of the release is not limited to
                claims based on the identical factual predicate as
                challenged pre-release conduct.......................15

            2.    The facial overbreadth of a release must be
                addressed at settlement approval. ...................19

            3.    The future release would violate antitrust policy
                even if it barred only claims with the identical
                factual predicate............................................21

i

4.    *In re Managed Care* does not sustain this release and, if it did, that would be inconsistent with prior Circuit precedent...........................................................22

E.    The low prospects for individualized relief or non-party or government enforcement cannot salvage the release................24

II.    The district court erred by approving a settlement where the same plaintiffs and their counsel represented (b)(2) and (b)(3) class members with materially different settlement priorities. ....................26

A.    Overlap between the (b)(2) and (b)(3) classes does not negate the conflict between class members with materially different settlement priorities. ...................................................27

B.    The involuntary (b)(2) class included subscribers with fundamentally different settlement priorities as to injunctive relief and damages. .................................................31

C.    The Settlement violates Rule 23(a)(4) and due process because material differences in the class members' settlement priorities precluded unitary representation.............35

D.    The Subscribers cite inapplicable cases involving variations in the value of class members' damages claims, not trade-offs between different forms of relief.......................40

CONCLUSION ....................................................................................41

ii

## TABLE OF CITATIONS

Case                                                                      Page

*14 Penn Plaza LLC v. Pyett*,
    556 U.S. 247 (2009)...................................................................4

*\*AmChem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997).........................................................*passim*

*American Express Co. v. Italian Colors Restaurant*,
    570 U.S. 228 (2013)...................................................... 4, 8-9, 22

*Arizona v. California*,
    530 U.S. 392 (2000)..................................................................18

*Bennett v. Behring Corp.*,
    96 F.R.D. 343 (S.D. Fla. 1982).............................................. 12-14

*Brooklyn Savings Bank v. O'Neil*,
    324 U.S. 697 (1945)................................................................5, 9

*California v. Am. Stores Co.*,
    495 U.S. 271 (1990)..................................................................25

*Evans v. Georgia Reg'l Hosp.*,
    850 F.3d 1248 (11th Cir. 2017) .......................................................6

*Evans v. Jeff D.*,
    475 U.S. 717 (1986)....................................................................8

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
    2023 WL 25065455 (2d Cir. Mar. 15, 2023) ......................... 20-21

*Fox Midwest Theatres v. Means*,
    221 F.2d 173 (8th Cir. 1955) ....................................................4, 7

*Gaines v. Carrolton Tobacco Board of Trade, Inc.*,
    386 F.2d 757 (6th Cir. 1967) ........................................................4

*Grunin v. International House of Pancakes*,
    513 F.2d 114 (8th Cir. 1975) ..........................................................................12

*In re Checking Account Overdraft Litig.*,
    2022 WL 472057 (11th Cir. Feb. 16, 2022) ...............................................40

*In re Equifax Inc. Customer Data Security Breach Litigation*,
    999 F.3d 1247 (11th Cir. 2021) ......................................................................40

*In re Ins. Brokerage Antitrust Litig.*,
    579 F.3d 241 (3d Cir. 2009) ..........................................................................40

*In re Literary Works in Elec. Databases Copyright Litig.*,
    654 F.3d 242 (2d Cir. 2011) ............................................................ 29-30, 37

*In re Managed Care Litigation*,
    756 F.3d 1222 (11th Cir. 2014) ............................................................. 22-24

*\*In re Payment Card Interchange Fee & Merchant Discount Antitrust
    Litigation*,
    827 F.3d 223 (2d Cir. 2016) .............................................................26, 29, 39

*In re Pet Foods Prod. Liability Litig.*,
    629 F.3d 333 (3d Cir. 2010)  .........................................................................40

*Int'l Salt Co. v. United States*,
    332 U.S. 392 (1947).........................................................................................13

*Kilgoar v. Colbert Cty. Bd. of Educ.*,
    578 F.2d 1033 (5th Cir. 1978) ......................................................................18

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997).........................................................................................23

*\*Lawlor v. National Screen Service Corp.*,
    349 U.S. 322 (1955).................................................................................*passim*

*Lee v. Flightsafety Servs. Corp.*,
    20 F.3d 428 (11th Cir. 1994) ...........................................................................7

iv

*Minnesota Mining & Mfg. v. N.J. Wood Finishing Co.*,
  381 U.S. 311 (1965)....................................................25

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985)............................................... 4-5, 8

*Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*,
  198 F.3d 823 (11th Cir. 1999) .....................................24

*Nall v. Mal-Motels, Inc.*,
  723 F.3d 1304 (11th Cir. 2013) .....................................5

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999)..............................................*passim*

*Parker v. DeKalb Chrysler Plymouth*,
  673 F.2d 1178 (11th Cir. 1982) .....................................5

*Pforr v. Parvati Lodging, LLC*,
  2021 WL 5033502 (N.D. Fla. May 5, 2021) ...................5

*\*Redel's Inc. v. General Electric Co.*,
  498 F.2d 95 (5th Cir. 1974) ................................*passim*

*Sapp v. Linked Commc'ns*,
  2014 WL 1584497 (N.D. Fla. Apr. 21, 2014) ................5

*Scott v. United States*,
  890 F.3d 1239 (11th Cir. 2018) ...................................13

*\*TVPX ARS, Inc. v. Genworth Life & Annuity Insurance Co.*,
  959 F.3d 1318 (11th Cir. 2020) .............................*passim*

*United States v. Jones*,
  29 F.3d 1549 (11th Cir. 1994) .....................................39

*\*Valley Drug Co. v. Geneva Pharms., Inc.*,
  350 F.3d 1181 (11th Cir. 2003) ................................ 30, 35-36, 38

v

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011)..............................................................................10

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
 396 F.3d 96, 111 (2d Cir. 2005) ...................................................41

*Walthour v. Chipio Windshield Repair, LLC*,
 745 F.3d 1326 (11th Cir. 2014) ......................................................9

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
 401 U.S. 321 (1971)..............................................................................23

Other:

28 U.S.C. § 2072(b) .................................................................................8

Fed. R. Civ. P. Rule 23(a)(4) .......................................................1, 26, 35

Fed. R. Civ. P. Rule 23(b)(2) ..........................................................1, 9, 27

Fed. R. Civ. P. Rule 23(c)(4)(B)...............................................................30

Fed. R. Civ. P. Rule 23(e)(2) ......................................................................9

Fed. R. Civ. P. Rule 23(e)(2)(D)..............................................................32

## ARGUMENT AND AUTHORITY[1]

For two reasons, this Court should not affirm the settlement approval. First, the Settlement features an involuntary release of future antitrust claims that precedent forbids. And second, the representation of the involuntary 23(b)(2) settlement class failed to satisfy Rule 23(a)(4) and due process.

## I.    The Settlement's compulsory perpetual release violates public policy.

Home Depot objects to the Settlement's compulsory *release* of future claims for injunctive relief based on post-settlement conduct. Home Depot does not, as the Settling Parties would frame it, contend the Subscribers had to litigate all injunctive relief claims to final judgment. Home Depot's very different point is that the law does not allow the parties to use their settlement to shield future antitrust violations from the private remedies that Congress enacted to protect competition.

