Nos. 22-13051, 22-13052, 22-13118, & 22-13120

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

IN RE: BLUE CROSS BLUE SHIELD
ANTITRUST LITIGATION(MDL 2406)

---

On Appeal from the United States District
Court for theNorthern District of Alabama,
Southern Division,
No. 2:13-CV-20000-RDP

---

# OBJECTOR-APPELLANTS JENNIFER COCHRAN
# AND AARON CRAKER'S REPLY BRIEF

---

George W. Cochran
LAW OFFICE OF GEORGE W. COCHRAN
1981 Crossfield Circle
Kent, Ohio 44240
Tel:  (330) 607-2187
Fax:  (330) 230-6136
lawchrist@gmail.com


*Counsel for Objector-Appellants*
*Jennifer Cochran and Aaron Craker*

Nos. 22-13051, 22-13052, 22-13118, & 22-13120

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

**Certificate of Interested Persons.** Pursuant to 11TH CIR. R. 26.1 and 11TH CIR. R. 26.1-1(b), Appellants certify that they believe the Certificate of Interest Persons is complete.

**Corporate Disclosure**. Pursuant to FED. R. APP. P. 26.1 and 11TH CIR. R. 26.1-1, 26.1-2, and 26.1-3, Appellants submit this Corporate Disclosure Statement in order to declare that neither party is a non-governmental corporation.

Dated: March 24, 2023                 Respectfully submitted,

                                      /s/ George W. Cochran
                                      George W. Cochran
                                      *Counsel for Objector-Appellants*
                                      *Jennifer Cochran and Aaron Craker*
                                      1981 Crossfield Circle
                                      Kent, Ohio 44240
                                      Tel:  (330) 607-2187
                                      Fax:  (330) 230-6136
                                      lawchrist@gmail.com

i

# TABLE OF CONTENTS <u>**Page**</u>

Certificate of Interested Persons and Corporate Disclosure Statement ................i

Table of Contents..........................................................................ii

Table of Citations ......................................................................... iv

Summary of Reply .......................................................................... 1

Argument ................................................................................... 3

    I.    Plaintiffs' Response Ignores Several Clear Errors That Invalidate The Court's Analysis of Adequate Representation…………………....3

        A.    The First Error Was Approving a Settlement Structure That Enabled Employer Representatives To Win Their Economic Conflict With Unnamed Employees Over Unclaimed Funds…………………..6

        B.    The Second Error Was Permitting The Employer Representatives To Violate ERISA By Seizing Their Employees' Assets…..............8

          1.    ERISA's Multi-Faceted Impact On The Settlement Was Obvious…………………………………………………….10

          2.    In Approving The Allocation Plan, The Employer Representatives Breached Their Duty Of Loyalty To Employees……………...14

          3.    The Employer Representatives Also Violated ERISA's Prohibited Transaction Rule…………………………………………… 15

          4.    The Settlement Violates ERISA's Statutory Disclosure Rules As Well……………………………………………….…….....17

5.      By Pushing ERISA Downstream, The Court Spawned Potentially 'Millions' of Questionable Employee Lawsuits……………….18

C.      The Third Error Was Finding Plaintiffs Had Vigorously Prosecuted Employees' Right To A Fair Share Of The Settlement's Residuals When, *In Fact*, They Are Reaping A Windfall Of Employee Refunds.……………………………………………...…...…..19

**II.      Plaintiffs' Response Also Overlooks The Fact That Failing To Recognize The Fundamental Unfairness Of Treating Similarly-Situated Class Members Differently Is Sufficient Alone To Vacate The Order**………...23

Hypothetical………….. ………………………….……………………….....26

Conclusion………………………………………………………………28

Certificate Of Compliance ..................................................................................viii

Certificate Of Service…………………………………………………….....ix

## TABLE OF CITATIONS

**Cases**                                                                                      **Page**

*Bannistor v. Ullman*, 287 F.3d 394 (5th Cir. 2002)……………………….…..11

*Better v. YRC Worldwide Inc*. (D. Kan. 2016)…………………………….…..7

*Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013)………………………………5

*Chavez v. PVH Corp*. (N.D. Cal. 2015)………………………………………24

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984). ……………………………………………………….8

*Cvelbar v. CBI Illinois Inc*., 106 F.3d 1368  (7th Cir. 1997)…………………..9

*Denney v Deutsche Bank*, 443 F.3d 253 (2nd Cir. 2006)………………………4

*Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101 (1989). ……………9,10

*General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147 (1982)………….8

*Heaven v. Trust Co. Bank,* 118 F.3d 735 (11th Cir.1997)……………………… 4

*Herman v. NationsBank Trust Co. (Ga.)*, 126 F.3d 1354 (11th Cir. 1997)……..11

*In re Airline Ticket Com'n Antitrust Litigation,* 307 F.3d 679
    (8th Cir. 2002)…………………………………………………………..8,24

*In re Elec. Carbon Prods. Antitrust Litig*., 447 F. Supp. 2d 389 (D.N.J.
    2006)…………………………………………………………………………24

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability
    Litigation*, 55 F.3d 768 (3rd Cir. 1995)……………….…………………10

*In re Health Ins. Innovations Sec. Litig*. (M.D. Fla. 2021)…………………..21, 24

iv

*In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011)……………………………………………………………5

*In re Luna*, 406 F.3d 1192 (10th Cir. 2005),………………………………………12

*In re Nat'l Football League Players' Concussion Injury Litig.* (E.D. Pa. 2015)…6

*In re Svncor ERISA Litig.*, 516 F.3d 1095 (9th Cir.2008)………………………23

*Lanfear v. Home Depot, Inc.*, 679 F.3d 1267 (11th Cir. 2012)…………………..10

*Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984)……………………………………14

*L.I. Head Start Child Development Services, Inc. v. Economic Opportunity Com'n*, 634 F.Supp.2d 290 (E.D. N.Y. 2009………………………………16

