Appeal No. 22-13051

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

*In re:  Blue Cross Blue Shield Antitrust Litigation*
*(MDL No. 2406)*

_____

Appeal from the United States District Court
Northern District of Alabama
Case No.: 2:13-cv-20000-RDP

_____

### BRIEF OF *AMICI CURIAE*

_____

Jay M. Ezelle
H. Thomas Wells, III
Benjamin T. Presley
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, AL 35209
(205) 868-6000

*Attorneys for Amici Curiae*
*(Additional counsel listed on subsequent pages)*

{B4520297}

Paul E. Slater
Joseph M. Vanek
David P. Germaine
Eamon P. Kelly
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel:   (312) 641-3200
Email: pes@sperling-law.com
        jvanek@sperling-law.com
        dgermaine@sperling-law.com
        ekelly@sperling-law.com

Phillip F. Cramer
SPERLING & SLATER, P.C.
150 3rd Avenue South, Suite 1100
Nashville, TN 37203
Tel:  (312) 641-3200
Fax: (312) 641-6492
Email: pcramer@sperling-law.com

J. Scott Hickman
Eric G. Osborne
SHERRARD ROE VOIGT & HARBISON, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
Tel: (615) 742-4200
Fax: (615) 742-4539
Email:  shickman@srvhlaw.com
        eosborne@srvhlaw.com

Jason A. Zweig
Patrick Huber
KELLER POSTMAN LLC
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 216-8667
Email:  jaz@kellerpostman.com
        patrick.huber@kellerpostman.com

William J. Blechman
Joshua B. Gray
Elizabeth B. Honkonen
KENNY NACHWALTER, P.A.
Four Seasons Tower - Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Tel: (305) 373-1000
Fax: (305) 372-1861
Email:  wjb@knpa.com
        jgray@knpa.com
        ebh@knpa.com

{B4520297}

*In re:  Blue Cross Blue Shield Antitrust Litigation* (Appeal No. 22-13051)

## CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

### Certificate of Interested Persons

Pursuant to 11th Cir. R. 26.1-1, the undersigned counsel for *amici curiae* hereby certifies that, in addition to the persons and entities listed in the Certificates of Interested Persons and Corporate Disclosure Statements filed by the other parties in this appeal, and to the best of counsel's knowledge, the following trial judges, attorneys, persons, associates of persons, firms, partnerships, corporations, and other legal entities have an interest in the outcome of this case:

Blechman, William J. (counsel for *Amici Curiae*)

Cramer, Phillip F. (counsel for *Amici Curiae*)

Ezelle, Jay M. (counsel for *Amici Curiae*)

Germaine, David P. (counsel for *Amici Curiae*)

Gray, Joshua B. (counsel for *Amici Curiae*)

Hickman, J. Scott (counsel for *Amici Curiae*)

Honkonen, Elizabeth B. (counsel for *Amici Curiae*)

Huber, Patrick (counsel for *Amici Curiae*)

Keller Postman LLC (counsel for *Amici Curiae*)

Kelly, Eamon P. (counsel for *Amici Curiae*)

Kenny Nachwalter, P.A. (counsel for *Amici Curiae*)

*In re:  Blue Cross Blue Shield Antitrust Litigation* (Appeal No. 22-13051)

Osborne, Eric G. (counsel for *Amici Curiae*)

Presley, Benjamin T. (counsel for *Amici Curiae*)

Sherrard Roe Voigt & Harbison, PLC (counsel for *Amici Curiae*)

Slater, Paul E. (counsel for *Amici Curiae*)

Sperling & Slater, P.C. (counsel for *Amici Curiae*)

Starnes Davis Florie LLP (counsel for *Amici Curiae*)

Vanek, Joseph M. (counsel for *Amici Curiae*)

Wells, III, H. Thomas (counsel for *Amici Curiae*)

Zweig, Jason A. (counsel for *Amici Curiae*)

## Corporate Disclosure Statement

1. Alaska Air Group, Inc. (stock ticker ALK) is a publicly traded company.  It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

   - Alaska Air Group, Inc. Welfare Benefit Plan is a health plan that is sponsored by ALK for the benefit of its employees and their dependents.

   - Alaska Airlines, Inc. is a wholly owned affiliate and/or subsidiary of Alaska Air Group, Inc.  It is not publicly traded.

   - Alaska Airlines, Inc. Welfare Benefit Plan is a health plan that is sponsored by Alaska Airlines, Inc. for the benefit of its employees and their dependents.

   - Horizon Air Industries, Inc. is a wholly owned affiliate and/or subsidiary of Alaska Air Group, Inc  It is not publicly traded.

*In re: Blue Cross Blue Shield Antitrust Litigation* (Appeal No. 22-13051)

- Horizon Air Industries, Inc. Welfare Benefit Plan is a health plan that is sponsored by Horizon Air Industries, Inc. for the benefit of its employees and their dependents.

- Employee Benefit Plan for Employees of Horizon Air Industries, Inc. is a health plan that is sponsored by Horizon Air Industries, Inc. for the benefit of its employees and their dependents.

- Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries is a health plan that is sponsored by Horizon Air Industries, Inc. for the benefit of its employees and their dependents.

2. Albertsons Companies, Inc. (stock ticker ACI) is a publicly traded company. It has no parent corporation and no publicly held corporation owns 10% or more of its stock. Cerberus Capital Management, L.P., Klaff Realty L.P., funds affiliated with Lubert-Adler Partners, LP, and Schottenstein Stores Corp. – all privately held companies – own more than 10% of ACI's stock.

   - Safeway Inc. is a wholly owned subsidiary of Albertsons Safeway LLC, which is a wholly owned subsidiary of Albertsons Companies, Inc.

   - New Albertsons L.P., formerly New Albertson's Inc., is a subsidiary of Safeway Inc., owned 95% by Safeway Inc. and 5% by NAI Holdings GP LLC.

   - Albertson's LLC is a wholly owned subsidiary of Albertsons Safeway LLC, which is a wholly owned subsidiary of Albertsons Companies, Inc.

   - The Albertsons Companies, Inc. Health and Welfare Plan, f/k/a Albertson's LLC Health & Welfare Plan, and the New Albertson's Inc. Health and Welfare Plan are the health plans that are sponsored by Albertsons for the benefit of their employees and their dependents.

3. American Electric Power Service Corporation (stocker ticker AEP) is a publicly traded company. The following entities are parents, subsidiaries and/or affiliates of AEP that have issued shares or debt securities to the public: American Electric Power Company, Inc.; AEP Generating Company; AEP Texas Inc.; AEP Transmission Company, LLC; Appalachian Power

*In re: Blue Cross Blue Shield Antitrust Litigation* (Appeal No. 22-13051)

Company; Columbus Southern Power Company; Indiana Michigan Power Company; Kentucky Power Company; Ohio Power Company; Public Service Company of Oklahoma; Southwestern Electric Power Company; and Wheeling Power Company.

- American Electric Power System Comprehensive Medical Plan is the health plan that is sponsored by AEP for the benefit of its employees and their dependents.

4. Big Lots, Inc. (stock ticker BIG) is a publicly traded company. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

- Big Lots Associate Benefit Plan is the health plan that is sponsored by BIG for the benefit of its employees and their dependents.