As the Subscribers acknowledge, private enforcement—including the full array of private remedies that Congress has authorized—is "a critical component in the nation's antitrust enforcement regime."[2] Home Depot objected to the Settlement because it allows three dozen entities with enormous collective power

---

[1] Home Depot cites to the District Court docket as D-___:##, where the underlined is the docket number and the ## represents the page number in CM/ECF. We cite to our appellant brief, Dkt.120, as HD:#, the Subscribers' Brief, Dkt. 147, as "SUB:#" and the Blues' Brief, Dkt. 146, as "BLUE:#," also using the CM/ECF page number.

[2] SUB:63.

over healthcare costs to contract out of private enforcement and remedies—forever. Although the settlement halts some of the Blues' restrictions, it would perpetuate a customer allocation scheme that prevents national employers like Home Depot from receiving competitive bids from all the Blue-branded defendants interested in competing for their business. And the compulsory future release forever impairs Home Depot—and every other employer—from seeking an injunction breaking apart those horizontal restrictions to secure more competition, more choice, and lower prices for employers and employees alike. No matter what the health insurance market looks like in five, ten, or even fifty years, this release prevents National Accounts from using the remedies Congress authorized to combat the Blues' market allocation.

### A.    The Settling Parties ignore the Supreme Court's repeated warning that prospective waivers of antitrust remedies violate public policy.

The Settling Parties try to diminish the case law prohibiting agreements to release private claims for future antitrust violations, but it is long-standing. In *Lawlor v. National Screen Service Corp.*, the Supreme Court held that an antitrust settlement that produced a dismissal with prejudice did not bar a subsequent claim for similar antitrust violations that post-dated the settlement.[3]

---

[3] 349 U.S. 322 (1955).

In the preceding case, the plaintiff settled after seeking an injunction to stop the alleged antitrust violations. When the same plaintiff sued again to challenge "essentially the same course of wrongful conduct," the trial court granted summary judgment, based on the *res judicata* effects of the judgment entered under the settlement.[4] But the Supreme Court reversed because all the "conduct presently complained of was subsequent to the [first] judgment."[5] While the settlement judgment precluded pre-judgment claims, the *Lawlor* Court held that "it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case."[6]

The Court also explained that the earlier compromise of the injunction claim that "if granted, would have prevented the illegal acts now complained of" did not change the outcome.[7] As in this case, the parties could settle the injunctive relief claim, but they could not foreclose future claims to challenge conduct after the settlement judgment. In words that could have been written for this case, *Lawlor* explains that neither procedure nor antitrust policy allows a settling defendant to

---

[4] *Id.* at 327.

[5] *Id.* at 329.

[6] *Id.* at 328.

[7] *Id.*

bargain away the prospect of private enforcement to address future antitrust violations:

> Particularly is this so in view of the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action. *Acceptance of the respondents' novel contention would in effect confer on them a partial immunity from civil liability for future violations. Such a result is consistent with neither the antitrust laws nor the doctrine of res judicata.*[8]

This Court's precedent in *Redel's Inc. v. General Electric Co.* expressly follows *Lawlor*.[9] And the Supreme Court cited both cases in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, saying that public policy would condemn any agreement that operated "as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations."[10] The Subscribers dismiss this as "*dicta* buried deep in a footnote,"[11] but the Supreme Court repeated the point again in *American Express Co. v. Italian Colors Restaurant*.[12] Although the Court divided

---

[8] *Id.* at 329 (emphasis added).

[9] 498 F.2d 95, 98-99 & n.4 (5th Cir. 1974).

[10] 473 U.S. 614, 637 n.19 (1985) (*citing Redel's*, 498 F.2d at 98-99; *Gaines v. Carrolton Tobacco Board of Trade, Inc.*, 386 F.2d 757, 759 (6th Cir. 1967); *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955). *Cf. Lawlor*, 349 U.S. at 329)).

[11] SUB:76.

[12] 570 U.S. 228, 236 (2013). *See also 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009) (public policy forbids waivers of certain ADEA remedies).

over the class arbitration question at issue, the justices agreed that the law forbids the prospective waiver of private antitrust claims.[13]

The courts have applied the same public policy to protect similar private enforcement regimes Congress enacted to protect public interests. In *Brooklyn Savings Bank v. O'Neil*, for example, the Supreme Court held that a plaintiff cannot waive liquidated damages in a FLSA settlement because that would defeat the statute's deterrent effects.[14] And in *Nall v. Mal-Motels, Inc.*, this Court employed this reasoning to reject such a settlement.[15] Under the FLSA, like with class actions, the district court must "scrutiniz[e] the settlement for fairness,"[16] and in doing so, courts have struck down settlements that waived prospective claims.[17] This Court similarly applied *Brooklyn Savings* to bar a settlement releasing TILA claims.[18]

---

[13] The majority cited *Mitsubishi Motors* for the policy objection to prospective waivers of antitrust claims. 570 U.S. at 236. The dissent cited *Lawlor* for the "uncontroversial proposition" that "[w]e would refuse to enforce an exculpatory clause insulating a company from antitrust liability—say, 'Merchants may bring no Sherman Act claims,'" and *Mitsubishi* to confirm "courts will not enforce a prospective waiver of the right to gain redress for an antitrust injury, whether in an arbitration agreement or any other contract." *Id.* at 241 (Kagan, J., dissenting).

[14] 324 U.S. 697, 706 (1945).

[15] 723 F.3d 1304, 1306 (11th Cir. 2013).

[16] *Id.*

[17] *E.g., Pforr v. Parvati Lodging, LLC*, 2021 WL 5033502, at *1 (N.D. Fla. May 5, 2021); *Sapp v. Linked Commc'ns*, 2014 WL 1584497, at *1 (N.D. Fla. Apr. 21, 2014).

[18] *Parker v. DeKalb Chrysler Plymouth*, 673 F.2d 1178, 1181 (11th Cir. 1982).

### B.    The Settling Parties cannot distinguish *Redel's*.

*Redel's* applies this long-standing precedent by prohibiting the release of future antitrust claims.[19] *Redel's* is binding precedent enforcing vital antitrust policy, and the Settling Parties offer no principled reason why it does not bar the release here. First, they fruitlessly attempt to reduce *Redel's* to a concern about the release's *generality*. Clearly that was not the issue because *Redel's* enforced the general release to bar *pre*-release antitrust claims.[20] And *Redel's* public policy concern over allowing competitive restraints to continue unchallenged would apply if the release had specified antitrust claims.

Second, the Subscribers claim that *Redel's* invalidated the release because it applied to all antitrust claims, not merely those arising from the "identical factual predicate" as pre-release conduct. But, as the Subscribers recognize, the issue in *Redel's* was whether the "release barred claims for price discrimination the defendant franchisor was alleged to have committed *both before and after* executing the agreement."[21] *Redel's* thus held that the release could not bar future antitrust claims based on continued pre-release conduct. And *Redel's* cited *Lawlor*, where the

---

[19] This was one of two bases for the holding, but *each* is binding precedent. *See Evans v. Georgia Reg'l Hosp.*, 850 F.3d 1248, 1255-56 (11th Cir. 2017).