*LoPresti v. Terwilliger*, 126 F.3d 34 (2nd Cir. 1997)……………………………11

*Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209 (2d Cir. 1987)………………14

*Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200 (11th Cir.2003)…….4

*Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985)…………..........8

*Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996)……………………..4

*Meyer v. Citizens and Southern Nat. Bank*, 677 F.Supp. 1196 (M.D. Ga. 1988)…………………………………………..……………..24

*Owens v. Metro. Life Ins. Co.*, 210 F.Supp.3d 1344 (N.D. Ga. 2016)…………..16

*Reynolds v. Beneficial National Bank*, 288 F.3d 277 (7th Cir. 2002)……………..9

*Shiyang Huang v. Equifax Inc. (In re Equifax Inc. Customer Data Sec. Breach Litig.)*, 999 F.3d 1247 (11th Cir. 2021) ............. …………………6

*Smith v. National Credit Union Admin. Bd.*, 36 F.3d 1077 (11th Cir. 1994)…....10

v

*Subway*: *Guoliang Ma v. Harmless Harvest, Inc.*, 2018 WL 1702740
    (E.D.N.Y. Mar. 31, 2018)…………………………………………....…..23

*United States v. Grizzle*,  933 F.2d 943 (11th Cir. 1991)…………………....…11

*Valley Drug Co. v. Geneva Pharms., LLC*, 350 F.3d 1181
     (11th Cir. 2003)................................................................. ………4

*Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.,*
    725 F.3d 1213, 1218 (10th Cir. 2013)………………………………..…..4

**Statutes/Rules**

Rule 23(a)……………………………………………………….…4, 9, 20, 21

Rule 23(e)…………………………………………………………21, 23, 24, 25

Title I of ERISA…………………………………………………………8

29 C.F.R. §2510.3-102 (1989)…………………………………………..…10, 11

*Department of Labor Advisory Opinion No. 93-14A* (May 5, 1993),
1993 WL 188473………………………………………………………12

 29 U.S.C. § 1024(b)(4)…………………………………………………..17

 29 U.S.C. § 1002(14)…………………………………………………....15

 29 U.S.C. § 1102(21)(A)…………………………………………….…15

 29 U.S.C. § 1103(c)(1)…………………………………………………14

 29 U.S.C. §1104(a)(1)………………………………………………..…14

 29 U.S.C. § 1106(a)(1)(B)……………………………………………… …...15

 29 U.S.C. § 1106(b)(1)…………………………………………………....14

vi

**<u>Publications</u>**

Lend, Black's Law Dictionary (7th ed. 1999)…………………………………….15

## SUMMARY OF REPLY

Class counsel's opposition to Cochran's[1] appeal only underscores Plaintiffs' abject failure to represent unnamed employees impartially in the allocation of unclaimed funds. What they concede, in fact, is more telling than what they assert. Concerned Cochran's objection has merit, Plaintiffs resort to labeling her attorney a 'serial objector'. However, courts have long recognized the critical role played by experienced counsel in challenging a settlement's fairness.[2] Their contribution is especially significant when a settlement proposes to release defendants from a complex issue beyond class members' grasp or ability to pursue.

Such is the case with Blue Cross-Blue Shield's ("BCBS'") settlement. The central question raised by Cochran's appeal is whether the district court committed reversible error by approving a distribution of unclaimed funds that enriches employers at employees' expense without addressing the employer's ERISA obligations or providing employees adequate representation. As a result, a handful of employer representatives were able to hijack $140 million of employee wages right under the court's nose. Since class counsel defends the order as "fact intensive", it's important to remember how intense the facts really are:

---

[1] Pursuant to Loc.R. 28(d), Objectors-Appellants Jennifer Cochran and Aaron Craker are cited herein as "Cochran", Plaintiffs-Appellees are "Plaintiffs", and Defendants-Appellees are "BCBS".

[2] Cochran's attorney has contributed much to this positive track record. For example, the court ruled he made several enhancements to the Syngenta settlement that justified his fee.

# FACTS

*Class representatives—who are mostly employers—structure the settlement to divert unclaimed employee assets to themselves, even though no one denies the funds belong in the employees' welfare plan. If they receive the "full boatload" of these funds, employers will get "the lion's share of the recovery." Yet the Settlement imposes no restrictions on how employers may actually spend the money. Neither is there a mechanism for ensuring their presumed compliance. In the meantime, DOL's Secretary warns the employees' discriminatory treatment raises serious ERISA concerns. One is breaching the employer's duty of loyalty by using plan assets for personal gain. Another is causing the plans to lend money to employers even though they're parties in interest. Convinced they're right about this "very technical ERISA matter" even though it's "completely unsettled", Plaintiffs insist it would be wrong to condition the employer's receipt of employee funds on complying with the statute. Confident that employers will "do what's right", the court ignores DOL's concerns before pushing the whole ERISA matter downstream to millions of potential lawsuits.*

In choosing Plaintiffs' assurances over DOL's plea, the district court overlooked ERISA's impact, committed clear errors, and sanctioned employers' breach of loyalty to employees. These judicial missteps formed a perfect storm for abuse of discretion. The fact that no other class member caught this fatal flaw testifies to counsel's considerable experience with complex class settlements. That the federal agency charged with enforcing ERISA shares his concern shows the issue has sweeping ramifications.

While class counsel try hard to ignore this 'elephant in the room,' their response only adds salt to employees' wound. The consequences of the Settlement's double-standard also loom large. Besides the fact that untold millions abandoned their claims without appreciating the implications, six million claimants will have a rude awakening unless this Court makes it right. The only way to prevent a train wreck is to appoint independent counsel for the employees' exclusive protection. Nothing in Plaintiffs' response changes what justice demands: vacating the order with instructions to provide subclass representation.