5. The Boeing Company (stocker ticker BA) is a publicly traded company. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

- The Boeing Company Master Welfare Benefit Plan is the health plan that is sponsored by BA for the benefit of its employees and their dependents.

6. Bridgestone Americas, Inc. is a wholly owned subsidiary of Bridgestone Corporation (stocker ticker BRDCY), which is a publicly traded company.

- Bridgestone Americas, Inc. Employee Group Insurance Plan is a health plan that is sponsored by Bridgestone Americas, Inc. for the benefit of its employees and their dependents.

- Bridgestone Americas, Inc. Retiree Medical Plan is a health plan that is sponsored by Bridgestone Americas, Inc. for the benefit of its employees and their dependents.

7. Berkshire Hathaway, Inc. (stocker ticker BRK.A) is publicly traded and owns 10% or more of Burlington Northern Santa Fe LLC.

*In re:  Blue Cross Blue Shield Antitrust Litigation* (Appeal No. 22-13051)

- Burlington Northern Santa Fe Corporation Welfare Benefits Trust is a health plan that is sponsored by Burlington Northern Santa Fe LLC for the benefit of its employees and their dependents.

- Burlington Northern Santa Fe Group Benefits Plan is a health plan that is sponsored by Burlington Northern Santa Fe LLC for the benefit of its employees and their dependents.

8. Conagra Brands, Inc. (stocker ticker CAG) is a publicly traded company. The Vanguard Group owns 10% or more of the stock of Conagra Brands, Inc.

- Conagra Brands, Inc. Welfare Benefit Wrap Plan f/k/a ConAgra Foods, Inc. Welfare Benefit Wrap Plan is a medical benefit plan that ConAgra Brands, Inc. sponsors, maintains and operates for the use and members of ConAgra Brands, Inc.

9. Dollar General Corporation (stock ticker DG) is a publicly traded company. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

- Dollar General Health Plan (a component of the Dollar General Corporation Employee Benefits Plan) is a health plan that is sponsored by DG for the benefit of its employees and their dependents.

10. FedEx Corporation (stock ticker FDX) is a publicly traded company. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

- Federal Express Corporation and FedEx Freight, Inc. are wholly owned subsidiaries of FedEx Corporation.

- FedEx Corporation Group Health Plan is a health plan that is sponsored by FedEx Corporation for the benefit of its employees and their dependents.

- FedEx Corporation Retiree Group Health Plan is a health plan that is sponsored by FedEx Corporation for the benefit of its employees and their dependents.

{B4520297}

*In re: Blue Cross Blue Shield Antitrust Litigation* (Appeal No. 22-13051)

- Federal Express Corporation Group Health Plan for Pilots is a health plan that is sponsored by Federal Express Corporation for the benefit of its employees and their dependents.

- Federal Express Corporation Retiree Group Health Plan for Pilots is a health plan that is sponsored by Federal Express Corporation for the benefit of its employees and dependents.

- FedEx Group Health Plan is a health plan that is sponsored by FedEx Freight, Inc. for the benefit of its employees and dependents.

- Federal Express Corporation Group Health Plan is a health plan that is sponsored by Federal Express Corporation for the benefit of its employees and dependents.

- Federal Express Corporation Retiree Group Health Plan is a health plan that is sponsored by Federal Express Corporation for the benefit of its employees and dependents.

11. Hy-Vee, Inc. is not publicly traded, has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

- Hy-Vee, Inc. sponsors the Hy-Vee and Affiliates Benefit Plan and Trust for the benefit of its employees and their dependents.

12. JetBlue Airways Corporation (stock ticker JBLU) is a publicly traded corporation. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

- JetBlue Airways Group Health Insurance Plan is a medical benefit plan that JetBlue Airways Corporation sponsors, maintains, and operates for the use of its eligible members.

13. Kellogg Company (stock ticker K) is a publicly traded company. W.K. Kellogg Foundation Trust owns 10% or more of the stock of Kellogg Company.

- Kellogg Company Welfare Benefit Plan and Kellogg Company Retiree Welfare Benefit Plan are medical benefit plans that Kellogg Company

*In re:  Blue Cross Blue Shield Antitrust Litigation* (Appeal No. 22-13051)

sponsors, maintains, and operates for the use and members of Kellogg Company.

14.   The Kraft Heinz Company (stock ticker KHC) is a publicly held corporation.  Berkshire Hathaway, Inc. (stocker ticker BRK.A) owns 10% or more of the stock of The Kraft Heinz Company.

- The Kraft Heinz Group Benefits Plan and Kraft Heinz Retiree Group Benefits Plan are medical benefit plans that The Kraft Heinz Company sponsors, maintains, and operates for the use of its eligible members.

15.   The Kroger Co. (stock ticker KR) is a publicly traded company.  It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

- The Kroger Co. sponsors The Kroger Co. Health and Welfare Benefit Plan for the benefit of its employees and their dependents.

- 84.51 LLC is a wholly owned subsidiary of The Kroger Co.

- 84.51 LLC sponsors the 84.51 LLC Health & Welfare Plan for the benefit of its employees and their dependents.

- Murray's Cheese LLC is a wholly owned subsidiary of The Kroger Co.

16.   McLane Company Inc. is owned by Berkshire Hathaway, Inc. (stock ticker BRK.A) which is a publicly traded company.

- McLane Company, Inc. sponsors the McLane Company, Inc. Welfare Plan for the benefit of its employees and their dependents.

- McLane Company, Inc. owns all issued and outstanding stock of McLane Foodservice Distribution, Inc.

- Employee Benefits Plan of MBM Corporation is a medical benefit plan that McLane Foodservice Distribution, Inc., f/k/a Meadowbrook Meat Company, Inc. a/k/a The MBM Corporation sponsors, maintains, and operates for the use and members of McLane Foodservice Distribution, Inc.

*In re: Blue Cross Blue Shield Antitrust Litigation* (Appeal No. 22-13051)

17.   Meijer, Inc. is a wholly owned subsidiary of Meijer Companies, Inc.  No publicly held corporation owns 10% or more of its stock.

- Meijer Great Lakes LP is a wholly owned subsidiary of Meijer, Inc.

- Meijer Stores, LP is a wholly owned subsidiary of Meijer, Inc.

- Total Town Health LLC is a wholly owned subsidiary of Meijer, Inc.

18.   Publix Super Markets, Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

- Publix Super Markets, Inc. Group Health Benefit Plan is a health plan that Publix Super Markets, Inc. sponsors, maintains, and operates for the use of its eligible members.

19.   Tractor Supply Company (stock ticker TSCO) is a publicly traded company.  It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

- Tractor Supply Company sponsors The Tractor Supply Company Medical Plan for the benefit of its employees and their dependents.

20.   United Natural Foods, Inc. (stock ticker UNFI) is a publicly traded company.  Blackrock Fund Advisors, a subsidiary of Blackrock, Inc., and The Vanguard Group, Inc. each own 10% or more of UNFI's stock.

- SUPERVALU, Inc. is a wholly owned subsidiary of UNFI.

- Unified Grocers, Inc. is a wholly owned subsidiary of UNFI.