[20] 498 F.2d at 98-100.

[21] SUB:76 (emphasis added).

second lawsuit challenged "essentially the same course of wrongful conduct" as the previously settled one.[22]

Third, the Settling Parties argue that *Redel's* did not involve a settlement, particularly not a class settlement. But *Redel's* reasoning—and the legislative policy it enforces—applies whether a release of future antitrust claims appears in a franchise renewal or a litigation settlement. The *public* interest in private antitrust enforcement doesn't change depending on the name of the agreement containing the release or the nature of the consideration.[23] Nothing in *Redel's* suggests the case would have turned out differently if the renewed franchise agreement and release had resolved litigation. To the contrary, *Redel's* relied on *Lawlor,* where the judgment was the product of a litigation settlement, and on the Eighth Circuit's reasoning in *Fox Midwest Theatres*, where the release appeared in a litigation settlement.[24]

Nor does the class nature of a settlement assuage the policy objection. Precluding an entire class of consumers from enforcing antitrust law has a far greater effect on the public interest than precluding only one. And Rule 23, like all Federal

---

[22] 349 U.S. at 327.

[23] *See, e.g., Lee v. Flightsafety Servs. Corp.*, 20 F.3d 428, 432 (11th Cir. 1994) (legislative policy prohibits releasing FSLA claims in a collective bargaining agreement).

[24] 498 F.2d at 99 & n.4 (citing 221 F.2d at 180).

Rules of Civil Procedure, cannot alter substantive law.[25] It cannot authorize a release on behalf of many that would violate legislative policy for one.[26] The Settling Parties say other cases have settled without addressing these objections, but they offer no substantive response.

Moreover, if there is some class exception to the policy prohibiting prospective releases of antitrust remedies, surely the Supreme Court would have noted it in *Italian Colors*, where the plaintiff sought to represent a class on antitrust claims. Rather than carve out an exception, the Court held that the class waiver in an arbitration agreement did not violate the legislative policy for private antitrust enforcement because it did not effect a "prospective waiver of a party's right to pursue statutory remedies."[27] But that is exactly what this release would accomplish. Unlike the *Italian Colors* plaintiff, which retained the right to bring an individual antitrust claim for all private remedies in arbitration, this release deprives Home Depot—and virtually every other private plaintiff—of the "right to pursue the

---

[25] *See* 28 U.S.C. § 2072(b).

[26] *See* HD:64.

[27] 570 U.S. at 236 (*quoting Mitsubishi Motors*, 473 U.S. at 637 n.19). *Cf. also Evans v. Jeff D.*, 475 U.S. 717 (1986) (considering the merits of a policy objection to a class action settlement rather than dismissing it as irrelevant to the settlement approval question).

statutory remed[y]" of an injunction to challenge the Blues ongoing restrictions in any forum.[28]

Beyond that, class settlement approval entails judicial deference to any private bargain within the wide range of reasonableness under the Rule 23(e)(2) factors—that is the extent of the review.[29] In holding that public policy does not tolerate private agreements to release future antitrust claims, *Redel's* did not inquire whether the releasor had made a reasonable bargain, nor did it evaluate its prospects of success had it litigated the alleged violation to resolution. None of that mattered to the Court's holding, and the law is no different here just because the release appears in a class settlement.

Subscribers urge that, without compulsory Rule 23(b)(2) releases of future antitrust claims no antitrust class action that includes injunctive relief claims could settle. Even if that were true, the Federal Rules cannot enable parties to do something that substantive law does not permit. But it is not true, and the Subscribers' protestations are both overblown and unfounded.

---

[28] *Id*.; *see also Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1336 (11th Cir. 2014) (distinguishing the permitted waiver of a litigation mechanism in *Italian Colors* with the prohibited waiver of a substantive right in *Brooklyn Savings*).

[29] HD:65-66.

For example, class settlements never compel the release of future *damages* claims for continuing conduct, since damages claims require 23(b)(3) certification and the concomitant right of opt-out.[30] Yet antitrust class actions for damages still settle; the prospect of ongoing liability (typically to the largest purchasers with strong incentives to pursue stand-alone claims) merely affects the settlement price.

Nor would taking *Redel's* at its word foreclose settlements involving injunction claims. Once again, enforcing this precedent will affect the terms of the bargain. But as long as settling parties know that they cannot buy or sell protection against future enforcement under *Lawlor* and the cases that follow, there is no reason they cannot compromise on injunctive relief.

The inability to release future claims may lead to more merits determinations regarding practices defendants wish to maintain. For example, the pre-Settlement summary judgment ruling condemning the National Best Efforts Rule led the Blues' to abandon that rule, rather than attempt to perpetuate it by settlement.[31] In approving the settlement, the district court cited evidence that this rule was responsible for the majority of past damages.[32] Yet the Blues did not agree to abandon that rule via settlement before losing a merits ruling.

---

[30] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363 (2011).

[31] HD:47.

[32] D-2931:41.

Additional merits rulings and narrower protection for future restraints are not costs to be avoided; they are benefits of the vigorous private enforcement Congress enacted to protect competitive markets. Indeed, the Subscribers hail this case as Exhibit A for those benefits. But no matter their gains, they may not bargain away *further enforcement* to challenge *future violations*. In any conflict between "private enforcement as the hallmark of the federal antitrust regulatory system" and judicial policy favoring settlement, this Court has held that "the first must prevail."[33]

To be sure, the Settling Parties cite cases where other courts have approved future antitrust releases. But, as discussed below and in Home Depot's initial brief, those examples of expediency cannot overcome antitrust policy or this Court's precedent enforcing it. If anything, the claim that mandatory (b)(2) releases to shield continuing conduct from antitrust scrutiny are becoming a standard feature of class settlements underscores the importance of the question before the Court. The future of private antitrust enforcement should not be held captive to private bargains that use staggering cash payments to confiscate the future remedies of the defendants' entire customer base.

---

[33] 498 F.2d at 100.

C.    **The release cannot be approved on the rationale that it does not apply to "clearly illegal" conduct.**

The Settling Parties wrongly contend that a settlement may release any future conduct that is not "clearly illegal." First, their claim that this is Circuit law rests upon their unsupported assertion that the *Bennett v. Behring Corp.* settlement included a release of future antitrust claims that must have been approved, even though no such release is mentioned in the district or circuit court opinions.[34] Nothing indicates that the *Bennett* objectors were complaining about a release of their rights to bring individual claims for post-settlement conduct—if that had been their agenda, they would have opted out, as over 2,000 class members did.[35] Although the Subscribers scoff, this Court's description of the *Bennett* objection is most logically read as a complaint about the scope of *relief*, *i.e.*, that the settlement did not dismantle the allegedly illegal tying arrangement outright, even though it "provide[d] an opportunity to terminate" the arrangement through subsequent action.[36]

---

[34] 96 F.R.D. 343 (S.D. Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984).

[35] *Id*. at 346.