## ARGUMENT

### I.    Plaintiffs' Response Ignores Several Clear Errors That Invalidate The Court's Analysis of Adequate Representation.

The premise of Cochran's appeal is a defective process produces a defective product. Likewise, the key to a fair settlement is adequate representation. *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996). This takes top priority because it protects absent members' rights before binding them to judgment. Id. at 379 n.5. Even fairness takes a back seat to ensuring the class is "sufficiently cohesive to warrant adjudication." *Denney v Deutsche Bank*, 443 F.3d 253, 268 (2nd Cir. 2006)). Accordingly, the district court must rigorously analyze whether this requirement is satisfied. *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1216 n. 37 (11th Cir.2003). Settlements that don't comply shouldn't be approved. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.* (2nd Cir. 2016).

The analysis begins by recognizing the burden of proof rests squarely with the plaintiffs. *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.,* 725 F.3d 1213, 1218 (10th Cir. 2013) (relaxing or shifting strict burden of proof under Rule 23(a) is abuse of discretion). To certify their claims for class treatment, the named plaintiffs must show they will fairly and adequately represent all members. *Heaven v. Trust Co. Bank,* 118 F.3d 735, 737 (11th Cir.1997). While the court has some discretion in the matter, it must still accurately interpret applicable law. *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003).

4

Appellate review of class certification thus poses two questions: (1) Does the order contain clear legal or factual error? (2) Does it fall outside the range of permissible decisions? *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). Evaluating the representatives' adequacy, however, asks two more: (1) Did they have a conflict of interest with *any* class member? (2) Did they vigorously prosecute the action for *all* class members? *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977). If the court topples even *one* hurdle, certifying the class for settlement purposes is abuse of discretion. Id. Factual findings are reviewed for clear error, while legal conclusions are examined de novo. *Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013).

The order approving BCBS' settlement trips all four. Fundamental conflicts in the settlement's structure empowered Plaintiffs to negotiate a distribution of unclaimed funds that enriched themselves at their employees' expense. That their chosen vehicle was a *prohibited transaction* adds salt to the wound. Instead of probing deeper, the court certified a unified class with no representative dedicated to safeguarding the employees' right to a fair share of the residuals. Approving a settlement with a fundamental conflict that harms the very class members Plaintiffs are supposed to protect is reversible error.

**A. The First Error Was Approving a Settlement Structure That Enabled Employer Representatives To Win Their Economic Conflict With Unnamed Employees Over Unclaimed Funds**.

Plaintiffs' first mistake is focusing on the *wrong issue*. This Circuit has long recognized *three* types of intra-class conflict threatening a representative's adequacy: (1) when one group benefits from the same conduct harming another (**Type A**) (2) when two groups have opposing interests (**Type B**) or (3) when one group's economic objectives clash with another's (**Type C**). *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,* 350 F.3d 1181, 1189 (11th Cir. 2003). These classifications were recently affirmed in *Shiyang Huang v. Equifax Inc. (In re Equifax Inc. Customer Data Sec. Breach Litig.)*, 999 F.3d 1247, 1275 (11th Cir. 2021).

Objections to the first (most common) type are defeated by showing the same conduct harmed each group differently. That Plaintiffs rely exclusively on this line of cases confirms their defense applies to *Type A* conflict only. It also explains why they portray Cochran's objection as "mere speculation" about a non-existent problem that steers clear of ERISA. The intra-class conflict woven into BCBS' agreement, however, is a 'tiger of a different stripe'. Because it also strikes at the very heart of the litigation, it should have been addressed head-on.

In a unified class action, adequacy must be scrutinized whenever the proposed settlement treats similar claims differently. *In re Nat'l Football League Players'*

6

*Concussion Injury Litig.* (E.D. Pa. 2015). A primary concern is whether the representatives' **economic interest** impaired their ability to represent all class members impartially. *Better v. YRC Worldwide Inc.* (D. Kan. 2016). If so, the problem may be corrected by altering the class' structure. *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 631 (3d Cir. 1996) (applying structural protections to assure that differently affected plaintiffs "negotiate for their own unique interests").

Such is the case with BCBS' settlement. Cochran doesn't claim employees were harmed by the same conduct that benefitted employers. Neither does she allege employers and employees have opposing interests. Rather, she contends the Employer Representatives leveraged their appointment to undercut employees' recovery for personal gain.[3] The goal? Winning a tug-of-war for limited funds. The result? An allocation scheme that enriches employers at employees' expense. The fallout? A shining example of Type C conflict. DOL explained how this economic clash bore fruit at the bargaining table:

> [E]mployers [] must consider different economic interests when negotiating or approving a settlement *** The problem is that both [the employers' and employees'] claims assert an injury over the same overcharge. The Secretary considers this conflict significant in the context of the settlement's negotiation and resultant framework.

---

[3] That the outnumbered employee representatives allowed this to happen not only sealed their own inadequacy, it proved the need for separate representation.

(Doc. No. 2812-13 at 6). Who emerged victorious is also plain to see. Funds not claimed by employers go to the *class*; funds not claimed by employees go to the *employer*. This double-standard flies in the face of equitable distributions. In a non-reversionary common fund requiring the submission of claims, residuals are usually shared proportionately among *all* claimants. Rule 23(e)(2)(D); *In re Airline Ticket Com'n Antitrust Litigation,* 307 F.3d 679, 682 (8th Cir. 2002). With the sole exception of employees' unclaimed funds, the parties honored this bedrock principle. (Doc. 2610-2 at 47-48). By choosing to divert employee residuals to their employers, Plaintiffs doomed millions to certain harm.