- UNFI Health and Welfare Plan, United Natural Foods Employee Benefit Plan, SUPERVALU Group Health Plan, SUPERVALU Retiree Benefit Plan, Unified Grocers, Inc. Group Welfare Plan and Unified Grocers, Inc. Retiree Medical Plan are health plans that UNFI or one of its subsidiaries sponsors, maintains and operates for the use of its eligible members.

*In re:  Blue Cross Blue Shield Antitrust Litigation* (Appeal No. 22-13051)

21.    US Foods, Inc. is a wholly owned subsidiary of U.S. Foods Holding Corp. (stock ticker USFD), which is a publicly traded corporation.  No publicly held corporation owns 10% or more of USFD's stock.

- US Foods, Inc. sponsors the US Foods Health & Welfare Plan for the benefit of its employees and their dependents.

22.    Walgreen Co.'s parent corporation is Walgreens Boots Alliance, Inc. (stock ticker WBA), which is publicly traded.

- Walgreen Co. sponsors the Walgreen Health and Welfare Plan (Plan No. 501) f/k/a Walgreen Major Medical Expense Plan for the benefit of their employees and their dependents.

- Duane Read, Inc. is owned by WBA.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.................................................................C-1

TABLE OF CITATIONS ................................................................................................ ii

STATEMENT OF THE ISSUE........................................................................................1

STATEMENT OF COMPLIANCE WITH RULE 29(a) ...................................................1

STATEMENT OF AMICI INTEREST .............................................................................2

SUMMARY OF THE ARGUMENT.................................................................................4

ARGUMENT .................................................................................................................9

    A.  Standard of Review.........................................................................................9

    B.  The District Court Did Not Abuse its Discretion by Approving the
        Settlement Without Enjoining Defendants' Use of ESAs.............................10

    C.  The District Court Did Not Abuse Its Discretion in Approving the Allocation
        of the Settlement Funds Among Class Members. ........................................14

CONCLUSION............................................................................................................22

# TABLE OF CITATIONS

## Cases

*Am. Pipe & Constr. Co. v. Utah*,
    414 U.S. 538 (1974).....................................................................16 n.12

*Barnebey v. E.F. Hutton & Co.*,
    715 F. Supp. 1512 (M.D. Fla. 1989) .......................................17 n.13

*Bennett v. Behring Corp.*,
    96 F.R.D. 343 (S.D. Fla. 1982).................................................13 n.9

*Bennett v. Behring Corp.*,
    737 F.2d 982 (11th Cir. 1984) .............................................9, 11, 22

*Coon v. Georgia Pacific Corp.*,
    829 F.2d 1563 (11th Cir. 1987) ...............................................17 n.13

*Crown, Cork & Seal Co. v. Parker*,
    462 U.S. 345 (1983).............................................................16, 17 n.14

*Griffin v. Singletary*,
    17 F.3d 356 (11th Cir. 1994) ...............................................16, 17 n.14

*Grunin v. Int'l. House of Pancakes, Inc.*,
    513 F.2d 114 (8th Cir. 1975) ..........................................................12

*Holmes v. Cont'l Can Co.*,
    706 F.2d 1144 (11th Cir. 1983) ...................................................5, 22

*In re Blue Cross Blue Shield Antitrust Litig.*,
    308 F. Supp. 3d 1241 (N.D. Ala. 2018) ......................................5 n.3

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
    999 F.3d 1247 (11th Cir.), *cert. denied sub nom. Huang v. Spector*, 211 L.
    Ed. 2d 254, 142 S. Ct. 431 (2021), and *cert. denied sub nom. Watkins v.
    Spector*, 211 L. Ed. 2d 479, 142 S. Ct. 765 (2022) ...........................9

{B4520297}

*In re Indep. Serv. Orgs. Antitrust Litig.*,
    No. MDL-1021, 1997 WL 161940 (D. Kan. Mar. 12, 1997)...............17 n.13

*Int'l Union, UAW v. Gen. Motors Corp.*,
    497 F.3d 615 (6th Cir. 2007) .........................................................21

*Jacoboni v. KPMG LLP*,
    314 F. Supp. 2d 1172 (M.D. Fla. 2004) ...............................17 n.13

*M & G Polymers USA, LLC v. Tackett*,
    574 U.S. 427 (2015).....................................................................21

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*,
    834 F.2d 677 (7th Cir. 1987) .........................................................21

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    210 L. Ed. 2d 314 (June 21, 2021) ................................................14

*Reynolds v. Roberts*,
    202 F.3d 1303 (11th Cir. 2000) ...........................................20 n.16

*Robertson v. Nat'l Basketball Ass'n*,
    556 F.2d 682 (2d Cir. 1977) .........................................................13

*U.S. v. Anthem, Inc.*,
    236 F. Supp. 3d 171 (D.D.C. 2017)...................................2 n.1, n.2

*U.S. v. Anthem, Inc.*,
    855 F.3d 345 (D.C. Cir. 2017).................................................2 n.2

*W. Va. v. Chas. Pfizer & Co.*,
    440 F.2d 1079 (2d Cir. 1971) ...............................................13 n.9

## Statutes and Rules

15 U.S.C. §15 ........................................................................16 n.11

Fed. R. App. P. 29 ............................................................................1

Fed. R. Civ. P. 23 ..................................................................*passim*

{B4520297}

**Other Sources of Authority**

4 Newberg § 13:47................................................................9

*Manual for Complex Litigation*, Third, §30.42 (1995)....................................15 n.10

## STATEMENT OF THE ISSUE

Did the district court abuse its discretion in approving the settlement?

## STATEMENT OF COMPLIANCE WITH RULE 29(a)

No party or party's counsel authored this motion in whole or in part; no party or party's counsel contributed money to fund the preparation or submission of this brief; and no other person except Amici, their members, or their counsel contributed money intended to fund the preparation or submission of this brief.

Amici's counsel contacted counsel for Defendants-Appellees and Plaintiffs-Appellees to ask for their consent to file an amicus brief. As of the time of this filing, Defendants-Appellees and Plaintiffs-Appellees have not provided their position.

The Home Depot Appellants consented to the filing of an amicus brief by the Amici.

The Topographic, Inc. and Employee Services, Inc. Appellants do not oppose Amici's motion for leave to file an amicus brief, but stated that they maintain their opposition to approval of the settlement and reserve all rights regarding responding to Amici's brief.

Objector-Appellant David Behenna informed undersigned counsel for Amici that he does not oppose the filing of an amicus brief provided that the brief "makes clear that your clients take no position on attorneys' fees." Consistent with Objector-

Appellant Behenna's request, Amici state that they take no position on attorneys' fees.

Objector-Appellants Jennifer Cochran and Aaron Craker do not consent to the filing of an amicus brief by the Amici.

## STATEMENT OF AMICI INTEREST

Amici are some of the largest corporate employers in the United States (*e.g.*, Boeing, Kroger, FedEx, Publix, Dollar General). They are also "National Accounts"[1] and members of the Rule 23(b)(2) class. Amici opted out of the settlement and have litigation pending against these same Defendants arising from their unlawful output restraints and their use of Exclusive Service Areas ("ESA") to allocate National Account subscribers. The market for National Accounts[2] is highly concentrated with few options because the BCBSA and its 34 insurance company owners allocate National Accounts amongst themselves, meaning that absent further relief National Accounts will continue to bear the brunt of Defendants' Sherman Act violation.