[36] *Id*. at 354. The same is true for *Grunin v. International House of Pancakes*, where the district court rejected an initial settlement that did not amend the challenged lease agreements and "would bar class members from seeking further injunctive relief." 513 F.2d 114, 120 (8th Cir. 1975). But the ruling the Settling Parties invoke approved a second settlement that achieved some changes in conduct and says nothing about a release of future claims for injunctive relief.

Notably, *Bennett* did not mention, let alone distinguish *Redel's*. That omission suggests that the Settling Parties are overreading the case as approving a future release. But even if they are correct, this Court must follow *Redel's*, which governs over any later, inconsistent panel precedent.[37]

Second, the release here would not fit even within the Settling Parties' reading of *Bennett* because it encompasses claims that post-Settlement conduct is *per se* illegal. For example, if a subscriber opts out of the (b)(3) class, sues for damages, and thereby establishes the *per se* illegality of post-Settlement conduct, the (b)(2) release would nonetheless foreclose any market-wide declaratory or injunctive relief. Despite showing a *per se* violation, no private litigant could "effectively pry open to competition a market that has been closed by defendants' illegal restraints," which the Supreme Court identifies as the *public* purpose of the Clayton Act's broad injunctive remedies.[38]

Third, as the Blues recognize, whether the *per se* standard applies to key restraints the Settlement preserves, including the horizontal allocation of the right to bid on National Accounts, remains unresolved.[39] So even if "clearly illegal" means

---

[37] *Scott v. United States*, 890 F.3d 1239, 1257 (11th Cir. 2018).

[38] *Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947) (emphasis added); HD69.

[39] BLUE:83.

only "*per se* illegal," rather than illegal under the equally important rule of reason,[40] the district court has *not* determined whether the Settlement protects "clearly illegal" conduct. Nevertheless, the court approved a (b)(2) release that would prohibit a class member who proved the *per se* illegality of that allocation agreement from obtaining an injunction dismantling it.[41]

Finally, if the Settling Parties mean that a release may protect a continuing competitive restraint so long as it has not *already* been held *per se* illegal, that would be flatly inconsistent with *Lawlor*, *Redel's*, and the entire line of cases cited above. *Redel's* didn't inquire whether the franchisor's pricing behavior was clearly illegal, *per se* illegal, or illegal at all. Instead, *Redel's* rejected a future release of antitrust claims—regardless of their strength—because it foreclosed private litigation to determine the merit of post-settlement claims. Under the Settling Parties' reading, therefore, *Bennett* would violate the prior precedent rule.

If the uncertainty of an undecided issue were enough to sustain a perpetual release of future antitrust claims, then the legislative policy *Redel's* enforced would

---

[40] *See* HD:88-89 (addressing the rule of reason).

[41] Relatedly, the Subscribers claim that Home Depot conceded that the legality of the post-Settlement restraints was uncertain. But read in context, uncertain meant *unresolved* and, more importantly, not *resolvable* through this settlement approval process (with both parties on the same side) because that would be an advisory opinion. D-2875:15-17. That's the same point Home Depot made in HD:65-66, not a concession.

mean very little. Under that standard, the public's interest in private antitrust enforcement would be at the mercy of litigation timing—so long as defendants settle early enough and pay enough, they could forever sideline their entire customer base without their consent. Their bargain would foreclose the very litigation that would determine *whether* their conduct was clearly illegal. The settling parties cannot reconcile that position with *Redel's* or the legislative policy it enforces.

### D.   The release cannot be approved under the identical-factual-predicate limitation.

The Parties also contend that a party may release future antitrust claims so long as they arise from the identical factual predicate ("IFP") as pre-release conduct. But the release here does not conform to that limitation and, even if it did, the IFP limitation is a *res judicata* doctrine that has nothing to do with antitrust policy.

### 1.   The plain language of the release is not limited to claims based on the identical factual predicate as challenged pre-release conduct.

This Court's decision in *TVPX ARS, Inc. v. Genworth Life & Annuity Insurance Co.* establishes that the IFP rule imposes the same limitations on releases that it does on merits judgments.[42] Thus, a class action settlement challenging an insurer's "cost of insurance" deductions could not bar post-settlement claims based on the same deductions because the calculation method had allegedly changed post-

---

[42] 959 F.3d 1318, 1325-27 (11th Cir. 2020) (emphasis added).

settlement.[43] Because of that one fact difference, *res judicata* did not apply and so neither could the release, even though the new claims involved the same policies and "[p]recisely the same primary right and duty."[44] In other words, when it comes to claim preclusion, "identical" means "identical."

The release here extends well beyond claims with the IFP as pre-release claims. It expressly encompasses all claims "based upon, arising from, or relating in any way to" either the factual predicates of the settled actions *or* any issues raised in any filing in those actions.[45] And it applies that release to "claims that arise after the Effective Date," *i.e.*, forever.[46] Fifty years from now, regardless of the state of health insurance market or any other changed circumstances, the release bars a claim that did not exist at the time of settlement but that the Blues can somehow relate to any fact at issue in this litigation.

So, the settlement does not require that *all* the factual predicates be the same, although that is precisely what *TVPX* requires. And it releases claims involving different factual predicates, so long as the claim relates in any way to an issue raised anywhere in a decade of pleadings. The approval order may *say* that "any released

---

[43] *Id.* at 1326-28.

[44] *Id.* at 1326.

[45] D-2610-2 ¶1(uuu).

[46] *Id.*

claim here would by definition arise from continued adherence to the existing arrangements that are 'the factual predicates of the Subscribers Actions' or the injunctive relief provided under the Agreement," but that's not what the release says.[47] Tellingly, that summary rewrites the release to impose a limitation ("based on an identical factual predicate") that does not appear in the agreement.[48] Likewise, both Settling Parties rely on assurances about what the release supposedly means, rather than what it says.[49] But the Blues will surely cite their bargained-for language when they face a future suit that they say "relat[es] in any way" to issues raised in this decade-long litigation.

Separately, extending the release to practices approved by the Monitoring Committee *inherently* exceeds the IFP limitation because that Committee only reviews "*new* rules or measures" the Blues adopt *after* Settlement.[50] If it determines that a new "rule, regulation, or action is outside the scope of [the injunctive relief provisions of] Paragraphs 10–18," then the release expands to cover it.[51] But just as "identical" does not mean "'conduct … of *the same nature* as the conduct

---

[47] D-2931:56.

[48] D-2931:54.

[49] SUB:81-82; BLUE:61-63.

[50] D-2610-2 at 38 ¶20 (emphasis added).

[51] *Id.* 38-39 ¶20(a)(iii).

complained of in a prior lawsuit'"[52] it does not mean new conduct merely "within the scope" of past practices.

Finally, the Subscribers wrongly construe Home Depot's citation to *res judicata* cases as some concession. They reason that, if *res judicata* can bar future claims, then so can a settlement. But as *Lawlor* explains*, claim preclusion *doesn't* bar claims arising after judgment,[53] which under antitrust law includes post-judgment sales and other injuries based on continuing conspiracies.[54] And, unlike adjudicated judgments, settlement judgments have no *issue*-preclusion effect (*e.g.*, on whether the defendants conspired or whether a practice violates antitrust law) unless the parties so agree.[55] Such an agreement to bar *unadjudicated* future antitrust issues and claims would offend the same public policy constraints as an agreement to release them. Of course, the *res judicata* effects of a *merits* judgment are different; in those circumstances, a court has ruled upon the legality of a restraint, rather than merely approved a bargain allowing it to continue.