## B. The Second Error Was Permitting Employer Representatives To Violate ERISA By Seizing Their Employees' Assets.

Plaintiffs' second mistake is sugarcoating ERISA's impact. If commandeering employees' unclaimed funds doesn't broadcast their partiality, using a *prohibited transaction* to execute the plan removes all doubt. Because ERISA's own champion saw all the warning signs, the court was fully aware of the consequences. "Considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations 'has been consistently followed by this Court.'" *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). Therefore, courts should not "rewrite or tamper with the enforcement scheme

embodied in the remedial provision." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985).

The Secretary of Labor is specifically "charged by Congress with responsibility for interpreting and enforcing the definitional, coverage, reporting and disclosure, and fiduciary responsibility provisions of Title I of ERISA. []. The Secretary therefore has a substantial interest in the proper interpretation of [its] provisions []." *Cvelbar v. CBI Illinois Inc*., 106 F.3d 1368, 1373 n.3 (7th Cir. 1997). This time, however, the Secretary's warning fell on deaf ears. Instead, the court was swayed by the litigation's storied history, the Settlement's notable benefits, an expert's exposition on "economic fairness"[4] and (most critically) class counsel's insistence that ERISA doesn't apply. (Doc. No. 2866 at 23; Doc. No. 2931 at 78-79).

By fixating on the Settlement's veneer instead of scrutinizing DOL's concern, the court glossed over ERISA's impact. During the settlement phase, a district judge must exercise "the high duty of care that the law requires of fiduciaries." *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 280 (7th Cir. 2002). Certification is proper only if "the trial court is satisfied, after a ***rigorous analysis***, that the prerequisites of Rule 23(a) have been satisfied." (emphasis added) *General*

---

[4] Unlike *Cendant*, Cochran soundly deconstructed Chodorow's "fact based" report. (11th Cir. Doc. No. 124 at 38-41). Cochran also showed the allocation mediator had confused the distribution of employees' unclaimed funds with classic pro-rata allocation. (Doc. No. 2610-8 at ¶7).

*Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 156 (1982). The Third Circuit explained why it's important to look beyond a settlement's veneer:

> These inferences depend on the implicit assumption that the lawyers actually negotiating really were doing so on behalf of the entire class, assumptions which are clearly unjustified in a context where the potential for intra-class conflict further imperils the class's representation. Far too much turns on the adequacy of representation to accept it on blind faith.

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 797 (3rd Cir. 1995). Specifically, the court warned a distribution is primed to award "considerably more value to one class of plaintiffs than to another." Id. As if to prove the point, it then proceeded to find conspicuous evidence of intra-class conflict in the settlement's very terms. Id. at 800-01.

## 1. ERISA's Multi-Faceted Impact On The Settlement Was Obvious.

Similar flags were raised in BCBS' Agreement. The Employees' Retirement and Income Security Act ("ERISA") was enacted in 1974 to regulate workers' pensions and health benefits. *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1278 (11th Cir. 2012). Its prime objective is to protect employees' vulnerable interest in plan assets. *Smith v. National Credit Union Admin. Bd.*, 36 F.3d 1077, 1080 (11th Cir. 1994). Consistent with this remedial purpose, a "fiduciary" is liberally construed as anyone who "exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting

management or disposition of its assets." *Bannistor v. Ullman*, 287 F.3d 394, 401 (5th Cir. 2002). All fiduciaries owe participants the highest standard of care known to law. *Herman v. NationsBank Trust Co. (Ga.)*, 126 F.3d 1354, 1361 (11th Cir. 1997). Those who breach it will be held personally responsible. Id.

While ERISA doesn't define "plan assets", its regulations clarify that funds contributed by employees to the company's welfare plan are included. *See* 29 C.F.R. §2510.3-102 (1989). Anyone who exercises control over the employee's contribution thus becomes a functional fiduciary. *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2nd Cir. 1997). In *United States v. Grizzle*, 933 F.2d 943 (11th Cir. 1991), this Court went a step further:

> [A]ssets of employee benefit plans subject to ERISA include employee contributions to benefit plans which are withheld from employees' paychecks and for deposit into their benefit plans, ***even though the contributions have not actually been delivered to the benefit plan***. (emphasis added)

Id. at 947. The Court's reasoning applies with equal force to the POA's allocation of unclaimed employee contributions. That the Agreement doesn't mandate depositing these funds into the employer's welfare plan isn't the only problem: the representatives' decision to snatch this loot for themselves also altered their *character*. (Doc. No. 2812-11 at 12). Hence, the district court cautioned that "all ERISA duties still apply, all ERISA fiduciaries must comply with those duties, and this Settlement does nothing to change or alter ERISA rights." (Doc. No. 2931

at 76). Unfortunately, only the first two statements are correct. DOL's guidance on Medical Loss Rebates (another type of premium refund) contradicts the third:

> [I] f participants paid the entire cost of the insurance coverage, then the entire amount of the rebate would be attributable to participant contributions and ***considered to be plan assets***. (emphasis added)

Id. (citing 29 C.F.R. §2510.3-102). It follows that employees' unclaimed refunds for past contributions were revived as plan assets immediately upon their assignment to employers. While abandoning a claim may forfeit an employee's *present* interest in the funds, DOL cautions that "assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law."[5] Specifically, an employee benefit welfare plan may include "any property, tangible or intangible, in which the plan has a beneficial ownership interest." Id. By steering these funds to their employers, Plaintiffs thus gave employees a *future* interest in plan assets due to their uninterrupted status as plan beneficiaries.

This conclusion is far from novel. In *In re Luna*, 406 F.3d 1192, 1199 (10th Cir. 2005), a bankrupt employer claimed its failure to make plan contributions was dischargeable because employees can't own 'non-existent' assets. The district court agreed, reasoning that unpaid contributions "do not become plan assets until they have been paid into the particular funds." Id. at 1198. Citing traditional distinctions between present and future property interests, the Tenth Circuit overruled:

---

[5] *Department of Labor Advisory Opinion No. 93-14A* (May 5, 1993), 1993 WL 188473, at *4.