---

[1]    National Accounts are employers with more than 5,000 employees across more than one state. *U.S. v. Anthem, Inc*., 236 F. Supp. 3d 171, 197-202 (D.D.C. 2017).

[2]    *Anthem,* 236 F. Supp. 3d at 198–99 (defining relevant market in terms of National Account purchase of "commercial health insurance"); *U.S. v. Anthem, Inc.*, 855 F.3d 345, 351 (D.C. Cir. 2017) (affirming finding that "the market for the sale of health insurance to national accounts … properly included both fully insured and 'administrative services only' ('ASO') plans").

Like Home Depot, Amici initially objected to the Subscriber Class settlement. In response to Amici's objection, the district court confirmed that Amici's claims were not being released and required that divisible injunctive relief (*i.e.*, relief not applicable to all claimants) be removed from the non-opt-out Rule 23(b)(2) class and placed in the (b)(3) opt-out class. Having confirmed their right to proceed against Defendants and secured the right to seek their own relief, Amici withdrew their objection to the proposed class settlement. Like the Appellants, Amici remain members of the (b)(2) class, which provides for certain indivisible injunctive relief and a corresponding release.

Amici have opted out of the Rule 23(b)(3) class to pursue (1) their own damages and (2) their own divisible injunctive relief. Home Depot has similarly opted out of the (b)(3) class and is similarly free to pursue its own monetary and divisible injunctive relief, including a prohibition of future conduct injuring Home Depot.

Amici agree with the Subscriber Class that the settlement approved by the district court provides for meaningful and constructive (b)(2) indivisible injunctive relief that should be affirmed. Due to the changes in the settlement required by the district court, Amici can now build off of this solid achievement of the class settlement and further inject competition into the health-insurance market. As some of the very largest Rule 23(b)(2) class members and as the largest group of opt outs

{B4520297}

3

from the Rule 23(b)(3) class, Amici respectfully suggest that our perspective on the benefits of the settlement and whether the district court abused its discretion by approving of the settlement may be helpful to the Court. Amici support the affirmance of the district court's approval of the class settlement so that class members can benefit from the prohibition on Defendants' National Best Efforts output restraint.

## SUMMARY OF THE ARGUMENT

Like all compromises, the class settlement is not perfect. Amici initially objected to the settlement, and in response to those objections, the district court and settling parties made material alterations and clarifications to the settlement. The non-opt out Rule 23(b)(2) portion of the settlement was reduced in scope to include only the indivisible injunctive relief afforded by the settlement. Other pertinent aspects of the settlement—both monetary and injunctive—were placed into a Rule 23(b)(3) class, from which the class members, including the Amici and the Appellants, could opt out to pursue their own monetary relief and individualized injunctive relief. This includes the right of an opt out plaintiff to pursue an order enjoining Defendants from allocating which of them may compete for the business of a particular opt out plaintiff, whether using the ESAs or otherwise.[3]

---

[3]    The ESA restraints are used in a variety of contexts by the Defendants, including to facilitate customer allocation whereby National Accounts are allocated among the 34 Blue insurance company defendants. *In re Blue Cross Blue Shield*

Given the nature of the (b)(2) indivisible injunctive relief—*e.g.*, an injunction against Defendants' "National Best Efforts" output limitation—any exceptions to the forward-looking release "would have little practical value or effect." *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1157 (11th Cir. 1983). As this Court has explained, "[a] (b)(2) injunction would enjoin all illegal action, and all class members would necessarily be affected by such broad relief." *Id.* In other words, since Defendants are enjoined from undertaking the very conduct that a plaintiff is being foreclosed from challenging, the forward-looking release is of little practical consequence. *Id.*

As for the other conduct for which indivisible injunctive relief was not afforded by the settlement and therefore part of the (b)(3) class relief *and* release, an opt-out can seek and obtain an injunction against the Defendants that remedies any injury to itself. The only thing Home Depot or other opt-outs cannot do is seek an injunction on behalf of others. By confirming the thoughtful due process safeguards built into the settlement by Judge Proctor, this Court can approve the settlement agreement, assuage Appellants' concerns, and preserve the meaningful Rule 23(b)(2) injunctive relief afforded to all class members.

---

*Antitrust Litig.*, 308 F. Supp. 3d 1241 at 1250-52, 1256 (N.D. Ala. 2018). Under these allocations, the only Defendant allowed to bid for a National Account is the Defendant that has been allocated the territory where the National Account is headquartered. *Id.* at 1256.

{B4520297}

The principal argument advanced by Home Depot is that the Defendants' ESA restraints are unlawful under either the *per se* rule or the Rule of Reason and that the future release of such conduct is contrary to public policy because the settlement "would terminate the rights of 23(b)(2) class members" to enjoin future wrongdoing or to opt out of the (b)(2) class. The Home Depot Appellant Brief (ECF 120) ("HD Br.") at 18. As succinctly stated by Home Depot, the (b)(2) class members "are stuck with this deal." *Id.* at 57.

Respectfully, we disagree with Home Depot. *First*, Home Depot is not "stuck with the deal" as the settlement does not prevent Home Depot from seeking and obtaining divisible relief, including an injunction that prevents Defendants from causing harm to Home Depot. Because Home Depot has opted out of the (b)(3) class, it is free to seek its own monetary damages and divisible injunctive relief precluding the Defendants from engaging in conduct that injures Home Depot.

*Second,* we disagree with Home Depot that a district court cannot ever approve a settlement in which Defendants continue to engage in legally-suspect behavior. Amici agree with Home Depot that Defendants' use of ESAs to allocate National Accounts is a *per se* violation of the Sherman Act. But experience cautions us to stop short—even if only just—of asserting that it is a "legal certainty" that our position will prevail, which is the applicable standard for settlement approval. The pertinent question is whether the district court abused its discretion in holding that

{B4520297}

6

the parties to the settlement struck a reasonable compromise by not enjoining all the pre-settlement conduct challenged by the Class. As explained below, and in light of all the factors in play, Amici believe that the district court did not abuse its discretion in approving the settlement.

The Topographic Objectors have appealed the district court's holding that the allocation of the $2.67 billion settlement fund among subscriber class members was fair and reasonable. Amici have filed their own lawsuits and will prove their own damages, but nonetheless address the allocation in one particular respect. One of the factors considered by the district court approving of a larger allocation of the settlement fund to "fully-insured" class members than to "self-funded" class members was whether the original class complaint included claims for all class members.[4] Whether the original complaint gave notice to the Defendants that all subscribers were part of the lawsuit is a question of fact. As the Class Subscribers explain in their brief,[5] those facts were never fully developed below and, in any event, were sharply disputed. Because there was less dispute as to the length of the damage period for so-called fully-insured subscribers, but more dispute as to the

---

[4] Final Order and Judgment (ECF 2931) at 59-62, No. 13-cv-20000 (N.D. Ala. Aug. 9, 2022) ("FAO").