---

[52] 959 F.3d at 1326-27 (quoting *Kilgoar v. Colbert Cty. Bd. of Educ.*, 578 F.2d 1033, 1035 (5th Cir. 1978) (emphasis added)).

[53] 959 F.3d at 1326.

[54] HD:70-71.

[55] *Arizona v. California*, 530 U.S. 392, 414 (2000).

### 2.    The facial overbreadth of a release must be addressed at settlement approval.

The Settling Parties can't dispute that the release language exceeds the IFP limitation under *TVPX*. Instead, they ask this Court to ignore the release's actual language—the Subscribers even call it "boilerplate"[56]—and approve the deal anyway. To avoid confronting that language, the Blues claim that Home Depot confuses "whether a release is lawful and may be approved in the first instance (the question here), with whether a subsequently asserted claim falls within the scope of a *previously approved* release (a question that cannot be answered now)."[57] Those are different questions. But Home Depot raises only the first, and the answer depends upon whether the release language is overbroad in violation of public policy.

To be sure, the Settling Parties cite approved settlements with phrasing like the "relating in any way to" language here. But these cases provide no reason *why* a court may approve a release with facially overbroad language over an asserted objection. For example, the Settling Parties note that the *McBride* settlement at issue in *TVPX* had such language. But in *McBride*, "[n]o class members objected" and anyone who wanted to opt out, rather than be bound by the release, could do so.[58]

---

[56] SUB:80.

[57] BLUE:62.

[58] 959 F.3d at 1323.

This type of approval of an unchallenged overbroad release means nothing. And some courts' refusal to apply previously-approved releases to bar some subsequent claims similarly doesn't mean that the settlement court—or this Court—should approve an overbroad release when it has been properly challenged at the approval stage. As the Blues emphasize, a release is a crucial term of a settlement—it should receive no less scrutiny than any other term.

Ultimately, the Settling Parties cite no precedent requiring this Court to approve a settlement containing a facially-overbroad release and leave the question of its validity to later courts.[59] Among other things, approving this overbroad release would have an *in terrorem* effect to deter any future challenge, because the district court has *already* enjoined all class members from bringing any action "based in whole or in part upon, arising out of, or in any way connected or related to any Released Claim"[60] and referenced the prospect of contempt.[61] Thus, challenging the

---

[59] To the extent the Second Circuit adopted that approach in approving a damages-only settlement in the *Payment Card* litigation, this Court should not do the same. *See Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 2023 WL 25065455 (2d Cir. Mar. 15, 2023). Deferring the question means that a defendant must pay for a release without knowing whether it is categorically void as to future claims; that result makes no sense. Indeed, the Second Circuit did not adopt the same approach when it rejected the first attempt to settle with a compulsory (b)(2) release of all injunctive relief negotiated via conflicted unitary representation. HD:52.

[60] D-2931:88.

[61] D-2864:107-09, 175-76.

release is also challenging an injunction already entered against Home Depot and other class members.

If, however, this Court accepts the Settling Parties' invitation to leave Home Depot's challenge for another day in another court, it should do so expressly. Similarly, if the Court affirms because the prospective waiver of antitrust enforcement will not be enforceable in future cases, it is essential that the Court say so. The same is true again if, notwithstanding the release language, the Court concludes that the release is lawful because it would not bar (1) claims seeking to establish the clear illegality of post-settlement conduct (per the "clearly illegal" discussion above) or (2) claims involving factual differences sufficient to escape *res judicata* (per *TVPX*).[62] Otherwise, the Blues and perhaps future district courts will cite this Court's ruling to bar such claims as soon as they are filed.

### 3. The future release would violate antitrust policy even if it barred only claims with the identical factual predicate.

Under *TVPX*, *res judicata* limitations set the *outermost* boundaries for any release. But it doesn't follow that legislative policy might not impose more stringent limitations in certain areas of law, such as the FLSA, TILA, or antitrust. *Redel's* public policy rationale applies equally, whether antitrust claims arise from the continuation of existing conduct (as in that case) or from entirely new conduct.

---

[62] *Fikes*, 2023 WL 25065455, at *8.

Indeed, participants in a scheme that has successfully generated supra-competitive profits have the largest incentives to pay for the right to continue that time-tested scheme.[63] The greater their market power, the greater their resources and incentive to buy protection. The Settling Parties offer no answer to this reality except to say that other courts have ignored it.

### 4. *In re Managed Care* does not sustain this release and, if it did, that would be inconsistent with prior Circuit precedent.

The *In re Managed Care Litigation* release applied only to claims arising "'on or before the Effective Date.'" [64] The release here includes "claims that could arise after the Effective Date."[65] So, on its face, this release exceeds anything authorized by *Managed Care*, just as it exceeds the IFP limitations confirmed by *TVPX*. This Court has not approved a release like this one that expressly releases claims arising after settlement relating in any way to facts or issues raised in the underlying litigation or new restrictions approved by an administrative process.

Rather than deny the differences in release language, the Settling Parties say *Managed Care* authorizes releases of all future antitrust claims arising from the

---

[63] HD:71. *Cf. Italian Colors*, 570 U.S. at 241 (Kagan. J. dissenting) ("the necessity [for prohibiting future releases] is nowhere more evident than in the antitrust context. Without the rule, a company could use its monopoly power to protect its monopoly power, by coercing agreement to contractual terms eliminating its antitrust liability.").

[64] 756 F.3d 1222, 1226 (11th Cir. 2014) (quoting release).

[65] D-2610-2 ¶1(uuu).

continuation of pre-release restraints of trade. If so, then it conflicts with *Redel's*, which prohibited a release of claims for the continuation of pre-release conduct. This Panel must follow *Redel's*, even if the *Managed Care* panel did not discuss it.

*Managed Care* also conflicts with prior Circuit and Supreme Court precedent regarding the accrual of antitrust claims. In the post-settlement suit, the plaintiffs asserted ERISA, RICO, and antitrust claims arising from the same alleged conspiracy to underpay claims. The panel held that the settlement did not release ERISA claims based on denials of benefits payments after the settlement's effective date because each denial constitutes a new claim, even if based on the same alleged conspiracy.[66]

However, *Managed Care* failed to follow prior Circuit precedent applying the same accrual rules to *antitrust* claims based on continuing conspiracies. Instead, the panel treated antitrust claims based on post-Settlement claim denials as "new, overt acts within an ongoing conspiracy, rather than new claims in and of themselves."[67] That is flatly inconsistent with Supreme Court precedent holding that: "[i]n the context of a continuing conspiracy to violate the antitrust laws … each time a plaintiff is injured by an act of the defendants a cause of action accrues to him …."[68]

---

[66] 756 F.3d at 1237-38.

[67] *Id.* at 1236.

[68] *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997).