Pursuant to ordinary notions of property rights, the plan holds a future interest in the collection of the contractually-owed contributions. A future interest in property is "an interest [] which is not, but may become a present interest." *** ***The plain meaning of the term "asset" includes a chose in action to collect contractually-owed contributions***. (emphasis added)

Id. at 1200. Like the bankrupt employer, Plaintiffs say unclaimed employee funds don't become plan assets until they're deposited into the plan. They also think DOL claims *all* funds allocated to employees are "plan assets". (Doc. No. 2866 at 47-48). Convinced they're right about this "very technical ERISA matter" even though it's "completely unsettled", Plaintiffs concluded it would be wrong to condition an employer's receipt of employee funds on complying with the statute. (Id.). The record shows their reasoning instantly clicked with the court:

> MS. GEE: [The DOL's approach is to] essentially have the settlement fund administered as if it were holding a pot of money that belongs to the ERISA plan. ***
>
> THE COURT: ***That's kind of a built-in assumption***.
>
> MS. GEE: Yes. But as a legal matter -- and this is a very technical ERISA matter *** [that] the plans have a property interest under ERISA. And *** there is fairly good authority out there that settlement funds held in a fund before distribution to an ERISA plan is not an ERISA plan asset. That becomes a plan asset after it has been distributed. So [the DOL] is presuming a legal point that doesn't exist here. (emphasis added)

Id. This brief exchange reveals two clear errors: (1) that DOL believes employee funds are *ipso facto* plan assets, and (2) that awarding employees' unclaimed funds to their employers doesn't make them plan assets. As a direct result

of these errors, the court approved a $2.7 billion settlement without scrutinizing ERISA's multi-faceted impact.

## 2. In Approving The Allocation Plan, The Representative Employers Breached Their Duty Of Loyalty To Employees.

Proper judicial scrutiny would have exposed several violations of the representative employers' fiduciary responsibility. To begin, ERISA plan fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. §1104(a)(1)(B). The employer must especially "discharge his duties with respect to a plan solely in the interest of participants and beneficiaries." 29 U.S.C. § 1104(a)(1)). Closely related is the prohibition against dealing "with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). Most importantly, "the assets of a plan shall never inure to the benefit of any employer []." 29 U.S.C. § 1103(c)(1). Consistent with Congress' desire to protect beneficiaries, these provisions are broadly construed. *Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir. 1984). Liability may "be imposed even if there's 'no taint of scandal, no hint of self-dealing, no trace of bad faith.' *Lowen v. Tower Asset Mgmt., Inc*., 829 F.2d 1209, 1213 (2d Cir. 1987). To honor this public trust, DOL sounded the alarm:

> Class-member ERISA plans appear to be ***inadequately represented*** in the proposed settlement. [] Here, none of the class representatives is an ERISA plan. And the class member ERISA plans likely have ***adverse***

*interests* to other class representatives, like their ***employer sponsors***, given ERISA's trust requirements and its fiduciary duties of loyalty, care, and prudence. (emphasis added)

(Doc. No. 2812-12 at 7). Unfortunately, the court didn't listen. As reinforced below, its failure to appreciate the enormity of Plaintiffs' economic conflict opened a veritable floodgate of ERISA violations.

### 3. The Employer Representatives Also Violated ERISA's Prohibited Transaction Rule.

ERISA prohibits a fiduciary from causing the plan "to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect lending of money or other extension of credit between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(B). A "party in interest" includes a plan fiduciary, a service provider, or a *sponsoring employer*. 29 U.S.C. § 1002(14). The employer's fiduciary role can also be triggered by exercising discretionary authority or control over plan assets. 29 U.S.C. § 1102(21)(A). To "lend" an asset is "to allow [its] temporary use [], sometimes in exchange for compensation, on condition [the asset] or its equivalent be returned." Lend, Black's Law Dictionary (7th ed. 1999).

Plaintiffs' treatment of employees' unclaimed funds displayed all of these signs. In exchange for releasing BCBS, the employer representatives were allowed to take their employees' unclaimed contributions on the presumption they will

15

deposit them into the company's welfare plan.[6] But employers now face a dilemma: if they keep the money, they benefit personally; if the plan receives it, they complete the loan. *See, e.g. Owens v. Metro. Life Ins. Co*., 210 F.Supp.3d 1344 (N.D. Ga. 2016) (fiduciary's temporary use of plan assets constitutes "lending" under ERISA § 406); *L.I. Head Start Child Development Services, Inc. v. Economic Opportunity Com'n*, 634 F.Supp.2d 290, 316 (E.D. N.Y. 2009) (employer breached fiduciary duty by failing to deposit plan contributions). The employers can't hide behind DOL's safe harbor rule either since (1) the funds represent *past* contributions for expired coverage (2) the employees aren't *voluntarily* giving the forfeited funds to their employer and (3) depositing them into the welfare plan won't expunge the *employer representatives'* ERISA violations.

That Cochran raised this very issue shows Plaintiffs were fully aware of the repercussions before snatching their employees' unclaimed assets. Neither may the class' 270,000 employer-claimants plead ignorance. First, they were told they're receiving employee wages with no strings attached. Then, they were assured there's no need to share the spoils with them. If that didn't catch the employers' attention immediately, the resulting windfall surely did. Yet class counsel looked Judge Proctor square in the eye before swearing there's no reason for concern:

---

[6] DOL chimed in that Plaintiffs caused "ERISA covered plans to release their antitrust claims— i.e., "exchanging" them for whatever benefits flow from the settlement to the plans." (Doc. No. 2812-13 at 8).