[5] Class Subscribers acknowledge that to have properly analyzed the damages "claimed by all members of the Self-Funded Sub-Class would have taken additional years and additional millions dollars to produce." Class Br. at 94.

length of the damage period for the self-funded subscribers, the issue of the relative length of the damage periods for different types of class members was ripe for compromise. That compromise was negotiated with the assistance of a mediator. On appeal, this Court need not, and we respectfully submit should not, decide the merits of when any class member's period starts. The settlement approval process is not the proper context within which to decide the *merits* of claims.[6] For current purposes the sole question that needs to be addressed is whether, based on the record and the multiple factors before it, the district court abused its discretion. Amici believe that it did not and this Court should affirm the approval of the settlement on that narrow and sufficient ground.

---

[6]     The statute of limitations start date for Amici's claims is currently pending before Judge Proctor as the Defendants have partially moved to dismiss on statute of limitations grounds. *See* ECF 232, *Alaska Air v. Anthem,* No. 2:21-cv-01209-RDP (Nov. 18, 2022). That motion is fully briefed and awaiting disposition. Despite taking no interest in the issue of allocation below, in this Court the Defendants spend one-third of the argument section of their brief reciting their motion to dismiss arguments in an apparent attempt to seek an opinion from this Court that they may use to prejudge issues in other cases. Defs. Br. at 54-67. Amici respectfully submit that the merits of that dispute should be decided by the district court in the first instance based on a fully developed record and not by this Court based on an incomplete record in the context of an appeal of settlement approval.

## ARGUMENT

### A. Standard of Review

Settlements need not be perfect to be approved.  If it were otherwise, the compromise nature of settlements themselves would almost always preclude their approval because a Defendant would have to concede every point.  Rather, the law requires only that a class settlement agreement be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

This Court "review[s] an order approving a class action settlement for abuse of discretion."  *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1273 (11th Cir.), *cert. denied sub nom. Huang v. Spector*, 211 L. Ed. 2d 254, 142 S. Ct. 431 (2021), and *cert. denied sub nom. Watkins v. Spector*, 211 L. Ed. 2d 479, 142 S. Ct. 765 (2022).  And because "[d]etermining the fairness of the settlement is left to the sound discretion of the trial court," this Court will not overturn the district court's decision "absent a *clear* showing of abuse of that discretion."  *Id.* (quoting *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); citing 4 Newberg § 13:47 ("[A]ppellate courts review the approval decision under a highly deferential abuse of discretion standard.")) (emphasis in original).

## B. The District Court Did Not Abuse its Discretion by Approving the Settlement Without Enjoining Defendants' Use of ESAs.

The district court held that the changes to Defendants' rules "creat[e] opportunities for more competition in the market … and provid[e] the potential for a more competitive environment…." ECF #2931 at 11. Amici believe that the settlement should be approved so that those opportunities may be pursued.

Under the releases required by the settlement, self-funded accounts that opt out of the (b)(3) class do not release claims for past or future conduct. To the contrary, opt outs such as Home Depot "retain the right not only to seek monetary damages, but also to seek individualized injunctive relief" precluding future illegal conduct (FAO at 15, 44). The only restriction on Home Depot's ability to enjoin future behavior is that it may not pursue "indivisible relief" on behalf of the entire class. *Id*. at 87-88.[7] As Judge Proctor's Amendment to Final Order makes clear, Home Depot "[did] not release any claims for individualized and declaratory or injunctive relief…." AFAO at 2.

---

[7] *See also* Amendment to Final Order and Judgment Granting Approval of Subscriber Class Action Settlement Relating Only to the Releases Provided by Opt-Outs (ECF 2939) at 1-2, No. 13-cv-20000 (N.D. Ala. Sept. 7, 2022) ("AFAO"). Judge Proctor's amended Order states that "opt-outs will release all claims for *indivisible* injunctive and declaratory relief" but that a "Self-Funded Account Opt-Out does not release any claims for *individualized* declaratory or injunctive relief…." (emphasis added). *Id*.

Reversing the district court's approval therefore would not afford Home Depot any greater rights for itself than it would have without the settlement. The district court repeatedly informed all objectors of this fact. *See, e.g.,* Tr. II-23 ("You haven't released a claim."); II-23 ("you've not released the claim"); II-23 ("it's not a matter of release"); II-24 ("It's not a release."); II-25 ("It's not a release."); II-25 ("it's not a waiver of a claim"). The settling parties below agreed. Tr. II-24 (Court: "Does anybody disagree with me that it's not a release, it's just a matter of what relief can be sought?" Counsel: "I believe the subscribers and the Blues are in alignment with Your Honor's recitation of how this would play out."). The district court explained that opt-outs retained the right post-settlement to "litigate whether ESAs are illegal" such that they are causing harm to them and "seek individualized relief if a court determines that they are." Tr. II-113.; *see also* I-93 ("you've not released your claim that…you should have the right to pursue other Blue bids").[8]

Thus, as a fellow opt out, the district court's approval of the settlement does not condone Defendants' ongoing conduct nor compromise Home Depot's ability to vindicate its rights. This is confirmed by *Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984). In *Bennett*, a class settlement was reached, and objectors argued it

---

[8] The district court asked Defendants' counsel if he agreed that "nothing about the approval of my settlement affects their ability to prove in their individual case a Sherman Act violation; right?" Tr. I-169. Counsel responded: "Absolutely – I totally agree." Tr. I-169.

could not be approved because it did not enjoin a continuing a *per se* violation.  *Id.* at 985-86.  The trial court approved the settlement and this Court affirmed, holding that whether the settlement allowed for future illegal conduct "properly goes to the merits of the case" and "is inapposite in our review of the settlement."  *Id.* at 987. This Court further held that "[w]hether there is some merit to plaintiff's contention that the … tie-in arrangements constitute antitrust violations is *not* the issue" and that, "unless the illegality of an arrangement under consideration is a *legal certainty*, the mere fact that certain of its features may be perpetuated is not a bar to approval." *Id.* (emphasis added).

The *Bennett* decision relied on *Grunin v. Int'l. House of Pancakes, Inc.*, 513 F.2d 114 (8th Cir. 1975).  In *Grunin*, the Eighth Circuit approved a class settlement over the objection that the settlement would "perpetuate[] antitrust violations."  *Id.* at 123.  The Eighth Circuit rejected this argument and held that neither the trial nor appellate court "have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute."  *Id.*  Indeed, the Court held that "in examining a proposed compromise for approval or disapproval … the court does not try the case" as "the very purpose of compromise is to avoid the delay and expense of such a trial."  *Id.* at 124.  The Eighth Circuit further pointed out that whether the conduct in question violated the Sherman Act was "vigorously contested" and that the eventual finding of illegality "is not a legal certainty."  *Id.*

As a result, the Court held that the trial court did not abuse its discretion by approving the settlement. *Id*. at 125; *see also Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977).[9]

Home Depot argues that the class settlement is contrary to public policy and cannot be approved because it does not enjoin the ESAs, including their role in Defendants' allocation of National Accounts. Home Depot asserts that under either the *per se* rule or the rule of reason the conduct is anticompetitive and illegal. HD Br. at 49.