And it violates Circuit precedent holding that "when sellers conspire to fix the price of a product, each time a customer purchases that product at the artificially inflated price, an antitrust violation occurs and a cause of action accrues."[69]

The Blues say that these cases involved the statute of limitations. True, but the *reason* the limitations period didn't bar recovery is the underlying antitrust rule that each new sale pursuant to a continuing conspiracy creates a new cause of action. Thus, even aside from *Redel's*, this Court cannot accept *Managed Care*'s incorrect rationale for approving the release of post-release antitrust claims arising from the continuation of pre-release conspiracies. Every time the Blues act upon their ongoing agreements to deny competing Blue bids to a National Account, that constitutes a new violation, giving rise to a new antitrust claim that they cannot prospectively release as a matter of antitrust law or policy.

### E. The low prospects for individualized relief or non-party or government enforcement cannot salvage the release.

The Setting Parties endeavor to minimize the impact of the future release based on the prospect of government enforcement. Yet Supreme Court precedent recognizes Congress's determination "that *private* antitrust litigation is one of the

---

[69] *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000).

surest weapons for effective enforcement"[70] and "was an integral part of the congressional plan for protecting competition."[71]

Home Depot has also shown why the market-wide remedies this (b)(2) release extinguishes are the ones most important to the *public* interest in private antitrust enforcement.[72] The Settling Parties cite no contrary authority, and the Blues are now strategically silent about their prior position that a (b)(2) class member could not obtain even *individualized* relief on a theory that would logically invalidate a market-wide restraint.[73]

Regardless, the prospect of government enforcement or private enforcement by future first-time Blue subscribers cannot salvage the release. *Redel's* rejected a future release that also did not bar government enforcement and side-lined only a single plaintiff. If public policy will not enforce an agreement to eliminate a single private plaintiff, it cannot tolerate a release that applies to over 100 million potential plaintiffs.[74]

---

[70] *Minnesota Mining & Mfg. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 318 (1965) (emphasis added).

[71] *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990) (emphasis added).

[72] HD:55, 89.

[73] HD:68.

[74] To the extent the Settling Parties are serious about the prospect of private enforcement by new Blue subscribers unbound by the release, it only serves to confirm that antitrust cases can settle even though the defendants remain open to future claims for injunctive relief.

**II.    The district court erred by approving a settlement where the same plaintiffs and their counsel represented (b)(2) and (b)(3) class members with materially different settlement priorities.**

As the Supreme Court warns, district courts certifying classes for settlement, rather than litigation, must be even *more* careful to ensure that all class members are adequately represented.[75] While the Subscribers pretend that Home Depot is advocating some new, unworkable categorical rule, the objection relies on settled law that different class representatives and counsel must adequately represent class members with fundamentally different settlement priorities.

Rule 23(a)(4) and due process require that basic protection to prevent the structural temptation to trade off one group's interests in future relief against another group's interest in maximizing damages (and attorneys' fees). That conflict proved fatal to the settlements rejected in *AmChem* and *Ortiz v. Fibreboard Corp.*[76] Rather than break new ground, this Court must reject this settlement to adhere to these binding precedents, just as the Second Circuit did in the *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation.*[77]

---

[75] HD:90 (citing *AmChem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).

[76] 527 U.S. 815, 858 (1999); HD:93-94.

[77] 827 F.3d 223 (2d Cir. 2016).

### A. Overlap between the (b)(2) and (b)(3) classes does not negate the conflict between class members with materially different settlement priorities.

The district court approved 65 fully-insured subscribers and their common counsel to represent the single 23(b)(2) class.[78] Those same fully-insured subscribers and counsel simultaneously represented the 23(b)(3) class of fully-insured subscribers, but not the 23(b)(3) subclass of administrative-services-only subscribers, or ASOs. A sole self-funded subscriber (Hibbett Sports) represented that (b)(3) subclass to negotiate the damages division but was not a (b)(2) class representative.[79] Thus, the plaintiffs representing the (b)(2) class were all fully-insured subscribers interested in 93.5% of the monetary compensation, along with their counsel.

The Subscribers say that this representational structure entails no fundamental conflict of settlement interests because the membership of the (b)(2) and (b)(3) classes is almost entirely the same. But that misses the point: The fatal adequacy problem in cases like *AmChem*, *Ortiz*, and *Payment Card* occurs when the same plaintiffs and counsel represent class members with materially different priorities on bargaining for prospective relief (and avoiding a broad release of prospective claims)

---

[78] D-2931:84.

[79] *Id.*

versus recovering damages for past harm. That conflict does not require two classes with different membership.

To the contrary, *AmChem* and *Ortiz* both featured single classes. In *AmChem*, the inadequate representation arose from the unitary representation of "a single giant class rather than … discrete subclasses" where "[i]n significant respects, the interests of those within the single class are not aligned."[80] Likewise, the settlement reversed in *Ortiz* involved a single "mandatory class."[81] Notably, the Subscribers do not address either case.

The problem here is not a lack of overlap in class *membership*, but in class member *interests*. As Home Depot objected below, "the Settlement trades away the best interests of national self-funded employers in order to facilitate a deal that primarily benefits the remainder of the class and, through broad prospective releases, the defendants."[82]

> A case brought solely on behalf of all national self-funded employers would not settle for total compensation of $120 million [*i.e.*, 6.5% of the settlement fund after fees and costs] and the possibility of one more Blue Bid, especially not if it required releasing all future claims for damages and injunctive relief arising from practices that would still significantly restrict Blue branded competition for the accounts of self-funded national employers.[83]

---

[80] 521 U.S. at 626.

[81] 527 U.S. at 825-26.

[82] D-2812-20:45-46.

[83] *Id.*; D-2875:46-47.

Even complete identity of (b)(2) and (b)(3) class membership would not have cured this fundamental defect. Whether the differently-interested subscribers were combined in one class or in two virtually-identical ones, the problem is that they were represented by a single set of subscribers (all fully-insured) and their counsel.

To be sure, *Payment Card* involved (b)(2) and (b)(3) classes with materially less overlap than the classes here. But as in *AmChem* and *Ortiz*, the fatal problem was the unitary representation of all class members—with their differing settlement priorities—by the same plaintiffs and counsel. As the Second Circuit wrote: "Like the settlement-only classes in *AmChem*, *Ortiz*, and *Literary Works*,[84] the unitary representation of these plaintiffs was inadequate."[85] All three examples were single-class settlements, demonstrating that unitary representation of class members with diverging settlement objectives is what matters. Further proving that point, the Second Circuit added that "the trouble with unitary representation here is exacerbated because the members of the worse-off (b)(2) class could not opt out. The (b)(2) merchants are stuck with this deal and this representation."[86]

---

[84] *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011).

[85] 827 F.3d at 233.

[86] *Id.* at 234.