> [J]ust like a weather man doesn't need to know which – or doesn't need
> to be told which way the wind is blowing, an ERISA fiduciary does not
> need to be told that there are ERISA issues when they receive notice or
> hear about a claim or litigation involving an ERISA plan.

(Doc. No. 2866 at 49). Ironically, this guarantee came right after
acknowledging ERISA never came up after *twelve years* of litigation. (Id.).
Persuaded that employers will "do what's right", the court ignored DOL's plea
before repurposing employee funds as plan assets and awarding the windfall to
employers. (Doc. No. 2866 at 18). Despite washing its hands of the whole matter,
the court still felt compelled to warn that "all ERISA duties [] apply, all ERISA
fiduciaries must comply with those duties, and this Settlement does nothing to
change or alter ERISA rights." (Doc. No. 2931 at 76).

### 4.  The Settlement Violates ERISA's Statutory Disclosure Rules.

Unfortunately, the Settlement's assault on ERISA doesn't end there. Its
disclosure provisions require providing participants certain information in response
to their request. 29 U.S.C. § 1024(b)(4). Examples include an updated plan
summary, full plan description, latest annual report and "other instruments under
which the plan is established or *operated*." (emphasis added) *Firestone Tire and
Rubber Co. v. Bruch,* 489 U.S. 101, 116 (1989). The idea is to ensure every
"participant knows exactly where he stands with respect to the plan." Id.

Nonetheless, the Settlement expressly forbids employees from requesting any
premium payment history from their employer, *even though* BCBS admits they're

the only reliable source. (11ᵗʰ Cir. Doc. No. 147 at 40). Even class counsel had to work closely with employers to make "reasonable approximations of the employer/employee split in determining appropriate pro rata shares." (Id.). On the other hand, the chances of employees saving their pay stubs for 15 years are slim-to-none. If they try to prove their contributions anyway, they'll get trapped in an elaborate maze. In the end, the POA will decide *for* them because they simply "don't know where they stand". (11ᵗʰ Cir. Doc. No. 147 at 133).

### 5. By Pushing ERISA Downstream, The Court Spawned 'Millions' of Questionable Employee Lawsuits.

Last but not least, the Settlement releases BCBS from any and all liability *without* excluding ERISA. (Doc. No 2610-2 at 49-50). This omission could render an employee's suit for breach of fiduciary duty virtually untenable. On one hand, the release ensures BCBS can't be drawn into the litigation; on the other hand, employers will undoubtedly brandish it like a sword. Bottom line: the absence of an ERISA carve out will dilute an already costly legal challenge with little hope of a return. Rather than spawn 'millions' of dubious actions down the road, the court should have resolved the problem once-and-for-all in the only forum created for this purpose. Choosing to ignore ERISA instead will have the *reverse* domino effect:

- o While untold millions of employees still had valid claims,

- o Employers didn't notify them of their ERISA rights.

- o Plaintiffs then repurposed their unclaimed funds as plan assets,

18

o Instead of depositing them into the common fund.

o Giving employers a windfall of employee wages

o With no obligation to deposit the funds into their plan,

o Even though Plaintiffs released their ERISA claim against BCBS.

o Which diminishes the employers' ERISA liability

o And shrouds potentially millions of suits with uncertainty,

o When the problem could have easily been resolved in one class action.

Two conclusions can be drawn from this outcome: (1) leveraging the economic conflict to Plaintiffs' advantage proves they didn't vigorously represent employees; (2) sanctioning the result with an order that's beyond the pale of permissible decisions proves the court abused its discretion.

### C. The Third Error Was Finding Plaintiffs Had Vigorously Prosecuted Employees' Right To A Fair Share Of The Settlement's Residuals When, *In Fact*, Employers Are Reaping A Windfall Of Employee Refunds.

Apart from exposing Plaintiffs' economic conflict, the litany of ERISA violations also confirms they were unable (or unwilling) to safeguard the vulnerable rights of untold millions in the workforce. Like *GM Trucks*, the proof of the pudding is in the terms of the Agreement. The POA begins by conditioning payment of refunds on submitting timely claims. (Doc. 2610-2 at 50). Once forfeited, the claim's

character switches from 'employee asset' to 'settlement residual'.[7] At that point, they should be shipped straight to the common fund for equitable reallocation among the claimants. (Doc. 2610-2 at 47-48). That is, in fact, how the settlement treats *employers'* unclaimed funds. (Doc. No. 2615-1 at 16). In contrast, the *employees'* funds are repurposed as plan assets and shipped directly to the employer without any restriction. (Doc. 2715-1 at 11). To add insult to injury, the Settlement's own website assures employers there's no need to share this gift with them.[8] Because Plaintiffs failed to disclose these funds may be *plan assets*, the answer to this "Frequently Asked Question" is inherently misleading. (Doc. No. 2812-13 at 8).

Plaintiffs' knee-jerk response to their conundrum is to give the Settlement a thick coat of veneer. (11th Cir. Doc. No. 147 at 55, 122-23). Beneath the surface, however, lie several troubling flaws. First is their appeal to the "economic evidence concerning the relative contributions of employers and employees to healthcare coverage." (Id.). Championing the cause is Darrell Chodorow, Plaintiffs' damage expert. A more careful review of his report, however, would have revealed it centers on his default allocation model. (11th Cir. Doc. No. 147 at 148). As a result, the expert's "painstaking assessment" has no bearing on the real issue at hand. (Id.). It

---

[7] "Residual Funds means funds that remain after the payment of all approved class member claims, expenses, litigation costs, attorney fees, and other court−approved disbursements in an action under this section." www.lawinsider.com/dictionary/residualfunds (accessed 03/05/23).
[8] FAQ No. 38. https://www.bcbssettlement.com/faq. Accessed 03/02/23.

also demonstrates why Rule 23 requires rigorously analyzing a settlement's *terms*, not blindly accepting an expert's *opinion*.