To be clear, Amici firmly believe that the customer allocation of National Accounts effectuated by the ESA rules *is* a *per se* violation of Section 1 of the Sherman Act. Defendants, not surprisingly, disagree and argue that the existence of common law trademark rights prior to the time they agreed to implement the ESA restraints distinguishes their conduct from cases that have found a *per se* violation. The existence of such common law trademark rights is disputed and whether such common law rights would constitute a basis for avoiding the *per se* rule, even if they did exist, is also disputed. Amici believe the proffered pre-existing common law

---

[9]     *Robertson* relied on *W. Va. v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1086 (2d Cir. 1971), which held that an objector "must show … that the rules of law for which she is contending are so clearly correct that it was an abuse of discretion for … the court to approve the settlement." That is similar to the approach of the trial court in *Bennett*, which held that the settlement could be affirmed because there was a dispute that "exists as to the legality" of the allegedly anticompetitive conduct. *Bennett v. Behring Corp.*, 96 F.R.D. 343, 354 (S.D. Fla. 1982).

trademark defense to the *per se* rule lacks merit, but that is not the same as saying that Defendants' arguments are so patently deficient that it is a "legal certainty" they will fail.

The same conclusion is reached if the ESA restraints and/or the allocation of National Accounts are analyzed under the rule of reason. The rule of reason involves analysis of the nature of the restraint and its actual or probable effect, the purpose of the restraint, and the reasons for its adoption. *Nat'l Collegiate Athletic Ass'n v. Alston,* 210 L. Ed. 2d 314 (June 21, 2021). Amici believe that upon the development of the full record, Defendants use of ESAs to allocate the business of opt out National Accounts will be found to be unlawful even under the rule of reason. However, at this stage of the proceedings before the district court, and given the nature of the inquiry mandated by the rule of reason, it is understandable why the district court would not declare such a violation to be "a legal certainty."

## C. The District Court Did Not Abuse Its Discretion in Approving the Allocation of the Settlement Funds Among Class Members.

The district court approved the allocation of the settlement fund among subscriber class members that was proposed by class counsel. Class counsel explain that it was the result of a negotiation among class counsel mediated by Ken Feinberg. FAO at 60, fn.24. The proposal allocates to "fully-insured" class members 93.5% of the funds and allocates to "self-funded" class members 6.5% of the settlement funds. At the fairness hearing, class counsel's proposal was supported by the expert

report and testimony of Dr. Mason. The Topographic Objectors challenged Dr. Mason's analysis and attacked the proposed allocation as inadequate. Topographic supported its position and its critique of Dr. Mason's work with its own expert reports and testimony.

The district court found that the proposed allocation had a "reasonable, rational basis." *Id*. at 56. The district court considered numerous factors. It pointed out that the allocation was recommended by "experienced and competent counsel" (*id*.);[10] the objectors had failed to credibly show that a higher allocation for the self-funded accounts could have been negotiated (*id*.); the allocation negotiation was mediated by "the country's leading neutral on allocations of large settlements…" (*id*. at 57); Dr. Mason used four metrics (*i.e.*, "proxies") to appraise the fairness of the allocation, which resulted in an estimated range for the allocation to the self-funded accounts of between 1.7% and 10.7% of the settlement fund; Topographic and its experts targeted only one of the four metrics in their critique of Dr. Mason (*id*. at 58); Dr. Mason opined that there was no reason to assume that the overcharge rate for fully insureds and self-funded accounts was the same (*id*. at 58); Dr. Mason opined that fully insured business was more profitable than self-funded business (*id*.

---

[10]    "A presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel…." *Manual for Complex Litigation*, Third, §30.42 (1995).

at 58); and Topographic's experts had not attempted to measure the relative amounts of overcharges attributable to the two groups and did not believe that the allocation of damages should be based "on the relative amount of overcharges" paid (*id*. at 58). As between the competing experts, the district court credited Dr. Mason's analysis over that of Topographic's experts. *Id*. at 56-61. As opt-outs, Amici do not weigh in on these factors.

However, the district court also reasoned that the smaller allocation for the self-funded accounts was defensible because self-funded accounts were not part of the original complaint filed in 2012, which gave at least some fully-insured accounts a damages period going back to 2008.[11] Under the *American Pipe*[12] tolling doctrine, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class…." *Griffin v. Singletary*, 17 F.3d 356, 360 (11th Cir. 1994) (quoting *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353-54 (1983)). This tolling doctrine applies to claims and is not restricted by the form of relief requested.[13] So if self-funded subscribers were part of *either* the original

---

[11]    Under §4 of the Clayton Act (15 U.S.C. §15), the statute of limitations period for antitrust claims is four years. A case filed in 2012 would therefore have a damage period commencing in 2008.

[12]    *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).

[13]    This is because tolling applies to the legal "claim" and not to the specific remedy requested. Thus, for the purpose of *American Pipe* tolling, "[c]ourts traditionally have found that multiple remedies based on the same set of facts

damages class *or* part of the original injunctive relief class, then the statute of limitations was tolled for them back to 2008 – just like the fully insured accounts – for purposes of *both* injunctive relief and damages.[14]

Without the benefit of a fully developed fact record, which was unnecessary for the fairness hearing, the final approval order provides that self-funded accounts did not become part of the case and Defendants did not receive notice of their claims

---

comprise a single cause of action or claim." *In re Indep. Serv. Orgs. Antitrust Litig.*, No. MDL-1021, 1997 WL 161940, at *5 (D. Kan. Mar. 12, 1997) (allowing an opt-out purchaser to assert a lost profits damage theory because it was asserting the identical cause of action as the class, just seeking a different remedy). This is consistent with the principle that damages do not constitute a new cause of action but are simply an additional remedy for the same cause of action. *Jacoboni v. KPMG LLP*, 314 F. Supp. 2d 1172, 1186 (M.D. Fla. 2004) ("Typically, the law looks at a cause of action as a unit, encompassing all rights and remedies that may flow from a given set of circumstances.").

This *American Pipe* jurisprudence aligns with this Court's functional view of a "cause of action." Tolling applies as long as a new claim involves the same "evidence, memories, and witnesses" as the class claims. *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1528 (M.D. Fla. 1989) (quotation omitted). This Court reasoned similarly in *Coon v. Georgia Pacific Corp.*, when it stated that, due to *American Pipe* tolling, a plaintiff "could have raised her additional claims . . . assuming . . . that they concern the same evidence, memories, and witnesses as the subject matter of the original class suit." 829 F.2d 1563, 1571 (11th Cir. 1987) (quotation omitted).

[14]    "[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action [such that] [o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied." *Griffin*, 17 F.3d at 360 (cleaned up) (quoting *Crown, Cork & Seal*, 462 U.S. at 353-54).

until July 2019 (FAO at 60). This is why the district court believed the shorter damages time period for the self-funded accounts used in the settlement fund allocation was defensible. Amici agree with Topographic that the trial court , without a fully (or even partially) developed record, could not have properly considered whether self-funded class members were part of the case from the beginning. This does not, however, mean that the district court abused its discretion in approving the settlement.