*Payment Card* further explains that sub-dividing classes solves nothing unless those different classes are separately represented. Quoting *Ortiz*, the Second Circuit observed that "[o]ne common structural protection is division of the class into 'homogenous subclasses under Rule 23(c)(4)(B), *with separate representation* to eliminate conflicting interests of counsel.'"[87] "'Only the creation of subclasses, *and the advocacy of an attorney representing each subclass*, can ensure that the interests of that particular subgroup are in fact adequately represented.'"[88]

Accordingly, unitary representation—as in *AmChem*, *Ortiz*, *Literary Works*, *Payment Card*, and this case—renders moot whether the jointly-represented class members fall into one or two classes. Moreover, these decisions reversed certification and settlement approval notwithstanding the abuse of discretion standard of review. That reflects the grounded-in-due-process importance of the adequacy requirement, which is so critical that, in this Circuit, a district court "has the responsibility of conducting its own inquiry" even if no party raises it.[89]

The Subscribers highlight features of *Payment Card* that made the conflict particularly obvious. They note, for example, that only some class members could benefit from a key form of relief (surcharging), which is a curious choice since only

---

[87] *Id.* at 231 (quoting *Ortiz*, 527 U.S. at 856, emphasis added).

[88] *Id.* at 233 (quoting *Literary Works*, 654 F.3d at 252, emphasis added).

[89] *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 (11th Cir. 2003).

some class members can benefit from the Second Blue Bid under this Settlement.[90]

Regardless, this case need not share all the flaws that plagued the *Payment Card*

settlement because it shares the fundamental one: a single set of plaintiffs and

attorneys represented class members with materially diverging interests in the forms

of settlement relief, with no escape by opt-out.

### B. The involuntary (b)(2) class included subscribers with fundamentally different settlement priorities as to injunctive relief and damages.

The mandatory (b)(2) class represented by the fully-insured subscriber

plaintiffs and their counsel comprises all Blue subscribers.[91] That includes:

- Fully-insured individuals;

- Employers with fully-insured plans;

- Employers with administrative-services-only (ASO) plans that do not qualify as National Accounts; and

- National Accounts.

National Accounts are employers with ASO plans *and* a workforce sizeable

and scattered across enough states to enjoy the best prospects of attracting vigorous

Blue-versus-Blue bidding in an unrestricted market.[92] However, that market is—and

---

[90] D-2610-2 ¶¶1.sss (defining "Qualified National Accounts"), 1.yyy (defining "Second Blue Bid").

[91] D-2931:8-9.

[92] D-2610-2 ¶1.u.

will continue to be—restricted. As the Subscribers described in pre-Settlement briefing, the Blues operate under "a naked customer allocation agreement for national accounts" that "not only forecloses competition among Member Plans for national accounts, depriving those accounts of the benefits of competitive bidding, but also prevents the national account itself from requesting and receiving a competitive bid from a Member Plan of its choice."[93] The Subscribers demonstrated that Blue Plans would compete fiercely for National Accounts absent these rules.[94]

The Settlement Agreement itself reflects that National Accounts are the practical candidates to attract multiple Blue Plan bids. Through an employee-location-and-dispersal formula, the Settlement identifies hundreds of ASOs that—so long as they don't opt out of the (b)(3) class—can request a Second Blue Bid (but not a third or fourth or as many competing bids as an unrestrained market would provide).[95] That second bid is limited to National Accounts precisely because they are differently situated; otherwise that limitation would violate the Rule 23(e)(2)(D) requirement to treat "class members equitably relative to each other."

With this limited exception, the Settlement allows the National Account allocation rules to continue though, as even the Blues acknowledge, no court has

---

[93] D-2408:15.

[94] *Id.* at 16.

[95] D-2610-2¶1(u); 84-97.

decided whether those rules are subject to *per se* condemnation or violate the rule of reason.[96] And for good measure, the Settlement forever prevents any National Account from trying to enjoin any such future antitrust violations. That concession was inconsequential to much of the (b)(2) class, as compared to cash compensation, but not to National Accounts.

The different types of class members forced into the single (b)(2) class have naturally divergent priorities in the balance of damages and equitable relief negotiated in any settlement. For one thing, fully-insured individuals and employers split 93.5% of the damages award, while ASOs (including National Accounts) split 6.5%. Leaving aside whether that is a fair allocation of the money, this disparity means that those groups are likely to place different importance on the monetary payment *relative to injunctive relief*. But neither the National Accounts nor the other ASOs were separately represented in negotiating the (b)(2) relief and release.

Aside from the allocation of settlement dollars, class members would, as explained above, have different interests in obtaining (and releasing) prospective injunctive relief depending upon the competitive positions they would enjoy in an unrestrained market. Based definition, National Accounts naturally would be more interested in dismantling Blue-bidding restrictions than smaller ASOs or fully-

---

[96] BLUE:83; *see also* HD:82-86.

insured subscribers with little ability to attract multiple Blue bids in a competitive market. For National Accounts, eliminating or minimizing anticompetitive bidding restrictions (rather than enshrining them forever) would be more valuable than their individual shares of 6.5% of the monetary fund. By contrast, fully-insured individuals and local employers naturally would sacrifice that and other injunctive relief (and broaden the injunctive release) to maximize dollars.

Although these intra-class differences would be enough to dictate different settlement priorities, they are accentuated by other variables. Both the (b)(2) and (b)(3) classes include anyone who was a fully-insured subscriber since 2008—*i.e.*, at any point during the past 15 years—but is no longer covered by a Blue Plan (or, in the case of an employer, out of business). Those past members have every interest in maximizing monetary compensation at the expense of injunctive relief, while National Accounts benefit primarily from reducing barriers to competitive bidding for years to come.

Subscribers defend the unitary representation of the entire (b)(2) class by arguing that no potential subscriber representative would be *entirely* disinterested in (b)(3) compensation. But adequate representation wouldn't require a representative with *no* interest in compensation. The problem lies in having a single (b)(2) class covering class members with materially different *relative* interests in monetary and injunctive relief. Worse, the (b)(2) class was represented only by fully-insured

subscribers likely to place a lower value on injunctive relief (relative to monetary compensation) than ASOs, particularly those most affected by the National Account bid allocation rules. There may not be a subscriber with *no* interest in monetary compensation, but there are ASOs and National Accounts that would naturally value it far less than certain forms of prospective injunctive relief. Those subscribers cannot be lumped into the same class with subscribers who have materially different negotiating priorities, to be represented by a single set of plaintiffs and counsel.

### C.    The Settlement violates Rule 23(a)(4) and due process because material differences in the class members' settlement priorities precluded unitary representation.

Contrasting *Valley Drug Co.*, the Subscribers urge that the divergent settlement priorities here were not sufficiently fundamental to preclude unitary representation.[97] True, the conflict within the litigation class rejected in *Valley Drug* was different, but it does not follow that the diverging interests within the settlement classes here are unimportant.

To the contrary, *Valley Drug* stands for the same principle at stake here: "Rule 23(a)(4) … preclude[s] class certification where the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class members."[98] Here there are material

---

[97] 350 F.3d at 1193.

[98] *Id.* at 1190.

differences in the class members' "economic interests and objectives" for any settlement. Notably, *Valley Drug* emphasized that "antagonistic interests are not only those which directly oppose one another, but also are those which *may* be hostile to one another *or unharmonious such that one party's interest may be sacrificed for another's*."[99] Even "the potentiality [of such a conflict] is enough."

This *Valley Drug* principle applies in full force to intra-class differences over settlement relief priorities.  Indeed, *AmChem*, *Ortiz*, and *Payment Card* specifically involved different relative interests in past compensation versus future relief, which is the primary clash of priorities here. Subscribers are thus wrong to suggest that differing interests pose adequacy problems only if they affect how to litigate some substantive element of a claim.