Next, Plaintiffs try to separate treating employers and employees the same from taking "appropriate account of differences among their claims." (Id. at 151). Rule 23's equitable treatment mandate, however, applies to distributing unclaimed funds just as much as evaluating relative claims. *See, e.g. In re Health Ins. Innovations Sec. Litig.* (M.D. Fla. 2021) at 16. ("Rule 23(e)(2)(D) is satisfied because the Settlement treats Settlement Class Members equitably relative to one another via the Plan of Allocation"). Plaintiffs overlook this fact for good reason: they know that determining a claim's value has nothing to do with allocating forfeited funds. In other words, they understand that the strength of an employer's claim doesn't excuse its conversion of employee assets.

Another broken arrow in Plaintiffs' quiver is claiming the "designation of employers as residual claimants allowed the POD to increase employees' default allocation percentages." (11th Cir. Doc. No. 147 at 55). That the individual default percentage is near the *bottom* of the published range is reason enough to reject this argument.[9] But Plaintiffs don't stop there. They also forget Cochran debunked the entire defense in her opening brief with eight points:

---

[9] This default percentage is also 2% lower than the *national average*. On Employer Health Benefits: 2021 Annual Survey. (https://files.kff.org/attachment/Report-Employer-Health-Benefits-2021-Annual-Survey.pdf) Accessed 03/03/23.

o  Zero-sum theory doesn't apply to the distribution of unclaimed funds.

o  Employee participation is raised by assigning the highest percentages only.

o  In any event, the employers' percentages were raised even higher.

o  No FI group can 'lay claim' to funds held in a common pool.

o  Distinguishing employees as claimants acknowledges their distinct interests.

o  Certifying a class for settlement purposes removes evidentiary trial issues.

o  Varying state remedies don't defeat commonality and predominance.

o  All Plaintiffs (including the employee representatives) have standing.

That Plaintiffs didn't refute a single point says it all. Instead, they applaud the court's "careful consideration" of ERISA before concluding "correctly, that the Settlement does not purport to affect any ERISA rights, to release any ERISA claims, or to relieve employers of their ERISA obligations". (11th Cir. Doc. No. 147 at 55). As already demonstrated, however, several violations are woven into the Settlement's fabric. Even if they weren't glaring, DOL's warning was enough to order everyone back to the bargaining table. The employees' subclass counsel would have then proposed several ways the employer representatives' could honor their dual fiduciary roles without mistreating employees or violating ERISA:

(1) **diffuse** ERISA safely by distributing all unclaimed funds to the common pool for distribution to eligible claimants;

(2) *honor* ERISA fully by distributing employees' unclaimed funds directly to the plans for their exclusive benefit;

(3) *avoid* ERISA entirely by allowing subclass counsel to negotiate a fair POA on the employees' behalf.

The ramifications of each would be subject to subclass negotiation. That Plaintiffs rejected all three to enrich themselves means only one thing: *they conspired to leverage their position for selfish gain*. That they persist in denying ERISA's impact shows they also miss the heart of Cochran's objection. In reality, this appeal doesn't hinge on proving the Settlement violates ERISA. The court's real mistake was pushing the issue downstream instead of addressing it head-on. By any standard, a settlement that awards one group for violating another group's rights should never be certified.

## II. Plaintiffs' Response Also Overlooks The Fact That Failing To Recognize The Fundamental Unfairness Of Treating Similarly-Situated Class Members Differently Is Sufficient Alone To Vacate The Order.

Even if employees were adequately represented, Plaintiffs make light of the separate ground for vacating the court's order—fundamental fairness. *See, e.g. Subway*: *Guoliang Ma v. Harmless Harvest, Inc.*, 2018 WL 1702740 (E.D.N.Y. Mar. 31, 2018) at \*7 (despite the class' adequate representation, the "nature of the relief rendered the settlement unfair under Rule 23(e)"). Whereas Cochran's first challenge scrutinized Plaintiffs' motives, the second examines their impact. This

inquiry is thus more about equitable results than relative contributions. The premise is that parity in the nature of *claims* requires parity in the allocation of *residuals*.

"While it is not the role of the Court to 'delete, substitute or modify' provisions of the settlement, the Court is obligated 'to protect the unnamed members of the class from unjust or unfair settlements affecting their rights.'" *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir.2008). For a settlement to be 'fair, adequate and reasonable', the court must specifically find "Rule 23(e)(2)(D) is satisfied because [it] treats Settlement Class Members equitably relative to one another via the Plan of Allocation." *In re Health Ins. Innovations Sec. Litig.* (M.D. Fla. 2021) at *16 (finding "[m]embers' recoveries are based upon their relative losses and Settlement Class Members will receive a pro rata distribution from the Net Settlement Fund, calculated in the same manner"). As long as an allocation "provides recovery to Class Members based on the extent of their injuries," Rule 23(e) is satisfied. *Chavez v. PVH Corp.* (N.D. Cal. 2015) at 12. *See also In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 404 (D.N.J. 2006) (pro rata distribution "eminently reasonable and fair to the class members"); *In re Airline Ticket Comm'n Antitrust Litig.*, 953 F. Supp. 280, 285 (D. Minn. 1997) (fractional shares are "cost-effective, simple, and fundamentally fair").

These cases establish that the mark of a fair allocation is being "impartial to *all* class members"(emphasis added). *Meyer v. Citizens and Southern Nat. Bank*, 677

F.Supp. 1196, 1206 (M.D. Ga. 1988) ("objectors made no effort to show [] the method of allocating the settlement proceeds [] favored any group of class members over another"). Against this backdrop, the POA clearly fails Rule 23's fairness test. "Partiality", in fact, is its middle name: premium refunds not claimed by employers are shared with the whole class, while employers get the "full boatload" of employees' unclaimed refunds—giving them "the lion's share of the recovery." (Doc. No. 2866 at 7, 22). Ironically, the parties' only point of agreement supports Cochran's position: *but for* the employers' special treatment, the POA treats all unclaimed funds the same. (11th Cir. Doc. No. 147 at 40).