There was some dispute amongst the settling parties as to the damages period for self-insured class members. There was less dispute as to the damages period for the fully insured class members.[15] This conceivably subjected the two groups to different degrees of litigation risk and difficulty. The district court could consider that difference in evaluating, for settlement purposes, whether the allocation was rationally based. The standard of review in judging the reasonableness of a proposed settlement as compared to a determination on the merits based on a complete record

---

[15]    Although not apparently factored into the time period dispute, National Accounts that purchased "full insurance" from Defendants were included in the fully insured allocation even though they had been putatively excluded from the proposed damages class, which had limited it to groups of less than 200 members. Likewise, the original *Cerven* damages classes were limited to businesses in North Carolina, yet fully-insured subscribers outside of North Carolina were afforded a damages period based on the *Cerven* filling date apparently because they (like Amici and other sub-class subscribers) were members of its injunctive relief "Nationwide Class." *Cerven* Compl.(ECF 1) at ¶ 21, No. 12-cv- 00017 (W.D.N.C. Feb. 7, 2012).

is key to explaining how the district court could approve the settlement while not conclusively deciding when the statute of limitations was tolled for certain members of the class such as National Accounts.

The Topographic Objectors have explained why the self-funded subscribers were encompassed by the original *Cerven* complaint and have proffered direct evidence that the Defendants had notice of that inclusion and specifically understood that the language of the *Cerven* complaint "encompassed both large and small groups that self-insure." Topographic Appellant Br. (ECF 121) ("Top Br.") at 50. That is just a small sampling of the evidence on this subject. [16] Indeed, it is difficult to

---

[16]    Defendants state that the applicable test is whether the original complaint "gave notice to Defendants of the claims now being asserted" (Defs.' Apellees' Resp. Br. (ECF 146) ("Def. Br.") at 55) and further acknowledge that whether notice was given must be determined "as a matter of fact" (*id*. at 56-57).

Furthermore, there is substantial evidence that as the terminology is commonly used and understood in the industry, self-funded subscribers are routinely described as purchasing "insurance" and members of self-funded plans are described as being an "insured" and self-funded policies are routinely described as "insurance." *See, e.g.*, *Health Insurance Glossary*, CareFirst https://employer.carefirst.com/employer/health-insurance-glossary/health-insurance-glossary-i.page?alphaId=glossary-i (last visited Feb. 15, 2023) (defining "insured" as: "Person, including dependents, covered by a contract. Also known as 'covered person' or 'member.'"); *Provider Finder*, BlueCross BlueShield of Illinois, https://www.bcbsil.com/boeing/doctors-and-hospitals/provider-finder (last visited Feb. 15, 2023) (informing employees of Boeing that they are "a Blue Cross and Blue Shield of Illinois member"); *Glossary of Health Care Terms*, BlueCross BlueShield of Illinois, https://www.bcbsil.com/insurance-basics/understanding-health-insurance/glossary (last visited Feb. 15, 2023) (defining "insured person" by explaining that it is "often referred to as a member/subscriber"); *Blue Facts*, BlueCross BlueShield Association, May 2018,

{B4520297}

understand how Defendants could have insisted on releases from self-funded class members as part of settlement if self-funded class members were not part of the case. *See* Pls.' Appellees' Resp. Br. (ECF 147) ("Class Br.") at 76. In this regard, Defendants claim the self-funded subscribers were not part of the case until November 2, 2020, when the Fourth Amended Complaint was filed. Def. Br. at 62-63. But the settlement agreement, including the funds for self-insured accounts and the release of their claims, was fully executed 17 days before the Fourth Amended Complaint was filed.[17] How is it possible that self-funded accounts agreed to settle and release their claims prior to being part of the case?

---

https://www.bcbs.com/sites/default/files/file-attachments/page/BCBS.Facts__0.pdf (last visited Feb. 15, 2023) ("Today, Blue Cross and Blue Shield companies cover: 88 of America's Fortune 100 employers, including some of America's top companies like Microsoft, Walmart, General Motors and UPS."). Additional examples abound and have been briefed below in Amici's litigation with Defendants.

This trade usage is evidence that the self-funded subscribers were included as class members in the *Cerven* complaint. *Reynolds v. Roberts*, 202 F.3d 1303, 1316 (11th Cir. 2000) ("to determine the meaning of a provision, the court might look to… usage of trade"). Indeed, when Defendants originally sought the creation of the MDL, the MDL panel explained that Defendants described themselves as "providing **health insurance** to approximately 100 million subscribers," which necessarily includes all subscribers, both "self-funded" and "fully-insured." MDL Transfer Order, ECF #1, at 1 (emphasis added).

[17]    The Subscriber Class moved to file its Fourth Amended Complaint on November 2, 2020. (ECF 2609), No. 13-cv-20000 (N.D. Ala. Oct. 30, 2020). Twenty minutes later, the Motion for Preliminary Approval of Proposed Class Settlement (ECF 2610) was filed, including the 61 page settlement agreement executed weeks earlier on October 16. (ECF 2610-2).

As the Class has correctly noted, however, the question here "is not whether" the *Cerven* complaint did or did not include self-funded accounts or any number of other class members such as non-North Carolina based subscribers. "Instead, the question is whether the District Court abused its discretion in approving an allocation that treated the self-funded sub-class" differently due to the dispute over its damage period. Class Br. at 105. Positing and qualifying the question in this manner, the district court "did not." *Id*.

Although Amici agree with the Topographic Objectors, "the temptation to convert a settlement hearing into a trial on the merits must be resisted." *Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 834 F.2d 677, 684 (7th Cir. 1987). In a fairness hearing, the judge does not resolve the merits of the parties' disputes, but "merely ensures that the disputes are real and that the settlement fairly and reasonably resolves the parties' differences." *Int'l Union, UAW v. Gen. Motors Corp.*, 497 F.3d 615, 636-37 (6th Cir. 2007), *abrogated on other grounds by M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 430 (2015). Here, there was less enunciated dispute as to the damage period applicable to fully-insured class members, but there was (and still is) more dispute as to self-funded class members. The merits of that dispute did not need to be and were not decided by the district court, but the existence of the differing degree of the disputes and litigation risks was a "consideration" that could be taken into account by the district court in

deciding whether the allocation was "rationally based." *Holmes v. Cont'l Can Co.*, 706 F.2d at 1148.

## CONCLUSION

"[C]ompromise is the essence of settlement." *Bennett*, 737 F.2d at 986. The test for affirming approval of a settlement asks whether the district court abused its discretion in finding the settlement fair, adequate and reasonable. Here, the district court has not condoned Defendants' going-forward conduct nor precluded Home Depot from enjoining Defendants from injuring Home Depot with that conduct. And even though Amici agree with the Topographic Objectors about the time periods ascribed to different class members, and do not believe this Court need or should adopt that finding in affirming the settlement, Amici believe that Judge Proctor did not abuse his discretion in approving the settlement.

{B4520297}

Dated: February 17, 2023

Respectfully submitted,

By: */s/ Benjamin T. Presley*
Jay M. Ezelle
H. Thomas Wells, III
Benjamin T. Presley
STARNES DAVIS FLORIE LLP
100 Brookwood Place, 7th Floor
Birmingham, AL 35209
Tel: (205) 868-6000
Email: jezelle@starneslaw.com
        twells@starneslaw.com
        bpresley@starneslaw.com

*Counsel for Amici Curiae*

By: */s/ Paul E. Slater*
Paul E. Slater
Joseph M. Vanek
David P. Germaine
Eamon P. Kelly
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel:   (312) 641-3200
Email: pes@sperling-law.com
        jvanek@sperling-law.com
        dgermaine@sperling-law.com
        ekelly@sperling-law.com

By*: /s/ Phillip F. Cramer*
Phillip F. Cramer
SPERLING & SLATER, P.C.