Perhaps recognizing that reality, the Subscribers assert, without elaboration, that all members of the (b)(2) and (b)(3) classes "share a common interest in maximizing both monetary and structural relief."[100] Even if that aspiration were true in the abstract or at the outset of litigation, settlement negotiations entail choices, prioritization, and trade-offs. That is why the Supreme Court warns courts to apply "heightened" scrutiny to the adequacy of representation for settlement classes.[101]

---

[99] *Id.* at 1194 (cleaned up) (emphasis added).

[100] SUB:52.

[101] *AmChem*, 521 U.S. at 620.

Cases like *AmChem*, *Ortiz*, *Literary Works*, and *Payment Card* recognize the practical reality that it is not generally possible to maximize all possible forms of relief in a negotiated resolution. That is certainly true in negotiating antitrust settlements involving continuing practices, rather than a terminated scheme. In such a case, injunctive relief is valuable to a plaintiff and undesirable to a defendant for the same reason—it exposes the defendant's goods and services to greater price-lowering competition in the future. Thus, antitrust defendants are motivated to pay more in past damages to avoid injunctive relief that would reduce their future profits and vice versa.

The prospect of that trade-off was very real here for, as the Subscribers recognize, "equitable relief is *far more* likely to provide long-lasting relief [from the Blues' practices] than continual annual awards of damages."[102] If so, the Blues would naturally pay "far more" for a settlement with limited injunctive relief (and a broader release of injunctive relief claims) than for a settlement with greater injunctive relief (and a narrower injunctive release). That trade-off is attractive to some class members, but not to National Accounts.

Despite this, the Subscribers urge that Home Depot has not proved any actual trade-off between damages and prospective relief, implying that they have somehow

---

[102] D-2408:35 (emphasis added).

maximized both forms of relief. But reversal does not require an objector to prove either bad faith or an actual trade-off of interests—after all, it is impossible to reconstruct the deal that would have resulted from unconflicted representation. That is why, as this Court has emphasized, the *potential* for such a conflict is enough.[103] Likewise, Home Depot does not have to prove that the Blues would have settled on better terms with a class of separately-represented National Accounts. If this deal is the best the Blues had to offer National Accounts, then unconflicted class representatives and counsel could have decided not to settle, or at least not at this stage.

As if to confirm the point, the Blues assure this Court that, absent the (b)(2) release and the assured ability to continue the competitive restraints protected by the Settlement, there would have been no settlement at all.[104] In other words, the Blues were willing to pay $2.67 billion in compensation and fees, but only if they could secure a broad release of injunctive relief claims. Exactly. The representatives that drove the litigation and settlement negotiations could recover billions (with hundreds of millions in attendant attorneys' fees) only by delivering a broad injunctive release that would bind not only the subscribers they had been representing all along, but also the ASOs and National Accounts that the Settling Parties insist were not in this

---

[103] *Valley Drug*, 350 F.3d at 1194.

[104] BLUE:53.

case until just before the November 2019 term sheet.[105] Those previously uninvolved subscribers are precisely the parties most interested in broad injunctive relief from National Account allocation rules and most opposed to releasing that claim. The concurring judge in *Payment Card* rightly referred to a similar maneuver as a "confiscation."[106]

If any doubt remains that the (b)(3) payment is inextricably intertwined with parameters of the (b)(2) release, consider the recent district court proceedings. The Subscribers (unsuccessfully) sought to compel Home Depot to post a $113 million bond for appealing its objection to the (b)(2) release, half of which allegedly represents the lost time value of the (b)(3) distribution. The Subscribers urged that there was no way the $2.67 billion could be distributed while the (b)(2) release "remained under attack" because the injunction terms are "an obviously critical part of the overall compromise reached by the parties."[107] Put differently, the substantial cash payment depended on delivering the injunctive *release* at the expense of the ASOs' interest in future competition.

---

[105] SUB:129-38; BLUE:84-97.

[106] 827 F.3d at 241.

[107] D-3032:6. The Court can take judicial notice of the existence of this post-appeal filing. *See United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994).

### D. The Subscribers cite inapplicable cases involving variations in the value of class members' damages claims, not trade-offs between different forms of relief.

The Subscribers cite decisions that do not involve the adequacy problem here. They emphasize *In re Equifax Inc. Customer Data Security Breach Litigation*,[108] a (b)(3) damages settlement where this Court rejected an objection that the named plaintiffs could not adequately represent the entire class because D.C. and Utah class members supposedly had valuable statutory damages claims that other class members did not. The Court rejected the premise that those claims had any meaningful incremental value.[109] Regardless, the damages-only settlement presented "no opposing or economic interests that were at odds" because all class members' interests aligned in maximizing the total damages Equifax would pay for its past breach.[110]

In *Equifax* and Subscribers' other cases, class counsel's mission was clear and unconflicted—negotiate for as many dollars as possible.[111] They did not face the

---

[108] 999 F.3d 1247, 1275-77 (11th Cir. 2021).

[109] *Id*. at 1276.

[110] *Id*. The unpublished *In re Checking Account Overdraft Litig.*, rejects the same type of objection for class members with arbitration agreements and without because all class members "had an overriding shared interest in obtaining the largest cash settlement possible." 2022 WL 472057, at *5 (11th Cir. Feb. 16, 2022).

[111] *See In re Pet Foods Prod. Liability Litig.*, 629 F.3d 333, 346 (3d Cir. 2010) (involving "differences in settlement value" of damages claims of which the reviewing court was "skeptical"); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271-73 (3d Cir. 2009) (contrasting differences in the strength of damage claims with

question that confronted the plaintiffs and counsel simultaneously representing the (b)(2) and the (b)(3) fully-insured classes here: do we hold out for more money or for broader injunctive relief? Because different class members bound by that unitary representation would have answered that question in fundamentally different ways, the Settlement cannot stand.

## CONCLUSION

For the foregoing reasons, Home Depot respectfully requests the Court to reverse the settlement approval.

*Signatures appear on the following page.*

---

situations where "the interests of the various members are divergent"). Subscribers also cite *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 111 (2d Cir. 2005), but that case, too, did not feature a conflict between the types of relief that different class members would want to maximize in settlement.

Respectfully submitted this 24th day of March 2023.

/s/ *Frank M. Lowrey*
Frank M. Lowrey
Georgia Bar No. 410310
lowrey@bmelaw.com
Ronan P. Doherty
Georgia Bar No. 224885
doherty@bmelaw.com
E. Allen Page
Georgia Bar No. 640163
page@bmelaw.com
BONDURANT MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309-3417
(404) 881-4100

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) because this brief contains a total of 8,899 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (f) and 11th Cir. R. 32-4.

This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with size 14 Times New Roman font.

This certification is made on March 24, 2023.

*/s/ Frank M. Lowrey IV*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. Counsel for all parties as well as *pro se* parties are registered CM/ECF users and will be served with the foregoing document by the Court's CM/ECF System.

/s/ *Frank M. Lowrey*
Frank M. Lowrey