The employers' elevated status cuts against the grain of equitable distributions. A non-reversionary common fund requiring the submission of claims must distribute *all* unclaimed funds to *all* eligible claimants in an equitable manner. Rule 23(e)(2)(D). If any still remains, cy pres awards are made to charities that will benefit the whole class. *In re Airline Ticket Com'n Antitrust Litigation,* 307 F.3d 679, 682 (8th Cir. 2002) ("In such case, the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated.") Id.

Viewed this way, none of class counsel's pontifications justifies the Settlement's discriminatory treatment of employees. The bare fact that their unclaimed funds are captured by their own employer proves irrefutably they are

being unfairly treated. The consequences of this disparity could also be devastating. Since the Administrator declined to break down total class membership into subgroups, Plaintiffs alone are privy to the allocation's true impact. Absent these disclosures, it is speculative (if not misleading) to claim the default allocation model caused employees to submit claims at a higher rate than employers. To translate what's potentially at stake into "dollars and cents", the following hypothetical makes several assumptions.

\*

--*BCBS estimates there are 114 million members in the unified class.[10] Registered claimants include 5,989,798 employees and 266,292 employers. (Doc. No. 3029-1 at 2). Of $1.9 billion in the net settlement pool, $1.78 billion is allocated to the Fully-Insured subclass and $120 million to the Self-Insured subclass. If FI Groups only consisted of employers and employees, the default allocation model would award $1.5 billion to employers and $267 million to employees.*

---

[10] https://www.bcbs.com/sites/default/files/file-attachments/page/Blue_Facts_Sheet-2022.pdf

--*According to DOL, the average annual premium for a single subscriber in 2021 was $7,739.[11] Pursuant to the default allocation formula, the average employee contributed $1,160 of that total. After six-years (half of an FI Group's class period), the average employee will have contributed $6,960 of the premiums.*

--*In 2019, the Federal Trade Commission estimated the median participation rate for consumers in a claims-made settlement using a direct mail campaign was **9%**.[12] Applying this rate to BCBS' Settlement, an estimated 66,553,311 employees (58%) are class members. By extrapolation, we may further estimate that employees contributed a total of $463,211,044,560 toward premiums over the six-year period.*

--*According to Plaintiffs' damage expert, BCBS' average premium overcharge in Alabama ranged from 3.4% to 5.5%. (Doc. 2610-6 at 9). Applying a 4.5% median overcharge to total premium contributions would place employees' theoretical*

---

[11] Employer Health Benefits: 2021 Annual Survey at 7. https://files.kff.org/attachment/Report-Employer-Health-Benefits-2021-Annual-Survey.pdf. Accessed on Feb. 22, 2023.

[12] Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns. Federal Trade Commission (FTC Staff Report, 2019) at 1. As a crosscheck, this figure is 1% higher than the Settlement's verified participation rate overall. (*See* 11th Cir. Doc. No. 147 at 43).

*damages at $20,844,497,005—$313 each. In the interest of resolving Plaintiffs' claims, BCBS agreed to pay FI employees 12.8% of this figure ($267,000,000). If every claim is approved, the average employee will receive $44.57 from the Settlement. In contrast, the average employer will receive $5,692.91.*

*--Unfortunately, 91% of employees' premium refunds ($242,970,000) went unclaimed. If these funds were allocated to the common fund for equitable distribution to claimants, the employees' share would total $140,922,600—adding $23.53 to the average employee's award (a 53% increase). Instead, every employer will add $529.20 of employee wages to its sizeable award. The employees' loss is the employers' gain.*

—————————————— * ——————————————
————————————————————————————————

## CONCLUSION

Regardless of the actual numbers, the point remains the same: *a train wreck is about to happen if the Eleventh Circuit Court doesn't intervene.* For the reasons set forth in Cochran's opening and reply briefs, the order approving BCBS' Settlement should be vacated for abuse of discretion. In finding Plaintiffs met Rule

23(a)'s adequacy requirement, the district court committed factual and legal errors that precluded settlement class certification. Alternatively, the distribution of unclaimed funds violates Rule 23(e)'s fairness requirement because it treats similarly-situated class members differently.

Resolving these issues now instead of pushing them downstream is the only way to preserve the Settlement's fairness. Rather than trusting employers to "do what's right", millions of workers are hoping this Court *makes* it right. Nothing in Plaintiffs' response changes what justice demands: vacating the order with instructions to provide employees proper representation.

Dated: March 24, 2023                Respectfully submitted,

/s/ George W. Cochran
George W. Cochran
Counsel for Jennifer Cochran
and Aaron Craker
1981 Crossfield Circle
Kent, Ohio 44240
Tel: (330) 607-2187
Fax: (330) 230-6136
lawchrist@gmail.com

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 6,498 words. This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6).

Dated: March 24, 2023.               */s/ George W. Cochran*
                                      George W. Cochran
                                      1981 Crossfield Circle
                                      Kent, Ohio 44240
                                      Tel:  (330) 607-218
                                      Fax:  (330) 230-6136
                                      lawchrist@gmail.com

                                      *Counsel for Objectors-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. Those counsel for Appellants and Appellees who are registered ECF users will be served by the ECF system.

Dated: March 24, 2023.                              */s/ George W. Cochran*
                                                                        George W. Cochran
                                                                        1981 Crossfield Circle
                                                                        Kent, Ohio 44240
                                                                        Tel:  (330) 607-218
                                                                        Fax:  (330) 230-6136
                                                                        lawchrist@gmail.com

                                                                        *Counsel for Objectors-Appellants*