150 3rd Avenue South, Suite 1100
Nashville, TN 37203
(312) 641-3200
Fax: (312) 641-6492
Email: pcramer@sperling-law.com

*Counsel for JetBlue Airways Corporation and JetBlue Airways Group Health Insurance Plan, The Kraft Heinz Company, Kraft Heinz Group Benefits Plan, and Kraft Heinz Retiree Group Benefits Plan*

*Alaska Airlines, Inc.; Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc. Welfare Benefit Plan; Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; Big Lots, Inc.; Big Lots Associate Benefit Plan; The Boeing Company; Employee Benefits Plan Committee of The Boeing Company, as the plan administrator and named fiduciary of The Boeing Company Master Welfare Benefit Plan; Bridgestone Americas, Inc.; Bridgestone Americas, Inc. Employee Group Insurance Plan; Bridgestone Americas, Inc. Retiree Medical Plan; Conagra Brands, Inc.; ConAgra Foods, Inc. Welfare Benefit Wrap Plan; Dollar General Corporation; Dollar General Health Plan (a component of the Dollar General Corporation Employee Benefits Plan); The Federal Express Corporation; FedEx Freight, Inc.; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; FedEx Corporation Retiree Group Health Plan; The Federal Express Corporation Retiree Group*

*Health Plan; The Federal Express Corporation Group Health Plan for Pilots; The Federal Express Corporation Retiree Group Health Plan for Pilots; FedEx Group Health Plan; JetBlue Airways Corporation and JetBlue Airways Group Health Insurance Plan; Kellogg Company; Kellogg Company Welfare Benefit Plan; Kellogg Company Retiree Welfare Benefit Plan; The Kraft Heinz Company, Kraft Heinz Group Benefits Plan, Kraft Heinz Retiree Group Benefits Plan; McLane Company, Inc. McLane Company, Inc. Welfare Plan; Meijer Inc. including its affiliates Meijer Great Lakes LP, Meijer Stores LP, and Town Total Health LLC; Meijer Health Benefits Plan; Publix Super Markets, Inc.; Publix Super Markets, Inc. Group Health Benefit Plan; Tractor Supply Company; Tractor Supply Medical Plan; United Natural Foods, Inc., including its affiliates SUPERVALU, INC.. and Unified Grocers, Inc. ("UNFI"); UNFI Health and Welfare Plan; Employee Benefits Plan of MBM Corporation; and the MBM Corporation*

By: */s/ J. Scott Hickman*

J. Scott Hickman
Eric G. Osborne
SHERRARD ROE VOIGT & HARBISON, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
Tel: (615) 742-4200
Fax: (615) 742-4539
Email:  shickman@srvhlaw.com
           eosborne@srvhlaw.com

*Counsel for The Kraft Heinz Company, Kraft Heinz Group Benefits Plan, and Kraft Heinz*

{B4520297}

25

*Retiree Group Benefits Plan*

*Counsel for The Boeing Company; Employee Benefits Plan Committee of The Boeing Company, as the plan administrator and named fiduciary of The Boeing Company Master Welfare Benefit Plan; Bridgestone Americas, Inc.; Bridgestone Americas, Inc. Employee Group Insurance Plan; Bridgestone Americas, Inc. Retiree Medical Plan; Dollar General Corporation; Dollar General Health Plan (a component of the Dollar General Corporation Employee Benefits Plan); The Federal Express Corporation; FedEx Freight, Inc.; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; FedEx Corporation Retiree Group Health Plan; The Federal Express Corporation Retiree Group Health Plan; The Federal Express Corporation Group Health Plan for Pilots; The Federal Express Corporation Retiree Group Health Plan for Pilots; FedEx Group Health Plan; Tractor Supply Company; Tractor Supply Medical Plan*

By: */s/ Jason A. Zweig*

Jason A. Zweig
Patrick Huber
KELLER POSTMAN LLC
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 216-8667
Email: jaz@kellerpostman.com
        patrick.huber@kellerpostman.com

*Counsel for JetBlue Airways Corporation*

*and JetBlue Airways Group Health Insurance Plan, McLane Foodservice Distribution, Inc., and Employee Benefits Plan of MBM Corporation*

*Counsel for Alaska Airlines, Inc.; Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc.; Alaska Air Group, Inc. Welfare Benefit Plan; Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; American Electric Power Service Corporation; American Electric Power System Comprehensive Medical Plan; Big Lots, Inc.; Big Lots Associate Benefit Plan; Burlington Northern Santa Fe LLC (f/k/a Burlington Northern Santa Fe Corp.); Burlington Northern Santa Fe Corporation Group Benefits Plan; Burlington Northern Santa Fe Corporation Welfare Benefit Trust; FedEx Corporation; The Federal Express Corporation; FedEx Freight, Inc.; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; FedEx Corporation Retiree Group Health Plan; The Federal Express Corporation Retiree Group Health Plan; The Federal Express Corporation Group Health Plan for Pilots; The Federal Express Corporation Retiree Group Health Plan for Pilots; FedEx Group Health Plan; McLane Company, Inc.; McLane Company, Inc. Welfare Plan; Employee Benefits Plan of MBM Corporation; and the MBM Corporation*

/s/ William J. Blechman
_____

William J. Blechman
Joshua B. Gray
Elizabeth B. Honkonen
KENNY NACHWALTER, P.A.
Four Seasons Tower - Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
Email:  wjb@knpa.com
      jgray@knpa.com
      ebh@knpa.com

*Counsel for Albertsons Companies Inc.; New Albertsons L.P.; Albertson's LLC; New Albertson's Inc.; Safeway Inc.; Albertsons Companies, Inc. Health and Welfare Plan, f/k/a Albertson's LLC Health & Welfare Plan; New Albertson's Inc. Health and Welfare Plan; Hy-Vee Inc.; Hy-Vee and Affiliates Benefit Plan and Trust; The Kroger Co.; 84.51 LLC; Murray's Cheese LLC; The Kroger Co. Health and Welfare Benefit Plan; 84.51 LLC Health & Welfare Plan; US Foods Holding Corporation; US Foods, Inc.; US Foods Health & Welfare Plan; Walgreen Co.; Walgreen Health and Welfare Plan (Plan No. 501) f/k/a Walgreen Major Medical Expense Plan*

**CERTIFICATE OF COMPLIANCE**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7) because this brief contains 5,643 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as computed by the word count function of Microsoft Word.

2.    This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using 14-point Times New Roman font in Microsoft Word.

*/s/ Benjamin T. Presley*
Benjamin T. Presley

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 17, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notice to all counsel of record. Counsel for all parties as well as *pro se* parties are registered CM/ECF users and will be served with the foregoing document by the Court's CM/ECF system.

*/s/ Benjamin T. Presley*
Benjamin T. Presley
Starnes Davis Florie, LLP
100 Brookwood Place, 7th Floor
Birmingham, AL 35209
(205) 868-6000
*Counsel for Amici Curiae*

{B4520297}

30